UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
UNITED STATES OF AMERICA,

         -against-

JASON KURLAND,

               Defendant.

**MEMORANDUM & ORDER**

**20-CR-306 (S-1) (NGG)**

NICHOLAS G. GARAUFIS, United States District Judge.

Pending before the court are numerous motions *in limine* from the Government and Defendant Jason Kurland. The court previously issued rulings on certain evidentiary issues and now issues its rulings on those remaining. For the reasons set forth below:

The court RESERVES judgment on the Government's motion to admit various out-of-court statements by non-testifying declarants, and Kurland's motion to exclude such evidence.

The Government's motion to admit evidence of Kurland's transactions with his brother-in-law, and Kurland's motion to exclude such evidence are both GRANTED in part and DENIED in part.

The Government's motion to admit Defendant's tax returns as evidence is GRANTED.

The Government's motion to admit limited testimony about an SEC investigation is GRANTED in part and DENIED in part.

The Government's motion to preclude cross-examination of the cooperating witnesses regarding certain matters is GRANTED in part and DENIED in part.

The Government's motion to preclude evidence and argument that the Lottery Victims are to blame for having acted negligently or gullibly is GRANTED.

The court RESERVES judgment on the Government's motion to exclude certain hearsay evidence.

Kurland's motion to exclude the Government's proposed expert testimony is GRANTED.

The court RESERVES judgment on Kurland's motion to preclude evidence or testimony regarding others' beliefs or statements about Kurland's potential guilt or liability.

Kurland's motion to preclude the Government from referring to "money laundering" in argument or examination is DENIED.

Kurland's motion to admit evidence regarding his acts of disclosure is GRANTED in part and DENIED in part.

## I.   BACKGROUND

The court assumes familiarity with the Government's theory of this case, which charges Kurland, an attorney, with defrauding his clients, the winners of jackpot lotteries (the "Lottery Victims"). Kurland is charged with conspiracy to commit wire fraud, wire fraud, honest services wire fraud, conspiracy to engage in unlawful monetary transactions, and unlawful monetary transactions. (*See* Superseding Indictment (Dkt. 170).) Trial is scheduled to begin on July 11, 2022.

## II.   DISCUSSION

### A.   Out-of-Court Statements by Non-Testifying Declarants

The Government moves to admit out-of-court statements by two non-testifying declarants, who are unindicted co-conspirators (the "CCs"), through the testimony of two cooperating witnesses (the "CWs"). (Gov't Mot. (Dkt. 194) at 5-7.) Defendant separately moves to exclude this evidence. (Def.'s Mot. (Dkt. 191) at

12-14.)[1] The Government expects that the testimony will describe conversations between Kurland and a co-conspirator ("CC-1") that occurred in the presence of the CWs. In these conversations, Kurland allegedly advocated for a finder's fee for sourcing investors for merchant cash advance businesses (the "MCA entities"). CC-1 expressed concerns about how a finder's fee would look to prospective investors. In response, Kurland allegedly stated that he simply wouldn't tell the investors—his clients. Ultimately, CC-1 agreed to arrange the finder's fee, and Kurland agreed to steer clients toward investing in the MCA entities. The Government argues that CC-1's statements are admissible non-hearsay since they would be used to provide context, and not for their truth; or in the alternative, that the statements are admissible as co-conspirator statements pursuant to Rule 801(d)(2)(E). Kurland argues that the testimony is not admissible under either standard, and further, that he expects to show that these conversations never happened, and the Government is mistakenly relying on the word of the CWs.

### 1. Non-Hearsay

The Government argues that the statements are not hearsay, as they would not be admitted for their truth—that CC-1 had concerns about disclosing the finder's fee—but rather to provide context for Kurland's responses, which are themselves non-hearsay because he is a party opponent. *See United States v. Dupre,* 462 F.3d 131, 137 (2d Cir. 2006) (reasoning that messages were not hearsay because they were offered "to provide context for defendants' messages sent in response to them, messages whose

---

[1] At points in his motion, Kurland refers broadly to the court excluding any testimony from the CWs regarding "their beliefs about Mr. Kurland's disclosures to his clients." (*See* Def.'s Mot. at 13.) However, the evidence discussed is limited to alleged conversations involving the CCs. To the extent that Kurland seeks to preclude testimony on this topic more broadly, such as from a different out-of-court declarant, the court will address objections as they arise.

3

admissibility is not contested").[2] Further, to the extent that the CCs asked questions, the Government argues that those are questions, not assertions, and thus not hearsay. Kurland argues that even if this evidence is non-hearsay, it is still subject to Rules 401 and 403. *See United States v. Forrester*, 60 F.3d 52, 62 (2d Cir. 1995) (holding that while the evidence was not hearsay, the district court erred in admitting it because the court had not properly balanced Rule 403). The *Forrester* panel focused on the following factors: whether (1) the declaration addresses important disputed issues in the trial, (2) the statement was made by a knowledgeable declarant with credible testimony, (3) the declarant will testify and be available for cross, and (4) a curative or limiting instruction can protect against prejudice or misuse. *See id*.

Here, the alleged conversation bears on important, disputed issues in the case, specifically, whether Kurland intentionally did not disclose his financial interests in the MCA entities to his clients, the alleged victims. Where the evidence bears on an important, disputed issue, other courts have excluded the evidence given the "risk that the jury will improperly consider the [evidence] for its truth." *United States v. Midyett*, 256 F.R.D. 332, 332 (E.D.N.Y. 2009); *see also United States v. Johnson*, 529 F.3d 493, 501 (2d Cir. 2008) (holding that since "the evidence sought to be justified as background in a nonhearsay application included hearsay which bore importantly on the guilt of the defendant," the nonhearsay purpose "could not justify the receipt of importantly inculpatory hearsay"). When the declarant is knowledgeable or credible, or even just has "no apparent motive to lie," courts are more likely exclude the evidence due to concerns about prejudicing the jury. *Forrester,* 60 F.3d at 62; *see also*

---

[2] When quoting cases, and unless otherwise noted, all citations and quotation marks are omitted, and all alterations are adopted.

*United States v. Grecco*, 728 F. App'x 32, 35 (2d Cir. 2018) (summary order) ("As to prejudice, the alleged confession was made by a knowledgeable declarant . . . and thus was likely to prejudice the jury."); *United States v. Kaiser*, 609 F.3d 556, 572 (2d Cir. 2010) ("[T]the jury could have concluded that Abramson—who had never been charged with a crime—was a knowledgeable and credible source about Kaiser's involvement and culpability."). The court has no particular reason to doubt CC-1's credibility, as he had "no apparent motive to lie" in these conversations; he may even seem more credible to the jury since he was apparently concerned about disclosures to potential investors. Courts are also more likely to find prejudice resulting from the admission of this type of evidence when the defendant will not be testifying. *See United States v. Cummings*, 858 F.3d 763, 777-78 (2d Cir. 2017) ("[B]ecause the government neither identified the unknown third-party declarant nor called that person to testify . . . [,] Cummings was . . . denied the opportunity to undermine the trustworthiness of the third-party declarant and to minimize the injurious effect of the . . . evidence."); *United States v. Reyes*, 18 F.3d 65, 69 (2d Cir. 1994) ("The principal vice of hearsay evidence is that it offers the opponent no opportunity to cross examine the declarant on the statement that establishes the declared fact."). The declarant, CC-1, does not appear to be testifying, and as a result, will not be available for cross. The court finds that if this testimony were admitted as non-hearsay, it would invite the jury to consider the evidence for an impermissible purpose and would result in substantial prejudice. A limiting instruction would not be sufficient to cure the extent of this prejudice. *See Reyes*, 18 F.3d at 71-72 (concluding that an instruction would be of little value "[g]iven the high potency of these declarations, their determinative significance for the only important issue in the trial, and their lack of significance for any other purpose"). Accordingly, the court declines to find that the evidence is admissible as non-hearsay.

### 2. Co-Conspirator Statements

Alternatively, the Government argues that the statements are admissible as co-conspirator statements pursuant to Rule 801(d)(2)(E), as they were in furtherance and in the course of the kickback and fraud scheme. Under Rule 801(d)(2)(E), a statement is not hearsay if it is offered against an opposing party, and it was made by the party's co-conspirator during and in furtherance of the conspiracy. Fed. R. Evid. 801(d)(2)(E). The court must find by a preponderance of the evidence that (i) "there was a conspiracy"; (ii) "its members included the declarant and the party against whom the statement is offered"; and (iii) "the statement was made during the course of and in furtherance of the conspiracy." *United States v. Gupta*, 747 F.3d 111, 123 (2d Cir. 2014). This requires consideration of "the circumstances surrounding the statement, as well as the contents of the alleged co-conspirator's statement itself." *Id*. at 123-24.

As to the fact of and membership of the conspiracy, "[a]lthough the Court may consider hearsay or other inadmissible evidence when deciding whether to admit the proposed co-conspirator statements, it cannot conclude that a conspiracy exists based on *only* inadmissible evidence." *Funk v. Belneftekhim*, No. 14-CV-376 (BMC), 2018 WL 11169575, at *8 (E.D.N.Y. Nov. 30, 2018) (finding that defendants "made the threshold showing of the existence of a tortious or criminal conspiracy . . . [t]hrough mostly hearsay evidence"). Further, the parties need not be part of the same charged conspiracy, as "the fact that there was some variation of the nuts and bolts of the fraud at the heart of the conspiracy does not make each style of fraud an independent conspiracy." *United States v. Adelekan*, 567 F. Supp. 3d 459, 467 (S.D.N.Y. 2021); *see also United States v. Malka*, No-19-CR-497 (NSR), 2022 WL 1488568, at *13 (S.D.N.Y. May 11, 2022) ("[T]he Government must demonstrate only that the defendant

and the declarant are members of some conspiracy that some-
how is 'factually intertwined' with the charged offenses.").

With respect to the "in furtherance of" prong, in *Gupta*, the court
reasoned that it requires "more than merely narrative description
by one co-conspirator of the acts of another," but could be shown
by a statement that "provide[s] reassurance, serve[s] to maintain
trust and cohesiveness . . . , or inform[s] each other of the current
status of the conspiracy"; is "designed to induce the listener's as-
sistance with respect to the conspiracy's goals"; or "prompt[s] the
listener to respond in a way that facilitates the carrying out of
criminal activity." 747 F.3d at 123-25. Moreover, "the standard
for what qualifies as a statement 'in furtherance' of a conspiracy
is not very restrictive." *Malka*, 2022 WL 1488568, at *13. For
example, courts have found that a list containing "information
regarding the current status of the conspiracy and its member-
ship, is sufficiently in furtherance of a conspiracy." *United States
v. Fawwaz*, 694 F. App'x 847, 851 (2d Cir. 2017) (summary or-
der). Even where a conspirator told a cooperator only that he was
going to meet his "best guy from Foundry," the Second Circuit
found that it was in furtherance of the conspiracy because the
Government showed that the individual from Foundry was the
defendant's source of nonpublic information, which he then pro-
vided to the cooperator, among others. *United States v. Riley*, 638
F. App'x 56, 63-64 (2d Cir. 2016) (summary order). Still, "idle
chatter" and "tenuous" statements "seeking reassurance" about
the whereabouts of a co-conspirator, though connected to the
conspiracy, are not "necessary to perpetrat[e] the conspiracy."
*Belneftekhim*, 2018 WL 11169575, at *8.

Kurland argues that the co-conspirator exception doesn't apply
because the contested conversations are the only evidence of the
conspiracy. Consequently, he argues that the court should either
exclude the evidence or reserve judgment until the Government

has proffered additional facts that establish the predicates for admission. In opposition, the Government argues that the CWs will testify that (i) in mid-2018, the CCs discussed how to encourage the Lottery Victims to invest in Cheddar Capital ("Cheddar") (one of the MCA entities), in which Kurland had an interest, (ii) CC-1 requested to meet with Lottery Victim 1 to pitch Cheddar, (iii) in exchange for access, Kurland advocated for and received a finder's fee, and (iv) the finder's fee negotiations occurred primarily between Kurland and CC-1, sometimes in the presence of the CWs. Subsequently, in a supplemental letter, the Government provided sample contemporaneous text messages between the CCs and Kurland, which arguably corroborate the out-of-court statements and support the reliability of the testimony. (Gov't Supp. Ltr. 2 (Dkt. 211) at 1-3.)[3]

The court tends to agree that this proposed testimony, as the Government describes it, would likely satisfy Rule 801(d)(2)(E). However, the court is not prepared at this time to hold that the statements were in furtherance of a conspiracy by a preponderance of the evidence. Instead, the court will follow the *Geaney* protocol. *See United States v. Ferguson*, 676 F.3d 260, 273 n.8 (2d Cir. 2011). The "statements proffered as coconspirator statements may be admitted in evidence on a conditional basis, subject to the later submission of the necessary evidence establishing" the requirements of Rule 801(d)(2)(E). *United States v. Loera*, No. 09-CR-0466 (BMC), 2018 WL 2744701, at *6 (E.D.N.Y. June 7, 2018) (quoting *United States v. Tracy*, 12 F.3d 1186, 1199 (2d Cir. 1993)).

---

[3] In response to the Government's supplemental letter, Kurland focuses on discrepancies in the Government's filings as to whether the CWs were present for the CCs' out-of-court statements or whether the statements were later relayed to them by Kurland or CC-1. (Def.'s Opp. to Supp. Ltr. 2 (Dkt. 212).) Kurland is free at trial to question the CWs on which conversations they were present for and object to the extent that the second level of hearsay renders the statements inadmissible.

Accordingly, the court RESERVES judgment on the Government's motion to admit the testimony about Kurland's conversation with the CCs and on Kurland's motion to preclude this evidence. At trial, the Government must establish by a preponderance of the evidence each requirement under Rule 801(d)(2)(E).

### B.   Evidence of Purportedly Related Schemes

The Government argues that three related schemes are admissible as either direct evidence or as evidence of other crimes, wrongs, or acts under Federal Rule of Evidence 404(b). (Gov't Mot. at 7-15.) Kurland separately moved to exclude evidence and testimony regarding one of these schemes and opposes the Government on all three. (Def.'s Mot. at 4-9; Def.'s Opp. to Supp. Ltr. 1 (Dkt. 208).)

#### 1.   Applicable Law

##### a.   *Direct Evidence*

"Evidence of uncharged criminal conduct is not evidence of other crimes, wrongs, or acts under Rule 404(b) if that conduct arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial." *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000).

##### b.   *Rule 404(b)*

Under Federal Rule of Evidence 404(b), evidence of "other crimes, wrongs, or acts" is admissible to "prov[e] motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b). The evidence must be (1) "offered for a proper purpose"; (2) "relevant to a material issue in dispute"; and (3) "its probative value [must be] substantially outweighed by its prejudicial effect." *United States*

*v. Guang*, 511 F.3d 110, 121 (2d Cir. 2007). While the Government points to the Second Circuit's "inclusionary" approach to Rule 404(b), *see United States v. Paulino*, 445 F.3d 211, 221 (2d Cir. 2006), Kurland cautions the court that these non-propensity factors may not be used "as a pretext to submit propensity evidence to the jury," *United States v. Basciano*, No. 03-CR-929 (NGG), 2006 WL 385325, at *4 (E.D.N.Y. Feb. 17, 2006). With these principles in mind, the court proceeds to consider the proposed evidence.

### 2. Evidence

#### a. *Transactions Involving Kurland's Brother-in-Law*

The Government and Kurland have both made motions regarding Kurland's transactions with his brother-in-law. The Government argues that this conduct should be admitted, and Kurland argues that it should be excluded. This proposed testimony concerns the brother-in-law's investments in Cheddar at Kurland's recommendation. The brother-in-law, cooperating with the Government, is expected to testify that he sought to evade taxes on cash income from his business. The brother-in-law made a $100,000 investment in Cheddar and, in exchange, Kurland allegedly agreed that Cheddar would make incremental payments back to him in order to evade IRS scrutiny. Kurland also allegedly created a false advertising contract between Cheddar and his brother-in-law as a "cover story" in case the IRS questioned the payments at a later time. In late 2019, Kurland's brother-in-law attempted to invest another $300,000 with Kurland, but Kurland allegedly told him it was not a good time to invest in Cheddar (while, a month before, telling the Lottery Victims that it was). After Kurland was arrested, he allegedly advised his brother-in-law to either use the false advertising contract to respond to the criminal subpoena, to tell the truth, or to invoke his Fifth Amendment privilege against self-incrimination. When the brother-in-law indicated that he preferred to use the

contract and asked for advice on how to explain the variations in payments, Kurland allegedly advised him to state that the volume of advertising varied. The Government argues that this evidence is admissible as direct evidence of the charged crimes or alternatively for a permissible other purpose under Rule 404(b). Kurland argues that the evidence is inadmissible under either standard, and in any event, under Rule 403, its probative value is substantially outweighed by unfair prejudice to him.

The Government argues that this conduct was "inextricably intertwined" with the charged conduct since Kurland disclosed his ownership interest in the entities to his brother-in-law (a disputed issue), and continued to accept investments from the Lottery Victims (without disclosing anything about Cheddar's financial condition) at a time when he told his brother-in-law that it was not a good time to invest. Thus, the Government says, the conduct is direct evidence of the charged crime. Defendant argues that Kurland's dealings with his brother-in-law did not involve a client, a lottery winner, the concealment of Kurland's business interests, or any alleged breach of fiduciary duties. Consequently, it is neither inextricably linked with nor necessary to complete the story of the charged crimes.

The court agrees with Kurland. While the brother-in-law transactions may provide additional context for the jury, the schemes are not inextricably linked, as they involve different parties and different types of transactions. *See United States v. Newton*, No. 01-CR-635 (CSH), 2002 WL 230964, at *3 (S.D.N.Y. Feb. 14, 2002) ("While the activity was similar, these were separate visa referrals made with respect to different individuals at different times."). There is no piece of the alleged victims' stories that is missing but for the brother-in-law's testimony, as contrasted with the cases cited by the Government. *See, e.g.*, *United States v. Quinones*, 511 F.3d 289, 309 (2d Cir. 2007) ("[T]he challenged statements . . . contained [defendant's] admissions to the

[charged crime]"); *Carboni*, 204 F.3d at 44 (holding that the trial court did not abuse its discretion in finding that evidence was inextricably linked where the same parties involved in the charged conduct added fictional inventory as part of their scheme of making false statements to secure advances on a line of credit); *United States v. Inserra*, 34 F.3d 83, 89-90 (2d Cir. 1994) (same, where testimony about a meeting in which the defendant admitted to owning a Porsche was direct evidence of the crime of falsifying probation reports because the defendant indicated he neither owned nor drove vehicles); *United States v. Conception*, 983 F.2d 369, 392 (2d Cir. 1992) (same, explaining that the direct evidence proved the existence of the conspiracy).

The Government, in its opposition brief, points to four key disputed issues in this case that this evidence bears on: Kurland's ownership stake in the entities, his relationship with his co-conspirators, his knowledge of Cheddar's financial difficulties during the relevant period, and his intent to defraud by failing to disclose information to the alleged victims that he disclosed to a family member. But the fact that evidence may be relevant to proving the charged crimes does not make it so "inextricably intertwined" with them as to be outside the scope of Rule 404(b). The Government's story will still come into clear focus without it. On the first issue, the Government will still be able to prove Kurland's ownership stake in Cheddar with the self-authenticating New York State Department of State records. (*See* June 30, 2022 Memorandum & Order (Dkt. 220) at 4-7; Gov't Supp. Ltr. 1 (Dkt. 198) at 4 n.4.) With respect to Kurland's relationship with the co-conspirators, the Government will be free to call these witnesses to testify about the relevant relationships. While Kurland's knowledge of the financial issues may be admissible under some other evidentiary rule, it is not a required element of the charged crimes, and the same can be said for the discrepancies in disclosures between the brother-in-law and alleged Lottery Victims. While there are certainly aspects of the scheme with Kurland's

brother-in-law that would help the Government make its case, it is not part of the same transaction, nor inextricably linked with the charged conduct.

In the alternative, the Government contends that the evidence is highly probative of Kurland's plan to use the entities to commit fraud, as well as his criminal intent and knowledge (which Kurland has repeatedly disputed), and is thus admissible under Rule 404(b). Defendant reiterates that how he "allegedly behaved in a transaction with no common facts except some overlap in participants is hardly probative of his intent with the charged conduct." (Def.'s Mot. at 7.) The court mostly agrees with Kurland. However, certain facts, such as the fact that Kurland declined to take additional investment from his brother, citing the financial state of the Cheddar entity, but continued to funnel money from his clients into the entity is probative of fraudulent intent. This tends to show that Kurland was not duped unwillingly by his co-conspirators but that he knew what was going on and sought to protect his family, but not his clients. Though less probative, the evidence that his brother-in-law was informed of Kurland's ownership interest is similarly probative of intent to the extent that Kurland did not make the same disclosures to the alleged victims.

For this limited purpose, the court further concludes that the evidence satisfies Rule 403. In fact, Kurland himself has even sought to admit evidence that he disclosed his interest to other clients and professionals in this case. (*See* Def.'s Mot. at 20-22.)[4] The evidence that Kurland invested his brother-in-law's money in Cheddar, that he disclosed his ownership interest to his brother-in-law, and that he, at a certain point, declined to take the brother-in-law's additional investment due to Cheddar's financial

---

[4] Defendant refers to this evidence as "if anything, *exculpatory*," so the court is not especially concerned about prejudice. (Def.'s Opp. (Dkt. 204) at 4.)

condition, is no "more sensational or disturbing" than the charges in this case—that Kurland preyed on vulnerable clients and abused their trust by using their lottery winnings to fund his and his co-conspirators' lavish lifestyles. *See United States v. Rose-mond*, 958 F.3d 111, 126 (2d Cir. 2020) (holding that the district court did not abuse its discretion in finding that several earlier violent incidents and uncharged narcotics trafficking acts were less sensational and disturbing than murder-for-hire).

Still, the court is not persuaded that any other part of the scheme is much more than propensity evidence, and to the extent it has any probative value, that value would clearly be substantially outweighed by unfair prejudice. Evidence of an entirely separate scheme of tax fraud and Kurland using his legal expertise to cover his brother-in-law's tracks with the IRS "could lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." *United States v. Zhong*, 26 F.4th 536, 553 (2d Cir. 2022). The Government could have charged those crimes but did not. The court will therefore not hold a mini-trial on them. Introducing an entirely uncharged scheme involving different legal issues would create substantial and unfair prejudice, and would risk the jury confusing the issues.[5]

Accordingly, the Government's and Kurland's cross-motions on the brother-in-law's testimony are GRANTED in part and DE-NIED in part. The Government will be permitted to introduce extremely circumscribed evidence of Kurland's dealings with his brother-in-law. Specifically, it may introduce evidence that the brother-in-law invested in the Cheddar entity (without reference to the fact that it was part of an alleged tax evasion scheme), that Kurland disclosed his ownership interest in Cheddar to his brother-in-law, and that when the brother-in-law again sought to

---

[5] As it is required to do, the court will provide a limiting instruction to the jury regarding this evidence if requested by Kurland. *See Huddleston v. United States*, 485 U.S. 681, 691 (1988).

invest in Cheddar, Kurland declined due to Cheddar's financial state. This limited scope invites minimal prejudice, as it does not introduce new criminal conduct that would simply serve to confuse the jury.

### b.  *Evidence Regarding Failure to Report Income*

The Government further seeks to admit Kurland's 2018 and 2019 tax returns in which he allegedly failed to accurately report income from two of the MCA entities. (Gov't Supp. Ltr. 1 at 1-6.) The Government argues that this evidence is admissible at trial since it is further evidence that Kurland sought to intentionally conceal or misrepresent his ownership interests. The tax records allegedly show that Kurland failed to report about $2.7 million in income from the entities. The Internal Revenue Code separately governs the disclosure of tax records, but provides that protected tax information may be used at trial "if the court finds that [it] is probative of a matter in issue relevant to establishing the commission of a crime or the guilt or liability of a party." 26 U.S.C. § 6103(i)(4)(A)(i).

The Government argues that this is direct evidence of the charged crimes—again, not subject to Rule 404(b)—because Kurland sought to conceal his ownership interests in, and his income from, the MCA entities. But Kurland did not conceal his ownership interests from the IRS, just the amount of income he received. And the allegation that Kurland also lied to the IRS about receiving income from the same entities that he invested the Lottery Victim's money in is hardly the kind of inextricably linked evidence that the Second Circuit has found is appropriately admitted as direct evidence. *Cf. United States v. Hinton*, 543 F.2d 1002, 1012-13 (2d Cir. 1976) (affirming the district court's admission of the defendant's failure to file tax returns "to negate the existence of any legitimate source for the money [defendants] had expended"). The Government also has not pointed the

court to any cases in which courts have admitted tax return evidence solely under the standard for direct evidence. *See United States v. Bergstein*, 788 F. App'x 742, 745 (2d Cir. 2019) (summary order) (explaining that the district court admitted the tax returns, but under Rule 404(b) because they showed "intent and absence of mistake"); *United States v. Valenti*, 60 F.3d 941, 946 (2d Cir. 1995) (holding that the returns were properly admitted under Rule 403 but not addressing whether it was admitted as direct evidence or as Rule 404(b) evidence); *United States v. Black*, No. 13-CR-316 (DLI), 2014 WL 5783067, at *4-*5 (E.D.N.Y. Nov. 5, 2014) (explaining that the court was persuaded by other circuits that had found that "failure to report significant sums of money in tax filings is relevant to, and evidence of . . . participation in a money laundering conspiracy," but nonetheless "conduct[ing] an analysis under 404(b), as an alternative basis" because the Second Circuit had not yet spoken to the issue). Accordingly, the court declines to find that the tax returns are admissible as direct evidence of the charged conduct.

Under Rule 404(b), the Government contends, in the alternative, that the tax returns are probative of the various non-propensity permissible purposes available to admit bad act evidence. Specifically, his knowledge that the income was illegitimate, as it contradicted the representations that he made to the alleged victims, *i.e.*, that the retainer was the only fee he received, and his absence of mistake. Further, it rebuts the argument Kurland acted in good faith because the tax returns tend to show he did not lawfully believe he was entitled to the proceeds. In opposition, Kurland contends that his alleged failure to report his income does not satisfy the "connection or similarity" required for admission under Rule 404(b). (Def.'s Opp. to Supp. Ltr. 1 at 2-3.)

Courts in the Second Circuit frequently admit tax evidence in cases involving other types of fraud to show the defendant's plan,

16

lack of mistake, and knowledge that the funds were proceeds of illegitimate activity. *See, e.g.*, *Bergstein*, 788 F. App'x at 745 (affirming admission of tax returns for intent and absence of mistake since defendant's failure to pay taxes contradicted his claim that the transactions were legitimate); *United States v. Osarenkhoe*, 439 F. App'x 66, 68 (2d Cir. 2011) (summary order) ("Because Thompson denied she had knowingly defrauded New York City's Administration for Children's Services by accepting the adoption subsidy payments, evidence going to her intent and absence of mistake was relevant to the issue in dispute."); *United States v. Wallach*, 935 F.2d 445, 472 (2d Cir. 1991) (finding that the district court did not err in admitting evidence that defendant did not disclose $150,000 lobbying payment as evidence that "concealment of the . . . payments was not innocent"); *United States v. Barrett*, 153 F. Supp. 3d 552, 570-71 (E.D.N.Y. 2015) ("[T]he government's evidence of tax fraud is interrelated with and relevant to defendant's knowledge, plan, lack of mistake and motive to engage in the charged conduct."). Further, at least one court has allowed evidence of failure to pay taxes as evidence of consciousness of guilt. *See United States v. Hatfield*, 685 F. Supp. 2d 320, 324 (E.D.N.Y. 2010). Here, "[t]he alleged tax fraud evidence . . . would tend to show that defendant sought unlawfully to conceal or disguise fraudulently obtained income from taxation, from which a jury could find that defendant knew the proceeds at issue . . . derived from illegal activity." *Barrett*, 153 F. Supp. 3d at 571. Thus, the court finds that it would be appropriate to admit this evidence as evidence of criminal intent under Rule 404(b), which is sufficiently connected to the charged conduct.[6]

---

[6] The court declines to admit the evidence for the Government's other proffered purposes to show plan, knowledge, absence of mistake, or lack of accident.

Though Defendant argues that the Government failed to provide "reasonable notice" as required under Rule 404(b) and this court's earlier scheduling order, courts in the Second Circuit have leniently construed that requirement. *See, e.g.*, *Osarenkhoe*, 439 F. App'x at 68 (noting that defendant "ha[d] not demonstrated that the government was purposely withholding information," that "the government informed [defendant] within hours of making the discovery," and defendant had "more than five days to prepare"); *United States v. Valenti*, 60 F.3d 941, 945 (2d Cir. 1995) ("The government furnished records of the transfers only four days before trial. [W]e hold that the government provided reasonable notice by giving the documents to him the very day it obtained them."). Here, the Government received the tax records on June 10, 2022. On the very same day, and more than one month before jury selection, the Government produced the records to Kurland and notified Kurland that it intended to move to admit these records at trial. (*See* Gov't Mot. at 7 n.3.) While the court agrees with Kurland that the Government could have solicited and received this information at any point over the last two years, the cases in this circuit instruct that reasonable notice has been satisfied. Further, it is not clear to the court what precisely Kurland would have done differently having had this information earlier since presumably he was aware of his own alleged failure to accurately report his income.

Of course, the returns are still also subject to Rule 403 balancing. This type of evidence—suggesting that Kurland committed not only a bad act but possibly also another uncharged crime—invites a meaningful possibility of prejudice. The jury might conclude that if Kurland was willing to lie to the IRS, he would be willing to lie to others, *i.e.*, the Lottery Victims. *See United States v. Shellef*, 507 F.3d 82, 101 (2d Cir. 2007). However, in *Shellef* and other cases, the court has found that a limiting instruction is sufficient to cure such prejudice. *See id.*; *Osarenkhoe*, 439 F. App'x at 68 ([T]the probative value of the tax return was

not substantially outweighed by any prejudice to the defendant, particularly because the district court gave the jury a limiting instruction at the time the evidence was introduced."). Kurland further asserts that this evidence will be complicated for the jury, as compared to other cases in which the failure to pay taxes was clearer cut, such as a complete failure to file taxes. However, even where the tax evidence involved a "false business deduction tax fraud," presumably at least as complicated as underreporting income, the court found that the prejudice did not substantially outweigh the probative value, as the evidence "would give the jury a complete picture of defendant's motive and how he personally benefitted from the charged conduct." *Barrett*, 153 F. Supp. 3d at 569-70.

Accordingly, the Government's motion to admit Kurland's 2018 and 2019 tax returns is GRANTED. Upon request, the court will give a limiting instruction as to how this testimony may be used by the jury.

        *c.   Reference to the SEC Investigation*

The Government also asks the court to admit evidence of a parallel SEC investigation as direct evidence of the charged crimes. In late 2019 or early 2020, Lottery Victim 1 received a letter from the SEC requesting documentation pertaining to investments in the MCA entities, including Cheddar and Francis Bay, which Kurland had recommended that Lottery Victim 1 invest in. Lottery Victim 1 notified Kurland of the SEC's request, and Kurland referred him to an attorney, whom he retained. Kurland also retained counsel with respect to the SEC investigation. On July 20, 2020, Kurland received a subpoena from the SEC, requesting documents concerning the MCA entities and trusts pertaining to the alleged victims. The Government seeks to have a witness from Rivkin Radler (the "Rivkin witness"), Kurland's former law firm, testify about the investigation.

19

The Government expects that the witness will testify that a few days before Kurland's arrest, he contacted the Rivkin witness to notify the witness about the SEC subpoena, as he needed to produce documents from Rivkin. The witness referred Kurland to Rivkin's general counsel, as the witness was under the impression this was a routine SEC request. Eventually, the witness reviewed the subpoena and determined that Kurland had received it weeks earlier through counsel that had been retained. The witness believed that this delayed response and allegedly incomplete initial disclosure was a breach of Kurland's duties to Rivkin because the investigation impacted Rivkin clients. The witness scheduled a partnership meeting at which the firm would discuss potential disciplinary action, but Kurland was arrested before it could happen.

The Government seeks to introduce the fact that Lottery Victim 1 received an SEC subpoena regarding the investments, which he discussed with Kurland; that Kurland himself received a subpoena in June 2020; and the circumstances under which Kurland disclosed the investigation to Rivkin months later. The Government argues that these facts are inextricably linked to the timeline of the offense conduct and show a pattern of concealment by Kurland to further the charged offenses and demonstrate consciousness of guilt. Apparently nodding to Rule 404(b), the Government also argues it is probative of intent.

Kurland does not oppose introducing the fact of the subpoenas or that he disclosed them to his law firm partners. He objects to the Rivkin witness's testimony to the extent that it will characterize his response to the investigation as "delayed and incomplete" in a way that constituted a "significant breach of Mr. Kurland's duties and responsibilities." (Def.'s Opp. to Supp. Ltr. 1 at 4.) He also objects to testimony that a disciplinary committee meeting was scheduled. Kurland argues that the fact that he may have breached duties to his law firm is not related to breaching duties

to his clients. Further, Kurland argues that this testimony would be impermissible legal instruction.

The court finds that this evidence, subject to the limitations described below, is "inextricably intertwined with evidence of the charged offenses[] and complete[s] the story of defendant's fraudulent scheme." *Barrett*, 153 F. Supp. 2d at 566-67. Thus, this evidence is direct evidence of the charged scheme. These limited references, subject to the limitations discussed below, will not unduly prejudice Kurland.

The court largely agrees with the limitations proposed by Kurland. The court agrees that testimony about the scheduled disciplinary meeting and the fact that this witness perceived that Kurland had breached his duties and responsibilities are of limited relevance given that they are different duties than the ones Kurland is alleged to have breached with respect to his clients. However, the Rivkin witness is a lay witness and may testify based on "their personal knowledge." *United States v. Scali*, No. 16-CR-466 (NSR), 2018 WL 543584, at *2-*4 (S.D.N.Y. Jan. 23, 2018). To the extent that the Rivkin witness has "personal knowledge" of or experience with other Rivkin attorneys receiving subpoenas and the typical turnaround time for notifying the firm and what is included in the notification, it would be appropriate for the Rivkin witness to testify as to whether this was in fact "delayed and incomplete," as compared to common practice. *See id.* at *4. This kind of delay could be probative of Kurland's consciousness of guilt. However, if this witness would merely be speculating based on his or her understanding of the rules of professional responsibility or other sources of legal obligations, it is not appropriate for the witness to opine on the timeliness or completeness of the disclosure.

Accordingly, the Government's motion to admit limited testimony about the SEC investigation is GRANTED in part and DENIED in part. The Rivkin witness will be permitted to testify

about Kurland contacting him or her about the SEC subpoena, and to the extent the witness has personal knowledge of or experience with how other attorneys have disclosed subpoenas, the witness may testify as to how the timeline and nature of Kurland's disclosure compares. However, in the absence of personal knowledge or experience, the witness may not speculate about the timeliness or completeness of the disclosure, and cannot testify about any purported breached duties or the disciplinary proceedings. Upon request, the court will provide a limiting instruction on how the jury may use testimony about the SEC investigation.

### C.   Uncharged Prior Bad Acts

The Government seeks to preclude cross-examination of the CWs regarding their uncharged prior bad acts. Federal Rule of Evidence 608(b) provides that while "extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness," on cross-examination, the court may "allow them to be inquired into if they are probative of the character for truthfulness or untruthfulness of: (1) the witness; or (2) another witness whose character the witness being cross-examined has testified about." Fed. R. Evid. 608(b). Further, as with any evidence, this cross-examination is subject to Rule 403, *see Aponte v. Kanbur*, No. 20-624, 2021 WL 3854069, at *2 (2d Cir. Aug. 30, 2021) (summary order), so the court may exclude the evidence "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence," Fed. R. Evid. 403. The Government also notes the "trial court's discretion to limit the scope of cross-examination," is "well-established." (Gov't Mot. at 24 (citing *United States v. Scarpa*, 913 F.2d 993, 1018 (2d Cir. 1990).) On this basis, the

Government seeks to exclude prior bad acts of the CWs (individually, "CW-1" and "CW-2").

For CW-1, the Government seeks to exclude evidence that he visited massage parlors and paid individuals to engage in sexual conduct on multiple occasions. There is no evidence that the court is aware of indicating that CW-1 has been dishonest about this conduct or that it bears on his credibility or truthfulness in any manner. Consequently, Kurland does not currently oppose excluding this evidence. Given that CW-1's prior bad acts are not probative of his character for truthfulness nor anything else that is relevant to this matter, the court finds that cross-examination of this topic is properly excluded. *See United States v. Person*, 745 F. App'x 380, 384 (2d Cir. 2018) (summary order) (finding no abuse of discretion where district court excluded photograph because it "was not probative of the witness's credibility").

For CW-2, the Government seeks to preclude cross-examination of the following topics:

- Two incidents of domestic violence with CW-2's wife, which were not reported to law enforcement.

- CW-2 engaged sex workers on multiple occasions.

- An individual has alleged that CW-2 sexually assaulted her multiple times between December 2018 and March 2019, which was not reported to law enforcement until the alleged victim was interviewed in connection with this case, and which CW-2 denies.

The Government argues that these prior bad acts are not probative of truthfulness or any other claims at issue in this case, and thus cross-examination on these incidents should be precluded since they would seriously prejudice CW-2. Kurland argues that he must be able to cross-examine CW-2 on his lies to the Government and contends that CW-2 lied about all three of these incidents. CW-2 initially lied about his contact with sex workers

and the domestic violence incidents, but he later admitted to both of those incidents. (*See* Def.'s Opp. at 14 n.8.) Consequently, the court can conclude that he initially was untruthful (or was subsequently untruthful), which is probative of his truthfulness and untruthfulness and therefore admissible under Rule 608(b). *See United States v. Triumph Capital Grp., Inc.*, 237 F. App'x 625, 629 (2d Cir. 2007) (summary order) (upholding district court's decision to allow a witness "to be cross-examined about specific instances in which he made false statements" under Rule 608(b)).

The court also finds that it is appropriate to permit this cross-examination under Rule 403. The Government is asking the jury to take CW-2's word as to Kurland's crimes. His credibility is highly relevant. Though the jury may not approve of CW-2 engaging sex workers or assaulting his wife, this prejudice does not substantially outweigh the importance of the evidence concerning CW-2's credibility.

However, for the sexual assault that CW-2 denies to date, admissibility is a closer call. Since the assault remains uncharged and unproven, the court cannot definitively conclude that CW-2 is being untruthful. The court recognizes that few sexual assault allegations are fabricated. But here CW-2 is not alleged to have told conflicting stories, and as the court understands it, the only evidence of the sexual assault is the allegation from the alleged victim. Since this evidence is admissible only to the extent that it is probative of CW-2's untruthfulness under Rule 608(b), the question is whether denying an unproven and uncharged allegation is probative of untruthfulness.

The Second Circuit has not spoken to the basis for questioning that a lawyer must have when inquiring into specific instances of conduct on cross-examination. Other circuits have variously held that there must be a "reasonable basis," some "factual basis," or a "genuine belief" to support the questioning. *See, e.g., United*

*States v. Alston*, 626 F.3d 397, 405 (8th Cir. 2010); *United States v. Whitmore*, 359 F.3d 609, 621 (D.C. Cir. 2004); *United States v. Finley*, 934 F.2d 837, 840 (7th Cir. 1991). It may be, then, that denying an allegation of sexual assault is sufficiently probative of a character for untruthfulness as to satisfy Rule 608(b).  The court need not decide that question, however, because even if the conduct satisfied Rule 608, it would still be subject to Rule 403. Other courts have hesitated to admit untested allegations under that rule. *See Jean-Laurent v. Hennessey*, 840 F. Supp. 2d 529, 556 n.16 (E.D.N.Y. 2011) ("[E]ven if the evidence were admissible under Rule 608(b), the court would deem the evidence inadmissible under Rule 403 because the prior allegations have not been substantiated."). Although sorting out the validity of such allegations may sometimes be necessary, doing so here would require a mini-trial on issues entirely unrelated to the charges that Kurland faces, and the court finds that this kind of distraction outweighs the marginal probative value it would provide. Because the court will allow cross-examination into past incidents of domestic violence and hiring of sex workers, the jury will already have "sufficient information with which to judge the credibility of the witness." *United States v. Singh*, 628 F.2d 758, 764 (2d Cir. 1980) (excluding evidence of a prior bad act because the jury would be hearing evidence that "[t]he witness had contradicted himself in his testimony concerning the time when he first arrived in New York" and that "the witness failed to report two years' employment," which were sufficiently probative of his credibility). The court "must set the limits" on cross-examination and does so here. *Singh*, 628 F.2d at 764.

Finally, Kurland argues that if CW-2 testifies about the sexual assault victim's allegations on direct, questions regarding and the introduction of extrinsic evidence supporting the sexual assault allegation on cross would be appropriate. (*See* Def.'s Opp. at 15.) That practice, known as the "impeachment by contradiction" doctrine, is an "open question" in the Second Circuit because

Rule 608(b) ordinarily expressly prohibits the use of extrinsic evidence to show that a witness's answer was false. *United States v. Ramirez*, 609 F.3d 495, 499 (2d Cir. 2010); Fed. R. Evid. 608(b). The question is unlikely to reemerge because the Government is unlikely to elicit such testimony on direct now that the court has precluded the evidence on cross-examination. If the Government nonetheless does elicit testimony about the sexual assault allegations on direct, the court will at that time consider what scope of cross-examination and what, if any, extrinsic evidence, are appropriate.

Alternatively, and notwithstanding whatever CW-2 testifies to on direct examination, Kurland contends that evidence regarding the sexual assault allegations is still appropriate to show CW-2's bias. Kurland argues that "[a] reasonable jury could view" the Government's apparent inaction on the rape allegations "as a benefit . . . conferred to [CW-2] in consideration of his cooperation." (Def.'s Opp. at 16.) That, Kurland says, creates a motive for CW-2 to fabricate his testimony so as to appease the Government. This argument is unpersuasive. Kurland provides no independent basis under which this evidence should be admitted, and the court has already found that under Rule 403, any probative value, including Kurland's strained argument about bias, is substantially outweighed by a danger of prejudice.

Accordingly, the Government's motion to preclude cross-examination about the "bad acts" of the CWs is GRANTED in part and DENIED in part. Kurland is precluded from cross-examining CW-1 on his encounters with sex workers and CW-2 on the sexual assault allegation. Kurland may cross-examine CW-2 about his shifting stories concerning past domestic violence and his encounters with sex workers.

### D.  Evidence About the Negligence or Gullibility of Lottery Victims

The Government moves to preclude evidence about the negligence or gullibility of the alleged victims. (Gov't Mot. at 33-35.) The Government argues that such evidence is inadmissible under Rule 402, which prohibits the admission of irrelevant evidence, and Rule 403. The Government explains that the fraud statutes that Kurland is charged with—wire fraud and honest services fraud—do not require proof of reliance on Kurland's conduct. As a result, Kurland should be precluded from suggesting that the alleged victims are to blame based on a failure to conduct due diligence, negligence, or unreasonable reliance on misrepresentations.

The elements of wire fraud are: (1) intent to defraud, (2) a fraudulent scheme involving money or property and material misrepresentations, and (3) use of wires to further the scheme." *United States v. Johnson*, 945 F.3d 606, 612 (2d Cir. 2019). The elements of honest services fraud are: "(1) a scheme or artifice to defraud; (2) for the purpose of depriving another of the intangible right to honest services; (3) where it is reasonably foreseeable that the scheme could cause some economic or pecuniary harm to the victim that is more than de minimis; and (4) use of the mails or wires in furtherance of the scheme." *United States v. Rybicki*, 354 F.3d 124, 147 (2d Cir. 2003). The parties agree that, to show a scheme to defraud, "the Government must prove the *materiality* of a defendant's false statements or misrepresentations." *United States v. Calderon*, 944 F.3d 72, 85 (2d Cir. 2019). The Government argues that the materiality inquiry in the Second Circuit focuses, not on the reasonableness of the victim, but on the defendant's statements and intent. Consequently, evidence about the "diligence and sophistication of the Lottery Victims (or lack thereof)" should not be admitted in the trial. (Gov't Mot. at 35.)

Kurland represents that he does not intend to introduce evidence that the alleged victims were negligent or gullible. (Def.'s Mot. at 17-19.) However, given that materiality is a key element of the scheme to defraud, he seeks to introduce evidence that tends to show:

(1)   the facts that the Government alleges that Kurland concealed or misrepresented would not have been material to a reasonable person under the circumstances;

(2)   the course of dealing with his clients led Kurland to believe he *had* disclosed all material facts to them or had authority to make certain decisions on their behalf;

(3)   the alleged victims have a motive to misremember the truth about Kurland's disclosures to them or other material facts.

The court agrees that each of these categories of questioning is appropriate. The Government must prove that a scheme to defraud is "capable of influencing the intended victim." *Johnson*, 945 F.3d at 614 (quoting *Neder v. United States*, 572 U.S. 1, 24 (1999). The first category of evidence is an appropriate avenue for questioning because it gets directly at the scheme to defraud standard. Kurland's proposed questions about the alleged victims' decision-making processes, factors they considered important, or amounts of money that are material to them bear on the question of materiality to the extent that they illuminate whether Kurland "possessed a fraudulent intent." *United States v. Thomas*, 377 F.3d 232, 242 (2d Cir. 2004). For substantially the same reasons, evidence of their course of dealing, such as how much information they usually received about their investments, is relevant—"to assure that the defendant's conduct was calculated to deceive, not to grant permission to take advantage

of the stupid or careless." *Id*. So long as Kurland avoids that implication, such evidence is admissible. Likewise, and finally, the court agrees that general information about the alleged victims' background is admissible to the extent that it may explain a biased motive to misremember or distort the information they actually received from Kurland.

The Government's motion to preclude testimony about the gullibility or negligence of the alleged victims is GRANTED. However, Kurland is permitted to elicit testimony about materiality where it bears on elements of the fraud crimes with which he is charged.

### E.   Inadmissible Hearsay

The Government seeks an advance ruling on hearsay as it pertains to any attempts by Kurland to elicit his own prior out-of-court statements under Rule 802. (Gov't Mot. at 35-36.) Kurland states that he does not intend to introduce inadmissible hearsay, but he may introduce his own statements that are not hearsay and relevant to his good faith. (Def.'s Mot. at 19-21.)

The court finds that this type of blanket advance ruling is not appropriate at this time. It would also be meaningless. The parties are well aware that hearsay is not admissible (subject to exclusions and exceptions), and a ruling from the court does not alter the import of this rule. The court expects that counsel will ask appropriate questions and make appropriate objections.

Accordingly, the court RESERVES judgment on the admissibility of hearsay, as it pertains to Kurland's attempts to elicit his own prior out-of-court statements.

### F.   Expert Testimony Concerning Lawyer's Duties to their Clients

Kurland moves to preclude the Government from introducing expert testimony from Professor Stephen Gillers about lawyers' duties to their clients. (Def.'s Mot. at 1). Professor Gillers has

written extensively on the topic of legal ethics and teaches courses in areas, such as "Professional Responsibility" and "Regulation of Lawyers." (Gillers Curriculum Vitae (Dkt. 180-1).) The Government expects Professor Gillers to testify about "the obligations, rules, and professional responsibility requirements imposed upon lawyers admitted to the bar of the state of New York," including "the nature of the attorney-client relationship, the origin and purpose of such obligations, rules, and requirements, and how they operate in practice." (Gov't Expert Disclosure (Dkt. 180) at 1.) Specifically, the Government expects Professor Gillers to testify about the obligations imposed under several New York Rules of Professional Conduct ("NYRPC"). (*See id.* at 1-2.) Kurland moves to preclude the testimony primarily on the ground that it is testimony about the law and thus unhelpful to the jury. (Def.'s Mot. at 3.)[7] The Government objects to this characterization, arguing that the proposed expert testimony is highly relevant and not improper legal testimony.

Under Federal Rule of Evidence 702, a qualified expert may offer opinion testimony if, *inter alia*, "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed R. Evid. 702. While "Rule 702 embodies a liberal standard of admissibility for expert opinions," *Nimely v. City of New York*, 414 F.3d 381, 395 (2d Cir. 2005), the use of expert testimony "must be carefully circumscribed to assure that the expert does not usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it," *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991); *see Marx & Co. v. Diners' Club, Inc.*, 550 F.2d 505, 509-10 (2d Cir. 1977). Thus, expert testimony that will opine on what the law is or to apply the law to the facts of the case is

---

[7] At present, Kurland does not challenge Professor Gillers's qualifications but reserves the right to do so.

inadmissible, as it "undertakes to tell the jury what result to reach," *Nimely*, 414 F.3d at 397, or otherwise competes with the trial judge's capable instruction on the applicable law, *see Marx & Co.*, 550 F.2d at 509-510.

Though the rules of professional conduct are not law, courts in this circuit have recognized that, as distinguished from ethics standards in other professions, the legal professional rules are inextricably bound up with the law.[8]  For example, in *Joffe v. King & Spalding LLP,* the court reasoned:

> While it is true that disciplinary rules themselves do not have the force of law, their interpretation is nonetheless governed by judicial precedent. As a result, an expert opinion as to the meaning of the [NYRPC] must be consistent with controlling caselaw for it to be valid—and yet, if the testimony were to be premised on the expert's interpretation of judicial precedent, the testimony would impinge on the Court's obligation to instruct the jury on the law.

No. 17-CV-3392 (VEC), 2019 WL 4673554, at *17 (S.D.N.Y. Sep. 24, 2019); *see also Bernstein v. Bernstein Litowitz Berger & Grossmann LLP*, 814 F.3d 132, 144 (2d Cir. 2016) (declining to consider the declaration of a legal ethics expert on whether a complaint should be sealed under the NYRPC because it "formed an 'issue[ ] of domestic law'"); (Jan. 22, 2022 Transcript ("Tr.") at 34, *United States v. Avenatti*, No. 19-CR-373 (PGG) (S.D.N.Y. Jan. 20, 2020) (Dkt. 235) ("*Avenatti I*") ("But in order to offer opinions as to [a lawyer's ethical obligations], Professor Engstrom would have to interpret the relevant California rule,

---

[8] By contrast, testimony about the ethical obligations of professionals in other professions is admissible when it is directed towards the ordinary customs and practices within the profession and aids the jury in comparing the conduct of a party to industry standards. *See Marx & Co.*, 550 F.2d at 509.

statute, or case, and offer a legal conclusion as to how the rule, statute, or case applies.").) Consequently, these types of expert opinions encroach on the trial court's role of instructing the jury as to the applicable law.

In accordance with this understanding, courts within this circuit have routinely precluded expert testimony that purports to interpret a state's legal ethics rules.[9] In *Avenatti I*, the court precluded expert testimony that would apply and interpret the obligations imposed upon lawyers by the California Rules of Professional Conduct because this was a "topic that must be addressed in the jury charge." (Tr. at 37:1-8.) Subsequently, the court in *United States v. Avenatti* ("*Avenatti II*"), excluded similar testimony, reasoning that "[t]o the extent that legal ethics rules generally or California's rules of professional conduct specifically are relevant to the jury's consideration of the charges against Defendant in this case, the proper course is for the Court to give appropriate instructions to the jury, not for an expert to testify." No. 19-CR-374 (JMF), 2022 WL 103298, at *2 (S.D.N.Y., Jan. 11, 2022). Finally, in *Joffe*, the court precluded expert testimony interpreting and applying the NYRPC to the question of whether the

---

[9] State courts, too, have consistently recognized that the interpretation and application of legal ethics rules is a question of law and have thus limited this kind of expert testimony. *See Commonwealth v. Lambert*, No. 0423-1992, 1998 WL 558749, at *10 n.34 (Pa. Com. Pl. Aug. 24, 1998) ("The interpretation of the Rules of Professional Conduct and the Rules of Criminal Procedure is a legal issue to be decided by a court, for which use of an expert would be wholly inappropriate."); *Villa v. Heilmann*, 162 Vt. 543, 551 (1994) ("Plaintiff also argues that the court erred by excluding testimony from a law professor who would have explained why the prohibition against the splitting of fees by unassociated attorneys . . . did not apply. . . . The court did not err in excluding expert testimony on this question of law."); *Fishman v. Brooks*, 396 Mass. 643, 650 (1986) ("Expert testimony concerning the fact of an ethical violation is not appropriate, any more than expert testimony is appropriate concerning the violation of, for example, a municipal building code. A judge can instruct the jury (or himself) concerning the requirements of ethical rules.").

lawyer-plaintiff had an ethical obligation to report misconduct because this was "a topic on which the Court can capably instruct the jury." *Joffe*, 2019 WL 4673554, at *17.

The Government's attempts to distinguish Professor Gillers's proposed expert testimony from these cases are unavailing.[10] The Government characterizes Professor Gillers's expected testimony as merely "laying the rules of professional conduct before the jury" and thus in line with the kind of circumscribed testimony that the court in *Avenatti I* was inclined to permit. (Gov't Opp. (Dkt. 207) at 10 (quoting Tr. at 35:12).) However, the court is unclear on how the Government's proposal here differs from the proposed testimony that Judge Furman rejected in *Avenatti II*. (*See* Response in Opp. to Mot. at 4, *Avenatti II,* No. 19-CR-374 (JMF) (Dkt. 210) ("To the extent that the defendant suggests that the Government intends for an expert to opine as to whether the defendant is guilty, lied to anyone, or even violated any rule of professional responsibility, the argument is merely a distraction, as the Government intends to do none of those things. . . . *[T]he Government intends for its expert to explain certain professional rules of conduct so that the jury can understand the context in which to place certain evidence*.") (emphasis added).) Moreover, Professor Gillers is also expected to "explain the professional obligations imposed upon all attorneys." (Gov't Opp. at 13.) This is precisely the kind of interpretive testimony that the court in *Avenatti I* precluded. (*See* Tr. at 35:13-14 ("The government

---

[10] The cases that the Government cites to in which courts held that legal ethics testimony would have been appropriate are inapposite and non-binding. The primary concern animating the decisions in *United States v. Kellington*, 217 F.3d 1084 (9th Cir. 2000) and *United States v. Cavin*, 39 F.3d 1299 (5th Cir. 1994) was that the exclusion of expert testimony relating to the defendants' ethical obligations would have infringed on defendants' fundamental right to present a defense. *See Kellington*, 217 F.3d at 1100; *Cavin*, 39 F.3d at 1309. This case does not implicate those concerns since the Government, not Kurland, seeks to admit this testimony.

wants to have Professor Engstrom opine on what those rules. . . require, and on whether certain actions do or do not violate these rules.").)

The Government also argues that its proposed testimony is distinguishable from the *Avenatti* cases because it does not expect to invoke any statutes or case law.  (*See* Gov't Opp. at 10-11.) But nowhere did the court in *Avenatti I* state that testimony was inadmissible only because it would also touch on related statutes and case law. (*See* Tr. at 34-35.) To the contrary, the court made clear that "to the extent that any interpretation of the *rules* is necessary, that cannot come through a witness." (*Id.* at 45 (emphasis added).) In addition, the court in *Avenatti II* made clear that the interpretation of legal ethics rules, whether accompanied by a discussion of statutes and case law or not, is a matter reserved for jury instructions. *See* 2022 WL 103298, at *2.

Accordingly, Kurland's motion to preclude the testimony of Professor Gillers is GRANTED. In light of the court excluding this evidence, the parties may submit amendments to the jury instructions on this topic.

### G.  Co-Conspirator's Statements or Speculations About Kurland's Purported Criminal or Civil Liability

Kurland argues that Rule 701 precludes the admission of live testimony and wiretap evidence from the CWs opining about Kurland's civil or criminal liability. Rule 701 provides that a lay witness's testimony is limited to what is: "(a) rationally based on the witness's perception; (b) helpful to clearly understand the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. Kurland argues that these statements about possible legal liability are inappropriate based on the CWs' lack of legal education, and they are not in furtherance of the conspiracy. The court agrees at least that

these statements cannot be introduced to tell the jury what verdict to reach. But the Government persuasively argues that these statements may be admissible depending upon their precise content and context. Specifically, the Government notes Kurland's stated intention to challenge the credibility and bias of at least CW-2. (*See* Def.'s Opp. at 9-17). If, for example, Kurland is seeking to suggest that CW-2 has fabricated his testimony to "curry favor" with the Government, these wiretap statements about Kurland's liability could be used to rehabilitate him on redirect as a prior consistent statement.

Just as the court declines to make an advance formal ruling on the inadmissibility of hearsay, the court declines to rule that these statements are entirely precluded. The court RESERVES judgment on the admissibility of the cooperator's statements about Kurland's purported criminal or civil liability and will consider individual objections on these issues, as they arise during trial.

### H.   Reference to Money Laundering Rather than Charged Offense of "Unlawful Monetary Transactions"

Kurland moves to prohibit the Government from using the phrase "money laundering" at trial since Kurland is charged in the Superseding Indictment with violating 18 U.S.C. § 1957 by engaging in "unlawful monetary transactions," not § 1956 by engaging in a "conspiracy to commit money laundering." (*See* Def.'s Mot. at 18.) He argues that § 1957 does not require proof of the core conduct of laundering: making "dirty" money appear "clean." (*Id.*) Because Kurland is now charged with a less serious offense, he argues that he should not be prejudiced by the negative associations that jurors will have with this more serious charge.

However, upon the court's review of the two statutes, the court agrees with the Government that § 1956 similarly permits a

charge of money laundering in the absence of any intent to conceal the provenance of the cash:

- Section 1956(a)(1)(A)(i) criminalizes knowingly using the proceeds of an unlawful activity "with the intent to promote the carrying on of specified unlawful activity."

- Section 1957(a) criminalizes a person who "knowingly engages or attempts to engage in a monetary transaction in criminally derived property . . . derived from unspecified unlawful activity."

That is: neither statute requires what Kurland argues is the "core conduct of 'laundering,'" and a person may be charged under § 1956 without any proof of attempting to conceal. Notably, Kurland is also charged with violating § 1956(h), part of what Kurland refers to as the "money laundering" section, which criminalizes conspiracies to engage in both § 1956 and § 1957 conduct.

Further, as the Government notes, the statutes were enacted at the same time as part of the Money Laundering Control Act of 1986, further indicating that "money laundering" is used as an umbrella term for a variety of conduct. *See United States v.* Greenberg, No. 12-CR-301 (ADS) (ARL), 2014 WL 5306553, at *2 (E.D.N.Y. Oct. 14, 2014) (referring to conduct under § 1957 as "money laundering through unlawful monetary transactions" and "Money Laundering – Unlawful Monetary Transactions"), *conviction aff'd in United States v. Greenberg*, 659 F. App'x 694 (2d Cir. 2016) (referring to the same § 1957 conduct as "money laundering through unlawful monetary transactions"). The court is further persuaded that this is a distinction without a difference by the myriad of courts, up to and including the Supreme Court, that have referred to § 1957 conduct as money laundering. (*See* Gov't Mot. at 22 (citing cases).) Finally, Kurland has not provided

any basis upon which the court can police the Government's lan-
guage in this way nor any decisions finding that the use of the
word money laundering is notably prejudicial. Accordingly, Kur-
land's motion to preclude the Government from referring to
Kurland's conduct as "money laundering" is DENIED.

## I.   Evidence of Acts of Disclosure by Kurland

Kurland alleges that he disclosed information about his relation-
ship with the MCA entities to the alleged victims and to other
clients and professionals with whom he worked. Since the al-
leged victims claim that he never made these disclosures to them,
he argues that he should be able "to introduce evidence of dis-
closures to establish his good faith defense and present a
complete picture of the evidence to the jury." (*See* Def.'s Mot. at
20.) In support of this argument, Kurland contends that an out-
of-court statement is not hearsay "[i]f the significance of an of-
fered statement lies solely in the fact that it was made." Cmt. to
Fed. R. Evid. 801(c). Kurland also invokes the verbal acts doc-
trine addressed in the court's previous opinion on these motions
*in limine*—that the out-of-court statement gives rise to legal con-
sequences because it "put his clients on notice of facts the
government maintains he did not." (Def.'s Mot. at 21.) The court
agrees that these statements are not hearsay because they are not
being used to show the truth of the matter asserted, *i.e.* that Kur-
land's disclosures were accurate, but to show that the statements
in fact were made. *See DeNigris v. N.Y.C. Health & Hosp. Corp.*,
552 F. App'x 3, 6 (2d Cir. 2013) (summary order) (allowing ad-
mission of "numerous statements made to Appellee. . . for the
effect on [Appellee's] state of mind"). Further, "the utterance is
an operative fact which gives rise to legal consequences." *United
States v. Vargas*, 279 F. App'x 56, 61 n.3 (2d Cir. 2008). A central
point of the Government's case is that Kurland was legally obli-
gated to make these disclosures, but did not, so the act of
disclosure has important legal consequences. The Government

37

does not appear to dispute this. The court agrees with Kurland that these disclosures are likely non-hearsay and proceeds to assess whether they are admissible under Rules 401 and 403.

Kurland argues that the evidence is relevant because it undermines the honest services charge by showing lack of misrepresentation or omission.[11] Kurland's argument proceeds in two parts. First, that this evidence would undermine the charge because there was no misrepresentation or omission. The

---

[11] Kurland also argues that this evidence is relevant because it shows his lack of a subjective belief that he needed to conceal his interests. He directs the court to *United States v. Litvak*. 808 F.3d 160 (2d Cir. 2015). In *Litvak*, the district court excluded evidence that the defendant's supervisor and other managers at the bank he worked at had knowledge of or approved of other employees' similar conduct because "such evidence is irrelevant when it does not involve" the defendant. However, the Second Circuit disagreed, holding that the jury could infer from this evidence that the defendant "held an honest belief that his conduct was not improper or unlawful, a belief the jury may have found more plausible in light of his supervisors' approval of his colleagues' substantially similar behavior," which would undermine his alleged intent to defraud. *Id.* at 190. So too here, Kurland argues that the fact that he disclosed his interests to others demonstrates that he didn't think he needed to hide his interests in various investment entities, and as a result, lacked culpable intent.

This interpretation strains the court's holding in *Litvak*. In *Litvak*, the evidence of the tacit approval of the unlawful actions of others was used to support the defendant's belief that he too was acting within the bounds of the law. This would be like if Kurland saw his partners failing to disclose financial interests in investment opportunities to clients, which was generally approved by the firm leadership, and as a result, subjectively believed he was permitted to take the same tactic with his clients. Instead, Kurland seeks to use evidence that he made appropriate disclosures to certain clients to prove that he subjectively didn't think he needed to hide anything with other clients, and thus either (i) wasn't intentionally hiding anything when he allegedly failed to disclose his interests to the alleged victims, or (ii) was more likely to have actually made these disclosures because he subjectively believed he had nothing to hide. Kurland attempts to take *Litvak* well beyond its narrow holding to allow the admission of any evidence that a person was acting within a particular subjective belief.

court agrees that evidence showing that Kurland made these disclosures to the alleged victims would undermine this charge and thus are highly probative. Furthermore, evidence that Kurland made these disclosures to other clients is relevant to show that this was his "usual practice" with clients under Federal Rule of Evidence 406. *Carrion v. Smith*, 549 F.3d 583 (2d Cir. 2008); *see also Crawford v. Tribeca Lending Corp*, 815 F.3d 121, 125 (2d Cir. 2016) (holding that attorney's practice of "explaining [the documents'] significance as he went . . . constitutes the sort of regular response to a repeated situation contemplated by Rule 406"). However, evidence that he made these disclosures to other professionals is not probative of whether he made these same disclosure to his clients and thus inadmissible.

Second, Kurland argues that by showing that clients proceeded with the investments in spite of these disclosures, it establishes that Kurland's ownership interests or compensation were not material to the clients' decisions to invest. Since the Supreme Court in *Neder* held that materiality hinges on whether the misrepresentation is "capable of influencing the intended victim," this inquiry is probative only insofar as it is limited to similarly-situated parties, *i.e.*, lottery winners with similar educational backgrounds and investment experiences, who Kurland facilitated investments for in the same MCA entities. What other clients or professionals who were not similarly-situated did or did not find material is not relevant evidence.

The court finds that admitting evidence of Kurland's disclosures to the alleged victims for the purpose of undermining the charges at issue and impeaching the alleged victims' testimony; to other clients, to show conformity with usual practice; and to similarly-situated clients to inquire into materiality, is not substantially outweighed by any prejudice. The Government argues that the fact that Kurland defrauded some clients and not others is irrelevant, but as the court explained above, this evidence is relevant

under Rule 406 and is not merely an example of a "good act," as the Government purports. The Government is also concerned that this will confuse the jury by drawing a false equivalency between the clients who were provided different information. The court finds that any risk of confusion will be minimal given that Kurland's examination on this topic will be limited to similarly-situated individuals. The Government is also free to make the argument that Kurland made different disclosures and representations to different clients, which it has already sought to make with respect to Kurland's brother-in-law. (*See* Gov't Mot. at 12.)

Accordingly, Defendant's motion to admit evidence of Kurland's accurate disclosures is GRANTED in part and DENIED in part. Kurland may introduce evidence that he disclosed his interests in the entities to the alleged victims and to other clients, but not to other professionals. To the extent that Kurland intends to question witnesses about what disclosures were material in their decisions to invest or not, these questions are only appropriate for witnesses who are similarly-situated to the alleged victims.

### III. CONCLUSION

For the reasons stated above:

The court RESERVES judgment on the Government's motion to admit various out-of-court statements by non-testifying declarants, and Kurland's motion to exclude such evidence.

The Government's motion to admit evidence of Kurland's transactions with his brother-in-law, and Kurland's motion to exclude such evidence are both GRANTED in part and DENIED in part.

The Government's motion to admit Defendant's tax returns as evidence is GRANTED.

The Government's motion to admit limited testimony about an SEC investigation is GRANTED in part and DENIED in part.

The Government's motion to preclude cross-examination of the cooperating witnesses regarding certain matters is GRANTED in part and DENIED in part.

The Government's motion to preclude evidence and argument that the Lottery Victims are to blame for having acted negligently or gullibly is GRANTED.

The court RESERVES judgment on the Government's motion to exclude certain hearsay evidence.

Kurland's motion to exclude the Government's proposed expert testimony is GRANTED.

The court RESERVES judgment on Kurland's motion to preclude evidence or testimony regarding others' beliefs or statements about Kurland's potential guilt or liability.

Kurland's motion to preclude the Government from referring to "money laundering" in argument or examination is DENIED.

Kurland's motion to admit evidence regarding his acts of disclosure is GRANTED in part and DENIED in part.


SO ORDERED.


Dated:     Brooklyn, New York
           July 8, 2022

                              s/Nicholas G. Garaufis
                              NICHOLAS G. GARAUFIS
                              United States District Judge