```
1    UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
2    ------------------------------x
                                        20-CR-306(NGG)
3    UNITED STATES OF AMERICA,
                                        United States Courthouse
4                                       Brooklyn, New York

5              -versus-                 July 14, 2022
                                        9:30 a.m.
6    JASON KURLAND,

7              Defendant.
     ------------------------------x
8              TRANSCRIPT OF CRIMINAL CAUSE FOR TRIAL
            BEFORE THE HONORABLE NICHOLAS G. GARAUFIS
9            UNITED STATES SENIOR DISTRICT JUDGE
                        BEFORE A JURY
10
     APPEARANCES
11   For the Government:        UNITED STATES ATTORNEY'S OFFICE
                                Eastern District of New York
12                              271 Cadman Plaza East
                                Brooklyn, New York 11201
13                              BY:  BRIAN MORRIS, ESQ.
                                Assistant United States Attorney
14
                                UNITED STATES ATTORNEY'S OFFICE
15                              Southern District of New York
                                1 Saint Andrew's Plaza
16                              New York, New York 10007
                                BY:  OLGA I. ZVEROVICH, ESQ.
17                                   LOUIS A. PELLEGRINO, III, ESQ.
                                     DANIELLE M. KUDLA, ESQ.
18                              Assistant United States Attorneys

19   For the Defendant:         MORVILLO ABRAMOWITZ GRAND
                                IASON & ANELLO P.C.
20                              565 Fifth Avenue
                                New York, New York 10017
21                              BY:  TELEMACHUS P. KASULIS, ESQ.
                                     ANDREW D. DILLON, ESQ.
22
     Court Reporter:            Rivka Teich, CSR, RPR, RMR, FCRR
23                              Phone:  718-613-2268
                                Email:  RivkaTeich@gmail.com
24
     Proceedings recorded by mechanical stenography.  Transcript
25   produced by computer-aided transcription.
```

*Rivka Teich CSR RPR RMR FCRR*
*Official Court Reporter*

PROCEEDINGS

1                    (In open court.)

2          THE COURT:  Case on trial.  Appearances.

3          MS. KUDLA:  Good morning, your Honor.  On behalf of

4     the Government, Danielle Kudla.  I'm joined by Olga Zverovich,

5     Louis Pellegrino, Brian Morris, and parallel specialist Emily

6     Hochron and Matthew Bailey.

7          MR. KASULIS:  Tim Kasulis and Dennis Dillon.  We are

8     joined by Mr. Kurland, and our paralegal Isabel Tegtmeyer.

9          THE COURT:  Good morning, everyone.  Please be

10    seated.

11          I met with alternate number four, I think it was, at

12    the end of the day with a court reporter present and the

13    proceeding was placed under seal but you can look at it.  I

14    think the matter is closed.

15          Apart from that, today we have the direct of the

16    current witness and then the cross.  About how much cross do

17    you have?

18          MR. KASULIS:  Fifteen or 20 minutes, your Honor.

19          THE COURT:  My question is with regard to the next

20    witness, who is Mr. Russo I understand; is that right -- I'm

21    sorry, you have a witness out of turn from the IRS.

22          MS. ZVEROVICH:  Correct, your Honor.

23          THE COURT:  How long is the direct for that witness?

24          MS. ZVEROVICH:  I think about 30 minutes, your

25    Honor.

PROCEEDINGS

1          THE COURT:  How much cross is there?

2          MR. KASULIS:  About the same, Judge.

3          THE COURT:  That will take us into or past the

4   mid-morning break.  Then we'll have after that Mr. Russo?

5          MS. ZVEROVICH:  Correct, your Honor.

6          THE COURT:  How long have Mr. Russo's direct?

7          MS. ZVEROVICH:  I think approximately four and a

8   half hours, your Honor.

9          THE COURT:  That will take us well into the

10  afternoon; and the cross may take us into next week.

11         MR. KASULIS:  I think that's right, your Honor.

12         THE COURT:  When Mr. Russo testifies are we going to

13  follow the regular -- he's not going to come in with an

14  escort, he's just going to come in and testify, right?

15         MS. ZVEROVICH:  Correct.

16         THE COURT:  He's on bail?

17         MS. ZVEROVICH:  Correct.

18         THE COURT:  Okay.  Anything else before we call in

19  the jury?  The jury is here on time.  They are anxious to get

20  started, so let's get started.

21         Let's call in the witness.

22         (Whereupon, the witness resumes the stand.)

23         (Jury enters the courtroom.)

24         THE COURT:  Please be seated everyone.  Good

25  morning, members of the jury.

D. WILK – DIRECT – MR. PELLEGRINO

1           THE JURY PANEL:  (Collectively)Good morning.

2           THE COURT:  Before we continue with the examination

3    of the witness, I just I forgot to introduce one person who I

4    should have introduced along with everyone else yesterday.  My

5    law clerk for this case is Jennifer Katz, who is seated over

6    there.  She's assisting me with this trial.  I think that

7    completes the introductions.

8           At this time we're going to continue with the direct

9    examination of David Wilk.

10          Mr. Wilk, I remind you that you're still under oath.

11          You may continue, Mr. Pellegrino.

12          MR. PELLEGRINO:  Thank you, your Honor.

13          (Witness takes the witness stand.)

14   DAVID WILK, called as a witness, having been previously first

15   duly sworn/affirmed, was examined and testified as follows:

16   DIRECT EXAMINATION

17   BY MR. PELLEGRINO:

18   Q    Good morning, Mr. Wilk.

19   A    Good morning.

20   Q    We got an instruction from the court reporter that we

21   were going very fast yesterday, I think we both have to slow

22   down so she can keep up.

23          Let's resume where we were, which was looking at

24   Government Exhibit 655.  Sorry, we're just having a technical

25   issue here.

D. WILK – DIRECT – MR. PELLEGRINO

1          Can you see that on your screen, sir?

2     A    Yes.

3     Q    Ms. Hochron, go to the second to last page, please?

4          Assuming where we left off, do you recall discussing

5     this question that you posed on the top of this text string

6     here?

7     A    Yes.

8     Q    Were you say:  Do you have any other e-mails to that

9     effect for SC or other winners.  What are you referring to?

10    A    To the South Carolina winner or other winners, lottery

11    winners.

12    Q    When you say South Carolina or other winners, who are

13    they in relation to the firm?

14    A    I'm not sure what you're asking.

15    Q    Are they firm clients?

16    A    I didn't know at the time who they were, but I assumed.

17    Jason's practice was lottery, I assumed they were lottery

18    clients from the firm.

19    Q    Did Jason respond:  I have a text from a member of Chen's

20    company, not sure that will help?

21    A    Yes.

22    Q    Was Chen's company, to your knowledge, one of the SC or

23    other winners that you were asking about?

24    A    I don't know.  I don't know.

25    Q    Do you have any understanding of who Chen's company was?

D. WILK - DIRECT - MR. PELLEGRINO

1   A    I recall there being a client Chen that Jason had, and I

2   don't think that she was a lottery winner.

3   Q    As part of this inquiry that you're conducting, did you

4   look into that?

5   A    No.

6   Q    Continuing on to the next page.  Did he provide a further

7   response to you saying:  Found a text with another client from

8   Certilman Fino, saying they should invest with me.  Not sure

9   if that helps?

10  A    I recall getting that, yes.

11  Q    Was Fino a client of the Rivkin Radler firm?

12  A    I don't know.

13  Q    Who is Certilman?

14  A    Jason's prior law firm where he was a partner at.

15  Q    As part of your inquiry, did you investigate whether Fino

16  was a client of the Rivkin Radler firm?

17  A    No, I didn't have time.  At that point it was, I think

18  like a day before he was charged or close thereto.

19  Q    What did you respond to these two responses he gave you?

20  A    I said, send me what you have.

21  Q    You said:  Send me what you have.  Thanks?

22  A    Correct.

23  Q    Did he ever send you any other e-mails or documents

24  relating to the South Carolina or other winners that you asked

25  about on the previous page?

D. WILK - DIRECT - MR. PELLEGRINO

1    A    No.

2    Q    I want to direct your attention back to Exhibit 650,

3    which we had looked at previously.  Can you see that on your

4    screen?

5    A    Yes.

6    Q    We discussed yesterday that Mr. Kurland provided you this

7    brief description of specified entities.  Do you recall that?

8    A    Yes.

9    Q    We also talked in reference to an SEC subpoena that you

10   were looking at?

11   A    Right.

12   Q    Do you have an understanding of whether these were the

13   specified entities listed in that SEC subpoena?

14   A    I think they were.

15   Q    What was he providing you this information for?

16   A    It was I believe to give me a description or illuminate

17   what was in the subpoena provided to me, or some of the

18   documents that he might have sent over to me.

19   Q    Were these the entities the SEC was asking about?

20   A    I believe they were.

21   Q    Scrolling down to number three.  What did Mr. Kurland

22   tell you about whether he held an interest in Cheddar Capital?

23   A    You want me to read what he wrote here?

24   Q    Just the first sentence.

25   A    I hold an 18 percent interest in this entity referencing

*Rivka Teich CSR RPR RMR FCRR*
*Official Court Reporter*

D. WILK – DIRECT – MR. PELLEGRINO

1   Cheddar Capital.

2   Q    What did he say that entity does?

3   A    It offers Merchant Cash Advances.

4   Q    Approximately how much money did Rivkin clients have

5   invested in Cheddar Capital?

6   A    He says here is $20 million.

7   Q    Let's look at number four, please.  What did he tell you

8   about Francis Bay Holding Company?  You can read that.

9   A    He wrote:  This is an entity that owned a small fund in

10  Cheddar Capital like deals.  I don't think that I held a

11  formal ownership interest in this entity but I was an investor

12  when I first became involved, was planned to be structured as

13  a partnership.

14  Q    With regard to Francis Bay LLC, number five, who did he

15  say owned Francis Bay LLC?

16  A    He said, he wrote:  This entity is owned 100 percent by

17  my client Mangal.  He purchased the fund from Francis Bay

18  Holding Company Inc. for $2 million.  That company is active

19  and making loans.

20  Q    What about number six, what did he say about GK3 LLC?

21  A    This is an entity I own 100 percent.  It is a single

22  member LLC that I use for personal investments.

23  Q    What about JBMML LLC?

24  A    I hold a 33.3 percent ownership interest in this MCA

25  entity.  This is an entity that was hurt by Altieri.  Clients

D. WILK – DIRECT – MR. PELLEGRINO

1   have approximately $43 million invested in it.

2   Q    One more, number ten please.  What did he say about SMARK

3   Associates?

4   A    I do not hold an ownership interest in this entity.  It

5   was somehow involved in with the MCA companies, but I wasn't a

6   part of it.

7   Q    Prior to receiving this information from Mr. Kurland, do

8   you have an understanding of whether the firm had ever

9   previously received disclosures regarding these entities from

10  Mr. Kurland?

11  A    What do you mean disclosures?

12  Q    Had Mr. Kurland previously discussed to the firm his

13  ownership interest prior to providing you this information in

14  this e-mail?

15  A    I wouldn't know that at the time.

16  Q    Do you have an understanding as you sit here today?

17  A    Only what he said.  Could you repeat that question again?

18  Q    The question is, did Mr. Kurland previously disclose

19  these entity ownership interests to the firm prior to

20  providing this information in this e-mail?

21  A    I wouldn't know if he did or didn't.  You're asking me a

22  question about whether or not I ultimately learned if he

23  disclosed it?  I'm not sure if that's calling for perhaps

24  privileged communications between my firm and myself as

25  general counsel as to what we learned subsequently.  But at

D. WILK - CROSS - MR. KASULIS

1   this time, I was unaware of these companies or interests until

2   Jason was telling me about it.

3   Q    Is there a reason that you asked Jason to tell you this

4   information as opposed to looking at the firm's books or

5   records or some other place where it might have been located?

6   A    I don't think there was time.  It was more of immediately

7   just conversing with Jason trying to figure out what was going

8   on.  I think at some point ultimately I would have done that,

9   I would have looked to see what we knew or didn't know.  At

10  the time I'm just gathering information.

11  Q    Are you suggesting that Mr. Kurland previously disclosed

12  the information to the firm in some other format?

13  A    I'm not suggesting that at all.

14  Q    Do you have any knowledge whether the ownership interest

15  statements that he made in this e-mail were in fact true?

16  A    I do not know.

17          MR. PELLEGRINO:  Thank you, your Honor.  No further

18  questions.

19          THE COURT:  Cross-examination.

20          MR. KASULIS:  Thank you, your Honor.

21  CROSS-EXAMINATION

22  BY MR. KASULIS:

23  Q    Good morning, Mr. Wilk.

24  A    Good morning.

25  Q    I'm Tim Kasulis.  Nice to meet you in person.

D. WILK – CROSS – MR. KASULIS

1   A     You too.

2   Q     Mr. Wilk, in addition to being the general counsel of

3   Rivkin Radler, you're also a partner there; is that right?

4   A     That's correct.

5   Q     You have your own practice?

6   A     I do.

7   Q     One area that you specialize in is ethics and

8   professionalism; is that right?

9   A     That's correct.

10  Q     You represent professionals in connection with that

11  practice?

12  A     I do.

13  Q     By professionals I mean lawyers, doctors, accountants?

14  A     I don't represent doctors.

15  Q     No doctors.  Lawyers and accountants?

16  A     Correct.

17  Q     In that field of ethics and professionalism there are a

18  number of ways to address alleged wrongdoing by, let's say, a

19  lawyer; is that correct?

20          MR. PELLEGRINO:  Objection.

21          THE COURT:  I'm sorry, there is an objection.

22          Sustained.

23  Q     You're the general counsel in addition you said, correct,

24  sir?

25  A     I'm the general counsel in addition to what?

D. WILK - CROSS - MR. KASULIS

1   Q    In addition to being a partner with the practice of the

2   firm, sir?

3   A    That's correct.

4   Q    I believe you said yesterday that one of the things you

5   were trying to do when you gathered this information from

6   Mr. Kurland was first decide whether the documents could be

7   produced, whether the firm should give their blessing,

8   correct?

9   A    That's right.

10  Q    And the second thing was you were evaluating

11  Mr. Kurland's activities to see whether the firm had any

12  exposure or liability; is that right?

13  A    That's correct.

14          MR. PELLEGRINO:  Objection.

15          THE COURT:  I'll allow the question.

16  Q    Mr. Wilk, as the general counsel of the firm, am I

17  correct that you keep tabs on claims of wrongdoing that are

18  filed against the partners?

19          MR. PELLEGRINO:  Objection.

20          THE COURT:  I'll allow it.

21  A    I'm not sure what you mean by tabs.

22  Q    As general counsel is one of your duties and

23  responsibilities to be apprised of when, for instance, someone

24  sues a Rivkin and Radler partner?

25  A    That's correct.

*Rivka Teich CSR RPR RMR FCRR*
*Official Court Reporter*

D. WILK – CROSS – MR. KASULIS

1  Q     Or when someone brings an ethics cans complaint against

2  one of the Rivkin Radler partners?

3  A     Yes.

4  Q     Am I correct, sir, that no one has ever filed a

5  malpractice case against Mr. Kurland?

6              MR. PELLEGRINO:  Objection.

7              THE COURT:  Sustained.

8  Q     Mr. Wilk, you testified on direct examination that you

9  received an e-mail from Mr. Kurland in which Mr. Kurland told

10  you that the PPE deals were still in process.  Do you remember

11  that?

12  A     Yes.

13  Q     We went through it yesterday?

14  A     Right.

15  Q     He told you that they were tied up a bit in California.

16  Do you recall that?

17  A     Yes.

18  Q     But that hopefully they should be okay?

19  A     Correct.

20  Q     That was in response to your e-mail that asked about PPE

21  deals and whether they lost money; is that right?

22  A     Right.

23  Q     You sent that e-mail to Mr. Kurland because you knew that

24  Mr. Kurland had clients in PPE deals, right?

25  A     I sent that e-mail because as I recall -- you could give

D. WILK - CROSS - MR. KASULIS

1    me the documents, so it would help me -- but I believe in that

2    list that he provided at some point he said PPE deals more to

3    follow.  And underneath it -- I don't want to guess -- but

4    underneath he talked about certain investments, certain

5    amounts of money in PPE deals.

6    Q    I'm happy to show you the documents.

7    A    Right.  So I was just following.

8              MR. KASULIS:  Maybe we could put Government Exhibit

9    652 back up for the witness.  May we do that, your Honor?

10             THE COURT:  Of course.

11             MR. KASULIS:  Thank you.

12   BY MR. KASULIS:

13   Q    If you could go to page three of this document,

14   Ms. Tegtmeyer.

15             If, for instance, you look at number five there,

16   Mr. Wilk?

17   A    It's not up there.

18   Q    It's a redacted --

19   A    It's not up yet.

20             THE COURT:  It's in evidence.

21             MR. KASULIS:  It is.

22   Q    Do you see that now, sir?

23   A    I do now.

24   Q    You see a redacted client name SC client entity invested

25   in PPE deal.  Do you see that?

D. WILK - CROSS - MR. KASULIS

1   A    Right.

2   Q    This is what you were referring to correct?

3   A    I believe there were other references to PPE in that

4   e-mail or prior e-mails.  I'm pretty sure of that.  But I

5   don't have it in front of me.

6   Q    If you could back up to the main page of the document.

7   If you could look, for instance, at number six as well.  You

8   can see that, Mr. Wilk?

9   A    That's correct.

10  Q    This is the kind of thing you were referring to, right,

11  that it mentioned PPE deals?

12  A    Maybe 11 has it too?

13  Q    You wanted to show -- on the top there?  Sure.  We can

14  blow that one up for the witness.

15       You see where it says:  Southbound Relief Company, I

16  do not have an interest in this entity but it is involved in

17  the PPE deals.

18  A    Right.  There may have been an introductory sentence or

19  two that he references PPE in the e-mail.

20  Q    This is what you were referring to when he said he

21  disclosed them to you and you were asking follow-up questions

22  about it?

23  A    That's right.

24  Q    Jason also told you that the entities in the PPE deals in

25  California had hired Quinn Emmanuel to represent them.  Do you

D. WILK - CROSS - MR. KASULIS

1    remember that, sir?

2            MR. PELLEGRINO:  Objection.

3    A    I don't recall that.

4            THE COURT:  It's hard for me to hear objection.

5            I'll allow that.  Go ahead.

6            MR. KASULIS:  Thank you, your Honor.

7    Q    You don't remember Mr. Kurland saying Quinn had been

8    hired to sue the state of California to recover for the amount

9    in the PPE deal?

10   A    I don't remember that.

11   Q    On direct you also made a point of referencing a few

12   times that Jason was signing documents for other entities

13   besides Rivkin Radler.  Do you remember that, sir?

14   A    Yes.

15   Q    Am I correct, sir, that nothing in the Rivkin Radler

16   partnership agreements prohibits a partner from owning an

17   outside business?

18   A    I don't have the partnership agreement in front of me.

19   Q    You don't know -- are you done?

20   A    Yes.

21   Q    You don't know as you sit here today as the general

22   counsel of the firm testifying in a trial about an outside

23   interest, whether that's allowed or prohibited by the

24   partnership agreement?

25   A    I don't know what the partnership agreement said back

D. WILK - CROSS - MR. KASULIS

1  then nor -- I just don't know what it said back then.

2  Q    On direct I believe Mr. Pellegrino spent sometime walking

3  you through texts and e-mails about the information

4  Mr. Kurland was providing to you, correct?

5  A    That's right.

6  Q    Just to be clear, that process that we've been talking

7  about for the last day, started when Mr. Kurland disclosed to

8  the firm that he had received the subpoena from the SEC,

9  right?

10  A    That's right.

11  Q    He reached out, as I think you said, to seek the firm's

12  blessing to produce certain documents to the Government?

13  A    Correct.

14  Q    You understood from that, sir, that he wanted to give the

15  firm, give Rivkin Radler, the opportunity to object or ask

16  questions about it if they wanted to, right?

17  A    You say "he," you mean Jason?

18  Q    I do.

19  A    I don't recall what he meant or said regarding what you

20  just said.

21  Q    To be fair, you took that opportunity to ask questions

22  about what was going on?

23  A    Of course.

24  Q    In fact, Mr. Kurland answered a number of those questions

25  for you; is that correct, sir?

*Rivka Teich CSR RPR RMR FCRR*
*Official Court Reporter*

D. WILK - CROSS - MR. KASULIS

1   A    He began the process of answering, yes.

2   Q    Including in those documents we saw yesterday and again

3   this morning, those are the some of the answers to your

4   questions correct, sir?

5   A    That's correct.

6   Q    He described the investment entities for you?

7   A    Yes.

8   Q    He described the clients for you?

9   A    Some.

10  Q    For the ones that collected anonymously, he actually kept

11  them anonymized in these e-mails, right?

12  A    I don't know.

13  Q    Can you please show the witness, blow up number five for

14  him again, Ms. Tegtmeyer.

15          Can you see it's been redacted here, sir, to protect

16  anonymity again?

17          MR. PELLEGRINO:  Objection.

18          THE COURT:  Just ask the question.

19  Q    Can you see it's referred to by the initials, sir, but

20  there is a big black box?

21  A    Right.

22  Q    You see an entity it ends with LLC?

23  A    Right.

24  Q    That's an entity and not a person, you understand that?

25  A    Yes.

*Rivka Teich CSR RPR RMR FCRR*
*Official Court Reporter*

D. WILK – CROSS – MR. KASULIS

1    Q     You understand that this is the South Carolina client

2    entity, you see where it says that?

3    A     Right.

4    Q     So he's using the entity name and not the person's name?

5    A     In this particular entry, yes.

6    Q     So that's a way of preserving the anonymity of his

7    client's name, correct?

8          THE COURT:  Can we have a clarification?  This

9    redaction, when it took place there is no way of knowing on

10   this document whether it took place in anticipation of this

11   trial or at some other point.  I think that if we're going to

12   go into this we have to have a better understanding.  I don't

13   have that understanding.  I don't want the jury to

14   misunderstand, as I might misunderstand, exactly the source of

15   the redaction.

16         MR. KASULIS:  Rather than having me try to explain

17   it, should we have a sidebar where we can talk about how the

18   redactions will work?

19         THE COURT:  Sure.

20         (Continued on the next page.)

21

22

23

24

25

SIDEBAR CONFERENCE

1            (Sidebar conference.)

2            MR. PELLEGRINO:  The argument that Mr. Kurland

3    redacted this information is not correct.

4            MR. KASULIS:  That's not what I'm trying to say.  If

5    there was no redaction on there, there would be an entity

6    name.  Right.  All I'm trying to get the witness to say is,

7    yes, there is an entity name and not a person's name.  It's

8    being confused that since then the entity has been redacted

9    for this trial.

10           THE COURT:  You can ask him if he recalls that there

11   was an entity's name there.  I guess that would be

12   appropriate.

13           MR. KASULIS:  That's why I tried to do the LLC

14   thing, to get him to say it's an entity not a person.  That's

15   all I'm trying to get to.

16           MR. PELLEGRINO:  I just think it needs to be done

17   without the redaction reference.  He's confused.  He knows he

18   can't say anything that is underneath the redaction.

19           THE COURT:  Has the jury been told how the

20   redactions are working at all?  This will be recurring?  We

21   started to do that about redactions but we were going to deal

22   with redactions in connection with the witnesses who are the

23   two lottery winners witnesses and not as a general prospect.

24   So I don't know that this is the right time to do it unless

25   you're going to go into a lot more redactions.

SIDEBAR CONFERENCE

1           MR. KASULIS:  Very much not.  I'm trying to get him

2      to say it's an entity.

3           MR. PELLEGRINO:  Let me offer, the redactions are

4      meant to be read as if they are on the document.  He disclosed

5      GP LLC; I agree with that.

6           MR. KASULIS:  Do you think he will be able to say

7      that?

8           THE COURT:  Let's try.

9           (End of sidebar conference.)

10          (Continued on the next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D. WILK - CROSS - MR. KASULIS

1           (In open court.)

2           THE COURT:  Continue.

3           MR. KASULIS:  Thank you, your Honor.

4   BY MR. KASULIS:

5   Q    Looking at number five here.  Mr. Kurland disclosed to

6   you that GP LLC, the SC client entity, invested in the PPE

7   deal?

8   A    That's right.

9   Q    You also understand, Mr. Wilk, that Mr. Kurland was never

10  actually accused of any wrongdoing by the Securities and

11  Exchange Commission?

12          MR. PELLEGRINO:  Objection.

13          THE COURT:  Sustained.

14  Q    You described your role in this process, I believe, sir,

15  as gathering information for the firm?

16  A    Yes.

17  Q    Mr. Kurland, as we've discussed, has been supplying you

18  with information in these e-mails and texts that we've been

19  looking at?

20  A    That's right.

21  Q    You mentioned, sir, I believe it was in a text, that you

22  had scheduled a follow-up Zoom with Jason to discuss it in

23  more detail?

24  A    That's right.

25  Q    That Zoom, from your end, was so that he could answer

D. WILK - CROSS - MR. KASULIS

1    more questions that you had; is that correct?

2    A    And go over some of the documents, yes.

3    Q    That Zoom did not happen right, sir?

4    A    No.

5    Q    That was because Mr. Kurland was arrested?

6    A    That's right.

7    Q    Even after that, though, Mr. Wilk, Mr. Kurland worked to

8    get you the client contact information so Rivkin Radler could

9    reach out to his clients, correct?

10   A    I'm not sure what you're referencing.

11   Q    Well, some of his clients were anonymized, correct?

12   A    Correct.

13   Q    After he was arrested, we worked to provide you with

14   information so you could contact them, correct?

15   A    That's correct.

16   Q    So that the representation of his clients could continue

17   with as little disruption as possible?

18   A    I recall that.

19             MR. KASULIS:  I have no further questions.

20             THE COURT:  Anything else from the Government?

21             MR. PELLEGRINO:  No.  Thank you, your Honor.

22             THE COURT:  The witness is excused.  You may stand

23   down, sir.

24             (Whereupon, the witness was excused.)

25             THE COURT:  The Government may call its next

Rivka Teich CSR RPR RMR FCRR
Official Court Reporter

V. HERNANDEZ – DIRECT – MS. ZVEROVICH

1    witness.

2            MS. ZVEROVICH:  The Government calls Victoria

3    Hernandez.

4            (Witness takes the witness stand.)

5            THE COURTROOM DEPUTY:  Please raise your right hand.

6            (Witness sworn.)

7            THE WITNESS:  I do.

8            THE COURTROOM DEPUTY:  Have a seat.  State and spell

9    your full name for the record.

10           THE WITNESS:  Victoria Hernandez.  V-I-C-T-O-R-I-A,

11   H-E-R-N-A-N-D-E-Z.

12           THE COURT:  You may inquire.  And will the witness

13   take off her mask for her testimony?  Thank you very much.

14   VICTORIA HERNANDEZ, called as a witness, having been first

15   duly sworn/affirmed, was examined and testified as follows:

16   DIRECT EXAMINATION

17   BY MS. ZVEROVICH:

18   Q    Good morning, Ms. Hernandez.

19   A    Good morning.

20   Q    Where do you work?

21   A    For the Internal Revenue Service.

22   Q    Is that the IRS for short?

23   A    Yes.

24   Q    Do you work for any particular unit or department within

25   the IRS?

V. HERNANDEZ – DIRECT – MS. ZVEROVICH

1    A    Yes.  I work for Criminal Investigations the court

2    witness program.

3    Q    What is the court witness program?

4    A    I am a court witness coordinator.  I represent the

5    Commissioner of the Internal Revenue Service in his role as a

6    custodian of records.  I secure tax returns, correspondence,

7    transcripts, and I certify that they are trued and valid

8    copies of what is on our systems.

9    Q    How long have you served as a court witness coordinator

10   for the IRS?

11   A    I've been in my position for two years.

12   Q    Approximately how long in total have you worked for the

13   IRS?

14   A    Fourteen years.

15   Q    What did you do for the IRS prior to becoming a court

16   witness coordinator?

17   A    Prior to being a court witness coordinator, for five

18   years approximately, I was a customer service representative

19   prior.  Before that, for about two years, I was in the

20   statutes department.  Prior to that, I was in 1040X amended

21   return adjustments unit.

22   Q    What is your highest level of education?

23   A    Some college.

24   Q    Does your current position within the IRS involve reading

25   IRS records and codes that are within those records?

V. HERNANDEZ - DIRECT - MS. ZVEROVICH

1    A    Yes, it is.

2    Q    What kind of training did you receive to be a court

3    witness coordinator?

4    A    The basic court witness training, testifying at trials

5    training.

6    Q    Do you have any training in accounting?

7    A    No, I do not.

8    Q    Are you familiar with the IRS's record keeping practices?

9    A    Yes, I am.

10   Q    Is there a computer system within the IRS that tracks and

11   stores tax return information?

12   A    Yes, there is.

13   Q    What is the name of that system?

14   A    That is our master file system located in either West

15   Virginia or Memphis, Tennessee.

16   Q    What do you use to access the master file system?

17   A    We use our integrated data retrieval system, known as

18   IDRS, to access the master file.

19   Q    Generally what kinds of information are stored within the

20   IDRS?

21   A    Tax returns filed, correspondence, W2 income information,

22   things like that.

23   Q    Does the system have a function to extract the

24   information for any particular taxpayer?

25   A    Yes, we do.

V. HERNANDEZ – DIRECT – MS. ZVEROVICH

1   Q    How is that information presented?

2   A    We can research accounts through social security numbers

3   or employer identification numbers.

4   Q    Are you familiar with something called an account

5   transcript?

6   A    Yes, I am.

7   Q    What is that generally?

8   A    It's a summary of an account for a specific year, all

9   actions that have been taken on it, adjustments, payments,

10  things like that.

11  Q    Are you generally familiar with the term informational

12  returns?

13  A    Yes, I am.

14  Q    What are those?

15  A    Informational returns are for example W2s, 1098, 1099s

16  that are reported to the IRS.

17  Q    Typically by an employer or somebody the person received

18  income from?

19  A    Yes.

20  Q    Ms. Hernandez, before coming to testify today, did you

21  review IRS records in order to prepare for your testimony?

22  A    Yes, I did.

23  Q    In particular, did you review IRS records relating to

24  Jason Kurland for the years 2017 through 2020?

25  A    Yes, I have.

V. HERNANDEZ – DIRECT – MS. ZVEROVICH

1   Q    Did you also review IRS records for the entity GK3 LLC

2   for the same years?

3   A    Yes, I have.

4   Q    Ms. Hernandez, we're going to show what you is marked for

5   identification as Government Exhibit 2201 through 2206.  Let's

6   scroll through the pages.

7          Let's go to 2202.  I think we can go to 2203.  2204.

8   2205.  And 2206.

9          Ms. Hernandez, do you recognize these documents?

10  A    Yes, I do.

11  Q    Generally speaking what are they?

12  A    Tax returns, transcripts, and information return

13  transcripts.

14  Q    Have you reviewed the official IRS account transcripts

15  and returns that are associated with the copies presented in

16  Government Exhibit 2201 through 2206?

17  A    Yes, I have.

18  Q    Are Government Exhibits 2201 through 2206 true and

19  correct copies of tax records contained within the IRS's

20  system, except that certain names and social security numbers

21  have been redacted?

22  A    Yes, they are.

23  Q    And were these records kept in the course of regularly

24  conducted business activity of the IRS?

25  A    Yes, they are.

V. HERNANDEZ – DIRECT – MS. ZVEROVICH

1          MS. ZVEROVICH:  The Government offers Government

2     Exhibit 2201 through 2206.

3          MR. KASULIS:  No objection.

4          THE COURT:  Government Exhibit 2201 through 2206 are

5     received in evidence.  You may proceed.

6          (Government Exhibit 2201 – 2206, was received in

7     evidence.)

8          MS. ZVEROVICH:  Thank you, your Honor.

9     Q    Ms. Hernandez, did Jason Kurland file income tax returns

10    for each of the years 2017 through 2020?

11    A    Yes.

12    Q    How about the entity GK3 LLC, were there any tax returns

13    on file for that entity for 2017 through 2020?

14    A    No, there was not.

15    Q    Let's publish for the jury Government Exhibit 2205.

16    Ms. Hernandez, what is this record?

17    A    This is a certification of lack of records.

18    Q    For which taxpayer?

19    A    This is for GK3 LLC.

20    Q    What is the address listed for GK3 LLC?

21    A    Twenty Pepper Mill Lane.  I believe it says Dix Hills,

22    New York, 11746.

23    Q    And what does this record reflect?

24    A    This reflects that for this entity no returns were filed

25    for tax years 2017, '18, '19 and 2020.

Rivka Teich CSR RPR RMR FCRR
Official Court Reporter

V. HERNANDEZ – DIRECT – MS. ZVEROVICH

1   Q    Is that what it says above the time periods as of June 8,

2   2022, the Internal Revenue shows no returns filed for the

3   following periods?

4   A    That is correct.

5   Q    For the business entity described above, correct?

6   A    Correct.

7   Q    Ms. Hochron, let's publish Government Exhibit 2201.

8          Ms. Hernandez, what is this?

9   A    This is a form 1040 U.S. individual income tax return for

10  tax year 2017.

11  Q    For which taxpayer?

12  A    Jason M. Kurland and Lauren B. Blyer.

13  Q    Focusing on page one, line 22, of this tax return.  What

14  is shown there?

15  A    On line 22 it shows the total amount of income.

16  Q    What is the total amount of income reports?

17  A    $493,321.

18  Q    Let's go to page 24 of this exhibit.  What type of form

19  is shown on page 24?

20  A    This is a Schedule E, supplemental income and loss form.

21  Q    Generally, what types of income are reported on the

22  Schedule E of a 1040?

23  A    We report rental income, royalties, income from

24  partnerships, things like that.

25  Q    Let's go to page 25.  Is this the second page of the same

V. HERNANDEZ – DIRECT – MS. ZVEROVICH

1    Schedule E?

2    A    Yes, it is.

3    Q    Ms. Hochron, if we can zoom in on the A, B, C, D boxes of

4    the tax return.

5         Ms. Hernandez, according to this schedule, what are

6    the entities from which Jason Kurland reported receiving

7    income in the year 2017?

8    A    There is Certilman Balin Adler & Hyman LLP, Loft

9    Associates LLC, Cheddar Capital LLC, American Yuexianggui LI

10   LLC.

11   Q    Focusing on line 32 on the bottom, what is the total

12   partnership and S Corporation income reflected there from

13   these entities?

14   A    $491,046.

15   Q    Ms. Hochron, let's publish now Government Exhibit 2202.

16        Ms. Hernandez, what is this?

17   A    This is a form 1040 U.S. individual income tax return for

18   2018.

19   Q    For which taxpayer?

20   A    Jason M. Kurland and Lauren B. Blyer.

21   Q    Let's go to page two of the tax return and focus on line

22   six.  What is reflected in line six?

23   A    $934,603.

24        (Continued on next page.)

25

V. HERNANDEZ – DIRECT – MS. ZVEROVICH

1    EXAMINATION CONTINUES

2    BY MS. ZVEROVICH:

3    Q    And what does that figure represent?

4    A    The total income amount.

5         THE COURT:  And all of this, we're talking about

6    dollars, correct?

7         THE WITNESS:  Correct.  Sorry about that.

8         MS. ZVEROVICH:  Thank you, Your Honor.

9         Ms. Hochron, let's now go to page 36 of this

10   exhibit.

11        (Exhibit published.)

12   BY MS. ZVEROVICH:

13   Q    Ms. Hernandez, what are we looking at here?

14   A    This is a breakdown of Form 1040, Schedule E, Part 2,

15   Line 28, Income or Loss From Partnership and S Corporations.

16   Q    So, this is the same schedule that we looked at before

17   for 2017, but for 2018?

18   A    Correct.

19   Q    And according to the schedule, what are the entities from

20   which Jason Kurland reported receiving income in 2018?

21   A    Certilman  Balin Adler & Hyman, LLP; Cheddar Capital,

22   LLC; American Yuexianggui, LLC; Rivkin Radler, LLP; and

23   Sugar AC, LLC.

24   Q    Now, is there any income reported here from an entity

25   called Francis Bay Holding Company, Inc.?

SAM    OCR    RMR    CRR    RPR

V. HERNANDEZ – DIRECT – MS. ZVEROVICH

1    A    No, there is not.

2    Q    And have you reviewed the entirety of Mr. Kurland's 2018

3    tax return, Government Exhibit 2202?

4    A    Yes, I have.

5    Q    Is Francis Bay Holding Company, Inc., mentioned anywhere

6    on this tax filing?

7    A    No, it is not.

8    Q    Now, based on this page 36 of Schedule -- the Schedule E

9    we're looking at, how much income did Mr. Kurland report

10   receiving from Cheddar Capital, LLC, in 2018?

11   A    $332,074.

12         MS. ZVEROVICH:   Ms. Hochron, let's now publish

13   Government Exhibit 2206, page 28.

14         (Exhibit published.)

15         MS. ZVEROVICH:   And let's zoom in on the bottom

16   portion of this page.

17   BY MS. ZVEROVICH:

18   Q    Now, first, Ms. Hernandez , what are we looking at here,

19   what is this record?

20   A    This is an Informational Return print for tax year 2018.

21   Q    And what does this record reflect?

22   A    It reflects a Schedule K-1, 1065 income.

23   Q    And what is a Schedule  K-1?

24   A    A Schedule K-1 is a form that is used for corporations to

25   show partnership income, losses, and deductions.

SAM     OCR     RMR     CRR     RPR

V. HERNANDEZ – DIRECT – MS. ZVEROVICH

1   Q    Okay.  And is that what we see on the top of the page on

2   the left where it says:  Document Type K-1?

3   A    Yes, it is.

4   Q    Okay.  And who issued this K-1?

5   A    This was from Cheddar Capital, LLC.

6   Q    And who was it issued to?

7   A    GK3, LLC.

8   Q    And how much income was reported on this K-1 to GK3, LLC?

9   A    1 million --

10  Q    7,000 --

11         MS. ZVEROVICH:  Actually, can you remove that

12  highlighting?

13  BY MS. ZVEROVICH:

14  Q    So, how much in income was reported from Cheddar Capital

15  to GK3, LLC, on this?

16  A    $332,074.

17  Q    And that's the same amount to the dollar that we just

18  looked at, we saw on Jason Kurland's personal tax return on

19  Schedule E, correct?

20  A    Correct.

21         MS. ZVEROVICH:   Now, let's go to the next page of

22  Government Exhibit 2206.  And let's, again, zoom in on the

23  bottom portion.

24         Thank you, Ms. Hochron.

25  Q    Ms. Hernandez, what is shown here?

SAM     OCR     RMR     CRR     RPR

V. HERNANDEZ – DIRECT – MS. ZVEROVICH

1   A     This is an Informational Return print for 2018.

2   Q     And what type of -- looking at the "Document Type" on the

3   top, what type of informational return is this?

4   A     This is a 1099 Miscellaneous.

5   Q     And, generally speaking, what is a 1099?

6   A     A 1099 is used for employers that pay their employees for

7   services.  They'll use this, like, for contractors and -- and

8   people who are their -- they're paying out of --

9   Q     Okay.  And focusing on the payer entity, who issued this

10  1099?

11  A     Francis Bay Holding Company, Inc.

12  Q     And looking at the payee section, who was it issued to?

13  A     GK 3, LLC.

14  Q     And in what amount?

15  A     $184,192.

16  Q     Now, you testified earlier that Francis Bay Holding

17  Company was not mentioned on Mr. Kurland's 2018 return,

18  correct?

19  A     Correct.

20  Q     Is this particular amount of income, $184,192, reported

21  on Mr. Kurland's 2018 tax return?

22  A     I did not see that amount on there.

23  Q     And you previously testified that GK3, LLC, itself, did

24  not file any tax return for 2018, correct?

25  A     That is correct.

SAM      OCR      RMR      CRR      RPR

V. HERNANDEZ - DIRECT - MS. ZVEROVICH

1          MS. ZVEROVICH:    Let's go to Government -- let's

2    publish Government Exhibit 2203.

3          (Exhibit published.)

4    BY MS. ZVEROVICH:

5    Q    Ms. Hernandez, what is this record?

6    A    This is a Form 1040 U.S. Individual Income Tax Return for

7    tax year 2019.

8    Q    For which taxpayer?

9    A    Jason M. Kurland and Lauren B. Blyer.

10   Q    And focusing on the received  stamp on the bottom there,

11   when did the IRS receive this 2019 tax return?

12   A    It was received October 26th of 2 -- 2020.

13         MS. ZVEROVICH:    Okay.  And let's go to page 1,

14   line 7B.  If we can zoom in on that, Ms. Hochron.

15         (Exhibit published.)

16   BY MS. ZVEROVICH:

17   Q    Ms. Hernandez, what is shown in line 7B?

18   A    This is the total of income.

19   Q    And how much is reported there?

20   A    $704,911.

21         MS. ZVEROVICH:    Okay.  Let's now go to page 11 of

22   this tax filing.

23         (Exhibit published.)

24   Q    What are we looking at on page 11?

25   A    This is page 2 of a Schedule E.

SAM     OCR     RMR     CRR     RPR

V. HERNANDEZ – DIRECT – MS. ZVEROVICH

1   Q    On the 2019 tax return?

2   A    Yes.

3        MS. ZVEROVICH:  And let's zoom in on, I think it's

4   box 28.

5   Q    Now, according to this Schedule E, what are the entities

6   from which Mr. Kurland reported receiving income from 2019?

7   A    Cheddar Capital, LLC; Rivkin Radler, LLP; Sugar AC, LLC;

8   and Chesmont Storage, PA, LLC.

9   Q    Is there any income reported on this schedule from an

10  entity called JBMML, LLC?

11  A    No, there is not.

12       MS. ZVEROVICH:   Let's go to page 22 of this tax

13  filing.

14       (Exhibit published.)

15       MS. ZVEROVICH:   And let's zoom in on the bottom

16  portion of this page.

17  BY MS. ZVEROVICH:

18  Q    Ms. Hernandez, was this note included in Mr. Kurland's

19  tax return for 2019?

20  A    Yes, it was.

21  Q    Could you please read that aloud for the jury?

22  A    In the tax year 2019, Mr. Kurland also received income

23  from JBMML, LLC, a New York  corporate entity.  Mr. Kurland

24  has requested documentation of his income from JBMML, but as

25  for the filing deadline of this return, October 15, 2020, he

                SAM    OCR    RMR    CRR    RPR

V. HERNANDEZ – CROSS – MR. KASULIS

1    has not yet received that documentation.  Mr. Kurland will

2    amend his 2019 return to reflect this income promptly upon

3    receiving the requested documentation from JBMML.

4

5                   SAM     OCR     RMR     CRR     RPR

6

7    Q    Now, Ms. Hernandez, have you reviewed IRS records to see

8    whether or not Mr. Kurland reported any additional income

9    subsequent to filing this tax return?

10   A    Yes, I have.

11   Q    And has he reported any additional income to the IRS?

12   A    No, he has not.

13              MS. ZVEROVICH:  No further questions.

14              THE COURT:  Cross-examination, please.

15              MR. KASULIS:    Thank you, Your Honor.

16   CROSS-EXAMINATION

17   BY MR. KASULIS:

18   Q    Good morning, Ms. Hernandez.

19   A    Good morning.

20   Q    I'm the lawyer for Mr. Kurland.

21              I believe you were just testifying a few moments

22   ago, Ms. Hernandez, about how you reviewed Mr. Kurland's 2019

23   tax return, correct?

24   A    Yes.

25   Q    And to be clear, because I get this wrong, the 2019 tax

                   SAM     OCR     RMR     CRR     RPR

V. HERNANDEZ – CROSS – MR. KASULIS

1    year return is the one filed in 2020, right?

2    A    Correct.

3    Q    And I believe you said it was received by the IRS on

4    October 26, 2020, correct?

5    A    Correct.

6    Q    Do you know when Mr. Kurland was arrested in this case,

7    ma'am?

8    A    No, I do not.

9    Q    I believe you testified that Mr. Kurland's 2019 tax

10   return did not include any income from the entity JBMML,

11   correct?

12   A    That is correct.

13          MR. KASULIS:  Can we please re-publish , Your Honor,

14   Government Exhibit 2203?

15          It's in evidence.

16          (Exhibit published.)

17   BY MR. KASULIS:

18   Q    This is the 2019 tax return for Mr. Kurland that you were

19   just discussing with Ms. Zverovich, right?

20   A    Yes.

21          MR. KASULIS:  Can we please go back to page 22 of

22   this document.

23          (Exhibit published.)

24   Q    I believe Ms. Zverovich  just showed you this a few

25   moments ago, Ms. Hernandez?

SAM     OCR     RMR     CRR     RPR

V. HERNANDEZ – CROSS – MR. KASULIS

1   A    Yes.

2   Q    Do you see this is listed as Form 8948 in the upper

3   left-hand corner, is that right?

4   A    Yes.

5   Q    I believe you told the prosecutors before you testified

6   today that you're not familiar with this form or how it works,

7   right?

8   A    Not a hundred percent familiar, no.

9   Q    But the name of the form is at the top, right?  You see

10  where it says:  Preparer Explanation for Not Filing

11  Electronically?

12          Do you see that, Ms. Hernandez?

13  A    Yes, I do.

14  Q    Okay.  And then I believe Ms. Zverovich referred you to

15  the note at the bottom.

16          Do you see that?

17  A    Yes, I do.

18  Q    And it says:  Mr. Kurland  has requested documentation of

19  his income from JBMML, but as of the filing deadline he has

20  not received it yet.

21          Do you see that, ma'am?

22  A    Yes.

23  Q    Do you have any idea, as you sit here today, whether

24  JBMML has ever provided that documentation to Mr. Kurland?

25  A    No, I do not.

V. HERNANDEZ – CROSS – MR. KASULIS

1   Q    He also says, and I believe you read this on direct

2   examination, that he will amend his 2019 return promptly upon

3   receiving that requested documentation.

4            Do you see that?

5   A    Yes, I do.

6   Q    Okay.

7            MR. KASULIS:   Ms. Tegtmeyer, can you back out of

8   the quote?

9            Thank you.

10  BY MR. KASULIS:

11  Q    You understand, Ms. Hernandez, that this document was

12  prepared by a professional tax preparer?

13  A    Yes.

14  Q    And you see his name is listed in the upper left-hand

15  corner:  Preparer Name, Luigi  Andreotti.

16           Do you see that?

17  A    Yes, I do.

18  Q    And he gives his tax preparer PIN number over on the

19  right to identify him as a professional tax preparer, correct?

20  A    It is stated on the form, correct.

21  Q    Now, you also stated about Mr. Kurland's reporting of

22  income regarding Francis Bay.

23           Do you remember that, ma'am?

24  A    Yes, I do.

25  Q    I believe you testified that you reviewed Mr. Kurland's

                SAM    OCR    RMR    CRR    RPR

V. HERNANDEZ – CROSS – MR. KASULIS

1    2018 tax transcripts.

2            Do I have that right?

3    A    Yes, I did.

4            MR. KASULIS:  Can we re-publish Government

5    Exhibit 2206 in evidence, Your Honor?

6            Thank you.

7            THE COURT:  Go ahead.

8            (Exhibit published.)

9    BY MR. KASULIS:

10   Q    This is the tax transcript that we were just talking

11   about, is that right, ma'am?

12   A    Yes, it is.

13   Q    Okay.

14           MR. KASULIS:  Can you please show the witness

15   page 29 of this document, Ms. Tegtmeyer?

16   Q    I believe the prosecutor showed you this page as well.

17           Do you see in the bottom third there where it says:

18   Payer Entity Francis Bay Holding Company, Incorporated?

19           Do you see that?

20   A    Yes, I do.

21   Q    And it indicates:  Miscellaneous Other Income, $184,192,

22   right?

23   A    Correct.

24   Q    And this is the transcript, which means it's a file that

25   the IRS keeps at the Treasury Department, which shows the

SAM     OCR     RMR     CRR     RPR

V. HERNANDEZ - CROSS - MR. KASULIS

1  information that should be appearing on a taxpayer's tax

2  return, is that correct?

3  A    This was an Informational Return that was reported to

4  the -- to the IRS, yes?

5  Q    It's separate from the tax return, itself ?

6  A    Correct.

7  Q    Okay.  But I believe you testified that you also reviewed

8  Mr. Kurland's tax return for the 2018 tax year?

9  A    Correct.

10  Q    And am I correct, ma'am, that you testified that the 2018

11  tax return for Mr. Kurland did not report this 184,192

12  Miscellaneous Other Income figure that we see here?

13  A    That is correct.

14  Q    And the reason it should be reported, ma'am, is that the

15  IRS can determine if Mr. Kurland owes taxes on it, right?

16  A    I don't know.

17  Q    You don't know what the purpose of putting income on the

18  tax return is?

19  A    Oh, yes, it's to report your income.

20  Q    Right.  And the IRS can decide if they owe you money or

21  you owe them money, right?

22          A refund or a tax payment, ma'am?

23  A    That's based off of the income reported on the tax

24  return.

25  Q    Right, right.  And so, it's important for income to be on

V. HERNANDEZ – CROSS – MR. KASULIS

1   the tax return, so the IRS can determine if they owe a

2   taxpayer money or if the taxpayer owes them money?

3   A     The income is reported to the IRS, and then the taxpayer

4   is to report that income on their return.

5   Q     Now, you're saying, I believe, that this income was not

6   on Mr. Kurland's 2018 tax return, right?

7   A     This income was not reported on GK3 income tax returns.

8   Q     Well, I believe you also said on direct examination that

9   you did not see this figure on Mr. Kurland's personal tax

10  return, right?

11  A     I did not.

12  Q     Okay.  And did the Government explain to you, ma'am, that

13  GK3 is Mr. Kurland's entity, but it's a pass-through entity?

14          Do you know what that means?

15  A     I do not.

16  Q     Okay.  Are you familiar with the concept of either the

17  corporation paying the tax or its owner, do you have any

18  training in that tax question?

19  A     I am not familiar with corporation --

20  Q     Okay.

21  A     -- tax training.

22  Q     I'm sorry, I didn't mean to interrupt you.

23  A     No problem.

24          MR. KASULIS:  May we re-publish Government

25  Exhibit 2202 that's in evidence, Your Honor?

V. HERNANDEZ – CROSS – MR. KASULIS

1          THE COURT:  Go ahead.

2          (Exhibit published.)

3          MR. KASULIS:  Thank you.

4    BY MR. KASULIS:

5    Q    All right.  This is the 2018 tax return for Mr. Kurland,

6    right?

7    A    Yes.

8    Q    And this is the tax return where you said you did not see

9    that $184,000 figure, right?

10   A    That is correct.

11   Q    Okay.

12         MR. KASULIS:  Can you please go to page 3 of this

13   document, Ms. Tegtmeyer ?

14         (Exhibit published.)

15   Q    Okay.  Do you see on line 21 there --

16         MR. KASULIS:  Maybe you can blow that up for the

17   witness, Ms. Tegtmeyer.

18   Q    Do you see where it says "Other Income," line 21?

19   A    Yes, I do.

20   Q    And can you read the figure next to it, the amount?

21   A    $197,433.

22   Q    And you understand that this line, "Other Income," is a

23   combination, you take all of your other income and you list

24   the total amount there?

25         Do you understand that, ma'am?

                    SAM      OCR      RMR      CRR      RPR

V. HERNANDEZ – CROSS – MR. KASULIS

1    A    That is correct.

2              MR. KASULIS:  Can you please show the witness, for

3    identification, Defense Exhibit 1701?

4    BY MR. KASULIS:

5    Q    Now, you see this is an e-mail, ma'am, but you're not on

6    it; do you see that?

7    A    I do see the e-mail, yes.

8    Q    All right.  Are you --

9              MS. ZVEROVICH:  Your Honor, objection.

10             MR. KASULIS:  I am going to offer this.  I can offer

11   this now.

12             I offer Defense Exhibit  1701, subject to

13   connection.

14             THE COURT:  Any objection to 1701?

15             MS. ZVEROVICH:  Your Honor, the Government objects.

16   There's no foundation.

17             MR. KASULIS:  It's subject to connection, Your

18   Honor.  I'll lay the foundation later.

19             Sorry, Your Honor.

20             THE COURT:  Could I see the whole exhibit?

21             (Pause.)

22             THE COURT:  I'll allow it, subject to connection.

23   Is that also part of it?

24             MR. KASULIS:  Yes, the exhibit is the -- I'm not

25   going to say what it is, Your Honor, but it's the -- in

                    SAM    OCR    RMR    CRR    RPR

V. HERNANDEZ – CROSS – MR. KASULIS

1    reference.

2              THE COURT:  Well, there's a second page.

3              MR. KASULIS:  Yes, Your Honor, it's the attachment.

4              THE COURT:  What number is it, 1701?

5              MR. KASULIS:  Yes, Your Honor.

6              THE COURT:  I'll allow it, subject to connection.

7              MR. KASULIS:  Thank you, Your Honor.

8              (Defense Exhibit 1701, was received in evidence.)

9              MR. KASULIS:  Can you please publish for the jury,

10   Your Honor, Defense Exhibit 1701?

11             (Exhibit published.)

12             MR. KASULIS:  Okay.  Ms. Tegtmeyer, can you zoom in

13   on the body of the text there?  Yes, with the caption.

14             Thank you.

15   BY MR. KASULIS:

16   Q    Do you see, ma'am, that this is an e-mail from someone at

17   an entity called Keep You Funded to Lotto Lawyer?

18             Do you see that?

19   A    I do.

20   Q    And you see the date is September 27th, 2019?

21   A    Yes.

22   Q    And the subject is GK3, LLC?

23   A    Yes.

24   Q    And the attachment is GK3, 1099 PDF.

25             Do you see that, ma'am?

SAM     OCR     RMR     CRR     RPR

V. HERNANDEZ – CROSS – MR. KASULIS

1    A    Yes, I do.

2    Q    And there are two things in the body text.  It says:  See

3    attached 2019 1099 MISC from Francis Bay.

4             Do you see that?

5    A    Yes, I do.

6    Q    And you also see that it says:  SMARK Associates,

7    Incorporated, $13,241.24.

8             Do you see that?

9    A    Yes, I do.

10   Q    Okay.

11            MR. KASULIS:  Can you please go to page 2,

12   Ms. Tegtmeyer?

13            (Exhibit published.)

14   BY MR. KASULIS:

15   Q    All right.  So, do you see that this is the attached 1099

16   that the cover page was talking about?

17   A    Yes.

18   Q    It's for tax year 2018.

19            Do you see that, ma'am?

20   A    Yes.

21   Q    And can you read the name of the entity there providing

22   that?

23   A    Francis Bay Holding Company, Inc.

24   Q    Okay.  And can you read on page -- I'm sorry, on line 3

25   there, the amount of "Other Income"?

SAM    OCR    RMR    CRR    RPR

V. HERNANDEZ – CROSS – MR. KASULIS

1          We can blow it up for you?

2     A     $184,192.

3     Q     Have you ever seen this document before, ma'am?

4     A     No, I have not.

5     Q     The prosecutors didn't show it to you in preparing for

6     testimony today?

7     A     I did not see this.

8     Q     Okay.  Do you have a calculator with you, by any chance,

9     Ms. Hernandez ?

10    A     I do not.

11         MR. KASULIS:  May I give the witness a calculator,

12    Your Honor?

13         THE COURT:  I'm not going to have her do

14    calculations on the stand.  We're not going there.

15         MR. KASULIS:  I'll do it from here then, Your Honor.

16    Is that all right?

17         THE COURT:  I don't know what you're doing, but go

18    ahead.

19         MR. KASULIS:  Well, this is what I'm –– I'll do,

20    Your Honor.

21    BY MR. KASULIS:

22    Q     Do you see that $184,192 figure on this 2018 1099?

23          Do you see that, ma'am?

24    A     Yes, I do.

25         MR. KASULIS:   And if you could go back to the

SAM     OCR     RMR     CRR     RPR

V. HERNANDEZ – CROSS – MR. KASULIS

1   first page, Ms. Tegtmeyer.

2   Q    Do you see that $13,241.24 number associated with SMARK

3   Associates, ma'am?

4            Do you see that?

5   A    I do.

6   Q    If you add those numbers together, ma'am, you get

7   $197,433.24.

8            Does that seem right to you?

9   A    If -- I guess.

10  Q    You don't dispute it?

11  A    (No response.)

12  Q    You don't dispute my math, that seems possible to you?

13  A    Okay.

14  Q    Okay.

15           MR. KASULIS:  Can you please re-publish Government

16  Exhibit 2022 [sic] again?

17           Thank you, Your Honor, I appreciate it.

18           (Exhibit published.)

19           MR. KASULIS:  And if we could go back to page 3,

20  Ms. Tegtmeyer, and if you could go to line 21 again.

21           THE COURT:  So, this is --

22  BY MR. KASULIS:

23  Q    If you could read out the figure --

24           THE COURT:  This is 2202.

25           MR. KASULIS:  Yes, Your Honor, 2202.

                SAM    OCR    RMR    CRR    RPR

V. HERNANDEZ – REDIRECT – MS. ZVEROVICH

1      THE COURT:  I think you said 2022.

2      MR. KASULIS:  Apologies, if I did, Your Honor.

3      THE COURT:  I just want to keep the record clear,

4  that's all.

5      MR. KASULIS:  My apologies.  2202.

6      THE COURT:  Yes, go ahead.

7  BY MR. KASULIS:

8  Q    And do you see the figure on line 21 there again, ma'am?

9  A    Yes, I do.

10  Q    Could you read that number out?

11  A    $197,433.

12  Q    So, that's the total of the Other Income 1099 from the

13  Francis Bay 1099 we just saw, plus the SMARK number added

14  together, right?

15  A    Okay.

16  Q    Does that change your view as to whether Mr. Kurland

17  reported the Francis Bay income on this tax return?

18  A    I don't know.

19      MR. KASULIS:  No further questions, Your Honor.

20  Thank you.

21      THE COURT:  All right.

22      Redirect.

23      MS. ZVEROVICH:  Very briefly, Your Honor.

24  REDIRECT EXAMINATION

25  BY MS. ZVEROVICH:

SAM      OCR      RMR      CRR      RPR

V. HERNANDEZ – REDIRECT – MS. ZVEROVICH

1   Q    Now, Ms. Hernandez, we walked through Mr. Kurland 's tax

2   filings for 2017 through 2019 while you were on the stand,

3   correct?

4   A    That is correct.

5   Q    And in each of those years he reported receiving income

6   from Cheddar Capital, LLP [sic], correct?

7   A    That is correct.

8   Q    And for each of those years the entity name, Cheddar

9   Capital, LLP, was listed on the defendant's tax return,

10  correct?

11  A    That is correct.

12  Q    Now, on cross-examination you were asked about the 2018

13  tax return for Mr. Kurland, right?

14  A    Yes.

15  Q    And that tax return also lists -- specifically mentions

16  Cheddar Capital, LLP, correct?

17  A    That is correct.

18  Q    Anywhere on that tax return does it reference Francis Bay

19  or Francis  Bay Holding Company, Inc.?

20  A    No, it does not.

21       MS. ZVEROVICH:  Ms. Hochron, let's publish

22  Government Exhibit 2203 -- 2202, I'm sorry, and go to page 3.

23       (Exhibit published.)

24       MS. ZVEROVICH:  And I'm sorry, I stand corrected.

25  It's actually Cheddar Capital, LLC not LLP.

SAM    OCR    RMR    CRR    RPR

V. HERNANDEZ – REDIRECT – MS. ZVEROVICH

1     So, let's go to page 3.

2  BY MS. ZVEROVICH:

3  Q    Now, Ms. Hernandez, on cross-examination you were asked

4  about line 21 --

5          MS. ZVEROVICH:  It actually might be the prior page,

6  2202.  I'm sorry, Ms. Hochron.

7  BY MS. ZVEROVICH:

8  Q    So, this is Mr. Kurland's 2018 tax return, correct?

9  A    Correct.

10         MS. ZVEROVICH:  Let's go to page 3, line 21.

11         I'm sorry, Your Honor, may I have one moment?

12         THE COURT:  Sure.

13         (Pause.)

14  Q    So, Ms. Hernandez, focusing on line 21 here, you were

15  asked on cross-examination about this $197,433, correct?

16  A    Correct.

17  Q    Now, anywhere on Mr. Kurland's tax return does it say

18  what the source of this income is, in terms of which entity

19  paid this income?

20  A    No, it does not.

21         MS. ZVEROVICH:   Ms. Hochron, let's go to page 26 of

22  2202.

23         (Exhibit published.)

24  BY MS. ZVEROVICH:

25  Q    Ms. Hernandez, what are we looking at here?

                SAM     OCR     RMR     CRR     RPR

V. HERNANDEZ – REDIRECT – MS. ZVEROVICH

1    A    This is a income  -- tax year 2018 "Other Income" type

2    statement.

3    Q    And does it say anywhere on here what the source of this

4    $197,433 is?

5    A    It's from a 1099 Miscellaneous.

6    Q    And does it say which company or companies it's for --

7    from?

8    A    No, it does not.

9          MS. ZVEROVICH:  No further questions.

10         MR. KASULIS:  Your Honor, just two very brief

11   questions, if I may?

12         Thank you, Judge.

13         (Continued on the following page.)

14

15

16

17

18

19

20

21

22

23

24

25

                SAM      OCR      RMR      CRR      RPR

V. HERNANDEZ - RECROSS - MR. KASULIS

1        MR. KASULIS:  Two very brief questions.

2   RECROSS-EXAMINATION

3   BY MR. KASULIS:

4   Q    Do you recall that these tax returns were prepared by a

5   tax preparer, correct?

6   A    Correct.

7   Q    You don't have any idea why he chose to break it down or

8   not break it down, correct?

9   A    I do not know.

10       MR. KASULIS:  Thank you.

11       THE COURT:  Anything else from the Government?

12       MS. ZVEROVICH:  No, your Honor.

13       THE COURT:  Very well, the witness is excused.  You

14   may stand down, ma'am.

15       THE WITNESS:  Thank you.

16       (Whereupon, the witness was excused.)

17       THE COURT:  The Government can call the next

18   witness.

19       MS. ZVEROVICH:  With the Court's permission I would

20   like to offer Government exhibits and read stipulations in

21   evidence.

22       At this time the Government offers Government

23   Exhibit 2103 and 2104, which are stipulations between the

24   parties.

25       THE COURT:  Go ahead.

Rivka Teich CSR RPR RMR FCRR
Official Court Reporter

V. HERNANDEZ - RECROSS - MR. KASULIS

1      MS. ZVEROVICH:  Ms. Hochron, let's publish 2104.  I

2  will read this stipulation in the record.

3      Wire recording stipulation.  It is hereby stipulated

4  and agreed by and among the United States of America by Damian

5  Williams, United States Attorney for the Southern District of

6  New York, Olga Zverovich, Danielle Kudla, Louis Pellegrino,

7  and Brian Morris, Assistant United States Attorneys of

8  counsel, and Jason Kurland, the defendant, with the consent of

9  his attorneys Telemachus Kasulis and Andrew Dillon, Esq.,

10  that;

11      One, Federal Bureau of Investigation, FBI, agents

12  conducted judicially authorized wiretap intercepts of three

13  cellular telephones in this case, the intercepted phones.

14  (516)238-1755, which was assigned to and used by Francis

15  Smookler, the Smookler phone.  (516)315-3045, which was

16  assigned to and used by Frangesco Russo, the Russo phone.  And

17  (917)299-0869, which was assigned to and used by Christopher

18  Chierchio, the Chierchio phone.

19      The Smookler phone and the Russo phone were both

20  intercepted during the period from May 18, 2020 through

21  August 13, 2020.  The Chierchio phone was intercepted during

22  the period from June 16, 2020 through August 13, 2020.

23      The contents of each intercepted communications from

24  the intercepted phones was recorded at the time of the

25  communication, along with the phone numbers placing and

V. HERNANDEZ - RECROSS - MR. KASULIS

1    receiving the call, and the date and time of the

2    communication.  The recorded communications were then

3    transferred to a computer system under the custody and control

4    of the FBI.

5          In total the FBI intercepted approximately 17,275

6    phone conversations and approximately 28,062 SMS text

7    messages.

8          Government Exhibits 701 through 750 as well as all

9    Defendant's Exhibits and any additional Government Exhibits

10   that consistent of audio files derived from the FBI's wiretap

11   intercepts of the intercepted phones, collectively the audio

12   exhibits, are audio files that are true and accurate full

13   recordings or partial clips of communications intercepted by

14   the FBI over the intercepted phones.  Government Exhibits and

15   Defense Exhibits with an exhibit number ending in -- "-T" are

16   transcripts of the corresponding audio exhibits, the

17   transcript exhibits.  For example, the transcript marked

18   Government Exhibit 701-T corresponds to the audio recording

19   marked Government Exhibit 701.  Each transcript exhibit

20   contains a cover page, and truly and accurately reflects the

21   following information:

22          A, the date of the communication; B, the time of the

23   commencement of the recorded communication; C the wiretapped

24   phone number; D the session ID; and E, the participants in the

25   communication.

V. HERNANDEZ – RECROSS – MR. KASULIS

1          Six, the transcribers who listened to each audio

2     exhibit identified how many speakers were speaking on each

3     audio exhibit and noted if an unidentified speaker was

4     speaking at any given time.

5          Seven, for any audio exhibit admitted at trial, the

6     audio exhibit will be admitted with it's corresponding

7     transcript exhibit.

8          Your Honor, pursuant to this stipulation as well as

9     Federal Rule of evidence 801(d)(2), the Government offers

10    Government Exhibits 720, 728, 731, 737, and 740 through 748,

11    as well always the corresponding transcripts 720-T, 728-T,

12    731-T, 737-T, 740-T through 748-T.

13         THE COURT:  Any objection?

14         MR. KASULIS:  No, your Honor.

15         THE COURT:  720, 728, 731, 737, 740 through 748 are

16    received in evidence, as are the corresponding transcripts for

17    those exhibits.

18         (Government Exhibit 720, 728, 731, 737, 740 – 748,

19    was received in evidence.)

20         (Government Exhibit 720-T, 728-T, 731-T, 737-T,

21    740-T – 748-T, was received in evidence.)

22         MS. ZVEROVICH:  Thank you, your Honor.

23         The Government calls Frangesco Russo.

24         (Witness takes the witness stand.)

25         THE COURTROOM DEPUTY:  Please raise your right hand.

Rivka Teich CSR RPR RMR FCRR
Official Court Reporter

F. RUSSO – DIRECT – MS. ZVEROVICH

1          (Witness sworn.)

2          THE WITNESS:  I do.

3          THE COURTROOM DEPUTY:  Have a seat.  State and spell

4    your full name for the record.

5          THE WITNESS:  Frangesco Russo, F-R-A-N-G-E-S-C-O,

6    R-U-S-S-O.

7          THE COURT:  You may inquire.

8          MS. ZVEROVICH:  Thank you.

9    FRANGESCO RUSSO, called as a witness, having been first duly

10   sworn/affirmed, was examined and testified as follows:

11   DIRECT EXAMINATION

12   BY MS. ZVEROVICH:

13   Q    Good morning, Mr. Russo.

14   A    Good morning.

15   Q    How old are you?

16   A    Forty years old.

17   Q    Where did you grow up?

18   A    I grew up in Old Brookville, Long Island.

19   Q    How far did you go in school?

20   A    First year of college.

21   Q    What did you study in college?

22   A    Business entrepreneuring (sic).

23   Q    Where do you live now?

24   A    Roslyn Harbor, Long Island.

25   Q    How long have you lived on Long Island?

F. RUSSO - DIRECT - MS. ZVEROVICH

1  A    Most of my life.  For about a year and a half I moved to

2  Montana.

3  Q    Can you briefly describe your work history for the jury?

4  A    Yes.  Had a job most of my life, since 13 years old

5  worked in delis, washing dishes, restaurants being a bus boy,

6  being a waiter, being a bartender for a little bit.

7          Early 2000s I got into the mortgage industry, was a

8  salesman and broker in the mortgage industry.  From there I

9  went into the car sales business.  And from there I was

10  offered a job in medical sales, where I provided medical

11  equipment, medical services and testing to various doctors and

12  hospitals and such.  From there I went to ADP providing

13  payroll services, selling health insurance.  From there I went

14  into the Merchant Cash Advance industry around 2015.  And from

15  there, for a short period of time, I was in the PPE business

16  providing protective equipment to hospitals and doctors in

17  various states around the country.

18  Q    Mr. Russo, were you arrested in this case?

19  A    Yes, I was.

20  Q    When?

21  A    August 18, 2020.

22  Q    Have you pleaded guilty to federal crimes?

23  A    Yes, I have.

24  Q    What crimes did you plead guilty to?

25  A    I pleaded guilty to wire fraud, conspiracy to wire fraud,

F. RUSSO – DIRECT – MS. ZVEROVICH

1  money laundering, conspiracy to money laundering, and

2  extortion.

3  Q    Did you, in fact, commit all of those crimes?

4  A    Yes, I did.

5  Q    With respect to the wire fraud and money laundering, did

6  you commit those crimes by yourself or with other people?

7  A    With other people.

8  Q    Do you see anybody in the courtroom here today that you

9  committed those crimes with?

10  A    Yes, I do.

11  Q    Who do you see?

12  A    Jason Kurland.

13  Q    Please identify Mr. Kurland by where he's sitting and an

14  article of clothing he's wearing?

15  A    Far table, wearing a gray suit.

16          THE COURT:  Let the record indicate that the witness

17  identified the defendant.

18  BY MS. ZVEROVICH:

19  Q    By what name do you usually refer to the defendant?

20  A    Either Jason or Jay.

21  Q    How do you know the defendant?

22  A    He was my business partner.

23  Q    Where was he your business partner?

24  A    In the Merchant Cash Advance industry, as well as PPE

25  space.

F. RUSSO – DIRECT – MS. ZVEROVICH

1    Q      In brief, what is the Merchant Cash Advance industry?

2    A      The Merchant Cash Advance industry is basically where a

3    direct funding company provides funding to a business that

4    would not be able to obtain a traditional loan from a bank.

5    Q      In brief, what is the PPE space?

6    A      The PPE space basically provides face masks, gloves,

7    surgical gowns to various customers that require protective

8    equipment.

9    Q      About how long was the defendant your business partner?

10   A      Since around 2015.

11   Q      Approximately through when?

12   A      Up until the moment that I was arrested.

13   Q      In 2020?

14   A      Yes.

15   Q      During this time, did the defendant have any other

16   profession or occupation?

17   A      Yes, he did.

18   Q      What was that?

19   A      He was a lawyer, as well as a partner at a large long

20   firm on Long Island.

21   Q      How did the defendant refer to himself?

22   A      He referred to himself as the Lottery Lawyer.

23   Q      What types of clients did he have?

24   A      He represented lottery winners.

25   Q      We will come back to this and discuss this in more

F. RUSSO - DIRECT - MS. ZVEROVICH

1  detail; but in brief, what crimes did you commit with the

2  defendant?

3  A    I committed fraud.  I committed money laundering with the

4  client (sic).

5  Q    How did you commit those crimes with him?

6  A    We were business partners for a long time.  I was aware

7  that Jason Kurland was basically not disclosing his percentage

8  of ownership and fees that he was collecting to his actual

9  clients.

10 Q    What did the clients have to do with your business?

11 A    They were major investors in various businesses that we

12 operated.

13 Q    In total, can you estimate how much Mr. Kurland's clients

14 ended up investing in your businesses?

15 A    I would say north of $80 million.

16 Q    Generally speaking, what happened with all that money?

17 A    We stole some, and we lost all of it.

18 Q    You also mentioned that he, that the defendant, was

19 involved in the PPE space with you.  Did you commit any fraud

20 in that space?

21 A    Yes.

22 Q    What was that?

23 A    There was a few investments that were made into the PPE

24 space.  One in particular, Jason Kurland explained to me that

25 he basically took the money from one of his client's accounts

Rivka Teich CSR RPR RMR FCRR
Official Court Reporter

F. RUSSO – DIRECT – MS. ZVEROVICH

1   without even disclosing that he actually took the money from

2   that account.

3   Q    How much money was that?

4   A    That tranche was for $19.5 million.

5   Q    Mr. Russo, have you been sentenced for the crimes that

6   you pled guilty to?

7   A    I have not.

8   Q    Did you plead guilty in this case pursuant to any kind of

9   agreement with the Government?

10  A    Yes, I did.

11  Q    What kind of agreement?

12  A    I have a cooperating witness agreement.

13  Q    As part of your cooperation with the Government, were you

14  required to disclose all crimes that you ever committed in

15  your life?

16  A    Yes.

17  Q    Did that include crimes for which you hadn't been caught?

18  A    Yes.

19  Q    I'd like to walk through your background and your prior

20  crimes.

21          At some point, Mr. Russo, did you learn that certain

22  members of your family were involved with criminal activity?

23  A    Yes.

24  Q    How did you learn that?

25  A    At around 11 years old my father was arrested.  I learned

F. RUSSO – DIRECT – MS. ZVEROVICH

1  from newspapers and news that he was arrested.

2  Q    Without going into detail, what did you learn about your

3  family?

4  A    That at the time my family had alleged involvement with

5  organized crime.

6  Q    Were members of your family convicted of being involved

7  with organized crime?

8  A    Yes.

9  Q    Were you ever personally involved in any organized crime?

10 A    No.

11 Q    Is your family name Russo associated with organized crime

12 in certain circles?

13 A    Yes.

14 Q    Have you ever used your family name to threaten people?

15 A    Yes.

16 Q    Did you ever physically harm anybody?

17 A    No.

18 Q    Going back to your childhood, did you commit any

19 misconduct as you were growing up?

20 A    Yes, I did.

21 Q    What was that?

22 A    Well, at an early age I used my brother's license to buy

23 cigarettes, obviously I wasn't of age.

24         There was a time when I was in high school and my

25 license I believe was suspended at the time.  I used my

F. RUSSO – DIRECT – MS. ZVEROVICH

1  brother's information, again, to avoid getting a ticket with

2  the police officer that pulled me over.

3         I experimented with some drugs in high school.  I

4  had sold marijuana in high school to cover any cost of my

5  personal use.

6         I was arrested in the early 2000s.

7  Q    Before we get to the arrest, did you have any involvement

8  with counterfeit currency?

9  A    Yes.

10 Q    Around tenth or 11 grade, I made a counterfeit 20-dollar

11 bill.

12 Q    Did you use that bill?

13 A    No.

14 Q    Did you make any other counterfeit money?

15 A    No.  It was basically for bragging rights that I thought

16 I could make a counterfeit bill.

17 Q    When was that?

18 A    It was either tenth or 11 grade, I can't remember the

19 actual time.

20 Q    You mentioned a prior arrest, when was that?

21 A    Early 2000s.

22 Q    Can you describe what happened?

23 A    Yes.  So I was working in the mortgage industry at the

24 time.  One night a van with a few gentlemen came to the office

25 and basically advertising that they had the stereo equipment

F. RUSSO - DIRECT - MS. ZVEROVICH

1    that was half price from what the Bose system was going for at

2    the time, which was the go-to system to get a home theater

3    system.  A few of us in the office paid a few thousand dollars

4    each for various equipment.

5           We learned that night at home after doing research

6    that the equipment was bogus.  We basically got scammed and

7    that this scam was going on around town.

8           The next day the van came back to try to, I guess,

9    get additional sales out of the office because it was so easy

10   the day before.  A bunch of us in the office surrounded the

11   van, stole equipment out of the van to try to make up for what

12   we felt we got scammed the day before.

13          That night the van operators went to the police, I

14   got arrested.  And the judge then sealed the case.

15   Q    This was in the early 2000s?

16   A    Yes.

17   Q    Do you know how that case was resolve?  Did you plead

18   guilty?

19   A    I don't remember if I actually pled guilty.  I signed a

20   statement explaining exactly what transpired in order for me

21   to, I guess, get arrested.  The judge agreed to seal the case.

22   Q    Were you truthful in that statement to the police?

23   A    Yes.

24   Q    Did you spend any time in jail on that case from the

25   early 2000s?

F. RUSSO – DIRECT – MS. ZVEROVICH

1    A    No.

2    Q    You also mentioned drugs.  During your life have you used

3    illegal drugs?

4    A    Yes, I have.

5              (Continued on next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

RUSSO – DIRECT – ZVEROVICH

1    DIRECT EXAMINATION (Continued)

2    BY MS. ZVEROVICH:

3    Q    Which drugs?

4    A    In high school, again, around tenth or 11th grade -- I

5    think it was around 11th grade -- I experimented with

6    mushrooms.  I also tried marijuana.

7    Q    And have you used mushrooms since high school?

8    A    No.

9    Q    How about marijuana?

10   A    Yes.

11   Q    How long did you use marijuana?

12   A    Right up until the moment when I was arrested.  I

13   actually had a medical marijuana license from the State of New

14   York, so I was an avid marijuana user.

15   Q    And when -- approximately when did you get that license?

16   A    A few years before I actually got arrested.

17   Q    Now, have you ever sold drugs?

18   A    Yes.

19   Q    When was that?

20   A    Again, in high school, when I started smoking marijuana,

21   the cost started to get a little bit more than what I could

22   afford, so I tried to sell marijuana to cover the cost of me

23   smoking, basically.

24   Q    Have you sold marijuana since high school?

25   A    No.

RUSSO – DIRECT – ZVEROVICH

1    Q    And aside from marijuana, have you ever sealed any other

2    drugs?

3    A    No.

4    Q    Prior to your arrest, did you drink alcohol?

5    A    Yes.

6    Q    How much did you drink?

7    A    Daily.

8    Q    Now, after you were arrested in this case in August of

9    2020, did you spend time in jail?

10   A    Yes, I did.

11   Q    Approximately how long were you in jail?

12   A    Twenty-one months.

13   Q    And while you were in jail, did you commit any

14   misconduct?

15   A    Yes, I did.

16   Q    What was that?

17   A    I rented various cell phones from different inmates

18   within the unit that I was in.

19   Q    And did you continue to do that even after you began

20   meeting with the Government in this case to cooperate?

21   A    Yes, I did.

22   Q    Why was that?  Why did you do that?

23   A    Because I was in the unit with 110 other inmates.  It was

24   only four actual working phones.  It was very difficult to get

25   on the phone.  So for the most part that was the only way for

RUSSO – DIRECT – ZVEROVICH

1  me to see and speak to my daughters and my wife.

2  Q    Did you use those phones for anything besides speaking

3  with your family?

4  A    No.

5  Q    Now, after your arrest in this case, were you interviewed

6  by pretrial services?

7  A    Yes, I was.

8  Q    What is pretrial services?

9  A    At the time, I wasn't sure, but knowing now, pretrial

10  services was basically an interview to determine how much, if

11  at all, I was going to be set for bail, basically, and what

12  was going to be used for trial.

13  Q    And during that interview, did you accurately disclose

14  all of your assets to pretrial services?

15  A    No, I didn't.

16  Q    Why not?

17  A    I was confused.  I was arrested very early in the

18  morning.  I was never arrested at this magnitude where FBI

19  came and surrounded my house and dragged me to the courthouse,

20  and when I did the interview, it was in the height of the

21  pandemic, my lawyer wasn't present, I was doing a three-way

22  call with my lawyer and pretrial services, and when they were

23  asking questions, they were asking questions which I believed

24  was based off of my personal assets and personal moneys that

25  were in bank accounts.  I didn't know whether I should answer

RUSSO – DIRECT – ZVEROVICH

1  what moneys I had in other bank accounts that were associated

2  with LLCs.  So when I answered, I was trying to answer based

3  off of what I had personally in the bank account or what I had

4  personally under my name.  I answered inaccurate.

5  Q    Were you trying to hide your assets from the Court?

6  A    I was not.

7  Q    Later on in your case, did you file any financial

8  affidavit with the Court?

9  A    Yes, I did.

10 Q    And in that affidavit, did you accurately disclose all of

11 your assets?

12 A    Yes, I did.

13 Q    Now, during the initial interview after your arrest with

14 pretrial services, were you also asked about substance abuse?

15 A    Yes.

16 Q    And what did you report?

17 A    No.

18 Q    Why did you report no?

19 A    Because at the time, I had a medical marijuana license

20 and I didn't see marijuana as a substance abuse.  So when they

21 asked me if I had substance abuse, I thought I was answering

22 accurate and I stated no.

23 Q    Since your arrest in August of 2020, have you used any

24 marijuana or any other controlled substances?

25 A    I have not.

RUSSO – DIRECT – ZVEROVICH

1    Q    Now, during the course of your case, did your lawyer make

2    any bail motions for you?

3    A    Yes.

4    Q    Was that once or more than once?

5    A    More than once.

6    Q    And with respect to your last application for bail, did

7    the Government oppose or consent to your bail?

8    A    They consented.

9    Q    And were you, in fact, released on bail?

10   A    Yes, I was.

11   Q    Approximately when?

12   A    End of May.  I don't remember the actual date.

13   Q    Of which year?

14   A    2020.

15   Q    2000?

16   A    2022, sorry.

17   Q    So of this year?

18   A    Yes.

19   Q    And what bail conditions did the judge impose in

20   releasing you on bail?

21   A    The judge imposed a $1.5 million bond that my brother, my

22   mother, and my wife signed to.  They also imposed a $50,000

23   cash bond of which my mother provided.  My mother also signed

24   a house that she has in Colorado, and it also required me to

25   have travel restrictions with an ankle bracelet that came with

*AVERY N. ARMSTRONG, RPR*
*OFFICIAL COURT REPORTER*

RUSSO – DIRECT – ZVEROVICH

1    a curfew from 10:00 p.m. to 7:00 a.m.

2    Q    Now, at the time you were released on bay bail, were you

3    already meeting with the Government as part of your efforts to

4    cooperate?

5    A    Yes, I was.

6    Q    And had you pleaded guilty yet to your cooperation

7    agreement?

8    A    No, I did not.

9    Q    And since you've been released in May of this year, have

10   you been fully compliant with all of your bail conditions?

11   A    Yes, I have.

12   Q    Now, I'd like to discuss your cooperation agreement with

13   the Government.

14          MS. ZVEROVICH:  Ms. Hochron, can we publish

15   Government Exhibit 802 for identification.

16   Q    Mr. Russo, do you recognize this document?

17   A    Yes, I do.

18   Q    What is it?

19   A    This is my cooperating agreement with the Government.

20          MS. ZVEROVICH:  Your Honor, the Government offers

21   Government Exhibit 802.

22          MR. KASULIS:  No objection, Your Honor.

23          THE COURT:  All right.  Government Exhibit 802

24   received in evidence and published to the jury.

25          (Government Exhibit 802, was received in evidence.)

                        *AVERY N. ARMSTRONG, RPR*
                        *OFFICIAL COURT REPORTER*

RUSSO – DIRECT – ZVEROVICH

1          MS. ZVEROVICH:  Ms. Hochron, can we publish to the

2    jury.

3          THE COURT:  Yes.

4          MS. ZVEROVICH:  Thank you, Your Honor.

5          (Exhibit published.)

6    Q    Mr. Russo, so this is your cooperation agreement with the

7    Government?

8    A    Yes, it is.

9    Q    And what is the date on this?

10   A    May 18th, 2020.

11   Q    And let's --

12         THE COURT:  I'm sorry.

13         THE WITNESS:  2022.  I apologize.

14         MS. ZVEROVICH:  Ms. Hochron, let's go to the last

15   page, Page 9.

16   Q    Mr. Russo, is that your signature on the bottom of the

17   agreement?

18   A    Yes, it is.

19   Q    Now, does this agreement contain all of the terms and

20   conditions of your agreement with the Government in this case?

21   A    Yes, it does.

22   Q    Has anybody promised you anything that is not in this

23   agreement?

24   A    No.

25   Q    Why did you decide to cooperate with the Government?

*AVERY N. ARMSTRONG, RPR*
*OFFICIAL COURT REPORTER*

RUSSO – DIRECT – ZVEROVICH

1  A    I feel like there's a chance to really right the wrongs

2  that took place, and I'm hoping that this will allow me to get

3  a greatly reduced sentence so I can really stay home with my

4  wife and kids.

5  Q    Now, during the course of your cooperation, did you meet

6  with the Government?

7  A    Yes, I have.

8  Q    How many times?

9  A    A lot of times.  I don't know the exact number, but quite

10  a few.

11  Q    And generally, who attended those meetings?

12  A    My lawyer, US Attorneys, and FBI agents.

13  Q    And sometimes did you have those meetings without your

14  lawyer present?

15  A    Yes.

16  Q    Now, Mr. Russo, what is your understanding of what this

17  cooperation agreement requires you to do?

18  A    It requires me to basically meet and have these proffer

19  agreements as many times as needed in order to basically

20  understand what took place, it requires me to tell the truth,

21  and it requires me not to break any laws.

22  Q    And if you do everything you're supposed to do under this

23  agreement, what is your understanding of what the Government

24  will do?

25  A    If I follow this agreement and don't break the agreement,

*AVERY N. ARMSTRONG, RPR*
*OFFICIAL COURT REPORTER*

RUSSO – DIRECT – ZVEROVICH

1  I believe that the Government will give me a letter in which

2  the judge will take into consideration at the time of my

3  sentencing.

4  Q    And what is that letter called?

5  A    A 5K1 letter, I believe.

6  Q    And what is your understanding of what information would

7  be in that letter if the Government writes one?

8  A    It would just basically state all the crimes that I

9  committed in my life up to date.  My participation within the

10  cooperating agreement as it stands.

11  Q    And who is the 5K1 letter sent to?

12  A    The judge, the Court.

13  Q    And who will decide your sentence in this case?

14  A    The judge.

15  Q    And what is your understanding about whether or not the

16  Government will be recommending any specific sentence in your

17  case?

18  A    As far as I'm aware, they're not going to recommend any

19  type of sentence in my case.

20  Q    And does the 5K1 letter require the judge to give you a

21  reduced sentence?

22  A    No, it doesn't.

23  Q    If the Government ends up writing a 5K1 letter for you,

24  what is the least amount of time that the judge can sentence

25  you to?

RUSSO - DIRECT - ZVEROVICH

1   A    If the judge sentences me to time served, I served 21

2   months so far.

3   Q    And even if you get the 5K1 letter, what is the maximum

4   sense sentence that the judge could impose on you?

5   A    The judge be could impose up to 140 years.

6   Q    That's the maximum sentence you're facing?

7   A    Yes.

8   Q    And sitting here now, do you have any idea what sentence

9   you're going to get?

10  A    No.

11  Q    And what is your understanding of what you're required to

12  do to get a 5K1 letter?

13  A    Again, I'm required to simply tell the truth, attend the

14  meetings at a -- that are needed to understand what took

15  place, and not break any laws additionally.

16  Q    And what is your understanding about whether the outcome

17  of this trial affects whether or not you get a 5K letter?

18  A    It does not affect.

19  Q    Now, switching gears.

20        Mr. Russo, you testified earlier that you worked in

21  something called the merchant cash advance industry; is that

22  right?

23  A    Yes.

24  Q    Approximately how long did you work in that industry?

25  A    From 2015 up until the day that I was arrested.

*AVERY N. ARMSTRONG, RPR*
*OFFICIAL COURT REPORTER*

RUSSO - DIRECT - ZVEROVICH

1  Q   Now, I'd like to just ask you a few general questions

2  about the merchant cash advance industry based on your

3  experience in it.

4        First, is merchant cash advance abbreviated as MCA?

5  A   Yes, it is.

6  Q   And what is a merchant cash advance or an MCA?

7  A   A merchant cash advance is basically a funding from one

8  company to another that provides funding to that business

9  where that business would not be able to acquire that type of

10  funding from any other avenue.

11  Q   You mean like if it could not acquire traditional bank

12  loan?

13  A   Yeah, traditional bank loan, line of credit, anything of

14  that sort.

15  Q   And how would you describe the characteristics of a

16  typical merchant cash advance?

17  A   They're very risky, they're expensive, and they're short

18  term, where you have to pay them back in a short amount of

19  time.

20  Q   And when you say expensive, what do you mean by that?

21  A   So a merchant cash advance is basically based off a money

22  factor, but it's very similar to an interest right.  So when

23  we provided a merchant cash advance and we -- associated with

24  a 150 factor, it's basically a 50 percent interest rate.  So

25  when you fund somebody a 10,000-dollar advance, they would pay

RUSSO – DIRECT – ZVEROVICH

1   you back a total of $15,000.

2   Q    And typically, how does the small business pay back the

3   cash advance?

4   A    A merchant cash advance is basically the purchase of

5   their future receivables.  So they pay us back with the

6   receivables from that business, that day to day collections of

7   revenue, basically.

8   Q    Now, based on your experience, what are some of the

9   reasons that a business might apply for a merchant cash

10  advance, as opposed to getting a loan from a bank?

11  A    A merchant cash advance requires no collateral, doesn't

12  report on any type of credit, and basically allows for a much

13  more acceptance of the volatility of the bank account of that

14  business.  So where a business loan would have a lot more

15  stipulations, a merchant cash advance is much more easier to

16  acquire by an actual business.

17  Q    Now, you mentioned that merchant cash advances are very

18  risky.

19       Why is that?

20  A    Again, because there's no collateral associated with it,

21  it doesn't report on the credit, and the underwriting is much

22  less than what's involved for a bank loan.  We simply take a

23  number of monthly bank statements from the business, determine

24  how much they're set to be receiving in their future

25  receivables, and come up with an amount and a term that would

*AVERY N. ARMSTRONG, RPR*
*OFFICIAL COURT REPORTER*

RUSSO – DIRECT – ZVEROVICH

1  justify their merchant cash advance.  The underwriting would

2  take 24 to 28 hours to get approved and funded, where a bank

3  would take weeks, months, and may not get funded at all or

4  approved at all.

5  Q    Now, at a basically basic level, who are the participants

6  in an MCA transaction?

7  A    It would be the business looking for the funding, it

8  would be a broker connecting that business with a direct

9  funder, and it would be a direct funder.

10 Q    And how does a broker in the MCA industry make money?

11 A    They collect a commission based off the businesses that

12 they find and matching them to the direct funders.

13 Q    And how about direct -- well, first of all, what are

14 direct funders?

15 A    A direct funder basically operates almost like a bank

16 where they have the capital in order to provide to the

17 businesses and they fund directly to the business.

18 Q    And how does a direct funder make money in this industry?

19 A    After paying out the commissions to the broker, they

20 collect everything else that they charge the actual business

21 itself.

22 Q    Mr. Russo, at some point, did you start your own company

23 in the MCA industry?

24 A    Yes.

25 Q    Approximately when?

RUSSO – DIRECT – ZVEROVICH

1   A    Around 2015.  I'm not sure the actual month.

2   Q    And what was the name of that company?

3   A    It was Loft Associates, and we were doing business as

4   Cheddar Express.

5   Q    What type of company was Cheddar Express?

6   A    A brokerage.

7   Q    In the MCA space?

8   A    In the MCA space.

9   Q    And what did Cheddar Express do as a broker in the MCA

10  space?

11  A    It basically contacted businesses around the country,

12  found businesses that were looking for MCA type of fundings,

13  and matched them to various funding companies that fit well,

14  basically.

15  Q    Now, did you start this company by yourself or did you

16  have business partners?

17  A    I had business partners.

18  Q    How many business partners?

19  A    I had four business partners.  We were five partners

20  total.

21  Q    And who were your business partners in Cheddar Express?

22  A    At the time, it was myself, Frank Smookler, Anthony

23  Lodati, Kevin Szypula, and Jason Kurland.

24  Q    And did this group of five partners stay the same or was

25  there a change at some point?

*AVERY N. ARMSTRONG, RPR*
*OFFICIAL COURT REPORTER*

RUSSO – DIRECT – ZVEROVICH

1   A     There was a change at some point.

2   Q     What was that?

3   A     A few month after we started, Kevin Szypula no longer

4   wanted to be in the space.  He had already owned a company and

5   was doing well with that company, so we basically very quickly

6   replaced him with a new partner, Brian Mastroberti.

7   Q     All right.  Mr. Russo, we will show you on the screen

8   what's been marked for identification as Government Exhibits

9   1, 2, 3, 5, and 6.

10          Do you recognize those individuals?

11  A     Yes, I do.

12  Q     Who are they?

13  A     They are my business partners in the various entities

14  within the merchant cash advance space.

15          MS. ZVEROVICH:  Your Honor, the Government offers

16  Government Exhibits 1, 2, 3, 5, and 6.

17          MR. KASULIS:  No objection, Your Honor.

18          THE COURT:  All right.  Government Exhibits 1, 2, 3,

19  5, and 6 are received in evidence and may be published to the

20  jury.

21          (Government Exhibit 1, 2, 3, 5, and 6, were received

22  in evidence.)

23          MS. ZVEROVICH:  And Your Honor, we'd like to ask the

24  Court's permission to publish them on the white board by the

25  jury box.

RUSSO - DIRECT - ZVEROVICH

1    THE COURT:  You may proceed.

2    MS. ZVEROVICH:  Thank you.

3    (Exhibit published.)

4  Q   Mr. Russo, I'd like to walk through these individuals one

5  by one, have you identify each one, and I'll ask you a few

6  questions.

7    MS. ZVEROVICH:  Now let's first publish Government

8  Exhibit 3.

9    (Exhibit published.)

10    THE COURT:   Three.

11  Q   Who is this?

12  A   Frank Smookler.

13  Q   And in 2015, when you started Cheddar Express, how long

14  had you known Frank Smookler?

15  A   For quite some time.  I met him when I was probably 14,

16  15.  He was my neighbor in Old Brookville, Long Island.

17  Q   And what did Mr. Smookler do for a living in 2015?

18  A   He owned a stock company.

19  Q   All right.

20    MS. ZVEROVICH:  Let's now publish Government

21  Exhibit 2.

22    (Exhibit published.)

23  Q   Who is that?

24  A   This is Anthony Lodati.

25  Q   And in 2015, how long had you known Mr. Lodati?

RUSSO – DIRECT – ZVEROVICH

1   A     I met Anthony Lodati a few years before we became

2   business partners.

3   Q     And how did you meet him?

4   A     He was Frank Smookler's partner in the stock companies.

5          MS. ZVEROVICH:  Let's now publish Government

6   Exhibit 6.

7          (Exhibit published.)

8   Q     Who is this?

9   A     Brian Mastroberti.

10  Q     In 2015 when you began Cheddar Express, how long had you

11  known Mr. Mastroberti?

12  A     I met Mr. Mastroberti a few weeks before we became

13  business partners.

14  Q     And how did you meet him?

15  A     Through Frank Smookler.

16  Q     And what does he do for a living?

17  A     He owned an elevator company and he was a lawyer, as

18  well.

19         MS. ZVEROVICH:  Let's publish Government Exhibit 5.

20         (Exhibit published.)

21  Q     Who is that?

22  A     Myself.

23         MS. ZVEROVICH:  And now let's publish Government

24  Exhibit 1.

25         (Exhibit published.)

*AVERY N. ARMSTRONG, RPR*
*OFFICIAL COURT REPORTER*

RUSSO – DIRECT – ZVEROVICH

1  Q    Who is that?

2  A    Jason Kurland.

3  Q    In 2015 when the five of you formed Cheddar Express, how

4  long had you known Mr. Kurland?

5  A    I met Mr. Kurland a few months before we became business

6  partners.

7  Q    And how did you meet him?

8  A    He was Frank Smookler's neighbor, so I met him at various

9  pool parties, barbecues at Frank Smookler's house in Dix

10 Hills, Long Island.

11 Q    What did Mr. Kurland do for a living?

12 A    He was a lawyer?

13 Q    When you met him, where did he work?

14 A    When I met him, he was a partner at a very large law firm

15 called, I believe, Certilman Balin.

16 Q    Now, how did the idea to create Cheddar Express come

17 about?

18 A    The five original partners were at Frank Smookler's house

19 in the basement having a few beers and we were discussing this

20 emerging industry that we basically had a few friends that had

21 confirmed that this business was very lucrative and thriving,

22 basically, and we all showed an interest and wanted to,

23 basically, enter the space.

24 Q    Who was at this meeting in Smookler's basement?

25 A    Myself, Frank Smookler, Anthony Lodati, Kevin Szypula,

*AVERY N. ARMSTRONG, RPR*
*OFFICIAL COURT REPORTER*

RUSSO – DIRECT – ZVEROVICH

1  and Jason Kurland.

2  Q    And what, if anything, did you discuss about how you

3  would raise capital for this new business?

4  A    We discussed that between the partners, we would

5  basically use our circle, our friends and family, to raise

6  capital through investments, and that we wanted to become

7  direct funders at some point.

8  Q    And what, if anything, did the defendant say at this

9  meeting?

10  A    Initially, he was concerned about the industry.  Being

11  that this was new to all of us, he wanted to confirm that the

12  industry was what we basically thought it was, and that we

13  wanted to wait until we had an education on the business,

14  basically, we knew what we were doing.  So that's why we

15  formed a brokerage first before we formed a direct funding

16  company.

17  Q    Now, did you discuss at that time how the defendant would

18  be raising money for the business?

19  A    Yes.  It was known that, obviously, he was a lottery

20  lawyer and that he could potentially raise a lot of money

21  through his clients.

22  Q    Now, did you have any prior experience in the MCA

23  industry?

24  A    No.

25  Q    And as far as you know, did Mr. Kurland have prior

RUSSO – DIRECT – ZVEROVICH

1    experience in the MCA industry?

2    A    No.

3    Q    And how about the other three partners?

4    A    No.  Nobody had prior experience within the merchant cash

5    advance industry.

6    Q    And did you, the defendant, and others, in fact, form

7    Cheddar Express?

8    A    Yes.

9    Q    Who came up with the name Cheddar?

10   A    I think Frank Smookler came up with the name Cheddar.

11   Q    Do you know what it means or stands for?

12   A    Cheddar refers to money, basically.

13   Q    Did Cheddar Express have a physical office location?

14   A    Yes.

15   Q    Where was that?

16   A    Initially, we had temporary office space in Melville,

17   Long Island, and then we moved to a more permanent space in

18   Syosset, New York, Long Island.

19   Q    And once Cheddar Express was up and running, how did it

20   operate?

21   A    Cheddar Express was basically a brokerage.  We found

22   businesses and matched them to their matching lenders or

23   funding companies.

24   Q    And how did Cheddar Express make money?

25   A    It basically got a commission based off of the total

*AVERY N. ARMSTRONG, RPR*
*OFFICIAL COURT REPORTER*

RUSSO – DIRECT – ZVEROVICH

1   amount of money that was charged to the businesses from each

2   particular deal.

3   Q    And after you started Cheddar Express, did you have any

4   goal in mind?

5   A    Yes.  The goal was always to become a direct funder.

6   Q    And why did you want to become a direct funder as opposed

7   to becoming a broker?

8   A    Because it was known right from the beginning, a direct

9   funding company made the majority of the profits in the

10  industry.  So when entering the space, it was always with the

11  intention that we wanted to become a direct funder at some

12  point.

13  Q    Why did you not start a direct funding company from the

14  very beginning then?

15  A    Nobody knew the industry.  We didn't know what it was.

16  So in order to get a quick education, the easiest way to do it

17  was to basically form a brokerage which didn't require

18  anything more than a telephone and leads, and that was what we

19  did.

20  Q    Did there come a time when you and others did start a

21  funding company in the MCA space?

22  A    Yes.

23  Q    Approximately when?

24  A    Shortly after we formed the entity for the brokerage, we

25  formed the entity for the direct funding company, but we

*AVERY N. ARMSTRONG, RPR*
*OFFICIAL COURT REPORTER*

RUSSO - DIRECT - ZVEROVICH

1  didn't start rasing capital for the funding company, I would

2  say, probably a year later.

3  Q    And what was the name of the funding company you opened?

4  A    Cheddar Capital.

5  Q    Who were the partners of Cheddar Capital?

6  A    Myself, Frank Smookler, Anthony Lodati, Brian

7  Mastroberti, and Jason Kurland.

8  Q    So the same five partners as for Cheddar Express?

9  A    Yes.

10        MS. ZVEROVICH:  Ms. Hochron, let's please publish

11  Government Exhibit 903 in evidence.

12        Mr. Russo, do you recognize this document?

13  A    Yes, I do.

14  Q    What is it?

15  A    This is the articles of organization for Cheddar Capital

16  LLC.

17        MS. ZVEROVICH:  And let's go to Page 2.

18  Q    What is the title of the document?

19  A    The title of the document the articles of organization

20  for Cheddar Capital LLC.

21  Q    And who is listed as the organizer of Cheddar Capital

22  LLC?

23  A    Jason Kurland.

24  Q    And what is the date listed above the defendant's name?

25  A    The tenth of February, 2015.

*AVERY N. ARMSTRONG, RPR*
*OFFICIAL COURT REPORTER*

RUSSO – DIRECT – ZVEROVICH

1  Q    Now, after Cheddar Capital was formed, what happened with

2  Cheddar Express?

3  A    It maintained being a brokerage, finding new deals to

4  broker out, basically.

5  Q    And did you have an office space for Cheddar Capital?

6  A    Yes.

7        MS. ZVEROVICH:  We can take that down Ms. Hochron.

8  Q    Now, did there come a time when you closed down Cheddar

9  Express?

10 A    Yes.

11 Q    Why did you -- and that's the broker company, Cheddar

12 Express?

13 A    Yeah, the brokerage.

14 Q    And why did you close down Cheddar Express?

15 A    At some point, we got bad reviews on the internet.  After

16 trying in vain to basically get these bad reviews off, we

17 basically just down that entity and opened up a new entity to

18 maintain the brokerage.

19 Q    What new entity did you open to replace Cheddar Express?

20 A    We opened up SMARK Associates that was doing business as

21 Keep You Funded.

22 Q    And was SMARK Associates another broker company in the

23 MCA space?

24 A    Yes, it was.

25 Q    Who created SMARK?

*AVERY N. ARMSTRONG, RPR*
*OFFICIAL COURT REPORTER*

RUSSO – DIRECT – ZVEROVICH

1  A    Jason Kurland.

2  Q    And who were the partners of SMARK?

3  A    It was the five of us.  It was myself, Frank Smookler,

4  Anthony Lodati, Brian Mastroberti, and Jason Kurland.

5  Q    And did all five partners have equal percentage ownership

6  or different percentages?

7  A    In the brokerage it was equal percentages.

8  Q    Now, what did SMARK stand for?

9  A    It's basically the initials of our last name, except

10 Anthony which we needed a vowel, so we used his first name or

11 the first initial of his first name.

12 Q    What does the S stand for?

13 A    The S stands for Smookler.

14 Q    How about M?

15 A    Mastroberti.

16 Q    A?

17 A    Anthony for Anthony Lodati.

18 Q    R?

19 A    Russo.

20 Q    K?

21 A    Kurland.

22 Q    Now, going back to Cheddar Capital, the funding company,

23 did you or your partners open bank accounts for this company?

24 A    Yes, we did.

25         MS. ZVEROVICH:  Ms. Hochron, let's please publish

*AVERY N. ARMSTRONG, RPR*
*OFFICIAL COURT REPORTER*

RUSSO – DIRECT – ZVEROVICH

1   Government Exhibit 406D in evidence.

2   Q     Mr. Russo, do you recognize this document?

3   A     Yes, I do.

4   Q     What is it?

5   A     These are the documents that are acquired in order to

6   open up a bank account at Signature Bank.

7   Q     And what account does this record relate to?

8   A     For Cheddar Capital LLC.

9   Q     And just focusing for a second on the bottom right of

10  Page one.

11          What is the date when this bank account was opened?

12  A     11/21/2016.

13  Q     Now, you testified earlier that Cheddar Capital was

14  formed in early 2015, correct?

15  A     Yes.

16  Q     So why wasn't this bank account opened until

17  November 2016?

18  A     For basically two reasons.  First, we didn't have an

19  education on the business.  We wanted to make sure that we

20  were confident in our abilities within the merchant cash

21  advance industry, and also, the need for investors to have

22  capital so that we could actually start funding.

23          MS. ZVEROVICH:  Let's go to Page 2.

24  Q     Now, do you see section one, says signers beneficial

25  owner over 20 percent?

*AVERY N. ARMSTRONG, RPR*
*OFFICIAL COURT REPORTER*

RUSSO – DIRECT – ZVEROVICH

1    A    Yes.

2    Q    I'd like to walk through here who is listed as a signer

3    and beneficial owner of this account.

4              Who is listed on the number one?

5    A    Anthony Lodati.

6    Q    And who is listed under number two?

7    A    Jason Kurland.

8    Q    And looking at the title, role field, what is listed

9    there?

10   A    Member and 20 percent.

11   Q    And that's the percentage ownership next to the title?

12   A    Yes, it is.

13   Q    What does that reflect?

14   A    That reflects each partner's percentage of ownership

15   within the entity.

16   Q    Cheddar Capital LLC?

17   A    Yes.

18             MS. ZVEROVICH:  All right.  Let's go to number

19   three.

20   Q    What's listed there?

21   A    Meeker World Management Incorporated.

22   Q    What is Meeker?

23   A    That's the entity that you used to maintain my ownership

24   in the business.

25   Q    So that's your company?

*AVERY N. ARMSTRONG, RPR*
*OFFICIAL COURT REPORTER*

RUSSO – DIRECT – ZVEROVICH

1    A    Yes, it is.

2    Q    And what is listed under title and percentage ownership?

3    A    Again, member, and 20 percent ownership.

4    Q    And what is listed under number four?

5    A    Colby Co Holdings Incorporated.

6    Q    What is Colby?

7    A    That's Frank Smookler's entity that you used to retain

8    his ownership.

9    Q    And what is listed under title and percentage ownership?

10   A    Again, member, and 20 percent owner.

11        MS. ZVEROVICH:  All right.  Let's now go to Page

12   six.

13   Q    So section one says, signers.

14        MS. ZVEROVICH:  Let's zoom in on that section.

15   Q    What is listed under number?

16   A    SophiaJack LLC.

17   Q    And what is that?

18   A    That's Brian Mastroberti's entity that he used to retain

19   his ownership.

20   Q    And what is listed under title and percentage ownership?

21   A    Member, and 20 percent ownership.

22        MS. ZVEROVICH:  And finally, let's go to number two.

23   Q    What is listed there?

24   A    LT Sunnyside Holdings LLC.

25   Q    What is that?

RUSSO – DIRECT – ZVEROVICH

1   A    That's Anthony Lodati's LLC that he used to retain his

2   ownership in the entity.

3   Q    And what is listed under title and percentage ownership?

4   A    Member, and 20 percent.

5   Q    All right.

6        MS. ZVEROVICH:  We can take that down, Ms. Hochron.

7   Thank you.

8   Q    Now, Mr. Russo, overall, did this account document for

9   Cheddar Capital correctly reflect the five partners and their

10  ownership interest in Cheddar Capital at the time?

11  A    At the time, it did.

12  Q    Was there a change later?

13  A    Yes, there was.

14  Q    What was that, briefly?

15  A    Once we started to raise money for the funding company,

16  Brian Mastroberti brought on one of his friends that made a

17  $5 million investment within the company, and we agreed to

18  give him a 10 percent ownership and in order to do so.

19  Myself, Frank Smookler, and Jason Kurland lowered our

20  percentages to make sure that we could give him the 10 percent

21  ownership at that time.

22  Q    So you became 18 percent owners at that time?

23  A    I believe I became 15 percent owner and I believe Frank

24  and Jason split the difference for the other 5 percent.

25  Q    Okay.  Now, once Cheddar Capital, the funding company,

*AVERY N. ARMSTRONG, RPR*
*OFFICIAL COURT REPORTER*

RUSSO – DIRECT – ZVEROVICH

1    was up and running, what did it do as part of its business?

2    A    It basically directly funded deals that we basically

3    either cherrypicked or deals that were on the table to invest

4    in.

5    Q    And what do you mean by cherrypicked?

6    A    So the brokerage, Cheddar Express, was literally finding

7    businesses that were looking for funding and matching them to

8    direct funding companies.  There were certain amount of deals

9    that we deemed were better than the rest, and those were the

10   ones that we basically chose to fund directly through Cheddar

11   Capital.

12   Q    How did the company make money?

13   A    Cheddar Capital, basically, after paying out the broker

14   commission kept all the fees and moneys that they charged the

15   actual businesses.

16        MR. KASULIS:  Your Honor, can we perhaps take a

17   brief break at some point when it's convenient to the Court.

18        THE COURT:  Yes.  Would this be a good time to take

19   a break.  It's about the right time or in 15 minutes?

20        MS. ZVEROVICH:  No, that's fine Your Honor.

21        We can take a break.

22        THE COURT:  Why don't we take a five minute break.

23   All rise for the jury.

24        (Jury exits the courtroom.)

25        THE COURT:  Mr. Russo, you may stand down.  Do not

RUSSO – DIRECT – ZVEROVICH

1    discuss your testimony with anyone except your lawyer, all

2    right.

3                THE WITNESS:  Yes, Your Honor.

4                THE COURT:  Okay.  Let's take five minutes.

5                (A recess was taken.)

6                (Judge Nicholas G. Garaufis enters the courtroom.)

7                THE COURT:  We can bring the witness back in.

8                Yes, please bring the witness back.

9                Let's bring in the jury.

10               (Witness resumes the witness stand.)

11               (Continued on the following page.)

F. RUSSO - DIRECT - MS. ZVEROVICH

1            (In open court - jury not present.)

2            (Judge NICHOLAS G. GARAUFIS entered the courtroom.)

3            THE COURT:  Let's bring the witness back.

4            (Witness resumes the stand.)

5            (Jury enters.)

6            THE COURT:  Please be seated, everyone.

7            You may continue with your examination of the

8    witness.

9            The witness is reminded that he is still under oath.

10           THE WITNESS:  Of course.

11           MS. ZVEROVICH:  Thank you, Your Honor.

12   EXAMINATION CONTINUES

13   BY MS. ZVEROVICH:

14   Q    Sir, so before we took the break, we were talking about

15   Cheddar Capital.

16           How did Cheddar Capital make money?

17   A    After what Cheddar Capital paid out to the broker as far

18   as commission, it kept, basically, all the money that it

19   charged the actual businesses for each deal.

20   Q    And how did you and your other partners in Cheddar

21   Capital get paid?

22   A    In partner distributions.

23   Q    And how were these partner distributions made?

24   A    Mostly they were biweekly, but sometimes they were

25   actually monthly.

SAM      OCR      RMR      CRR      RPR

F. RUSSO – DIRECT – MS. ZVEROVICH

1    Q    And did the defendant receive partner distributions?

2    A    Yes, he did.

3    Q    Who was primarily responsible for the day-to-day

4    operations of the business?

5    A    Early on, there was myself and Anthony Lodati.  And then

6    that changed to Anthony Lodati and Brian Mastroberti.

7    Q    And did you have partner meetings among the five of you?

8    A    Yes, we did.

9    Q    And how often did these meetings usually happen?

10   A    Quite often.

11   Q    Who typically came to those meetings?

12   A    Depending on scheduling conflicts, all five partners.

13   Q    And what did you discuss at these meetings?

14   A    The state of affairs, how the brokerage was doing, how

15   the direct funder was doing.  And the main priority was how we

16   were gonna raise additional capital for the direct funding

17   company, so that we can increase the deals that we were

18   funding.

19   Q    Why was raising capital important?

20   A    Because without investments, we could not directly fund

21   deals.  So, we needed as much capital as –– as we can get our

22   hands on.

23   Q    And how did the company raise capital?

24   A    Each partner, basically, went to their friends and family

25   trying to raise capital.

SAM      OCR      RMR      CRR      RPR

F. RUSSO – DIRECT – MS. ZVEROVICH

1   Q    Did you, personally, raise any capital for Cheddar?

2   A    Yes, I did.

3   Q    How did you do that?

4   A    I went to my family.

5   Q    Now, at these partner meetings, did you discuss any idea

6   about how to raise more capital?

7   A    Yes, it was always a discussion.

8   Q    How frequently would you say you had this conversation?

9   A    Every meeting, every day almost.

10  Q    And who participated in those discussions?

11  A    Depending on where and how the meeting was discussed,

12  whether it was over the phone or vice versa, it was all the

13  partners.

14  Q    And what, if anything, did you discuss with the

15  defendant, in particular, about how to raise capital?

16  A    The defendant was gonna approach his clients and raise as

17  much capital as possible.

18  Q    And did the defendant eventually agree to do this?

19  A    Yes.

20  Q    And did the defendant discuss with you how he would go

21  about pitching his clients -- well, first of all, what type of

22  clients are we talking about?

23  A    Mainly, his lottery-winning clients was the focus.

24  Q    And did the defendant discuss with you how he would go

25  about pitching these investments in your companies to his

SAM     OCR     RMR     CRR     RPR

F. RUSSO – DIRECT – MS. ZVEROVICH

1    clients?

2    A    Yes, he did.

3    Q    What did he say?

4    A    Basically, like, he was going to approach his clients and

5    pitch them that they were going to be invested, about

6    95 percent of their money, in a low-risk, very conservative

7    type of fund, like a Goldman Sachs or something of that sort.

8    And that they could afford a 3 or 5 percent higher-risk type

9    of scenario, that it came with a higher earn, with a higher

10   risk, basically.

11   Q    And how did the other partners react to the idea of the

12   defendant bringing in his lottery clients as investors?

13   A    We were all very happy.  I mean, obviously, Jason managed

14   some very large clients and had at his disposal very large

15   amounts of money.

16   Q    Now, did there come a time when one or more of your

17   partners in Cheddar started another company?

18   A    Yes.

19   Q    What was the name of that company?

20   A    Advantage Capital.

21   Q    And who started Advantage Capital?

22   A    Anthony Lodati and Brian Mastroberti.

23   Q    What kind of company was Advantage ?

24   A    It was a direct funder, as well as Cheddar Capital, but

25   it was a more involved direct funding company.

SAM    OCR    RMR    CRR    RPR

F. RUSSO – DIRECT – MS. ZVEROVICH

1   Q    And after Mastroberti and Lodati started Advantage, what

2   happened with Cheddar Capital?

3   A    Cheddar Capital maintained investing in each deal at a

4   very -- at a percentage, a set percentage of allowed,

5   basically.

6   Q    So, Cheddar Capital continued business?

7   A    Yes.

8   Q    And did Mastroberti and Lodati remain partners in

9   Cheddar?

10  A    Yes.

11  Q    Even after they formed Advantage?

12  A    Yes.

13  Q    Now, initially, during the earlier period of your

14  business, how successful was the defendant at raising capital

15  for -- for the business?

16  A    Early on, it was small tranches of raises, whether it was

17  50 or a hundred-thousand, and it very quickly grew to in the

18  millions.

19          MS. ZVEROVICH:  Ms. Hochron, let's publish

20  Government Exhibit 1010 in evidence.

21          (Exhibit published.)

22          MS. ZVEROVICH:  And let's zoom in on the second

23  message.

24  BY MS. ZVEROVICH:

25  Q    Mr. Russo, what is this?

              SAM     OCR     RMR     CRR     RPR

F. RUSSO – DIRECT – MS. ZVEROVICH

1    A    This is a text message between Jason Kurland and myself.

2    Q    And what is the date?

3    A    The date is 6/12/2018.

4    Q    And I'm just going to read Mr. Kurland's message.

5             We're still killing it, right?  I'm trying to keep

6    raising, but I squeezed everyone I know.

7             What did you understand the defendant to mean here?

8    A    He's asking:  We're still killing it, right, across the

9    board as far as our business.  And he's explaining that he,

10   basically, is still trying to raise more capital, but that at

11   that current time, he squeezed all of his clients that he

12   basically had.

13            MS. ZVEROVICH:  Let's take that down.

14            Thank you, Ms. Hochron.

15   BY MS. ZVEROVICH:

16   Q    Now, during the course of your partnership in the MCA

17   industry, what, if anything, ultimately became the main source

18   of capital for your business?

19   A    Jason Kurland's clients.

20   Q    And how successful did the defendant become at getting

21   lottery winners as clients?

22   A    Very successful.

23   Q    Did the defendant ever explain to you how he found

24   lottery-winner clients?

25   A    Yes, he did.

F. RUSSO – DIRECT – MS. ZVEROVICH

1   Q     What did he explain?

2   A     He, basically, had this website that was -- that he used

3   for his lottery lawyer name.  And he used, like, Google.

4   Google had this system, like Google Analytics, that allowed

5   him to, basically, target certain areas or certain key words

6   that you search on Google.

7            So that when we knew there was a big winner, whether

8   it was in any state, didn't matter, he would, basically,

9   target those areas and key words to, basically, increase his

10  percentage that he was gonna be contacted by that winner.

11  Q     And over time, did the defendant get large lottery

12  winners as clients?

13  A     Yes.

14  Q     And what was his reaction to getting these winners as

15  clients?

16  A     Ecstatic.  Each one was -- helped his name and helped

17  acquire the next one.

18  Q     I'm sorry, I couldn't hear the --

19  A     Each one that he retained was --  made it easier to

20  retain the next client because, obviously, he showed

21  experience.

22  Q     And what, if anything, was your reaction to him getting

23  lottery winners as clients?

24  A     Just as happy.  Just meant that we were going to be in

25  position to make a lot more money.

SAM     OCR     RMR     CRR     RPR

F. RUSSO – DIRECT – MS. ZVEROVICH

1    Q    And how would you make a lot more money?

2    A    Well, once the brokerage found deals, Cheddar Capital,

3    once it had the funds, was able to invest in those deals and

4    fund those actual deals, and our partner distributions would

5    increase.

6    Q    But how would the fact that Jason got new big lottery

7    winners make more money for you?

8    A    Because it allowed us to fund more deals.

9    Q    Okay.  What was your goal with the defendant's

10   lottery-winner clients?

11   A    To make as much money personally as possible.

12   Q    By getting them to invest in the business?

13   A    Yes.

14   Q    And did Mr. Kurland share that goal?

15   A    Yes.

16   Q    Did you ever personally meet any of Mr. Kurland's lottery

17   clients?

18   A    No.

19   Q    Why not?

20   A    There was no need.  Jason always wanted to maintain

21   control with his clients, so there was no need for me to ever

22   meet them or speak to them or anything of the sort.

23   Q    Now, how would you find out when particular clients were

24   about to invest in your businesses?

25   A    From Jason Kurland.

SAM     OCR     RMR     CRR     RPR

F. RUSSO – DIRECT – MS. ZVEROVICH

1      MS. ZVEROVICH:  Ms. Hochron, let's publish

2  Government Exhibit 1010 in evidence, and go to page 4.

3      (Exhibit published.)

4      MS. ZVEROVICH:   And let's focus on the middle of

5  the page.

6  BY MS. ZVEROVICH:

7  Q    Mr. Russo , what is this?

8  A    This is a text message between myself and Jason Kurland.

9  Q    What is the date?

10  A    9/6/2018.

11  Q    So, now we're in September 2018, correct?

12  A    Yes.

13  Q    All right, what I'd like to do is read several of these

14  messages in the screen.  And if you could read your own

15  messages for the jury, and I will read Mr. Kurland's messages,

16  beginning with this one.

17  A    Okay.  I text Jay:  Brother exclamation points.  Congrats

18  exclamation points.

19  Q    Thanks, man.  Have to figure out how to have this get to

20  us.

21  A    I text:  You are a beast, dude.  Get this done

22  exclamation points.

23  Q    Trying my best exclamation points.

24  A    I text him funny GIF that I had on my phone.

25  Q    Exactly.  So far it's going perfectly.

SAM     OCR     RMR     CRR     RPR

F. RUSSO - DIRECT - MS. ZVEROVICH

1          Now, Mr. Russo , what was the defendant discussing

2    here?

3    A    Basically, that he was retained by a lottery winner.  And

4    the next step was to figure out how he was going to get a

5    portion of the winnings over to our entities.

6          MS. ZVEROVICH:    And let's go back to page 4.

7          (Exhibit published.)

8    BY MS. ZVEROVICH:

9    Q    I just want to ask you about one specific message.

10         MS. ZVEROVICH:    On the bottom, Ms. Hochron, if we

11   can zoom into that one.

12   Q    What did you understand Mr. Kurland to mean by:  Have to

13   figure out how to have this get to us?

14   A    So, at this point he was retained, he was their lawyer to

15   represent them with their lottery winnings.  And he had to

16   figure out how to, basically, pitch them to get a percentage

17   of their winnings over to our entities.

18   Q    Okay.

19         MS. ZVEROVICH:  Now, let's go to page 6 on the

20   bottom of the same exhibit.

21         (Exhibit published.)

22   Q    What is the date now?

23   A    9/20/2018.

24   Q    All right.  And let's read several of these messages in

25   the same way.  So, you read your own messages, and I will read

                    SAM    OCR    RMR    CRR    RPR

F. RUSSO - DIRECT - MS. ZVEROVICH

1    the defendant's messages.

2    A    So, I text:  Bro exclamation points.

3    Q    I know.  I'm still nervous, ha, but it's looking so good.

4    A    Brother exclamation points.

5    Q    Ha, ha, ha, ha, ha.  Looking good, bro.

6    A    Really, bro?

7    Q    Yep, basically done.

8    A    Stop it.

9    Q    Yes, sir, should be in by next Wednesday/Thursday.

10   A    Amazing, bro.

11   Q    Mr. Russo, what are you discussing with the defendant in

12   these threads?

13   A    So, at this point,  he had pitched them the -- his

14   investment pitch and that he, basically, said it was a done

15   deal.  And now it was just a matter of when we were to receive

16   the -- the capital.

17   Q    And do you recall which client you were discussing in

18   this thread?

19   A    No, based off these text messages, I don't.

20   Q    Do you recall if this client ultimately invested in your

21   business?

22   A    Yes.

23         MS. ZVEROVICH:  Ms. Hochron, let's publish

24   Government Exhibit 1027 in evidence, and go to page 4 on the

25   bottom.

SAM     OCR     RMR     CRR     RPR

F. RUSSO – DIRECT – MS. ZVEROVICH

1      (Exhibit published.)

2      MS. ZVEROVICH:  And let's please zoom in on the last

3  message.

4  BY MS. ZVEROVICH:

5  Q    What is this?

6  A    This is a group text between Jason Kurland, Brian

7  Mastroberti, Frank Smookler, myself, and Anthony Lodati.

8  Q    And where it says "Brian MC," that's Brian Mastroberti ?

9  A    Yes.

10 Q    And "Anthony" is Anthony Lodati, correct?

11 A    Yes.

12 Q    And what is the date on this message?

13 A    10/1/2018.

14 Q    And the message from the defendant says:  Hey guys, I'm

15 thrilled to report the 5 MIL hit our  account this afternoon.

16 Go deploy!!!!!

17      Mr. Russo, could you explain this message to the

18 jury, what did you understand the defendant to mean?

19 A    That one of his clients had wired over $5 million into, I

20 believe, Cheddar Capital.  And that he was confirming that it

21 hit our account and, basically, telling us to go deploy or go

22 fund deals in the MCA space.

23 Q    And what was your reaction after you got this message?

24 A    This is huge, you know.  These are big numbers.  We're

25 not talking about little money here.  This is the start of

SAM     OCR     RMR     CRR     RPR

F. RUSSO – DIRECT – MS. ZVEROVICH

1    something big for us.

2    Q    So, you were also excited?

3    A    Yes.

4    Q    Now, after this investment did the defendant continue

5    bringing in lottery -client investments to your business?

6    A    Yes, he did.

7    Q    And generally, what was the size of those client

8    investments?

9    A    Large.

10   Q    In total, how much would you estimate the defendant's

11   clients invested in your MCA companies?

12   A    In the MCA companies, I would say north of 50 million .

13   Q    And, ultimately, what generally happened with all of that

14   money?

15   A    We lost the monies.

16   Q    Now, how was the defendant compensated as a partner in

17   the business?

18   A    Well, we received partner distributions based off of our

19   percentage of ownership.  He also received a finder's fee for

20   each of the raises through his lottery-winning clients.  And

21   that was it.

22   Q    And what do you mean by a "finder's fee"?

23   A    He -- he received a percentage of a one-time fee,

24   basically, off of the total amount that was raised for that --

25   for that raise, basically.

SAM      OCR      RMR      CRR      RPR

F. RUSSO - DIRECT - MS. ZVEROVICH

1  Q    For investments that came in through his lottery clients?

2  A    Yes.

3  Q    Now, was the defendant receiving finder's fees from the

4  very beginning of your business?

5  A    Can you repeat the question?

6  Q    Yes.  Was the defendant receiving finder's fees  from the

7  very beginning of your business in 2015?

8  A    No.  Once he started raising money from his lottery

9  clients is when the conversation came up that he wanted a

10  finder's fee for raising the capitals.

11  Q    And was there one conversation or multiple conversations

12  on this subject?

13  A    Multiple.

14  Q    And who participated in the discussions about the

15  finder's fee?

16  A    Depending at what point, all five partners.

17  Q    And were you present, yourself, for some of those

18  discussions?

19  A    Yes, I was.

20  Q    Focusing just on the discussions where you were present,

21  what did the defendant ask for?

22  A    Initially, the conversation was, basically, that he

23  wanted a finder's fee larger than what we all agreed to.  And,

24  basically, that it was a justified finder's fee because of the

25  niche ability for him to raise money through these lottery

SAM     OCR     RMR     CRR     RPR

F. RUSSO – DIRECT – MS. ZVEROVICH

1   winners.

2   Q    Now, had any of the five partners received any finder's

3   fees for bringing in investments prior to this?

4   A    No.

5   Q    You testified earlier that Brian Mastroberti  at some

6   point brought in a $5  million investment, correct?

7   A    Yeah, just one.  He brought in others as well.

8   Q    Did Mr. Mastroberti receive any finder's fees?

9   A    No.

10  Q    And what, if any, reason did Mr. Kurland give for asking

11  for a finder's fee for his lottery clients' investments?

12  A    Just that he had the ability to raise substantial amounts

13  of monies, and he felt it was justified because of his ability

14  in representing these lottery winners.

15  Q    And what size fee, finder's fee, did he initially

16  request?

17  A    I believe he initially wanted around 2 or 3 percent, and

18  we all agreed to a 1 percent finder's fee.

19  Q    So, that means that he would get 1 percent of whatever

20  money lottery clients agreed to invest in your company?

21  A    Yes, a one-time finder's fee.

22  Q    And what was your reaction to Mr. Kurland's request for a

23  finder's fee?

24  A    Listen, I was mixed emotions.  On one hand, I was happy

25  as anything because the monies that were being raised were

SAM     OCR     RMR     CRR     RPR

F. RUSSO – DIRECT – MS. ZVEROVICH

1  such large amounts, we were in position to make a lot of

2  money.

3          And then on the other hand, I just felt that it was

4  greed because we're already set to make so much money.  It

5  didn't make sense, that no other partner was getting finder's

6  fee and -- and only one partner wanted a finder's fee,

7  basically.

8  Q    Did any of the other partners express views about the

9  defendant's request for a finder's fee?

10 A    Yes.

11 Q    And were you present for some of those discussions?

12 A    Yes.

13 Q    Focusing just on the discussions where you were present,

14 what was discussed?

15 A    It was very similar.  All the partners didn't understand

16 it, but were mixed because they still wanted to receive these

17 investments.  So, everybody reluctantly agreed to give a

18 finder's fee.

19 Q    Now, did Mr. Mastroberti express any views about

20 Mr. Kurland's request for a finder's fee?

21 A    Yes.

22 Q    What was that?

23 A    He didn't think it looked good, obviously, receiving a

24 finder's fee with the amount of monies that were going in.  At

25 the time, he was taking over running Cheddar Capital.  He

SAM    OCR    RMR    CRR    RPR

F. RUSSO - DIRECT - MS. ZVEROVICH

1    didn't like the fact that it -- it hurt the fund by giving

2    this 1 percent finder's fee because it affected  our total

3    output or our total potential to make.

4    Q    And how did the defendant respond?

5    A    It was less of a discussion and more of a demand that he

6    wanted the finder's fee.

7    Q    And did you and the other partners agree to give him a

8    finder's fee off of each investment?

9    A    Yes, we did.

10   Q    Why did you agree?

11   A    Again, because it was mixed.  He had the potential to

12   raise so much money that we, basically, agreed to a 1 percent

13   finder's fee, so that we can continue to raise money through

14   his clients.

15   Q    And did you, in fact, give the defendant finder's fees

16   for each investment?

17   A    Yes, we did.

18   Q    From the lottery clients, correct?

19   A    Yes.

20   Q    Now, how did the defendant get the finder's fees?

21   A    Usually, the same day or the day after of receiving the

22   actual investment, we would wire him the money to his LLC.

23   Q    And what LLC was that?

24   A    At the time he was using a LLC called GK3.

25   Q    Do you know what GK3 stands for?

SAM      OCR      RMR      CRR      RPR

F. RUSSO – DIRECT – MS. ZVEROVICH

1    A    I did, I forgot.

2    Q    Now, after the defendant began receiving finder's fees,

3    did any of the other partners start getting them as well?

4    A    No.

5    Q    Why not?

6    A    Again, no -- none of the partners really wanted to give

7    finder's fees.  So, after that discussion it never came up

8    again as far as other partners wanting a finder's fee.

9    Q    Okay.  Now, switching gears, did there come a time when

10   you formed another MCA funding company apart from Cheddar

11   Capital?

12   A    Yes.

13   Q    What company was that?

14   A    Francis Bay Holdings Company, Incorporated.

15   Q    And what was that company?

16   A    We, basically, formed it to be similar to Cheddar

17   Capital, just on a smaller volume.

18   Q    And who were the owners of Francis Bay Holding Company?

19   A    Myself, Frank Smookler, and Jason Kurland.

20   Q    And were you equal partners?

21   A    Yes, we were.

22   Q    Were Lodati or Mastroberti part owners of this company?

23   A    No, they weren't.

24   Q    And why did you want to have another MCA funding company

25   if you already had Cheddar Capital?

SAM    OCR    RMR    CRR    RPR

F. RUSSO – DIRECT – MS. ZVEROVICH

1    A     So, when deals were identified from the brokerage, there

2    was a formula that the funding companies used.  For example,

3    Cheddar Capital would invest right around 25 percent of any

4    deal that was on the table or that was identified by the

5    brokerage.  That left roughly 65 percent that would have to be

6    funded from various other direct funders or other

7    relationships that we had.

8            So, we thought it was a good idea that we formed

9    another smaller direct funder to take a piece of the pie out

10   of that 65 percent and, basically, receive some more profit.

11   Q     And did you open any bank accounts for Francis Bay

12   Holding Company?

13   A     Yes, we did.

14           MS. ZVEROVICH:  Ms. Hochron, if we could please

15   publish Government Exhibit 409B in evidence.

16           THE COURT:  All right, 409B.

17           (Exhibit published.)

18   BY MS. ZVEROVICH:

19   Q     Mr. Russo, do you recognize this document?

20   A     (No response.)

21           MS. ZVEROVICH:  And we can go up to the first page.

22           THE WITNESS:  Yeah, I missed the first page.

23   A     Yes, I do.

24   Q     What is it?

25   A     These are the documents in order to open up a bank

SAM     OCR     RMR     CRR     RPR

F. RUSSO – DIRECT – MS. ZVEROVICH

1   account within TD  Bank.

2   Q    And what particular account is this document for --

3   account opening document for?

4   A    For Francis Bay Holding Company, Incorporated.

5   Q    And who is listed as the primary contact?

6   A    Francis Smookler.

7          MS. ZVEROVICH:   And let's go to page 14.

8          (Exhibit published.)

9   BY MS. ZVEROVICH:

10  Q    So, this is a form called "Certification Regarding

11  Beneficial Owners of Legal Entity Customers."

12         Who is listed in section number 1 as somebody who

13  has control?

14  A    Myself.

15  Q    And what is your listed percentage ownership?

16  A    50 percent.

17         MS. ZVEROVICH:   And let's go to section 2 on the

18  bottom.

19  BY MS. ZVEROVICH:

20  Q    Who is listed there?

21  A    Francis Smookler.

22  Q    And what is Smookler's listed percentage ownership?

23  A    50 percent.

24  Q    Now, is anybody else listed on this application as an

25  owner of Francis Bay Holding Company?

SAM     OCR     RMR     CRR     RPR

F. RUSSO – DIRECT – MS. ZVEROVICH

1    A    No.

2    Q    Were there, in fact, any other owners of Francis Bay

3    Holding Company?

4    A    Yes.

5    Q    Who else?

6    A    Jason Kurland.

7    Q    Why wasn't the defendant listed on this bank application?

8    A    At this time, there was a change.  When we first formed

9    the brokerage and the first direct funding company, Cheddar

10   Capital, he was on all documents.

11          At this point, he no longer wanted to be on the

12   corporate docs or the bank accounts or any other documentation

13   showing ownership.

14   Q    And did the defendant explain why?

15   A    Yes.  He, basically, said he didn't think it looked good

16   that he had ownership in all these various entities at that

17   point.

18   Q    Did he explain who it didn't look good to?

19   A    His clients.

20          MS. ZVEROVICH:  Now, let's go to page 18 and look on

21   the bottom.

22   BY MS. ZVEROVICH:

23   Q    What is the date when this account was opened?

24   A    11/8/2017.

25          MS. ZVEROVICH:  Okay.  We can take that down.

SAM     OCR     RMR     CRR     RPR

F. RUSSO – DIRECT – MS. ZVEROVICH

1    Thank you, Ms. Hochron.

2    Q    Now, after Francis Holding was up and running, did

3    Cheddar Capital continue to operate?

4    A    Yes, it did.

5    Q    And was that still with the same five partners?

6    A    At that point it was six partners, but, yes, the same.

7         MS. ZVEROVICH:  Ms. Hochron, let's publish

8    Government Exhibit 1010 in evidence, and go to page 2.

9         (Exhibit published.)

10        MS. ZVEROVICH:  Let's zoom in on the first message.

11   BY MS. ZVEROVICH:

12   Q    Mr. Russo, what is this?

13   A    This is a text message between me and Jason Kurland.

14   Q    And what is the date?

15   A    8/2/2018.

16   Q    And to be clear, the blue messages are your messages,

17   correct, and the green messages are Kurland?

18   A    Yes.

19   Q    I'd like to read several of these messages in the same

20   way we've been doing.  So, you read your own messages, and I

21   will read Mr. Kurland's, beginning with the top message.

22   A    It's very small on my screen.  Can we –– yeah.  Sorry.

23        I text:  When Frank gets back we need to get serious

24   about Francis  Bay.

25   Q    Yeah, but the less we have in Cheddar, the less deals we

SAM     OCR     RMR     CRR     RPR

F. RUSSO - DIRECT - MS. ZVEROVICH

1  are getting.  Also the less money I have to put in.  Ha.  We

2  need to be smarter about Francis Bay, not just take on all of

3  these partners without getting some initial benefits.  Let's

4  meet next week.

5  A    It will only get worse unless we do something about it.

6  If we don't grow Francis Bay, it's pointless.  We also need to

7  fill Cheddar back up.

8  Q    Yeah, that's priority.

9        Could you explain to the jury what you were

10 discussing with the defendant?

11 A    Yes.  So, initially, Frank Smookler, I believe, was on

12 vacation.  And I wanted to, basically, have a meeting with

13 Jason Kurland and Frank Smookler about Francis Bay and

14 specifically growing Francis Bay, finding more investments for

15 Francis Bay.

16       Jason brings up the fact that we still should be

17 focusing on Cheddar Capital because that really is the main

18 direct funding company.  And that the less money within

19 Cheddar Capital, the less total deals we'll be able to invest

20 in.

21       And I'm agreeing with him, but, basically, telling

22 him that if we don't grow Francis Bay, because it's already

23 operating at that point, if we don't grow it, it's pointless.

24 It doesn't make sense.

25       And that we also need to fill Cheddar back up

SAM    OCR    RMR    CRR    RPR

F. RUSSO – DIRECT – MS. ZVEROVICH

1   because in any funding company it's always the necessity to

2   continual raise money for that entity.  And he agrees that

3   that's priority.

4   Q    Now, what, if anything, did you ultimately do with

5   Francis Bay Holding Company?

6   A    Eventually, we sold Francis Bay.

7   Q    To whom?

8   A    Jason Kurland's client.

9   Q    How did that come about?

10  A    At some point, I believe Jason came to Frank and myself

11  and explained that -- that one of his lottery clients wanted

12  to, basically, own a fund directly instead of just being an

13  investor for a fund.  And the three of us thought it was a

14  great opportunity to, basically, market and sell Francis Bay.

15  Q    And did the defendant tell you which client this was?

16  A    Yes.

17  Q    Which client?

18  A    Sea and Sand Trust.

19  Q    Now, at this time, who owned Francis Bay Holding?

20  A    Myself, Frank Smookler, and Jason Kurland.

21  Q    And what was your reaction to the idea of selling the

22  company to the defendant's client?

23  A    I was excited.  This was the first time that we had a

24  chance to sell one of our funding companies.  So, it gave us a

25  great opportunity.

SAM     OCR     RMR     CRR     RPR

F. RUSSO - DIRECT - MS. ZVEROVICH

1  Q    And did you, in fact, agree to sell Francis Bay Holding

2  to the defendant's client?

3  A    Yes, we did.

4  Q    Did you have any discussions about what you would do next

5  after you sold it, the three of you?

6  A    Yes, we wanted to form another direct funding company at

7  a -- basically, a larger scale than Francis Bay.

8  Q    And did you, Smookler, and the defendant have any

9  discussions about a plan for this new company?

10  A    Yes.  Initially, we were going to fund or self-fund that

11  new entity, the three of us,  at -- I believe the figure was a

12  million dollars.  And, basically, get started right away.

13  Q    And did you, Smookler, and the defendant discuss how you

14  would fund that company going forward?

15  A    Yes.  It was discussed that at some point we were going

16  to raise money for this new entity.

17  Q    Now, did you prepare anything relating to the sale of

18  Francis Bay Holding Company?

19  A    Yes, I did.

20  Q    What did you prepare?

21  A    I had the office employees, basically, prepare a

22  70-some-odd page document that, basically, showed how Francis

23  Bay operated as a direct funder.  The amount of deals that it

24  had invested in, in the past, that were paid up.  The deals

25  that it was currently invested in.  And its projected

SAM     OCR     RMR     CRR     RPR

F. RUSSO – DIRECT – MS. ZVEROVICH

1    valuation in the near future:  In the first year, second year,

2    third year, fourth year and so on.

3    Q    Now, why did you prepare the 70-page stack of documents?

4    A    Jason told me he needed some sort of packet to help pitch

5    his clients.

6    Q    And what did you do with the packet after you prepared

7    it?

8    A    I gave it to Jason Kurland.

9    Q    And did you have any later discussions with the defendant

10   about that package of documents?

11   A    Yes, I did.

12   Q    What was that discussion?

13   A    Shortly after we finalized the sale for Francis Bay, I

14   believe we were at Limani, off of Northern Boulevard, Long

15   Island, and he explained to me that he didn't even show the

16   clients that packet.

17   Q    Did he explain why?

18   A    Yes, he said he didn't need it in order to finalize the

19   sale.

20   Q    And what was your reaction to hearing that?

21   A    At the time, I was annoyed.  It took a lot of office

22   hours in order to make this document.  And if I knew that he

23   needed something simplified or didn't need anything at all, I

24   wouldn't have put the time in to make this document or I would

25   have made a five-page document instead of a 70- some-odd page

SAM      OCR      RMR      CRR      RPR

F. RUSSO – DIRECT – MS. ZVEROVICH

1  document.

2  Q    Now, did you have any discussions with Smookler and the

3  defendant about how the transfer of Francis Bay would

4  physically take place?

5  A    Yes.

6  Q    How would it take place?

7  A    So, in order to complete the sale for Francis Bay, it had

8  already relationships with a few other direct funders that it

9  was, basically, participating it in deals.  So, we would form

10 or Jason would have his clients form a new entity with a

11 similar name to Francis Bay, so that it was an easy

12 transition.

13        And once we received the funds, we would, basically,

14 transfer all the rights of receivables to that new entity and

15 it would start collecting daily receivables and start

16 reinvesting each day.

17 Q    And what was the new company that was created for the

18 client?

19 A    Jason Kurland had his clients form Francis Bay, LLC.

20        MS. ZVEROVICH:  Ms. Hochron, let's please pull up

21 Government Exhibit 1009 in evidence, and go to page 4.

22        (Exhibit published.)

23        MS. ZVEROVICH:  And let's go in the middle of the

24 page.

25 BY MS. ZVEROVICH:

SAM     OCR     RMR     CRR     RPR

F. RUSSO – DIRECT – MS. ZVEROVICH

1  Q    Mr. Russo, what is this?

2  A    This is a group text between Jason Kurland, Frank

3  Smookler, and myself.

4  Q    And what is the date?

5  A    The date is 10/15/2018.

6  Q    All right.  I'd like to read these messages.  Now there

7  are three participants.  So, I will still read the defendant's

8  messages, and if you could read your own messages, as well as

9  Frank Smookler's messages, making clear when you're reading

10  which one.

11  A    Okay.

12  Q    Big week exclamation points.

13  A    Frank Smookler responds:  Dude exclamation points.

14         Frank Smookler responds:  Watch, just the beginning.

15         I respond:  Morning, bro.  Call me when you have a

16  second.

17         I respond:  Okay, spoke to the lawyer.  As soon as

18  you have the info on the new corp /LLC we are ready to go.

19  Q    It's done, Francis Bay, LLC.

20  A    Okay, will I need owner info for assignment doc?  I

21  believe so.

22  Q    That's the LLC.  Sea and Sand Trust will be the sole

23  member.  Nandlall Mangal is the trustee.

24         Now, what were you discussing in this thread with

25  the defendant and Smookler?

                    SAM     OCR     RMR     CRR     RPR

F. RUSSO – DIRECT – MS. ZVEROVICH

1  A    So, at this point we had already agreed upon amount, and

2  I believe this deal was verbally agreed upon.  In order to

3  finalize it, we needed to have this assignment doc filled out.

4       So, Jason Kurland had to have his clients form a new

5  entity in order to get the information to put on the doc

6  required and to start business.

7  Q    And do you know who Nandlall Mangal is?

8  A    Yes.

9  Q    Who is that?

10  A    That's the lottery winner out of Staten Island that owned

11  the Sea and Sand Trust.

12  Q    Now, did the sale of Francis Bay Holding, in fact, go

13  forward?

14  A    Yes, it did.

15  Q    And how much did Mr. Mangal pay for Francis Bay Holding?

16  A    $2 million.

17  Q    And did you all make a profit off of the sale?

18  A    Yes, we did.

19  Q    What was your reaction to the sale?

20  A    Again, very happy.  This was the first opportunity that

21  we had to sell a fund.  And it allowed us to do, basically,

22  the same thing at a much higher level.

23  Q    And what did you, Smookler, and the defendant do with the

24  $2 million that you got from Mr. Mangal?

25  A    There were a few investors within Francis Bay.  We very

SAM     OCR     RMR     CRR     RPR

F. RUSSO – DIRECT – MS. ZVEROVICH

1    quickly paid them out with a percentage of profit, and the

2    three of us equally split the remainder of the money.

3    Q    Approximately how much did you split up amongst the three

4    of you?

5    A    Roughly, $1.3 million.

6    Q    And what did you do with that money?

7    A    The very next day or very short afterwards, we,

8    basically, sent the money over to a new entity in order to

9    start direct funding once again under the three of us.

10        MS. ZVEROVICH:  Ms. Hochron, let's pull up

11   Government Exhibit 409E in evidence, and let's go to page 47.

12        (Exhibit published.)

13   BY MS. ZVEROVICH:

14   Q    Mr. Russo, do you recognize this document?

15   A    Yes, I do.

16   Q    What is this?

17   A    This is a monthly bank statement from TD Bank for Francis

18   Bay Holding Company, Incorporated.

19   Q    And what -- what statement period does this cover?

20   A    This is for the month of October in 2018.

21        MS. ZVEROVICH:  Now, Ms. Hochron, let's zoom in on

22   the "Other Credits" section of this.

23        Thank you.

24   Q    Mr. Russo, what is shown here?

25   A    This is an incoming wire on 10/17 from the Sea and Sand

SAM    OCR    RMR    CRR    RPR

F. RUSSO – DIRECT – MS. ZVEROVICH

1    Trust in the amount of $2 million.

2    Q    And that's October 17 of 2018?

3    A    Yes, it is.

4           MS. ZVEROVICH:  Let's now go to page 48.

5           (Exhibit published.)

6           MS. ZVEROVICH:  And let's zoom in on the

7    "Withdrawals" section.  One more.

8           Now, four lines from the top, let's highlight that

9    transfer.

10   BY MS. ZVEROVICH:

11   Q    Mr. Russo, what is this?

12   A    This is an outgoing wire on 10/17 to Gold Standard

13   Depository Company, LLC.

14   Q    And what's the amount?

15   A    $359,191.66.

16   Q    And what is Gold Standard Depository?

17   A    That's Frank Smookler's company.

18          MS. ZVEROVICH:  Let's now look at the next wire.

19   Q    What is that?

20   A    That's the same amount going to GK3.

21   Q    And what is GK3?

22   A    Jason Kurland's company.

23   Q    Okay.

24          MS. ZVEROVICH:  And let's look at the last wire

25   here.

SAM      OCR      RMR      CRR      RPR

F. RUSSO – DIRECT – MS. ZVEROVICH

1  BY MS. ZVEROVICH:

2  Q     What is this?

3  A     That's a transfer to my corporation.

4  Q     In the same amount of approximately 359,000?

5  A     Yes.

6  Q     And what is the date of all of these transactions?

7  A     10/17.

8  Q     So, that's the very same day that you got the $2  million

9  in your account from Mr. Mangal, correct?

10  A     Yes.

11  Q     And, again, what did the three of you do with the money

12  that you got from the sale of Francis Bay Holding?

13  A     After sending it to our respective corporations, the next

14  day, or shortly afterwards, we, basically, sent that money

15  over to a new entity that we were going to use as a direct

16  funder.

17  Q     And what was that new entity?

18  A     The new entity was called or referred to as JBMML, LLC.

19  Q     And did Mr. Mangal have anything to do with JBMML, LLC?

20  A     No.

21        MS. ZVEROVICH:  Ms. Hochron, let's please publish

22  Government Exhibit 1009 in evidence, and go to page 6.

23        (Exhibit published.)

24        MS. ZVEROVICH:  And let's zoom in on the last

25  message.

SAM      OCR      RMR      CRR      RPR

F. RUSSO – DIRECT – MS. ZVEROVICH

1   BY MS. ZVEROVICH:

2   Q    Mr. Russo, what is this?

3   A    This is a group text between Jason Kurland, Frank

4   Smookler, and myself.

5   Q    And what is the date?

6   A    10/18/2018.

7   Q    All right.  Let's read these messages in the same way.

8   So, I will read the defendant, and you can read yourself and

9   Frank Smookler.

10          Hey boys, what did we decide, 300 each and get a

11   fourth for 100 or 250 each?

12   A    Frank Smookler responded:  Give me till 1 to figure it

13   all out.

14   Q    At bank now, wire is going out, 300K.

15   A    Frank Smookler responds:  Send as much as you can, we're

16   going to be 100 light.

17          Frank Smookler then responds:  Me, too.  At bank

18   now.

19   Q    And the defendant writes:  It's done.  300.

20          What were you, the defendant, and Smookler

21   discussing?

22   A    Initially, we were discussing that we needed the figure

23   of $1 million and we didn't know how we were going to split

24   the $1 million, whether we were going to do $300,000 each,

25   find a fourth partner for a hundred-thousand, or whether we

SAM     OCR     RMR     CRR     RPR

F. RUSSO – DIRECT – MS. ZVEROVICH

1    were going to find a fourth partner and do $250,000 each,

2    basically.

3    Q    And this is for what?

4    A    This is for the funding -- the initial funding of

5    Francis -- of JBMML.

6    Q    And did you end up getting any fourth partner or was it

7    just the three of you?

8    A    No, in the end, we all put in enough money to fund the

9    original million dollars.

10   Q    Into JBMML?

11   A    Into JBMML.

12   Q    Now, we will come back to JBMML in a second, but I first

13   have a few questions about what happened when Francis Bay was

14   sold.

15         Now, after the defendant's client purchased it, what

16   happened with Francis Bay?

17   A    The very next day that the company was sold, we simply

18   just redirected the daily receivables into the new bank

19   account for Francis Bay, LLC.  And we, basically, managed the

20   fund, so that it continued to reinvest daily.

21   Q    And did Francis Bay, LLC, have a bank account?

22   A    Yes, it did.

23   Q    Who controlled that account?

24   A    Jason and Jason Kurland's clients.

25   Q    Now, did you, Smookler or the defendant get any fees in

SAM    OCR    RMR    CRR    RPR

F. RUSSO - DIRECT - MS. ZVEROVICH

1   connection with Francis Bay, LLC, after the sale?

2   A    Yes, we did.

3   Q    What fees were that -- was that?

4   A    So, we managed the fund for Jason Kurland's clients, and

5   we charged a 7 percent, whatever was received for that month

6   in daily receivables.

7   Q    And who got this payment?

8   A    Myself, Frank Smookler, Jason Kurland.  And we gave a set

9   amount to an assistant in the office who helped us manage the

10  fund.

11  Q    What assistant was that?

12  A    Litsa Palladino.

13  Q    Now, did the defendant do -- personally do anything to

14  manage or to run Francis  Bay, LLC?

15  A    No.

16  Q    Why did he get a management fee?

17  A    Because we were business partners.  Anything that we did,

18  we did together, basically.

19               (Continued on the following page.)

20

21

22

23

24

25

                  SAM      OCR      RMR      CRR      RPR

F. RUSSO – DIRECT – MS. ZVEROVICH

1    BY MS. ZVEROVICH:

2    Q    Let's pull up Government's Exhibit 1146 for

3    identification.  If we could zoom in on the e-mail.

4         Mr. Russo, do you recognize this?

5    A    Yes, I do.

6    Q    What is it?

7    A    This is an e-mail from me to Litsa Palladino and Frank

8    Smookler.

9         MS. ZVEROVICH:  The Government offers Government's

10   Exhibit 1146.

11        MR. KASULIS:  No objection.

12        THE COURT:  Government's Exhibit 1146 is received in

13   evidence and published to the jury.

14        (Government Exhibit 1146, was received in evidence.)

15   Q    Let's publish that to the jury.

16        Mr. Russo, you said this is an e-mail from you to

17   Litsa Palladino and Francis Smookler, correct?

18   A    Yes.

19   Q    Again, remind us who is Litsa Palladino?

20   A    She was our assistant, but for the most part she acted as

21   our comptroller for the various entities.

22   Q    What the date of the e-mail?

23   A    11/19/2019.

24   Q    What is the subject?

25   A    The subject is Francis Bay management fee October.

Rivka Teich CSR RPR RMR FCRR
Official Court Reporter

F. RUSSO – DIRECT – MS. ZVEROVICH

1    Q     What are you writing in this e-mail?

2    A     I'm letting Litsa and Frank Smookler know what was

3    received for the month of October for total for Francis Bay,

4    what our management fee was, which was the 7 percent, and the

5    breakdown of who was getting what out of the 7 percent

6    management fee.

7    Q     How much did the defendant receive that month in the

8    management fee?

9    A     $1,147.81.

10   Q     How much did you receive?

11   A     $1,670.71.

12   Q     Did you send similar e-mails in other months for this

13   management fee?

14   A     Yes, every month.

15   Q     We can take that down.

16          THE COURT:  Let me ask, the balance less the $5,700,

17   went to Sea & Sand or to the client of the defendant?

18          THE WITNESS:  Yes.  It went to their Francis Bay LLC

19   bank account.

20          THE COURT:  How did that entity acquire funds in

21   order to lend them?  Who was handling the obtaining of funds

22   for this Francis Bay company?

23          THE WITNESS:  Okay.  So when we sold Francis Bay,

24   they sent over $2 million to our entity.  They didn't require

25   any additional funding to start investing the money because

F. RUSSO - DIRECT - MS. ZVEROVICH

1  Francis Bay, the old Francis Bay, already had receivables owed

2  to them.  So each day it would receive daily incremental

3  payments from its various deals that it was invested in.  It

4  would take those deals that it was receiving daily and

5  reinvest them daily.

6          THE COURT:  So it reacquired the principle from

7  those deals and any income that came from those deals, then

8  reinvested those funds in other deals?

9          THE WITNESS:  Yes.  Like for example in October,

10 81,000 less $5,700 it had already reinvested back on the

11 street in new deals.

12         THE COURT:  And so they would invest in new deals

13 but some of the funds would go as profit to the owner.

14         THE WITNESS:  Funds don't work as far as it was seen

15 as a simple profit.  Basically if it received, let's say for

16 example $10,000 in incremental payments today, the same day

17 that 10,000 would be reinvested.  The nature of the business

18 was to reinvest at the same time.  You never wanted to have

19 money sitting in a bank account, that's when it costed money.

20 You want to make sure it was reinvesting so it can maximize

21 it's potential profit.

22         THE COURT:  Who actually administered Francis Bay

23 for the new owner?

24         THE WITNESS:  So we managed the fund.  So basically

25 we would --

F. RUSSO – DIRECT – MS. ZVEROVICH

1          THE COURT:  Who is we?

2          THE WITNESS:  Myself and Litsa Palladino on a daily

3    basis would basically manage the fund with the relationships,

4    like the direct funder that we were funding with.  And we

5    would know that, let's say today we were receiving $10,000 in

6    payments, we would make sure that $10,000 was going out in new

7    deals.  So that there were no real wires going back and forth

8    to the new Francis Bay, it was just tracking of the deals that

9    were coming in and the deals that were basically going out.

10   If that makes sense; I know it's difficult.

11         THE COURT:  And Mr. Kurland's role in managing the

12   Francis Bay account?

13         THE WITNESS:  There was no role.  He was just a

14   partner, so he received his percentage of the fee.

15         THE COURT:  I see.  All right.

16         MS. ZVEROVICH:  Thank you, your Honor.

17   BY MS. ZVEROVICH:

18   Q    We can take that down, Ms. Hochron.  Thank you.

19         Mr. Russo, after the sale of Francis Bay, did you

20   continue to work in the MCA industry?

21   A    Yes.

22   Q    What company or companies did you have?

23   A    After the sale of Francis Bay, we still had our SMARK

24   Associates, which was the brokerage.  We still had Cheddar

25   Capital, the direct funder.  Now the new company JBMML, which

Rivka Teich CSR RPR RMR FCRR
Official Court Reporter

F. RUSSO – DIRECT – MS. ZVEROVICH

1    was basically another direct funder.

2    Q    Was the defendant involved as a partner in all three of

3    these entities?

4    A    Yes, he was.

5    Q    Who were the partners of JBMML?

6    A    Myself, Frank Smookler and Jason Kurland.

7    Q    Were you equal partners or different percentages?

8    A    Equal partners.

9    Q    Besides you, Smookler and the defendant, were there other

10   owners or partners of JBMML?

11   A    No, there wasn't.

12   Q    Ms. Hochron, if we could pull up Government Exhibit 908

13   in evidence.  We can go to page two.

14            Mr. Russo, do you recognize this?

15   A    Yes, I do.

16   Q    What is it?

17   A    This is the articles of organization for JBMML, LLC.

18   Q    Looking at the bottom, who is listed as organizer and

19   filer of this document?

20   A    Francis Smookler.

21   Q    Going to the next page on the bottom right, what is the

22   filing date for this document?

23   A    8/7/2018.

24   Q    Did you actually start using JBMML right after it was

25   formed?

F. RUSSO – DIRECT – MS. ZVEROVICH

1    A    No.

2    Q    What happened?

3    A    We had to wait for the sale of Francis Bay to be

4    finalized.  We started right after that.

5    Q    Did JBMML have a physical office location?

6    A    Yes, it did.

7    Q    Where was that?

8    A    Syosset, Long Island.

9    Q    Same offices as for Cheddar Capital?

10   A    Yes.

11   Q    What kind of company was JBMML?

12   A    We operated similar to how Cheddar Capital was being run

13   and Francis Bay.  We just added the ability to basically

14   cherrypick deals and fund them directly with no other

15   participation from anyone else.

16   Q    It was just the three of you?

17   A    Yes, it was.

18   Q    Did the three of you have discussions about how you would

19   raise money for this new company, JBMML?

20   A    Yes.

21   Q    What did you discuss with the defendant and Smookler?

22   A    That just like the other companies, we would try to raise

23   money through our own abilities; and Jason Kurland would go to

24   his clients to try to raise the money.

25   Q    Did the defendant in fact raise money for JBMML through

F. RUSSO - DIRECT - MS. ZVEROVICH

1    his clients?

2    A    Yes, he did.

3    Q    How much?

4    A    Millions.

5    Q    Did you open any bank accounts for JBMML?

6    A    Yes, we did.

7    Q    Ms. Hochron, if we can pull up Government Exhibit 418B in

8    evidence.  Let's zoom in on the top portion.

9              Mr. Russo, what is this?

10   A    These are the documents that were required in order to

11   open up a bank account within TD Bank.

12   Q    What account is this?  What entity is this account for?

13   A    JBMML LLC.

14   Q    Who is listed as the primary contact?

15   A    Myself.

16   Q    Did you open this account?

17   A    Yes, I did.

18   Q    Let's now go to page five.  Let's zoom in on section one,

19   which is certification of individual with control.  Who is

20   listed in that section?

21   A    Myself.

22   Q    And what is your listed percentage of ownership of JBMML?

23   A    50 percent.

24   Q    Let's now look at section two, who is listed there?

25   A    Francis Smookler.

F. RUSSO - DIRECT - MS. ZVEROVICH

1   Q     What was Smookler's listed percentage of JBMML?

2   A     50 percent.

3   Q     Now, is anybody else listed on this bank application as

4   an owner of JBMML?

5   A     No.

6   Q     Were there in fact any other owners?

7   A     Yes, there were.

8   Q     Who else?

9   A     Jason Kurland.

10  Q     Why didn't you list Jason Kurland as an owner of JBMML on

11  this bank application for JBMML?

12  A     Again, after we formed Cheddar Capital, right before we

13  formed Francis Bay, Jason Kurland no longer wanted to be on

14  corporate docs or bank accounts with these different entities.

15  Q     What, if anything, did he explain to you about that?

16  A     Just that it didn't look good to his clients him showing

17  ownership on all these different businesses that he was

18  getting them to invest in.

19  Q     Let's go to page three, looking on the bottom.  When was

20  this bank account opened?

21  A     10/23/2018.

22  Q     So that's close in time to the sale of Francis Bay that

23  we just looked at, correct, in October 2018?

24  A     Yes, right after.

25  Q     Setting aside -- and we can take that down.

F. RUSSO – DIRECT – MS. ZVEROVICH

1          Setting aside this particular bank application, was

2     the defendant listed on any documents or bank accounts

3     associated with JBMML?

4     A     No.

5     Q     Why not?

6     A     He didn't want to be on any corporate docs or bank

7     accounts showing his ownership.

8     Q     Did he nonetheless have access to JBMML's accounts?

9     A     Yes.

10    Q     How did he have access?

11    A     He had my log ins.

12    Q     How did he get your log ins?

13    A     He requested them and I gave them.

14    Q     Ms. Hochron, let's pull up Government Exhibit 1010 in

15    evidence.  Let's go to page 14, in the middle of the page.

16          Mr. Russo, what is this.

17    A     This is a text message between Jason Kurland and myself.

18    Q     What is the date?

19    A     10/25/2018.

20    Q     That's two days after you opened the JBMML bank account

21    that we just looked at, correct?

22    A     Yes.

23    Q     I'd like to read several of these messages the same way

24    we've been doing.  I'll read the defendant's messages, you can

25    read your own.

F. RUSSO – DIRECT – MS. ZVEROVICH

1    Litsa doesn't have access to the Francis Bay

2   account.  How are we going to manage it?  Also send me the

3   JBMML log in info.

4   A    I will get you JBMML account.  TD giving me a headache.

5   Q    Any luck with the log on info.  I'm meeting Chen Tuesday

6   to discuss the 1.6.

7    Before we move off of this page, who is Chen,

8   Mr. Russo?

9   A    One of Jason Kurland's clients.

10   Q    What do you understand the defendant to have meant by:

11   I'm meeting Chen Tuesday to discuss the 1.6?

12   A    He was approaching his client for a $1.6 million raise.

13   Q    Do you know whether Chen was a lottery client?

14   A    No, Chen was not a lottery client.

15   Q    Let's keep going next page.  Go ahead.

16   A    Yes.  All set up.  JBMML 165PWJMBBL165!.  Please don't

17   get us locked out.  Pain in the A to deal with TD.

18   Q    How would I get us locked out?  What shouldn't I do?

19   A    TD is weird.  We get locked out even when Litsa signs in

20   and I sign-in from my computer.

21   Q    What were you and the defendant discussing in this

22   thread?

23   A    I had given him my log in to TD's online access.  And I'm

24   just explaining to him please don't get us locked out because

25   it's a pain to deal with TD to get us access once we're locked

Rivka Teich CSR RPR RMR FCRR
Official Court Reporter

F. RUSSO – DIRECT – MS. ZVEROVICH

1    out.

2    Q    Why couldn't the defendant get his own log in info?

3    A    Because he wasn't on the bank statements or any corporate

4    docs so TD wouldn't give online access to anyone.

5    Q    Do you know whether or not defendant in fact used your

6    log in credentials to access JBMML's accounts?

7    A    Yes.

8    Q    How do you know that?

9    A    Because we got locked out.

10   Q    Let's pull up Government Exhibit 1010, page 46 on the

11   bottom.  What is this?

12   A    This is a text message between Jason Kurland and myself.

13   Q    What is the date?

14   A    4/3/2019.

15   Q    Who are the participants?

16   A    Jason Kurland and myself.

17   Q    Let's read several of these messages in the same way.

18           Morning bud.  Can you send me the JBMML log in info

19   for TD.  My info is old.  Thanks.

20   A    The bank account?  All the same.  But don't get us locked

21   out.  I'll have a report sent to you if needed.  It's a 30 min

22   phone call if we get locked out.

23   Q    What were you discussing with the defendant?

24   A    He had texted that he wanted new log in information

25   because he believed his log in information was old.  I

Rivka Teich CSR RPR RMR FCRR
Official Court Reporter

F. RUSSO – DIRECT – MS. ZVEROVICH

1    responded that, no, actually the log in information is the

2    same, please don't get us locked out.  It's a 30-minute phone

3    call every time we get locked out to get access again through

4    TD.

5    Q     Did the defendant continue to access the JBMML account in

6    2019?

7    A     Yes.

8    Q     How do you know that?

9    A     Because we got locked out.

10   Q     Apart from bank accounts, did the defendant have access

11   to other financial records for JBMML?

12   A     Yes.

13   Q     What records were those?

14   A     We had Quickbooks that was hooked up to our bank account.

15   We also used a service through Google called Google live

16   spreadsheets that was a more detailed tracking of our

17   business.

18   Q     How did Mr. Kurland have access to those documents?

19   A     We gave him access.

20   Q     Switching gears.  Can we pull up Government Exhibit 7 for

21   identification?

22          Mr. Russo, do you recognize that person?

23   A     Yes, I do.

24   Q     Who is that?

25   A     Greg Altieri.

F. RUSSO – DIRECT – MS. ZVEROVICH

1          MS. ZVEROVICH:  The Government offers Government

2    Exhibit 7.

3          MR. KASULIS:  No objection.

4          THE COURT:  Government Exhibit 7 is received in

5    evidence.

6          (Government Exhibit 7, was received in evidence.)

7          MS. ZVEROVICH:  Permission to publish it on the

8    board, your Honor?

9          THE COURT:  Yes.

10   BY MS. ZVEROVICH:

11   Q    Who is this?

12   A    This is the owner of LNA Associates who was a client that

13   we were funding deals through.

14   Q    You said his name was Gregory Altieri?

15   A    Yes.

16   Q    How long have you known Mr. Altieri?

17   A    A few years before I got arrested.

18   Q    What, if any, relationship did you have with Altieri?

19   A    We had a business relationship.  He owned a business that

20   we first started brokering deals out, then we funded directly

21   through JBMML.

22   Q    Who is we?

23   A    Myself, Frank Smookler, and Jason Kurland.

24   Q    How did you meet Mr. Altieri?

25   A    He was referred by mutual friend.

F. RUSSO - DIRECT - MS. ZVEROVICH

1    Q    What did he do for a living?

2    A    He owned this entity that he said was, that he was

3    basically in the jewelry business acquiring these close-out

4    jewelry lots and reselling them for large mark up.

5    Q    Later on, what did you eventually learn about his

6    business?

7    A    That he was operating a ponzi scheme.

8    Q    How did you learn that?

9    A    Because he was arrested himself.

10   Q    Approximately when, do you recall?

11   A    I don't remember the date, but it was right before or

12   right around the start of COVID, or right after when COVID

13   hit.

14   Q    Now, what business, what was the name Mr. Altieri's

15   business entity?

16   A    LNA Associates.

17   Q    I'd like to walk through the history of your business

18   relationship with Altieri.  At first, what business dealings

19   did you have with Altieri?

20   A    At first it was pure brokerage.  He was referred to us as

21   a business that was already receiving cash advances from other

22   direct funders.  And the mutual friend thought it would be a

23   good fit if we were able to fund him Merchant Cash Advances

24   through our brokerage.

25   Q    Did you in fact broker loans, MCA deals, for Altieri?

Rivka Teich CSR RPR RMR FCRR
Official Court Reporter

F. RUSSO – DIRECT – MS. ZVEROVICH

1    A    Yes, quite a lot.

2    Q    Through what entity did you do that?

3    A    SMARK Associates.

4    Q    Generally what happened with those deals that you

5    brokered?

6    A    He paid off and was an exemplary client.

7    Q    Could you repeat that?

8    A    He paid off all the deals that were brokered, and he was

9    a great client of ours.

10   Q    What happened next?

11   A    At some point after we had a good report with Greg

12   Altieri he had pitched this scenario to Frank and myself that

13   he basically had these jewelry deals and that he needed a lot

14   more funding than he was already accustomed to within the

15   Merchant Cash Advance space.  And if we could fund those

16   deals, we would be partners in each deal that he shopped us.

17   Q    Who did Altieri pitch this to?

18   A    He pitched it to Frank and myself, who explained it to

19   Jay.

20   Q    What did you tell the defendant?

21   A    That we have a great client who's been proven through the

22   brokerage as -- we refer to them as A clients, the better of

23   the companies.  And that we had a great opportunity to be a

24   percentage of each, basically deal, that he had.

25   Q    What was the defendant's reaction or response?

F. RUSSO – DIRECT – MS. ZVEROVICH

1   A     Thrilled.  Again, this was a great client.  He had paid

2   back many, many, many cash advances seamlessly.  And this was

3   a great opportunity for us to basically get a lot more of the

4   pie.

5   Q     How much were you Smookler and the defendant hoping to

6   profit off of this?

7   A     Millions.

8   Q     Did you all in fact agree to fund Altieri for these

9   jewelry deals?

10  A     Yes.

11  Q     What entity did you use to fund Altieri?

12  A     JBMML.

13  Q     In total can you estimate how much money you Smookler and

14  the defendant gave to Greg Altieri?

15  A     I would say we gave him north of 30, $35 million.

16  Q     Whose money did you give him?

17  A     Jason Kurland's clients.

18          MS. ZVEROVICH:  Your Honor, if the Court would like

19  to take a lunch break, I think this is a good stopping point.

20          THE COURT:  I think it's a good time to stop.  We'll

21  resume in an hour.  All rise for the jury.

22          (Jury exits the courtroom.)

23          THE COURT:  The witness may stand down.  Do not

24  discuss your testimony with anyone.

25          THE WITNESS:  Yes, your Honor.

PROCEEDINGS

1          (Whereupon, the witness steps down.)

2          THE COURT:  You may be seated.  About how much more

3   do you have for this witness on direct?

4          MS. ZVEROVICH:  I believe we're about halfway

5   through.

6          THE COURT:  Another two hours.

7          MS. ZVEROVICH:  Correct, your Honor.

8          THE COURT:  And then on cross?

9          MR. KASULIS:  It depends on how the witness

10   responds, your Honor, but I would guess probably two or three

11   hours.

12          THE COURT:  That would bring us into Monday.

13          MR. KASULIS:  That's probably right, your Honor.

14          MR. KASULIS:  I think the Government has another

15   witness --

16          THE COURT:  We are going to finish with this witness

17   before going to the next one.

18          Let's take an hour for lunch.

19          (Continued on next page.)

20

21

22

23

24

25

Rivka Teich CSR RPR RMR FCRR
Official Court Reporter

PROCEEDINGS

1    (Afternoon session.)

2    THE COURTROOM DEPUTY:  All Rise.

3    THE COURT:  Are you ready?

4    MR. KASULIS:  Yes, your Honor.

5    MS. ZVEROVICH:  I wanted to briefly raise one issue

6    with the Court before the jury comes.

7    THE COURT:  Please be seated.

8    MS. ZVEROVICH:  Your Honor, this relates to

9    cross-examination of Mr. Russo.  We expect based on

10   Mr. Kasulis' opening and what he told us, that he plans to

11   impeach Mr. Russo by seeking to introduce multiple wiretap

12   recordings that the defense has marked as Defense exhibits.

13   In our view, the proper procedure here is to ask Mr. Russo, to

14   the extent that the calls have relevance, did you say X, Y,

15   and Z.  If he says that he did, there is no further need to

16   seek to introduce the recording to bolster his testimony.  If

17   he says he doesn't recall, he could be refreshed.

18   THE COURT:  To impeach him, you mean.

19   MS. ZVEROVICH:  Correct.  If he denies making the

20   statement, at that point it may be appropriate under 613 to

21   play the recording.

22   But we wanted to front this issue for your Honor

23   that cross may begin before the next break.

24   THE COURT:  Briefly.

25   MR. KASULIS:  Yes, your Honor.  That would be true

Rivka Teich CSR RPR RMR FCRR
Official Court Reporter

F. RUSSO - DIRECT - MS. ZVEROVICH

1    if we were using them for impeachment.  These wiretaps, I

2    think your Honor appreciates, have independent relevance.

3    They are going to demonstrate, for instance, that the state of

4    mind of Mr. Russo, and later Mr. Smookler, is inconsistent

5    with being in a conspiratorial relationship with Jason

6    Kurland.  Because they are direct evidence that bears on the

7    crimes at issue, not just for impeachment as to the

8    credibility of the witness, they should be allowed to be

9    played.

10            THE COURT:  Thanks for letting me know.  I'll let

11   you know.  Let's call in the jury.

12            (Jury enters the courtroom.)

13            THE COURT:  Please be seated everyone.

14            Ms. Zverovich, you may continue your examination of

15   the witness.

16            I remind the witness he's still under oath.

17            MS. ZVEROVICH:  Thank you, your Honor.

18   BY MS. ZVEROVICH:

19   Q    Mr. Russo, before we broke for lunch we discussed that

20   you, Smookler, and the defendant funded Gregory Altieri tens

21   of millions of dollars using clients' money, correct?

22   A    Yes.

23   Q    You testified that was for various jewelry deals that

24   Mr. Altieri pitched to you, correct?

25   A    Correct.

F. RUSSO – DIRECT – MS. ZVEROVICH

1  Q    Approximately how many such jewelry deals would you say

2  you did with Mr. Altieri?

3  A    I don't remember the final amount, but I believe around

4  15.

5  Q    Did you discuss those deals with the defendant before

6  funding them?

7  A    Yes, we did.

8  Q    Were there any contracts with either Mr. Altieri or his

9  company, LNA Associates, for these jewelry deals?

10 A    We used a standard MCA agreement because we didn't have

11 any others.

12 Q    Were these in fact MCA deals?

13 A    No, they weren't.

14 Q    Why not?

15 A    A traditional MCA funding basically determines an amount

16 based off of what is flowing through the bank statements of

17 that business.  We were basically determining an amount for

18 the Greg Altieri deals based off of the deal that was on the

19 table.

20       So if he needed five or $10 million, we funded it

21 based off the needs of the deal not based off of what was

22 determined that was flowing through the bank account itself.

23 Q    So is it fair to say that you papered these deals as MCA

24 deals but they were not really MCA deals?

25 A    Yes.

F. RUSSO – DIRECT – MS. ZVEROVICH

1    Q    Did you discuss that with Mr. Kurland?

2    A    Yes.

3    Q    Why did you do that?  Why did you paper these deals as

4    MCA deals?

5    A    Because if the time ever came where his clients wanted to

6    see how the business was operating, we needed some sort of

7    paperwork to show where we were funding or putting these

8    monies that were coming into JBMML.  So we used the Merchant

9    Cash Advance agreements to show what we were basically giving

10   it to Greg Altieri.

11   Q    Now, did you internally keep track you, or somebody at

12   JBMML, keep track of the various jewelry deals that you did

13   with Altieri?

14   A    Yes.

15   Q    Please take a look at what is marked for identification

16   as Government Exhibit 1202.  Mr. Russo, do you recognize that?

17   A    Yes, I do.

18   Q    What is it?

19   A    This was our Google live spreadsheet.  It's basically how

20   we kept track of all the ins and outs of the business, not

21   only with the deals but the investments that were made into

22   JBMML and our debt payments associated with those investments.

23   Q    Was this Excel spreadsheet made and created and kept in

24   the ordinary course of JBMML's business activities?

25   A    Yes, it was.  It was relied on daily, if not to the

F. RUSSO - DIRECT - MS. ZVEROVICH

1    minute.

2              MS. ZVEROVICH:  The Government offers Government

3    Exhibit 1202.

4              MR. KASULIS:  No objection.

5              THE COURT:  Government Exhibit 1202 is received in

6    evidence and published to the jury.

7              (Government Exhibit 1202, was received in evidence.)

8    BY MS. ZVEROVICH:

9    Q    Mr. Russo, could you please generally describe what types

10   of information are contained on this spreadsheet at a high

11   level?

12   A    So basically this kept track of everything associated

13   with the business within JBMML.  On the lower tabs we

14   basically kept track of any deals that JBMML funded internally

15   to its cherrypicked clients, any of the relationships that we

16   had with other funders where we invested in their deals, the

17   notes or loans that we had from investors in order to keep

18   track of the maturity date, the amount that they lent us or

19   invested with us, and our interest payments that were owed to

20   those investors.

21   Q    Who maintained the spreadsheet?

22   A    Litsa Palladino for the most part maintained it on a

23   daily basis.

24   Q    Did the defendant have access to this spreadsheet?

25   A    Yes, he did.

F. RUSSO − DIRECT − MS. ZVEROVICH

1    Q    Scrolling a little to the bottom of this page, could you

2    tell from here approximately through when this version of the

3    spreadsheet was updated?

4    A    It looks like this spreadsheet is valid through

5    4/22/2019.

6    Q    Let's go to the JBMML tab.  What is reflected in this

7    tab, what is contained here?

8    A    In the JBMML tab, these are all the deals that JBMML

9    funded by itself, a very high percentage basically.  Instead

10   of going outside and asking others to get involved in the

11   investment of these deals, we funded them directly basically.

12   Q    Who were the majority of these deals with?

13   A    Greg Altieri's LNA Associates.

14   Q    The merchant name is −− we can see that in row nine?

15   A    Yes.

16   Q    Let's focus on column Y.  Could you just walk the jury

17   through what we see in column Y, what is reflected?

18   A    This is the very first deal that we did with Greg Altieri

19   or LNA Associates in−house.  It was funded on 10/19/2018.  It

20   had a maturity date of 3/15/2019.

21   Q    What does that mean "a maturity date"?

22   A    It was supposed to be paid back in full by 3/15/2019.

23   Q    How much was Mr. Altieri supposed to pay you back?

24   A    The original funding amount was for $1 million, and the

25   total pay back was $1.35 million.

F. RUSSO - DIRECT - MS. ZVEROVICH

1  Q     Did Mr. Altieri end up paying off this particular deal

2  for $1 million?

3  A     You would have to scroll to the bottom.  Yes, this deal

4  was paid off.

5  Q     Looking at row 32, where it says, pay off adjustments, it

6  says $497,368.44.  Do you know what that reflects?

7  A     Yes.  It can reflect one or two things.  One, rolled over

8  into a new deal as far as payments that were owed.  Or that

9  balance was paid upon the new funding.

10 Q     Sitting here now you don't know which one, correct?

11 A     I do not.

12 Q     Were there any red flags that you experienced with

13 Mr. Altieri after this first deal?

14 A     Yes.  After the first deal there was one big red flag.

15          So to give a little insight.  When we funded these

16 deals with Greg.  He explained these were basically jewelry

17 wholesale deals where he was basically buying these lots of

18 jewelry from an entity like Costco and selling them to a

19 company like BJs.  He would buy them from one entity and he

20 needed something known as a fulfillment center.

21          What he did is he, basically, or advertised that he

22 would get this amount of jewelry which was a large amount of

23 jewelry, broken into rings, necklaces, bracelets, whatever

24 they were.  It would go to this fulfillment center.  In the

25 fulfillment center they would basically repackage the jewelry

F. RUSSO - DIRECT - MS. ZVEROVICH

1  put bar codes on the jewelry that was associated to who was

2  buying the jewelry.

3          So for example, if Costco was buying the jewelry, he

4  would repackage the jewelry and put Costco bar codes on it; so

5  when it was sent to Costco it was ready to be sold at Costco.

6  Q    Okay.  What was the red flag that you were talking about?

7  A    Right after we funded the first deal, he had another deal

8  on the table.  We asked for updated bank statements from LNA

9  Associates just to see where our million dollars went.

10         We seen that the million dollars was disbursed to

11 many different entities, and he explained to us how the

12 fulfillment center operated.  So we wanted to see a payment

13 going to the fulfillment center.  Because it was a crazy

14 business, because he didn't have direct access to the seller

15 and he didn't have access to the buyer, he was a middle man

16 for the seller and he was a middle man for the buyer, but the

17 fulfillment center is something he had dealt with personally

18 and we should be able to see transactions with that

19 fulfillment center.  It would show us something tangible

20 within that line of sale.

21         When he explained to us the fulfillment center, we

22 asked to see paperwork of an agreement with the fulfillment

23 center or at very least a payment going to the fulfillment

24 center.

25 Q    Did you see any payment to the a fulfillment center going

F. RUSSO - DIRECT - MS. ZVEROVICH

1  out from Greg Altieri's bank account?

2  A     No.  He couldn't produce paperwork going to the

3  fulfillment center or a payment going to the fulfillment

4  center.  Even when we asked to go to the fulfillment center

5  in-person with him to at least see them repackaging and it

6  working, he told us that it's such a secure security he is not

7  even allowed in the fulfillment center.

8        That was our first red flag of dealing with him.

9  Q     Did you discuss that incident with the defendant?  Did he

10 know about it?

11 A     Yes.  Jason, Frank, myself knew about it.  We even asked

12 advice from Anthony Lodati, who wasn't involved in the deal,

13 he was good with underwriting -- he was running Advantage and

14 Cheddar Capital -- about what his insight was regarding this

15 fulfillment center issue.

16 Q     What did Mr. Lodati say?

17 A     Major red flag, major issue.  If he can't at least show

18 some sort of proof with something that he deals with

19 personally, it didn't make sense.

20       We understand that he doesn't have contact with the

21 seller, and he doesn't have contact with the buyer, and he's a

22 middle man for each.  He should have a way prove that the

23 fulfillment center was real and was taking place.

24 Q     After this incident did you stop doing business with

25 Mr. Altieri or did you continue to fund him?

F. RUSSO – DIRECT – MS. ZVEROVICH

1    A    We continued to fund him.

2    Q    I'm going to skip several of these deals on the

3    spreadsheet.  Let's go to column I.  Is this another deal that

4    you did with Greg Altieri?

5    A    Yes, it is.

6    Q    What is the date?

7    A    This is funded on 3/7/2019.

8    Q    How much was this deal for?

9    A    The original funding amount, $15 million.

10   Q    Whose money was this that you were giving Greg Altieri?

11   A    Jason Kurland's clients.

12   Q    When was this deal supposed to be paid off?

13   A    The maturity date was 9/6/2019.

14   Q    Approximately six months later?

15   A    Yes.

16   Q    Was this deal paid off, did Greg pay?

17   A    No.

18   Q    If we look at the balance row, row 31, what is the

19   outstanding balance?

20   A    A little less than $20 million.

21   Q    Why is it that if you funded him 15 million, he owed back

22   this much more?

23   A    So Greg had signed to basically agree to pay us back a

24   total of $20,700,000.

25   Q    Okay, that's what is in row 17?

F. RUSSO - DIRECT - MS. ZVEROVICH

1    A    Yes.

2    Q    And the balance is 19.9 million, correct?

3    A    Yes.

4    Q    Did you do deals with Greg after this?

5    A    Yes.

6    Q    Let's look at column H.  What is the date?

7    A    3/21/2019.

8    Q    Approximately two weeks later after the prior deal,

9    correct?

10   A    Yes.

11   Q    How much did you fund Greg on that occasion?

12   A    $3.5 million.

13   Q    Whose money was used to give to Greg on this occasion?

14   A    Jason Kurland's clients.

15   Q    How much was Greg supposed to pay back?

16   A    On this particular deal it was $4,830,000.

17   Q    If we scroll to the bottom, what is the outstanding

18   balance as of April 2019?

19   A    A little more than $4.6 million.

20   Q    Did you fund Greg any more deals?

21   A    Yes.

22   Q    Let's look at column G.  What is the date?

23   A    4/12/2019.

24   Q    What is the amount?

25   A    $13.5 million.

F. RUSSO – DIRECT – MS. ZVEROVICH

1   Q    Whose money did the three of you use to give to Greg on

2   this occasion?

3   A    Jason Kurland's clients.

4   Q    How much was Greg supposed to pay back under this deal?

5   A    $16.2 million.

6   Q    If we scroll to the bottom, what is the outstanding

7   balance?

8   A    $16.2 million.

9   Q    We can take this down.  Thank you, Ms. Hochron.

10           Did you all continue to give money to Altieri after

11  April of 2019?

12  A    Yes, we did.

13  Q    Why?

14  A    I don't have a good answer.  I think we were still

15  believing that Greg was going to pay off and get the money

16  from his receivable.  And I think it was just agreed that we

17  were positioned to make so much money.

18  Q    You were hoping to make a lot of money?

19  A    Yes.

20  Q    You testified earlier that the defendant had access to

21  this spreadsheet.  Do you know whether or not he in fact

22  accessed spreadsheet?

23  A    Yes.

24  Q    How do you know?

25  A    Because we discussed it on multiple occasions.

Rivka Teich CSR RPR RMR FCRR
Official Court Reporter

F. RUSSO - DIRECT - MS. ZVEROVICH

1    Q     Ms. Hochron, if it we could pull up Government Exhibit

2    1009 in evidence.  Go to page 18.  Let's highlight all of the

3    three messages.  Let's start with the first message so it's

4    easier to see.

5              Mr. Russo, what is this?

6    A     This is a group text between Jason Kurland, Frank

7    Smookler and myself.

8    Q     What is the date?

9    A     12/6/2018.

10   Q     Who is sending the message?

11   A     Jason Kurland.

12   Q     Kurland wrote:  Looking at JBMML.  That's just the deals

13   we are in.  I need a schedule of debt.  When we owe the

14   payments back to investors.

15             Let's keep reading.

16             Go ahead and read your responses to Mr. Kurland.

17   A     I responded:  Look at bottom tabs.  Says notes and loans.

18   Q     What were you and the defendant discussing in this

19   thread?

20   A     We were discussing the Google live spreadsheet.  He

21   wanted to specifically know where it was that it showed where

22   his client's money was being tracked basically, and the

23   payments owed as far as the interest payments.

24   Q     This was the same spreadsheet that we just looked at?

25   A     Yes.

Rivka Teich CSR RPR RMR FCRR
Official Court Reporter

F. RUSSO – DIRECT – MS. ZVEROVICH

1  Q    If we can pull that back up, that's Government Exhibit

2  1202.  If we can scroll on the tabs to the right to see the

3  further tabs.  Are there in fact notes and loans tabs on the

4  spreadsheet?

5  A    Yes.

6  Q    You can take that down, Ms. Hochron.

7        Did the defendant continue to have access to the

8  spreadsheet after 2018?

9  A    Yes.

10 Q    Let's publish Government Exhibit 1010 in evidence and go

11 to page 51.  Let's look at the last message on the page.  What

12 is this?

13 A    This is a text message between Jason Kurland and myself.

14 Q    What is the date?

15 A    5/8/2019.

16 Q    And the defendant wrote:  Looking through the

17 spreadsheets now.  So the checks LNA didn't cash since

18 February and March are all rolled into the new loan.

19        Go to the next page.  What is your response?

20 A    Yes.

21 Q    What were you discussing here?

22 A    He was asking about the balances of each deal prior to

23 the new funding and how we were dealing with the balances,

24 whether they were rolled into new deals or not.

25 Q    Switching gears.  Did there come a time that you found

Rivka Teich CSR RPR RMR FCRR
Official Court Reporter

F. RUSSO – DIRECT – MS. ZVEROVICH

1   out about a lottery winner client of the defendant from

2   another state?

3   A     Yes.

4   Q     Do you know the client's true name?

5   A     No.

6   Q     How did you refer to this client?

7   A     The South Carolina lottery winners.

8   Q     Why did you refer to them as South Carolina?

9   A     If I'm not mistaken, that's where they won the lottery.

10   Q     What, if anything, did the defendant tell you about the

11   South Carolina clients?

12   A     It was his first -- his largest lottery winner basically.

13   Q     Do you know how much that client won in the lottery?

14   A     I think like 1.6 billion or something of the sort.

15   Q     Did you and the defendant discuss what goals you all had

16   for this client?

17   A     Yes.

18   Q     What was your goal?

19   A     Like any of his lottery clients, it was a goal to secure

20   an investment into our companies.

21   Q     You wanted to get the client's money into your companies,

22   correct?

23   A     Yes.

24   Q     Ms. Hochron, let's publish Government Exhibit 1009 in

25   evidence and go to page 20.  Let's start on the top of the

F. RUSSO - DIRECT - MS. ZVEROVICH

1   page, just enlarge that.

2              Mr. Russo, what is this?

3   A    This is a group text between Jason Kurland, Frank

4   Smookler and myself.

5   Q    What is the date?

6   A    The date is 3/4/2019.

7   Q    I'd like to read several messages in this thread in the

8   same way that we've been doing.  I will read the defendant's

9   messages and you please read your own messages as well as

10  Frank Smookler's.

11             The defendant wrote:  Check the news...

12  A    I respond, wow.

13             Then I respond with an article that I found on

14  Google.

15             I respond again, wow.

16  Q    And Mr. Kurland sends an article from FoxCarolina.com,

17  which includes:  Who is the lottery lawyer representing South

18  Carolina S billion.

19  A    I respond, amazing.

20             Then I respond, you are a -- Frank Smookler

21  responds, you are a celebrity legit.

22  Q    It's nuts.  How is Greg?

23  A    Frank Smookler responds, everything is perfect.  How are

24  you?  You are blowing up on the Internet.

25  Q    It's so great.  I think this one may have been a game

F. RUSSO – DIRECT – MS. ZVEROVICH

1    changer.  Michael Stratton e-mailed me last night.

2    A    Frank Smookler responds, you are the official lottery

3    lawyer.  Game over.

4             I respond, dude it's everywhere.  You are famous.

5    Q    Guys, how quickly can we get the deal going?  I may have

6    access to funds as early as tomorrow!!

7    A    Frank Smookler responds, right now.  Ready when you are.

8             I respond, get it in!

9    Q    What were you Smookler and the defendant discussing?

10   A    That he already retained this new billion-dollar lottery

11   winner.  He was discussing the potential of having the funds

12   into our account in the coming days.  He wanted to know how

13   fast we could have the deal that we were discussing about LNA

14   Associates ready to fund.

15   Q    Did the defendant's South Carolina client invest in your

16   MCA businesses?

17   A    Yes, they did.

18   Q    Ms. Hochron, go to the next page, page 26 in the same

19   exhibit.  If we can zoom in on the last message.

20            What is this?

21   A    This is a text message between Jason Kurland, Frank

22   Smookler and myself.

23   Q    What is the date?

24   A    3/5/2019.

25   Q    So that's one day later, correct?

F. RUSSO - DIRECT - MS. ZVEROVICH

1    A    Yes.

2    Q    The defendant wrote:  Just got the go-ahead to get ten

3    for Cheddar Capital and 20 for JBMML.  Hopefully tomorrow I'll

4    try to call later to discuss.

5         What did you understand the defendant to be saying

6    to you in this message and Smookler?

7    A    That he got his clients to agree to send $10 million to

8    Cheddar Capital and to send an additional $20 million to

9    JBMML.  And that he believed that hopefully the wires will hit

10   tomorrow.

11   Q    Were these investments for $10 million and $20 million

12   into your companies made?

13   A    Yes.

14   Q    How did you find out about them?

15   A    From Jason Kurland when the wires were released and from

16   the bank account when the wires hit.

17   Q    Let's publish, Ms. Hochron, Government Exhibit 1010 in

18   evidence, and go to page 34 in the middle of the page.

19         Mr. Russo, what is this?

20   A    This is a text message between myself and Jason Kurland.

21   Q    What is the date?

22   A    3/6/2019.

23   Q    So that's one day later, correct?

24   A    Yes.

25   Q    This is you sending the message?

Rivka Teich CSR RPR RMR FCRR
Official Court Reporter

F. RUSSO – DIRECT – MS. ZVEROVICH

1    A    Yes.

2    Q    Read your message.

3    A    Let us know the best way to communicate with you and time

4    so that we can keep the expectations managed as it pertains to

5    deploying capital.

6    Q    I'd like to read, continue to reading this chain the same

7    way that we've been doing.  I'll read the defendant you can

8    read yourself.

9              99 percent coming today.  Just keep looking.  Litsa

10   will text me when it hits.  Bank will let me know when it's

11   going.  Haven't heard from them yet.  How much are we ready to

12   deploy?

13   A    I respond, the machine is ready to go.  We're ready to

14   talk to you.

15              (Continued on next page.)

16

17

18

19

20

21

22

23

24

25

                    RUSSO – DIRECT – ZVEROVICH

1    DIRECT EXAMINATION (Continued)

2    BY MS. ZVEROVICH:

3    Q    Okay.

4    A    I respond, 20 hit, exclamation point.

5    Q    What were you referring to?

6    A    The 20 million hit the JBMML bank account.

7    Q    The defendant responds, show me a video of everyone

8    dancing.  Ha.

9    A    Dude, we are on the floor exhausted.

10            I respond, you are a fucking beast.

11   Q    Ha ha.  Can you ask Litsa to send me the 1 percent.

12            What did you understand the defendant to ask here?

13   A    Once the wire hit our account, he wanted his 1 percent

14   finder's fee.

15   Q    Let's continue.

16   A    Yes, sir.

17   Q    Thanks man.

18            Exciting times.

19   A    I respond, it has to sit in TD for 24 hours.  But nine

20   a.m. as soon as it opens.

21   Q    That's fine.

22   A    I will do it personally.

23   Q    Ha ha.

24            What are you discussing?

25   A    TD had a requirement that any large wires had to sit in

                      *Avery N. Armstrong, RPR*
                      *Official Court Reporter*

RUSSO − DIRECT − ZVEROVICH

1  the bank account for 24 hours before you were able to send

2  them out.  So that I was unable to send him his finder's fee

3  that day.  I had to wait 24 hours and do it the very next day.

4  Q    And did you send the finder's fee?

5  A    Yes, I did.

6  Q    And let's go to the next page --

7         THE COURT:  Hold on.  What was the finder's fee on

8  the 20 million?

9         THE WITNESS:  It was 1 percent.  It was $200,000.

10        THE COURT:  Go ahead.

11        MS. ZVEROVICH:  Thank you, Your Honor.

12        If we can continue reading.

13  Q    What is that?

14  A    This is a text between myself and Jason Kurland.

15  Q    And what's the date?

16  A    3/7/2019.

17  Q    Go ahead and read your message.

18  A    Sending the 1 percent now to you.

19  Q    Beautiful.  How's the vibe in the office?  Energy?

20  A    Dude of course.  We are killing it.

21  Q    Wore received, exclamation point.  Wire.

22        What you were discussing?

23  A    The 1 percent finder's fee that I had wired to him hit

24  his account.

25        MS. ZVEROVICH:  We can down this down, Ms. Hochron.

*Avery N. Armstrong, RPR*
*Official Court Reporter*

RUSSO – DIRECT – ZVEROVICH

1          Thank you.

2    Q    In addition to the 20 million-dollar investment into

3    JBMLL, did the South Carolina client also make an investment

4    in Cheddar around the same time?

5    A    Yes.

6    Q    How much was that investment?

7    A    10 million-dollar investment.

8    Q    And did the defendant get a finder's fee on that

9    transaction as well?

10   A    Yes.

11   Q    How much?

12   A    1 percent or 100,000.

13   Q    Now, did Cheddar and JBMML issue promissory notes for

14   these investments?

15   A    Yes.

16   Q    Please take a look at Government Exhibits 104 and 105 for

17   identification.

18          Do you recognize these?

19   A    Yes, I do.

20   Q    What are they?

21   A    This one is the promissory note for JBMML in the amount

22   of $20 million to Cedar Ridge Partnership.  And this is the

23   promissory note from Cheddar Capital to Cedar Ridge

24   Partnership in the amount of $10 million.

25   Q    And are these fair and accurate copies of the promissory

*Avery N. Armstrong, RPR*
*Official Court Reporter*

RUSSO – DIRECT – ZVEROVICH

1  notes?

2          THE COURT:  I'm sorry.  104, I tried to

3  differentiate between 104 and 105 for the record, please.

4          MS. ZVEROVICH:  Sure.

5  Q    Mr. Russo, what do you recognize 104 to be?

6  A    104 is the $10 million promissory note from Cheddar

7  Capital to Cedar Ridge Partnership.

8  Q    Great.  Now let's go to 105.

9  A    105 is the $20 million promissory note from JBMML to

10 Cedar Ridge Partnership.

11 Q    And what is Cedar Ridge Partnership?

12 A    Cedar Ridge Partnership is Jason Kurland's clients.

13 Q    The South Carolina clients?

14 A    Yes.

15 Q    And are these, 104 and 105, fair and accurate copy of the

16 promissory notes?

17 A    Yes.

18          MS. ZVEROVICH:  The Government offers Government

19 Exhibits 104 and 105.

20          MR. KASULIS:  No objection.

21          THE COURT:  Exhibits 104 and 105 are received in

22 evidence.

23          (Government Exhibit 104 and 105, were received in

24 evidence.)

25          MS. ZVEROVICH:  And we can take them down for now.

                    *Avery N. Armstrong, RPR*
                     *Official Court Reporter*

RUSSO – DIRECT – ZVEROVICH

1  Q    Mr. Russo, what did you do with most of the South

2  Carolina clients investments into JBMML?

3  A    We funded LNA Associates.

4  Q    And did Mr. Kurland know that you were doing that?

5  A    Yes.

6        MS. ZVEROVICH:  Ms. Hochron, let's pull up

7  Government Exhibit 1010 in evidence.  And let's go to Page 40

8  on the bottom.

9        The last message.

10 Q    What is this?

11 A    This is a text message between Jason Kurland and myself.

12 Q    What is the date?

13 A    3/7/2019.

14 Q    So that's approximately one day after you received the

15 20 million investment from South Carolina, correct?

16 A    Yes.

17 Q    All right.  Let's read several of these messages in the

18 same way.  I will read the defendant and you can read

19 yourself.

20        Funding Greg today?

21 A    Brother this is nothing.  Yes.  Done.

22 Q    Wow, four exclamation points.

23        What day of the week does he pay us?

24 A    Next Friday.

25 Q    And every Friday thereafter?

*Avery N. Armstrong, RPR*
*Official Court Reporter*

RUSSO – DIRECT – ZVEROVICH

1   A      Six month 1.38.  Yes.  Weekly.

2   Q      Would you explain what you were discussing here.

3   A      We're talking about the LNA Associates deal that we had

4   just funded.  He's asking when we should be receiving

5   payments, whether it's going to be this coming Friday and

6   every Friday after that.  I'm explaining that, yes, it will be

7   weekly and I gave the breakdown of the deal which was six

8   month and 1.38.

9   Q      And what is 1.38?  What does that mean?

10  A      1.38 associates to a money factor rate that we use within

11  the merchant cash advance space.  But to simplify it, a 1.38

12  is --

13              (Court reporter interrupts for clarification.)

14  A      The 1.38 associates with a money factor rate within the

15  merchant cash advance space, and to simplify it, you can

16  basically call it a 38 percent interest rate.

17  Q      Let's continue.

18              THE COURT:  And payments would be made every week?

19              THE WITNESS:  Yes.

20              THE COURT:  By the borrower?

21              THE WITNESS:  By the borrow.  In theory, they were

22  supposed to be made every week, principal and interest.

23              THE COURT:  The total interest over the six months

24  would be 38 percent?

25              THE WITNESS:  Yup.  38 percent to the dollar and at

*Avery N. Armstrong, RPR*
*Official Court Reporter*

RUSSO – DIRECT – ZVEROVICH

1   the end of six months, it should be paid off in total.

2          THE COURT:  All right.  Go ahead.

3          MS. ZVEROVICH:  Thank you, Your Honor.

4          Let's keep going, Mr. Russo.  I will read the

5   following message and we'll continue.

6   Q    Mr. Kurland wrote, we are going to have to make a big

7   distribution in April for personal taxes.

8          I guess we'll still have plenty from the balance but

9   we need to plan for it.

10  A    I respond, yes I am planning.

11         Brother this deal will not us almost 7 million not

12  including platinum or Webster.

13         Worry about that.

14         Net.

15  Q    Now, what did you mean by this deal will net us almost

16  $7 million, not including platinum or Webster?

17         Can you explain that?

18  A    Yes.  So Jay was worried about us being able to pay our

19  personal taxes, and I was explaining that not to worry because

20  this one deal that we funded with Greg, in theory, should

21  basically give a revenue to our funding company or JBMML in

22  almost $7 million, not including platinum or Webster which was

23  two other relationships that we had which were other direct

24  funders that we invested in on their platform, basically.

25         THE COURT:  And whose taxes was he concerned about?

RUSSO - DIRECT - ZVEROVICH

1          THE WITNESS:  His personal, my personal, and Frank

2    Smookler's personal.

3          THE COURT:  I see.

4    Q    And so you were going to pay these taxes using

5    distributions from the business?

6    A    Yes.

7          THE COURT:  But not the investment company's

8    personal, you know, taxes -- you know, the lottery winner's

9    taxes?

10         THE WITNESS:  No.  The taxes were -- he was only

11   worried about our taxes.

12   Q    By our, do you mean Mr. Kurland's, Mr. Smookler's, and

13   your personal taxes?

14   A    Yes.

15         THE COURT:  Was it your understanding that the

16   lottery winner's entity would also have a taxable event or did

17   you know?

18         THE WITNESS:  No.  So I did know.

19         So in the merchant cash advance space, there's

20   nothing taxable until they receive the moneys back.  So up --

21   while we had their money as an investment, if anything was --

22   it was a net loss to them until they received the money back

23   in full.

24         THE COURT:  I see.

25         THE WITNESS:  Or in part, depending on how much they

*Avery N. Armstrong, RPR*
*Official Court Reporter*

RUSSO – DIRECT – ZVEROVICH

1   received back.

2            THE COURT:  All right.  Thank you.

3            Go ahead.

4            MS. ZVEROVICH:  Thank you, Your Honor.

5            Ms. Hochron, if we can please go to Page 45 and I'd

6   like to continue reading some of the messages.

7   Q    Mr. Kurland -- and this is continuing from the prior

8   thread.  Mr. Kurland wrote, how so much?  What did we fund

9   him?

10  A    15 million.  Pay back 20,700,000.

11  Q    What were you explaining to Mr. Kurland here?

12  A    That this one particular deal of funding of $15 million

13  had a total pay back of $20,700,000.

14  Q    Now, I'd like to take a look at the very last message on

15  this page.

16           This is about two weeks later from Mr. Kurland to

17  you.

18           Love the SMARK distributions, three exclamation

19  points.  Thanks.

20           What does that refer to?

21  A    That's referring to the distributions from our brokerage

22  that paid the partners that month.

23  Q    Okay.

24           MS. ZVEROVICH:  You can take that down, Ms. Hochron.

25           Thank you.

*Avery N. Armstrong, RPR*
*Official Court Reporter*

RUSSO – DIRECT – ZVEROVICH

1   Q     Now, did you, in fact, fund Altieri using South

2   Carolina's clients money?

3   A     Yes.

4   Q     And generally, what happened with that money?

5   A     We lost it.

6         MS. ZVEROVICH:  Let's pull up Government

7   Exhibit 418I in evidence.

8         And let's go to Page 27.

9         Let's zoom in on the other credits section.  Well,

10  first, let's look at the top.

11  Q     What is this, Mr. Russo?

12  A     This is a bank account bank statement from TD Bank for

13  JBMML LLC.

14  Q     And what's the period that it covers?

15  A     The month of March 2019.

16        MS. ZVEROVICH:  Let's now zoom in on the other

17  credits section on this page.

18        Let's look at the second wire.

19  Q     What is that?

20  A     That's an incoming wire on 3/6 from Cedar Ridge

21  Partnership in the amount of $20 million.

22  Q     And Cedar Ridge Partnership is the South Carolina client?

23  A     Yes.

24        MS. ZVEROVICH:  Let's go to the next page.

25        And let's go into the other withdrawals section.

*Avery N. Armstrong, RPR*
*Official Court Reporter*

RUSSO – DIRECT – ZVEROVICH

1          Now, about six lines down.  Let's look at that

2    transaction to LNA Associates.  Two up, Ms. Hochron.

3    Q    What is this?

4    A    That's an outgoing wire on 3/7 to LNA Associates for a

5    little over $12 million.

6    Q    And two wires down, there is another ware to LNA

7    Associates.

8          What is that?

9    A    On the same day, there was a wire for a little bit more

10   than $46,000 wired out to LNA Associates.

11   Q    And what is the date of these wires?

12   A    3/7.

13   Q    So that's the -- one day after you received the

14   $20 million, correct?

15   A    Yes.

16   Q    Now, if you funded Altieri 15 million as we looked at in

17   the spreadsheet and in your message, why is this amount lower?

18        Why is it approximately 12.3 million?

19   A    Because in funding of an MCA deal, there was also fees

20   associated with it, particularly, an upfront fee.  So his

21   funding amount was minus the upfront fee that we charged him.

22   Q    So here, the upfront fee would be over two and a half

23   million dollars?

24   A    On this particular 15 million-dollar deal, the upfront

25   fee would be $1.5 million.

*Avery N. Armstrong, RPR*
*Official Court Reporter*

RUSSO – DIRECT – ZVEROVICH

1   Q   1.5 million, okay.

2   A   Yes.

3   Q   And who took that fee?

4   A   Frank Smookler and myself.

5   Q   Did the defendant get any portion of that fee?

6   A   No, he didn't.

7   Q   Now, let's look at still in the same section.

8          Following the first LNA transfer, do you see there's

9   a transfer to GK3 LLC?

10  A   Yes.

11  Q   And that's on the same date, March 7th, correct?

12  A   Yes, it is.

13  Q   In what amount?

14  A   $200,000.

15  Q   And what does this represent?

16  A   That represents Jason Kurland's finder's fee in the

17  amount of 1 percent of the total invested.

18         MS. ZVEROVICH:  We can take that down.

19         Thank you, Ms. Hochron.

20  Q   Now, in addition to these two wire transfers of

21  20 million and then 10 million, did the South Carolina client

22  invest additional funds into your MCA company?

23  A   Yes, they did.

24         MS. ZVEROVICH:  Let's pull up Government

25  Exhibit 1009 in evidence.  And let's go to Page 27.

*Avery N. Armstrong, RPR*
*Official Court Reporter*

RUSSO – DIRECT – ZVEROVICH

1          Let's zoom in on the bottom message.

2     Q     What is this?

3     A     This is a group text between Jason Kurland, Frank

4     Smookler, and myself.

5     Q     And what's the date?

6     A     4/12/2019.

7     Q     The defendant wrote 12.6 initiated.

8          Let's keep going.

9     A     I respond, you worried about your tax liability after

10    this year, question mark.

11    Q     Ha ha.

12         What were you discussing here, what is 12.6?

13    A     There was an additional investment or a raise in the

14    amount of $12,600,000 from Jason Kurland's clients.

15    Q     And that's on approximately April 12, 2019?

16    A     Yes.

17    Q     Now, did you also receive another investment from one of

18    Jason Kurland's clients on the say same day?

19    A     Yes.

20         MS. ZVEROVICH:  Let's pull up Government

21    Exhibit 1010 in evidence and go to Page 48.

22         And let's zoom in on the middle message.

23    Q     Looking at the top message, what is that?

24    A     That's a text message between myself and Jason Kurland.

25    Q     You sent it?

*Avery N. Armstrong, RPR*
*Official Court Reporter*

RUSSO – DIRECT – ZVEROVICH

1    A    Yes.

2    Q    What's the date?

3    A    4/12/2019.

4    Q    Same date as the 12.6?

5    A    Yes.

6    Q    What did you write?

7    A    Five hit.

8    Q    And what did you mean by that?

9    A    An additional $5 million hit the bank account for JBMML.

10   Q    Now, was there a promissory note for this

11   5 million-dollar investment?

12   A    Yes.

13   Q    Let's pull up Government Exhibit 106 for identification.

14        Mr. Russo, do you recognize this?

15   A    Yes, I do.

16   Q    What is this?

17   A    This is a promissory note in the amount of $5 million

18   from JBMML to Sea and Sand Trust.

19   Q    And what's the date?

20   A    April 12, 2019.

21   Q    And looking at the second page.

22        Is that your signature?

23   A    Yes, it is.

24        MS. ZVEROVICH:  The Government offers Government

25   Exhibit 106.

*Avery N. Armstrong, RPR*
*Official Court Reporter*

RUSSO – DIRECT – ZVEROVICH

1    MR. KASULIS:  No objection, Your Honor.

2    THE COURT:  All right.  Exhibit 106 is received in

3    evidence.

4    (Government Exhibit 106, was received in evidence.)

5    Q    Now, was there also any note for the $12.6 million

6    investment, Mr. Russo?

7    A    I believe we had signed something, but I don't think it

8    was a note for the 126.

9    MS. ZVEROVICH:  Let's pull up Government Exhibit 107

10   for identification.

11   And we can scroll through the various are pages for

12   Mr, Russo.

13   A    I remember this now.

14   Q    Do you recognize this?

15   A    Yes, I do.

16   Q    What is it?

17   A    This basically is our standard merchant cash advance

18   agreement that we use for all the deals that we funded to

19   businesses.

20   Q    And what is this agreement for?

21   What does it relate to?

22   A    At the time, we had no promissory note drafted for the

23   $12.6 million that Jason Kurland had just basically raised, so

24   we had just used a merchant cash advance agreement to paper up

25   something to show the 12 million-dollar investment and the

*Avery N. Armstrong, RPR*
*Official Court Reporter*

RUSSO – DIRECT – ZVEROVICH

1  total pay back of what was expected.

2  Q    Okay.  And is that your signature on the document?

3  A    Yes, it is.

4          MS. ZVEROVICH:  The Government offers Government

5  Exhibit 107.

6          MR. KASULIS:  No objection.

7          THE COURT:  Government Exhibit 107 is received in

8  evidence.

9          (Government Exhibit 107, was received in evidence.)

10          MS. ZVEROVICH:  Ms. Hochron, let's pull up

11  Government Exhibit 418I in evidence.

12          THE COURT:  418I?

13          MS. ZVEROVICH:  418I.  Yes, Your Honor.

14          And let's please go to Page 35 of this exhibit.

15  Q    Now, first focusing on the top, what is this?

16          What are we looking at?

17  A    This is a bank statement from TD Bank for JBMML LLC.

18  Q    And what period does this statement cover?

19  A    This is the month of April in 2019.

20  Q    Now, let's take a look at the other credits section.  And

21  about six from the bottom.

22          Do you see a deposit in the amount of 12,600,000?

23  A    Yes, I do.

24  Q    And what's the date?

25  A    4/12.

*Avery N. Armstrong, RPR*
*Official Court Reporter*

RUSSO - DIRECT - ZVEROVICH

1    Q    And what does this deposit reflect?

2    A    This reflects a deposit of $12,600,000 from one of Jason

3    Kurland's clients.

4    Q    And that's the South Carolina client?

5    A    Yes.

6    Q    Let's look at the next deposit.

7         What's the date?

8    A    4/12.

9    Q    Same day?

10   A    Yes.

11   Q    And what's the amount?

12   A    $5 million.

13   Q    And who was this wire coming from?

14   A    This was another one of Jason Kurland's clients.

15   Q    That's Mr. Mangal that we talked about?

16   A    Yes.

17   Q    Now, I'd like to you take a look at the some of the

18   transfers out from this account after these deposits.

19        MS. ZVEROVICH:  Let's go to Page 37.  Now, four

20   wires from the bottom, let's highlight that one.

21   Q    What is that wire?

22   A    That is an outgoing wire to LNA Associates in the amount

23   of $12,825,000.

24   Q    What does this reflect?

25   A    This reflects a funding that JBMML did to LNA Associates.

RUSSO – DIRECT – ZVEROVICH

1   Q     Using whose money?

2   A     Jason Kurland's clients.

3   Q     All right.

4         MS. ZVEROVICH:  Let's go to the next page.  Let's

5   look at the very first transaction.  If we can actually zoom

6   in a little.

7   Q     What is that transaction?

8         MS. ZVEROVICH:  Let's highlight it.

9   A     That's an outgoing wire to Jason Kurland's company in the

10  amount of $176,000.

11  Q     And why were you sending $176,000 to the defendant?

12  A     The two prior fundings were 12 million 6 and 5 million,

13  so that was 1 percent of the $17,600,000 that Jason Kurland

14  raised through his clients.

15        MS. ZVEROVICH:  Now, let's stay on the same page.

16  And actually, if we can expand the section just a little bit.

17        Thank you, Ms. Hochron.

18        And if we could take a look at, do you see that

19  there are three wires going out on 4/15, first in the amount

20  of 337,500.  Next in the amount of $250,000.  And let's

21  actually skip the next one and look at the following one for

22  $75,000.  And just for clarity, Ms. Hochron, can we remove the

23  highlighting from the third one.

24  Q     Now, Mr. Russo, do you see these wires going out on

25  April 15, 2019, and into an account ending in 0832 in the

RUSSO - DIRECT - ZVEROVICH

1    amount of $337,500, $250,000 and $75,000?

2    A    Yes.

3    Q    What are these transfers?

4    A    This is a share of the upfront fee that we charged Greg

5    Altieri.

6    Q    So who is this money going out to?

7    A    I believe that's going to my entity.

8    Q    And did Mr. Smookler also receive wire transfers in those

9    same amounts?

10   A    Yes.

11   Q    Now, Mr. Russo, did you disclose these upfront fees that

12   you were taking from Mr. Kurland's clients money to

13   Mr. Kurland?

14   A    No, we didn't.

15   Q    Why not?

16   A    Because Frank Smookler and I agreed that because we

17   weren't taking salaries and whatnot, even though it was a

18   wrong thing to do, basically, that we charged Greg Altieri

19   these upfront fees, and we split the upfront fees between

20   ourselves.

21   Q    And what are some of the things that you bought with

22   these upfront fees that you were taking from the clients

23   money?

24   A    Anything we could spend the money on.  Boats, anything.

25   Q    Now, why did you, the defendant, and Smookler invest --

*Avery N. Armstrong, RPR*
*Official Court Reporter*

RUSSO – DIRECT – ZVEROVICH

1   give tens of millions of dollars of the defendant's client's

2   money to Altieri?

3   A    Because it was a great opportunity.  We thought we were

4   going to become rich by investing in these deals with Greg

5   Altieri.

6   Q    And what happened with all that money?

7   A    We lost it.

8   Q    Now, switching gears a bit.  You testified earlier that

9   Mr. Kurland's name was not on the corporate documents for

10  Francis Bay Holding or for JBMML, correct?

11  A    Correct.

12  Q    And you also testified that his name was not on the bank

13  accounts for these entities, correct?

14  A    Correct.

15  Q    Why was that?

16  A    Again, after Cheddar Capital, once we formed Francis Bay,

17  he basically changed his thinking and no longer wanted to be

18  on corporate docs or anything pertaining to his ownership

19  because he felt it didn't look right to his clients.

20  Q    And was there a written agreement for the finder's fee

21  that Mr. Kurland was getting from JBMML?

22  A    No.

23  Q    And was that typical or atypical in the business?

24  A    No, that was not typical at all.  Usually on any type of

25  fees that were to leave the account, were usually documented

RUSSO – DIRECT – ZVEROVICH

1   so that there was some sort of paper trail keeping track

2   and -- of what was going on.

3   Q    And what, if anything, did the defendant tell you about

4   how he was pitching these investments to his clients?

5   A    He told us that he was very light in his pitch and

6   basically explained to his clients that he was investing

7   95 percent of their moneys into a very conservative low-risk

8   type of fund like a Goldman Sachs type of situation, and that

9   they could afford a three to 5 percent much more aggressive

10  riskier type of situation that would net them a higher amount

11  of revenue back, and that he knew the perfect type of place

12  for them to make this investment.

13  Q    And what do you mean when you say he was light with them

14  in the pitch?

15  A    He basically explained to us that that -- he had their

16  confidence, and that he basically didn't have to go into great

17  detail as far as what he was doing with the moneys or where he

18  was investing it, that he just gave a very light explanation

19  of this type of high-risk scenario, and because it was such a

20  small percentage of it, it was an easy type of pitch.

21  Q    And with respect to the sale of Francis Bay that we

22  talked about, can you remind the jury what happened with that

23  package of documents that you prepared for the defendant?

24  A    He never showed them to his client, he told me.

25  Q    Now, I'd like to go back and discuss Greg Altieri in some

*Avery N. Armstrong, RPR*
*Official Court Reporter*

RUSSO - DIRECT - ZVEROVICH

1    more detail.

2                On what schedule was Mr. Altieri supposed to be

3    making payments on his debt to JBMML?

4    A     There was a bunch of different deals, some were weekly,

5    some were biweekly, and some were monthly.

6    Q     And overall, how would you describe his payment history

7    over time?

8    A     He was in a space that was very volatile so that they

9    were -- we were at the mercy of holidays and however the

10   jewelry district and the jewelry business basically paid back.

11   So he started to miss a few payments here or there, but there

12   was nothing of a red flag because it happened in the past, and

13   then it progressively got worse and worse and worse, and then

14   it came to a point where our payments completely stopped and

15   there was an excuse for everything.

16   Q     And you testified earlier about one red flag that you had

17   after your initial investment with Altieri in October 2018.

18                Did you also have other red flags over time?

19   A     Yes.

20   Q     Would you say there were a few red flags or many red

21   flags?

22   A     Listen, looking back, there were a lot of red flags.

23   Q     And what were they, generally?

24   A     The receivable itself, we never got an understanding of

25   who the receivable was, where his office was, and what was

*Avery N. Armstrong, RPR*
*Official Court Reporter*

RUSSO – DIRECT – ZVEROVICH

1   going on.  We never really understood what he was actually

2   buying.  Although he explained to us he's buying a certain

3   type of jewelery and he gave us pictures of them, we never

4   knew what the actual orders were.  So there was red flags all

5   over the place.  Then we met other people that he had owed

6   millions of dollars to that he didn't disclose to us, and it

7   just started to get crazy with these excuses and whatnot.

8   Q    Now, while --

9          THE COURT:  Can I just ask a question.

10          How did you communicate with someone whose office

11   was a mystery and whose availability and location was a

12   mystery to the tune of tens of millions of dollars?

13          Did you actually meet with this man?

14          THE WITNESS:  The receivable from LNA Associates,

15   no.  At one point, I went into Manhattan and went to an

16   address that he gave me, and in the diamond district, it's

17   very hard to get in these building because they have security

18   and they're locked doors, and I ran into the building, and I

19   went to every one of the seven floors looking for this Sam

20   Jalice [phonetic], the name that he gave us and the business

21   name of creative, and I knocked on every door, went into every

22   office, and I left the city feeling disgusted because I

23   couldn't find the receivable or the location that he explained

24   to us.

25          So our relationship was through Greg, and we spoke

RUSSO – DIRECT – ZVEROVICH

1   to Greg every day, multiple times a day.  He didn't need a

2   traditional office.  He didn't need a fax number, because his

3   business was doing business on 47th Street, and going to these

4   different businesses and finding these type of deals.  So it

5   wasn't a red flag that he didn't have a traditional office or

6   that it wasn't a traditional way of doing business, because

7   this was a very unique way that the diamond district ran

8   itself, is how he advertised it.

9   Q    And Mr. Russo, just for the benefit of the jury, can you

10  describe that event again.

11         So you went to see somebody who you were told was

12  one of Greg Altieri's receivables, like, he owed money to Greg

13  Altieri?

14  A    Yeah.  It came to a point where myself, Jason Kurland,

15  and Frank Smookler just started not to believe Greg Altieri.

16  We were already invested into tens of millions of dollars, our

17  relationship was already two years old, and we were just at

18  the point of being fed up.  So I decided that I would take two

19  employees with me, I would go to Manhattan, and I would go to

20  this -- we had a fight with Greg back and forth over a few

21  months to get an address out of him, and it took us months to

22  get a name out of him of this receivable.  So once we had an

23  address and a name, I basically decided to go into Manhattan,

24  go to the diamond district on 47th Street, and go to this

25  building that he advertised that the receivable was in.

RUSSO - DIRECT - ZVEROVICH

1      I was explaining that these buildings are not easy.

2  They're in the diamond district, so they have a security guard

3  in them.  Each door to each business has a punch key and an

4  intercom, and I basically covered my hand, kept hitting

5  intercom at every single door, eventually they opened, and

6  after about three hours, I had gone to every single office and

7  in every single room on every single floor, and there was no

8  business with this name.  There was no receivable.

9      THE COURT:  So did you discuss that with Mr. Kurland

10  after it happened?

11      THE WITNESS:  Oh, yes.  I called Jason, I called

12  Frank Smookler, I called Greg.  I was disgusted.  You know, I

13  left there knowing that it was just more lies and Greg kept

14  assuring me, no, no, you're at the wrong building.  It was a

15  different building but I didn't want you to go to the right

16  building because this guy is so finicky that he'll run away

17  from you and he was giving us every excuse that he wanted to,

18  and you know, Jay and Frank and myself were all just pissed at

19  that point, but there was nothing that we could do because he

20  has all the money and payments had stopped.  So the very next

21  thing to do was take the steps that we did, which was file the

22  COJs and to go from there.

23  Q    But never got that money back, correct?

24  A    No.

25  Q    Now --

RUSSO – DIRECT – ZVEROVICH

1    MS. ZVEROVICH:  May I continue, Your Honor?

2    THE COURT:  Yes.

3    MS. ZVEROVICH:  Thank you.

4  Q    While Mr. Altieri was still making payments, how did he

5  make them?

6  A    Initially, Greg made payments via ACH directly out of his

7  bank account.  When we did these one-off deals, we had him

8  fill out hard copies of checks in the amount of every check

9  that was required for a deal.  So if it was a six-month deal

10 on a weekly basis, he would literally write us every check

11 that required to meet that six-month obligation, and we would

12 keep those checks in a safe in our office, and we would take a

13 check out on Friday, call him up to confirm that the moneys

14 were in the bank, and deposit that check.

15 Q    Apart from checks, did Mr. Altieri make any other types

16 of payments?

17 A    Yes.

18 Q    What was that?

19 A    Cash payments.

20 Q    How would Altieri make cash payments?

21 A    It came to a point or at one point he explained to Frank

22 and myself that he had the ability to receive cash from other

23 deals that he was closing in this jewelry business and that he

24 could make payments to us in cash, that it was easier for him

25 to make payments in cash.  So Frank, myself, and Jason thought

*Avery N. Armstrong, RPR*
*Official Court Reporter*

RUSSO – DIRECT – ZVEROVICH

1   it was a great idea.  Why not.  Let's accept cash as payments.

2   Q    And how did Mr. Altieri deliver the cash?

3   A    It looked like a bowling ball bag, but it was a small

4   leather bag that he brought to the office.

5   Q    And what sums -- what amounts of cash did he deliver?

6   A    It was anything from a few hundred dollars up to 2-,

7   $300,000 at any given payment.

8   Q    And what happened with the cash once he delivered it to

9   you?

10   A    We purchased the money counter at the office, we counted

11   the moneys, split it up three ways, and I took my share, Frank

12   Smookler took his share, and we delivered Jason Kurland's

13   share to himself or he came to the office to pick it up.

14           THE COURT:  In all, how much money was distributed

15   among the three partners from cash received from Greg?

16           THE WITNESS:  There was a lot, Your Honor.

17           I don't have a actual figure.  But several hundred

18   thousand dollars.

19           THE COURT:  Each?  I'm sorry, each?

20           THE WITNESS:  No, in total.

21           THE COURT:  Go ahead.

22   Q    And you divided that cash amongst of three of you?

23   A    Yes.

24   Q    Did you give any of this cash -- did any of the three of

25   you give any of this cash back to Mr. Kurland's clients?

*Avery N. Armstrong, RPR*
*Official Court Reporter*

RUSSO - DIRECT - ZVEROVICH

1    A     No.

2    Q     Did you report any of this cash that you got from

3    Mr. Altieri on your tax returns?

4    A     No.

5    Q     Now, how involved was Mr. Kurland in monitoring and

6    tracking whether or not Mr. Altieri was making his payments?

7    A     I spoke to Jay every day, multiple times a day.

8    Q     But about this particular topic, was he involved?

9    A     With the cash payments?

10   Q     No, just generally with respect to Mr. Altieri's

11   payment --

12   A     Oh, absolutely.

13   Q     -- track record?

14   A     Yes.

15   Q     And how was he involved?

16   A     Whether it was updates from myself, whether it was

17   updates from Google spreadsheet or QuickBooks or whether he

18   was having updates from Litsa Palladino.  Or from Frank

19   Smookler.

20            MS. ZVEROVICH:  Your Honor, if the Court would like

21   to take the afternoon break, now is a good time or I can keep

22   going?

23            THE COURT:  Just keep going.

24            MS. ZVEROVICH:  Thank you, Your Honor.

25            Ms. Hochron, let's publish Government Exhibit 1010

*Avery N. Armstrong, RPR*
*Official Court Reporter*

RUSSO – DIRECT – ZVEROVICH

1  in evidence.

2          (Exhibit published.)

3          And let's go to Page 25.  And let's look at the

4  second message from the top.

5  Q    Mr. Russo, what is this?

6  A    This is a text message from Jason Kurland to myself.

7  Q    What's the date?

8  A    1/7/2019.

9  Q    Let's read several of these messages in the same way

10 we've been doing.  I will read the defendant and you can read

11 yourself.

12         He's playing you.

13 A    We have seven other deals paying JBMML daily.

14         And yes, Greg is also making his daily payments

15 without fall.

16         It's just this one off.

17 Q    Are we still getting the 160?

18 A    I beg to differ.  Hard to play me cuzzie.  This boy would

19 have to wake up really early.

20 Q    Ha.

21         If he was going to default, this is exactly how it

22 would play out.

23         Now this message is January 2019.

24         What are you discussing here?

25 A    So at this current time, we had several deals with Greg

RUSSO – DIRECT – ZVEROVICH

1  Altieri, LNA Associates.  One deal in particular, he had

2  slowed down and he stopped making payments on.  The others, he

3  was still making payments on, so Jay and I were basically

4  discussing the fact that this one deal he stopped paying on.

5  I was naive or whatever you say.  I still was confident and I

6  told him, don't worry.  Basically, that all the other deals

7  are paying, it's just this one-off deal and that everything is

8  fine and that I have confidence this guy was not actually

9  paying me.  And Jay was explaining that if he's going to

10  default, this is exactly how it would work out.

11         MS. ZVEROVICH:  Let's now pull up Government

12  Exhibit 10 -- actually the same exhibit, but go to Page 60.

13         And let's look at the last message on the page.

14         What is this?

15  A    A text message from Jason Kurland to myself.

16  Q    And what's the date here?

17  A    7/26/2019.

18  Q    So this is now about six months later, correct?

19  A    Yes.

20  Q    Let's read several of these messages same way.  I will

21  read the defendant.

22         Greg feeling better?

23         There is absolutely no Jewish holiday this weekend

24  whatsoever.  Not sure if that will make you feel better or

25  worse.

*Avery N. Armstrong, RPR*
*Official Court Reporter*

RUSSO – DIRECT – ZVEROVICH

1          Not a minor one, major one, old one, new one.

2    A    But the mazal is real.

3          Not sure about holiday.

4    Q    Just don't love that he lied to you about a holiday.

5          What are you discussing?

6    A    One of Greg's many excuses was that it was a Jewish

7    holiday at that point and that his receivable could not make a

8    payment to him because of the holiday, and Jason was

9    explaining to me that there was no actual holiday whatsoever,

10   and that I was referring to a mazal or a handshake within the

11   Jewish community that was seen as almost, like, a bond, and

12   he's explaining that he just doesn't love the fact that he

13   lied about a holiday.

14   Q    And what was happening with Altieri's payments around

15   this time?

16   A    They ceased.  He stopped making payments and his excuses

17   were numerous to the reasons.

18         MS. ZVEROVICH:  Let's pull up Government

19   Exhibit 1006 in evidence.  And go to Page 1.

20   Q    What is -- looking at the top message, what is this?

21   A    This is a group text between Jason Kurland, myself, and

22   Frank Smookler.

23   Q    And what's the date?

24   A    9/8/2019.

25   Q    The defendant wrote, hey, boys.  Well we got through the

*Avery N. Armstrong, RPR*
*Official Court Reporter*

RUSSO – DIRECT – ZVEROVICH

1    weekend.  You guys want to have a quick call later to

2    strategize on how to deal with this tomorrow if we get any

3    answer other than it's in Greg's account by noon.

4              What did you understand the defendant to be saying?

5    A     That Jason Kurland wanted to have a phone call or meeting

6    to, basically, strategize on what we were going to do with

7    Greg if the answer was, basically, that the money wasn't in

8    his account by noon as he advertised.

9    Q     And the next message, what's the date?

10   A     9/10/2019.

11             (Continued on the following page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F. RUSSO – DIRECT – MS. ZVEROVICH

1   EXAMINATION CONTINUES

2   BY MS. ZVEROVICH:

3   Q    And Mr. Kurland wrote:  Just shoot me a text to let me

4   know if I'm keeping my Panamera or have to go back to my

5   Lexus.  Ha.

6           What did you understand him to mean?

7   A    He was joking that if –– he needed to know whether he was

8   going to keep his Porsche or he was going to have to go back

9   to his Lexus because of Greg Altieri defaulting.

10          MS. ZVEROVICH:    Let's go to Government Exhibit

11  1009 in evidence.  And let's go to page 37.  Let's go to the

12  top message.

13          (Exhibit published.)

14  BY MS. ZVEROVICH:

15  Q    What is this?

16  A    This is a group text between Jason Kurland, Frank

17  Smookler, and myself.

18  Q    And what's the date?

19  A    The date is 10/6/2019.

20  Q    The defendant wrote:  Frankie, hope you are feeling

21  better.  Can one of you guys call him today?  Not sure it will

22  do anything, but will make me feel better.  Ha.

23          And then it looks like about several days later the

24  defendant sent you an image.

25          Do you see that?

SAM      OCR      RMR      CRR      RPR

F. RUSSO – DIRECT – MS. ZVEROVICH

1    A    Yes.

2            MS. ZVEROVICH:  And, Ms. Hochron, if we can go to

3    page 61, which will have the actual image.

4    BY MS. ZVEROVICH:

5    Q    What was the defendant sending you?

6    A    A picture of his new client that won Cash4Life.

7            MS. ZVEROVICH:   Okay.  And let's go back to the

8    messages on 37.

9            (Exhibit published.)

10   Q    What did you respond?

11   A    Love.

12           MS. ZVEROVICH:  And let's go to the next page.

13           (Exhibit published.)

14   Q    Mr. Kurland wrote:  Your boy is putting this all in

15   jeopardy.  Enough is enough.

16           What did you understand him to mean?

17   A    That because Greg Altieri was defaulting on his deals, he

18   was putting in jeopardy the fact that Jay could be raising

19   additional monies through new clients.

20           MS. ZVEROVICH:  Let's pull up Government

21   Exhibit 1010 in evidence, and go to page 69.

22           (Exhibit published.)

23           MS. ZVEROVICH:  And let's go to the second message

24   from the top.

25   BY MS. ZVEROVICH:

                SAM     OCR     RMR     CRR     RPR

F. RUSSO - DIRECT - MS. ZVEROVICH

1   Q    What is this?

2   A    This is a text message between Jason Kurland and Frank

3   Russo, myself.

4   Q    And what's the date?

5   A    10/19/2019.

6   Q    Defendant wrote:  Is there actually proof of a meeting or

7   do you continue to take Greg at his word?

8        According to Greg, this guy has not been in the

9   office for two weeks.  You seriously believe he's going to

10  meet Frank in his first day back.  Joke.  Meanwhile, there

11  isn't even proof that this guy exists.

12       What did you understand the defendant to be saying

13  in these messages?

14  A    Jay's, basically, discussing the fact that Greg used an

15  excuse that his receivable was away or out of the office for

16  two weeks, and that we were pushing Greg to meet his

17  receivable in person.  And that he agreed to set up a meeting

18  between Frank Smookler and his receivable, basically, the --

19  the day that his receivable got back.

20       And Jason Kurland was questioning that, like, how

21  could that be?  The guy's gone two weeks and he's gonna meet

22  with Frank the very next day, and there isn't even proof that

23  this guy exists.

24            MS. ZVEROVICH:  We can take that down.

25            Thank you, Ms. Hochron.

            SAM     OCR     RMR     CRR     RPR

F. RUSSO – DIRECT – MS. ZVEROVICH

1  BY MS. ZVEROVICH:

2  Q    Now, how did Mr. Greg Altieri's failure to pay affect

3  your business?

4  A    It greatly affected the business.  Majority of the monies

5  that we received from investments were funded to Greg Altieri.

6  Q    And how did it affect your ability to make payments --

7  make payments to the defendant's clients?

8  A    We were unable to make payments, the interest payments to

9  his clients.  So, we were, basically, taking money from any

10  receivables that we were receiving with other deals, other

11  relationships, simply to pay the interest payments on his

12  clients.  Basically, borrowing from Peter to pay Paul.

13  Q    And whose idea was it to start borrowing from Peter to

14  pay Paul?

15  A    All of ours.  Jason explained to us that no matter what,

16  do not miss a payment.  That's the most important thing, do

17  not miss a payment to his clients.

18  Q    And did you discuss with the defendant that you would be

19  using other money to try to cover these interest payments?

20  A    Yes.

21  Q    And what was his response?

22  A    Do whatever it takes, do not miss a payment.  We're

23  hoping that this receivable comes in to right the ship, but

24  make sure you don't miss an interest payment.

25  Q    Now, did you continue making interest payments to the

SAM      OCR      RMR      CRR      RPR

F. RUSSO – DIRECT – MS. ZVEROVICH

1   defendant's clients up until your arrest, or did you stop?

2   A    We stopped.

3   Q    What happened?

4   A    It came to a point where shortly before the pandemic hit

5   we were unable to borrow from Peter to pay Paul, the interest

6   payments were just too large.  JBMML could not afford to make

7   interest payments, let alone to reinvest in new deals, so...

8   Q    And did you discuss all of that with the defendant?

9   A    Yes.

10  Q    And did you have any conversations with the defendant

11  about what he was telling his clients when you could no longer

12  make these payments?

13  A    Yes, there was multiple discussions.  And he, basically,

14  explained that he was telling his clients that we were on a

15  freeze, and that we would resume interest payments in the near

16  future, basically.

17  Q    And was that true?

18  A    No, unless we -- the receivable from Greg was real and we

19  received money, there was no way for us to make interest

20  payments.

21  Q    Now, did you come to any understanding about whether or

22  not the defendant told his clients about all this money that

23  you all lost with Altieri?

24  A    Shortly after the pandemic hit and we were entering this

25  PPE space, Jason had an idea that he wanted us to draft a type

SAM      OCR      RMR      CRR      RPR

F. RUSSO – DIRECT – MS. ZVEROVICH

1  of letter from JBMML to his clients.

2          And we were gonna have the lawyer that we used for

3  JBMML draft a letter that was going to give, basically, a

4  snapshot of where JBMML was, the steps that it took to secure

5  its receivables from Greg Altieri, specifically filing the

6  COJ.  The fact that it was going to resume payments shortly.

7  And that we were, basically, not giving up, and that we were

8  going to get this money back for them and get a plan to do so.

9  Q    And was that letter ever sent?

10 A    No.

11 Q    And was it true that you were going to resume making

12 payments shortly?

13 A    Listen, in reality, we had no ability  to make payments

14 shortly or at any time.  Unless the receivable paid us back,

15 JBMML was scuttled.  There was no ability to make any type of

16 payments or reinvest in deals to grow JBMML.  The JBMML ceased

17 to operate, basically, because of it.

18 Q    Now, while Mr. Altieri was defaulting on his payments,

19 did the defendant continue to solicit lottery investments?

20 A    Yes.

21          MS. ZVEROVICH:  Ms. Hochron, if we could please pull

22 the Government Exhibit 418I in evidence, and let's go to

23 page 87.

24          (Exhibit published.)

25          MS. ZVEROVICH:  Let's zoom in.

SAM    OCR    RMR    CRR    RPR

F. RUSSO – DIRECT – MS. ZVEROVICH

1  BY MS. ZVEROVICH:

2  Q     First of all, what is this, Mr. Russo?

3  A     This is a bank statement from TD Bank for JBMML.

4  Q     And what period does this cover?

5  A     The month of October in 2019.

6          MS. ZVEROVICH:  Let's zoom in to the "Other Credits"

7  section.

8  BY MS. ZVEROVICH:

9  Q     What is reflected on the last line there?

10  A     An incoming wire from Healthy Rainbow, LLC, in the amount

11  of $5 million on 10/31.

12  Q     And what's the -- of what year, 2019?

13  A     2019.

14  Q     And what is Healthy Rainbow?

15  A     One of Jason Kurland's clients.

16  Q     A lottery client?

17  A     Yes.

18  Q     Now, did you have any conversations with the defendant

19  about this investment?

20  A     Yes.

21  Q     What did he say?

22  A     He, basically, explained that he had access to another

23  investment, if we wanted it.  And asked, basically, do we

24  need -- do we want to take on this investment; which I

25  responded, obviously, absolutely.

SAM     OCR     RMR     CRR     RPR

F. RUSSO – DIRECT – MS. ZVEROVICH

1   Q    Now, I'd like to take a look at some of the debits from

2   this account after this $5 million deposit.

3        MS. ZVEROVICH:  Let's go to page 95.  And let's go

4   to the bottom section, "Electronic Payments" first.

5        (Exhibit published.)

6   BY MS. ZVEROVICH:

7   Q    What are the first two transactions here?

8        First of all, what is the date?

9   A    11/1.

10  Q    That's the next day after the $5 million deposit,

11  correct?

12  A    Yes.

13  Q    And what are these payments?

14  A    These are the payments to Jason Kurland's Porsche.

15       MS. ZVEROVICH:   Okay.  Let's go to page 96.  And

16  let's zoom in on the "Other Withdrawals" section.

17       (Exhibit published.)

18  Q    And I'd like to look at the fifth wire from the top.

19  What is -- what's the date?

20  A    11/01.

21  Q    So, the day after the 5 million deposit?

22  A    Yes.

23  Q    And what is this wire?

24  A    That's an interest payment to Jason Kurland's clients.

25  Q    Which clients?

SAM     OCR     RMR     CRR     RPR

F. RUSSO – DIRECT – MS. ZVEROVICH

1  A    Mangal, the Sea and Sand Trust.

2  Q    And whose money were you using to make this interest

3  payment?

4  A    Healthy  Rainbow's $5 million investment.

5  Q    Is this an example  of taking from Peter to pay Paul?

6  A    Yes.

7  Q    Now, I'd like to look a little down on the page.  There

8  are nine transfers in the amount of $12,500.

9         Do you see those?

10 A    Yes.

11 Q    What were those?

12 A    Those were part of interest payments to Jason Kurland's

13 South Carolina winners.

14 Q    And whose money was used to make these payments?

15 A    Healthy Rainbow's investment.

16 Q    Is this another example of taking --

17         MR. KASULIS:  Objection, Your Honor, to the

18 disparaging characterization.

19         MS. ZVEROVICH:  Your Honor, the defendant, that's

20 his phrase.  I'm just asking the question.

21         THE COURT:  Overruled.  You may answer to her

22 question.

23 BY MS. ZVEROVICH:

24 Q    Mr. Russo, is this another example of taking from Peter

25 to pay Paul?

               SAM     OCR     RMR     CRR     RPR

F. RUSSO – DIRECT – MS. ZVEROVICH

1   A    Yes.

2          MS. ZVEROVICH:  Now, Ms. Hochron, if we can go to

3   page 97.

4          THE COURT:  Did you know that the source of the

5   $5 million deposit is the -- as to which of the defendant's

6   clients was the source?

7          THE WITNESS:  I didn't know specifics, I just knew

8   that it was one of the new winners and --

9          THE COURT:  He wasn't --

10         THE WITNESS:  -- it wasn't Healthy  Rainbow.

11         THE COURT:  He wasn't paying back the same people

12  that were sending him the money?

13         In other words, it wasn't the same client, or did

14  you know?

15         In other words, it wasn't an entity from South

16  Carolina, from the South Carolina winners, that was then

17  redistributed to the South Carolina winners as interest, or

18  did you know?

19         THE WITNESS:  No.  The answer to that, Your Honor,

20  is no.  Because the South Carolina winners, when they made the

21  investments, we gave it to Greg Altieri.

22         When we received this $5 million, it was towards the

23  end of JBMML, where we had already received a major -- were

24  walking into the major default from LNA Associates.  So, this

25  is when we started to, basically, take monies from anywhere we

SAM     OCR     RMR     CRR     RPR

F. RUSSO – DIRECT – MS. ZVEROVICH

1   could to ensure that we're making the interest payments.

2          So, the South Carolina winners were invested early

3   on, where we didn't -- we weren't receiving any type of

4   default as of yet.  If that explains it.

5          THE COURT:  Okay, go ahead.

6          MS. ZVEROVICH:  Thank you, Your Honor.

7          And let's go to page 97, Ms. Hochron, and if we --

8   towards the middle of the page.  There is a wire transfer on

9   11/6 to GK3, LLC.

10         (Exhibit published.)

11  BY MS. ZVEROVICH:

12  Q    Do you see that, Mr. Russo?

13  A    Yes.

14  Q    What is that -- what's the date?

15  A    The date is 11/6.  That's an outgoing wire to GK3, LLC,

16  Jason Kurland's account, in the amount of $50,000.  That

17  represents a 1 percent finder's fee for that $5 million raise.

18  Q    Okay.

19         THE COURT:  So, Mr. Kurland then received a $50,000

20  finder's fee of $5 million that went into your account that

21  was used to pay back other investors who were clients of

22  Mr. Kurland?

23         THE WITNESS:  Yes.

24         THE COURT:  Go ahead.

25  Q    Now, Mr. Russo, was there a promissory note for this

SAM     OCR     RMR     CRR     RPR

F. RUSSO – DIRECT – MS. ZVEROVICH

1    $5 million investment by Healthy Rainbow?

2    A    Yes.

3             MS. ZVEROVICH:  Let's pull up Government Exhibit 108

4    for identification.

5             THE COURT:  For identification?

6             MS. ZVEROVICH:  Yes, Your Honor.

7             THE COURT:  Go ahead.

8    BY MS. ZVEROVICH:

9    Q    Mr. Russo, do you recognize this?

10   A    Yes, I do.

11   Q    What is it?

12   A    This is a promissory note in the amount of $5 million

13   from JBMML to Healthy Rainbow.

14   Q    And looking -- and what's the date?

15   A    The date is October 31st, 2019.

16   Q    And looking at the second page, is that your signature?

17   A    Yes, it is.

18   Q    And is this a fair and accurate copy of the promissory

19   note?

20   A    Yes, it is.

21            MS. ZVEROVICH:  The Government offers Government

22   Exhibit 108.

23            MR. KASULIS:  No objection, Your Honor.

24            THE COURT:  All right.  Government Exhibit 108 is

25   received in evidence.

SAM      OCR      RMR      CRR      RPR

F. RUSSO – DIRECT – MS. ZVEROVICH

1          (Government Exhibit 108, was received in evidence.)

2          THE COURT:  Do you have questions about this

3   exhibit, or can we take our break now?

4          MS. ZVEROVICH:  No, Your Honor, now is a good time.

5   Thank you.

6          THE COURT:  All right.  Let's take a ten-minute

7   break.

8          All rise for the jury.

9          (Jury exits.)

10          THE COURT:  All right, sir, you may stand down.

11   Please do not discuss your testimony with anyone.

12          (Witness steps down and exits the courtroom.)

13          THE COURT:  Be seated, everybody.

14          Apropos of your inquiry, Mr. Kasulis, if you on

15   cross ask the witness if he made these disparaging comments

16   about your client and he denies it, then you can impeach him

17   with the tapes.  But I think that would, basically, be it.

18          What was the other purpose of the tapes?

19          MR. KASULIS:  So, Your Honor, imagine a universe in

20   which Mr. Russo does not testify, right?

21          Imagine the Government were presenting this trial

22   without his testimony at all.  And the tapes, as they exist,

23   include Mr. Russo and Mr. Smookler, for instance, talking

24   about how they're lying to Mr. Kurland.

25          Those are admissible to go to the state of the mind

SAM      OCR      RMR      CRR      RPR

F. RUSSO - DIRECT - MS. ZVEROVICH

1   of the alleged co-conspirators.  So, even if -- even if Mr.

2   Russo did not testify, the tape would be admissible.

3           THE COURT:  Right, but he's here.

4           MR. KASULIS:  Understood, Your Honor.  I guess maybe

5   it's just a question of sequencing.

6           THE COURT:  Well, I'll take it as it comes.

7           MR. KASULIS:  Okay.

8           THE COURT:  But if he says, yeah, sure we played

9   him, you know, and we joked about it.  That's the end of the

10  discussion.  You have your admission and you can play that to

11  the jury in your summation and they can make of it what they

12  want.

13          But I am not going to have a side event about their

14  conversations that they disparaged your client, unless there's

15  a reason to do so.

16          MR. KASULIS:  Your Honor, I'm not sure where we're

17  going to end up breaking for today, I'm not sure how much

18  longer the Government has.  I may offer to send you a letter

19  over the weekend --

20          THE COURT:  You are more than welcome to do so, I'm

21  happy to consider it.  And you can give me case law.  That's

22  why I have a law clerk.

23          MR. KASULIS:  Having been a law clerk, I understand.

24  Thank you.

25          THE COURT:  Yes.

              SAM     OCR     RMR     CRR     RPR

F. RUSSO – DIRECT – MS. ZVEROVICH

1    So, how much longer will the direct take, do you

2    think?

3         MS. ZVEROVICH:  Your Honor, I believe I'm three

4    quarters of the way through, approximately.

5         THE COURT:  So, you'll finish and then we'll leave

6    cross-examination for Monday.  So, I can consider it over the

7    weekend.

8         MR. KASULIS:  Thank you, Your Honor.

9         THE COURT:  Try to have it --

10        MR. KASULIS:  We'll have it by the first part of the

11   weekend, Your Honor.

12        THE COURT:  That's a good idea.

13        MS. ZVEROVICH:  Thank you, Your Honor.

14        THE COURT:  Yes, I hate coming in on Monday

15   morning to a --

16        MR. KASULIS:  Understood.

17        THE COURT:   -- to a major project like that when we

18   have to start the trial.

19        All right, let's take five minutes.  Thank you very

20   much.

21        MS. ZVEROVICH:  Thank you.

22        MR. KASULIS:  Thank you.

23        (Judge NICHOLAS G. GARAUFIS exited the courtroom.)

24        (Recess taken.)

25        (In open court – jury not present.)

SAM     OCR     RMR     CRR     RPR

F. RUSSO - DIRECT - MS. ZVEROVICH

1           (Judge NICHOLAS G. GARAUFIS entered the courtroom.)

2           THE COURT:  All right.  On that submission, noon on

3  Saturday.

4           MR. KASULIS:  Yes, Your Honor.

5           THE COURT:  8 p.m. on Sunday for a response, if any.

6           MS. ZVEROVICH:  Yes, Your Honor.

7           MS. KUDLA:  Thank you, Your Honor.

8           THE COURT:  All right.  Let's get the witness and

9  let's call in the jury.

10          Do you think we'll be done by 5?

11          MS. ZVEROVICH:  I will try, Your Honor.

12          THE COURT:  Yes, that's a good idea.  Judge Kovner's

13  investiture ceremony is this afternoon at 4.  The reception

14  starts at 5.

15          MS. ZVEROVICH:  Understood, Your Honor.

16          MR. KASULIS:  Was she confirmed during COVID, Your

17  Honor, is that why it's taken this long?

18          THE COURT:  Yes, yes.  That's right.  She's been

19  here two years.

20          MR. KASULIS:  Yes, exactly.

21          (Witness enters and resumes the stand.)

22          (Jury enters.)

23          THE COURT:  Please be seated, everyone.

24          Members of the jury, we're going to try to finish

25  the direct examination this afternoon.  We may go a few

                SAM     OCR     RMR     CRR     RPR

F. RUSSO – DIRECT – MS. ZVEROVICH

1  minutes beyond 5.  We're trying hard to keep this matter, this

2  trial moving.  So, I just wanted to mention that.

3          I remind the witness that he's still under oath.

4          You may continue your examination of the witness.

5          MS. ZVEROVICH:  Thank you, Your Honor.

6  BY MS. ZVEROVICH:

7  Q   Mr. Russo, before you took the break we were talking about

8  Mr. Altieri.

9          What ultimately happened with respect to

10 Mr. Altieri's debt to JBMML?

11 A   Can you repeat the question?

12 Q   Yes.  What ultimately happened with Mr. Altieri's debt to

13 JBMML?

14 A   So, we filed a confession of judgment for the amount that

15 was owed,  and he never paid us back.

16 Q   And what is -- just generally, what is a confession of

17 judgment, very briefly?

18 A   So, every deal that we funded in the merchant cash

19 advance space, accompanied with what was referred to as a COJ,

20 it's a confession of judgment.  Basically, the business that

21 we' re funding, the amount, signs a confession to the full

22 amount of the judgment.

23          In case they do default, it allows us to avoid

24 any -- the red tape of going through the court procedures and

25 allows us to simply file that COJ so we can very quickly try

F. RUSSO – DIRECT – MS. ZVEROVICH

1    to get the monies that are owed.

2    Q    And ultimately, in what amount was the COJ that you filed

3    against Gregory Altieri, approximately?

4    A    Approximately, a $68 million COJ was filed against

5    LNA Associates and Greg Altieri.

6    Q    And was all or most of that money the defendant's

7    clients' money?

8    A    Yes.

9    Q    And did you get it back?

10   A    No, we did not.

11   Q    Now, you testified earlier that you and Smookler took

12   what you referred to as upfront fees from the defendant's

13   clients' investments, correct?

14   A    Yes.

15   Q    And you didn't tell the defendant about those, right?

16   A    No.

17   Q    And did you pay for various personal purchases and

18   expenses using the defendant's clients' money?

19   A    Yes.

20   Q    What was the largest purchase that you made?

21   A    I took $1.5 million out of the business in order to

22   purchase a home.

23   Q    And was that money that you took out from one of the

24   defendant's client's money?

25   A    Yes.

SAM      OCR      RMR      CRR      RPR

F. RUSSO – DIRECT – MS. ZVEROVICH

1   Q    And did you tell Mr. Kurland about that?

2   A    No.

3   Q    Why not?

4   A    Although it was wrong, and I understand that it was

5   wrong, at the time we -- I thought I was just taking an

6   advance on what was going to be, basically, paid out at the

7   end once the receivables were paid.  And that's how I

8   justified it at the time.

9   Q    And did you also use the defendant's clients' money to

10  buy other personal items?

11  A    Yes.

12  Q    How about Mr. Smookler?

13  A    Yes.

14  Q    Now, you testified that the defendant did not get upfront

15  fees, correct?

16  A    We didn't share the portions of the upfront fees that we

17  charged to LNA Associates with Jason Kurland.

18  Q    Did the defendant, nonetheless, get any personal items

19  paid for using his clients ' money?

20  A    Yes.

21  Q    And what types of things was he buying that were funded

22  by the business?

23  A    We bought watches for himself and -- and for his wife.

24  We paid for vehicles for the two of them.

25            We had provided limo services to and from the

SAM     OCR     RMR     CRR     RPR

F. RUSSO - DIRECT - MS. ZVEROVICH

1  airports for Jay.  We had also wrapped a truck when he wanted

2  it wrapped to change the color of it at the time.  And we

3  bought watches for ourselves.

4  Q    Now, what watches did you buy for Mr. Kurland and his

5  wife?

6  A    We bought, I believe, two watches for Jay, and one watch

7  for his wife.

8  Q    And what kinds of cars?

9  A    One Porsche Panamera and one Lincoln truck.

10 Q    And when you say that he had this  truck wrapped, what

11 does that mean?

12 A    At the time, they were very sought after, they were hard

13 to get.  So, he didn't - - he didn't like the color that we

14 were able to acquire.  So, we simply had the car wrapped,

15 which is basically putting some type of, like, plastic over it

16 that changes the color of the car.

17 Q    And you did that using money from what, JBMML?

18 A    Yes.

19 Q    Now, did there come a time when you had a conversation

20 with the defendant about personal expenses being paid from the

21 business?

22 A    Yes.

23 Q    What was that conversation?

24 A    Again, I think we were at Limani off of Northern

25 Boulevard on Long Island, and we were discussing the cars and

SAM     OCR     RMR     CRR     RPR

F. RUSSO – DIRECT – MS. ZVEROVICH

1    the watches.  And Jay was asking how were we going to justify

2    this.  And, basically, I explained to him on QuickBooks, that

3    we were just going to write it down as a operational expense.

4    Q    And was it an operational expense?

5    A    No.

6    Q    And was the defendant fine with you writing it down as an

7    operational expense?

8    A    Yes.

9    Q    Now, switching gears.

10           Apart from the jewelry deals, did you give Greg

11   Altieri any other money?

12   A    Yes.

13   Q    What money?

14   A    $250,000 in cash.

15   Q    Approximately when?

16   A    It was right before the pandemic.  I'm not sure of the

17   actual date.

18   Q    And who gave Altieri this $250,000 in cash?

19   A    Myself and Frank Smookler.

20   Q    Now, at this point, what was Altieri's status with

21   respect to paying back on the jewelry deals?

22   A    It was a mess.  He was in full default.  One of his other

23   investors that he had defaulted on also had literally beat up

24   Greg and hit him with a wrench, tried to cut his finger off

25   with a cigar cutter.

SAM     OCR     RMR     CRR     RPR

F. RUSSO – DIRECT – MS. ZVEROVICH

1    And he had came to us in our office after this had

2    all happened and, basically, explained to us that if he

3    couldn't acquire $250,000 to pay off this crazy lunatic, that

4    he wouldn't even be around to collect the receivable to pay us

5    back.

6  Q    So, did you agree to give him the $250,000?

7  A    Yes, we did.

8  Q    And you gave it to him in cash?

9  A    Yes.

10 Q    What were the basic terms of this loan?

11 A    The terms of the loan were very short.  I believe it was

12 over a nine-week period.  There was -- he was gonna pay us

13 back more than $300,000, and it was a weekly type of payback.

14 Basically, in cash as well.

15 Q    And did Altieri repay the loan like he promised?

16 A    He made either two or three payments and then, like

17 everything else, defaulted on that as well.

18 Q    And what did you do?

19 A    I did something that I greatly regret.  We threatened him

20 on the phone to, basically, collect our cash that we,

21 basically, gave him.  And tried to turn up the pressure so

22 that he would make the payments as he promised and get him

23 performing to make payments.

24 Q    And when you say "we threatened" Greg, who are you

25 referring to?

SAM     OCR     RMR     CRR     RPR

F. RUSSO – DIRECT – MS. ZVEROVICH

1  A    Myself and Frank Smookler.

2  Q    And did you threaten Greg with physical violence?

3  A    Yes.

4  Q    And did you use graphic language in your threats?

5  A    Yes.

6  Q    Did you tell Altieri on one call:  They're going to make

7  you watch as they rip your son's teeth out of his mouth?

8  A    (Nodding.)

9  Q    Did you say that?

10  A    Yes, I did.  That wasn't pertaining to the $250,000, but

11  that phone call was made.

12  Q    And did you also tell him that:  They're gonna do worse

13  things to your wife?

14  A    Yes, I did.

15  Q    And did you tell him:  They're gonna pop your head off in

16  front of your fucking kids?

17  A    Yes, I did.

18  Q    Why did you make these violent threats?

19  A    So, there were two components of the phone calls.

20        One phone call I made and I threatened Greg because

21  he owed us the $250,000.  And I was just at wit's end, this

22  guy was lying to us left and right.  There was no truth coming

23  out of him.  I was emotional because we, basically, had

24  scuttled the JBMML because this man had defaulted.  And I was

25  pissed, upset, whatever you want to call it, at him owing the

SAM    OCR    RMR    CRR    RPR

F. RUSSO – DIRECT – MS. ZVEROVICH

1     $250,000.

2             The phone call I –– in regarding to the –– his kid's

3     teeth was actually made because –– I wasn't describing what I

4     was going to do or anyone that I knew.  The person that had

5     actually beat him up, their friends came to our actual office

6     one day and explained to us –– and these are retired cops that

7     came to us with their weapons on them.  And they came to our

8     office and explained that if this guy gets arrested for fraud,

9     he's going to be murdered before the trial even finishes.  And

10    that the beating that he received at Dunkin' Donuts was

11    nothing.

12            So, I was completely freaked out by this.  And so,

13    it came to a point where we had spoken to one of the retired

14    cops on the phone.  I –– I explained it in  –– in the proffer

15    meetings that –– I –– I had watched The Seven Five with this

16    Michael Dowd.  That's what these guys reminded me of.  They

17    reminded me of, like, a crooked cop that had no lines, and

18    that these guys would go and do anything.

19            And so, when they came to our office and they

20    explained what would happen to Greg Altieri, we had spoken to

21    them right around the same time where he owed us the money and

22    we were fed up.  And they, basically, told us, that's it,

23    judgment day is here.  Watch what happens to him.  And they

24    were talking crazy.

25            And so, I called Greg up –– Greg up and I was like:

SAM      OCR      RMR      CRR      RPR

F. RUSSO - DIRECT - MS. ZVEROVICH

1  Dude, that's it, I don't even want to bother with you anymore.

2  This is my last phone call.  What's about to happen to you is

3  crazy.  And I said graphic things, but only because I was

4  freaked out by -- by these people that he also owed money to

5  and had already physically harmed him.

6      And I -- I was completely freaked out that they were

7  also going to come after  me.  Because at some point in the

8  office, they explained that they were following me and Frank

9  Smookler because they thought we were taking their money they

10  were giving Greg, even though Greg was running a Ponzi scheme

11  and taking all of our money.

12      So, I was freaked out that when -- enough was

13  enough.  They were gonna, basically, come to us, because they

14  weren't gonna believe my excuse that I wasn't taking their

15  money.

16      So, there was phone calls where I threatened Greg,

17  and then there was the phone call with the -- the teeth.  And

18  it wasn't me threatening Greg, it was me explaining that, you

19  have people over here that are really gonna do craziness to

20  you.  And I was trying to, basically, let him know, like, it

21  was just -- that's it, there's no more excuses.  The lies

22  don't -- they're not going anywhere.  They're not gonna work

23  anymore.

24  Q    Okay.  But on other occasions you did threaten him for

25  owing you the 250,000, correct?

SAM     OCR     RMR     CRR     RPR

F. RUSSO – DIRECT – MS. ZVEROVICH

1   A    Yes, I did.

2   Q    Did you have any intention of physically harming Altieri?

3   A    No, I didn't.

4   Q    And did you ever harm him in any way?

5   A    No.

6   Q    Now, switching gears to a different topic.

7        Did there come a time when you became involved in a

8   horse business?

9   A    Yes.

10  Q    How did that come about?

11  A    I believe Jay came to Frank Smookler and myself and

12  explained that one of his clients had an interest in entering

13  the horse space.  And Frank explained to him that he knew the

14  horse business, and that this is something that we could

15  manage for them also.  And we can form an entity, get it

16  funded, and buy horses.

17       And we can, basically, split the profits of what

18  these horses would, in theory, make based off of racing  and

19  selling the mating rights to the horses if they started

20  winning races and whatnot.

21  Q    And who did you have these discussions with?

22  A    Myself, Frank Smookler, Jason Kurland, and this gentleman

23  named Luca Williams.

24  Q    Who's that?

25  A    It's Frank Smookler's friend, who was partners with Frank

SAM     OCR     RMR     CRR     RPR

F. RUSSO – DIRECT – MS. ZVEROVICH

1  in other horses, who was brought on because he could help us

2  manage the horse business.

3  Q    Okay.  And which client was it that the defendant said

4  was interested in horse -- a horse business?

5  A    The South Carolina winners.

6  Q    Now, did you open any company for this horse business?

7  A    Yes, we did.

8  Q    Without telling us the full name of the company, and

9  using only its initials, what company did you open?

10 A    B and B █████, LLC.

11 Q    And who created that?

12 A    Myself and Frank Smookler.

13 Q    And who were the owners of that company?

14 A    Initially, it was just Frank and myself when we formed

15 it.  And then Jay gave us a basic operating agreement, where

16 we mapped out who was getting what, as far as percentage-wise.

17 Q    Okay.

18        MS. ZVEROVICH:  Ms. Hochron, if we can publish

19 Government Exhibit 910 in evidence, and go to page 2.

20        (Exhibit published.)

21 BY MS. ZVEROVICH:

22 Q    Mr. Russo, do you recognize this document?

23 A    Yes.

24 Q    What is it?

25 A    This is the Articles of Organization for B and B, LLC.

SAM     OCR     RMR     CRR     RPR

F. RUSSO – DIRECT – MS. ZVEROVICH

1  Q    Is that the company that you opened for this horse

2  business?

3  A    Yes.

4  Q    And who is listed as the "Organizer and Filer" here?

5  A    Myself.

6  Q    And did you or Smookler open a bank account for B and B,

7  LLC?

8  A    Yes, we did.

9  Q    Who opened that account?

10 A    Myself and Frank Smookler.

11 Q    And who provided funding to invest in the horses?

12 A    Jason Kurland's clients.

13 Q    Which clients?

14 A    The South Carolina winners.

15 Q    Did you, personally, contribute any money towards this

16 horse business?

17 A    No.

18 Q    How about the defendant, did he personally provide any

19 money?

20 A    No.

21 Q    Mr. Smookler?

22 A    No.

23 Q    And how much money did you get from the defendant's South

24 Carolina client?

25 A    $1 million.

SAM     OCR     RMR     CRR     RPR

F. RUSSO - DIRECT - MS. ZVEROVICH

1  Q    Who brought in this investment?

2  A    Jason Kurland.

3  Q    Did Mr. Kurland  get any finder's fee for this horse

4  investment?

5  A    No.

6  Q    And what was the $1 million supposed to be used for?

7  A    A large portion of it was supposed to be used to purchase

8  actual horses.  And then the rest that was left over in the

9  bank account was left to, basically, manage the horses; pay

10 the vet bills, pay the trainers, pay everything else

11 associated with racing horses.

12 Q    Were you allowed to use any part of that money on

13 anything else?

14 A    No.

15 Q    And where was this $1 million deposited?

16 A    Into the B and B, LLC, bank account.

17 Q    And did you, in fact, use this money to buy any horses?

18 A    Yes.

19 Q    How many?

20 A    Three.

21 Q    And approximately how much did they cost?

22 A    I don't remember the exact amount, but around $600,000

23 for the three of them.  It may have been a little bit more.

24 Q    And after the purchase, who owned these horses?

25 A    Frank and myself retained a percentage, Jason Kurland

SAM    OCR    RMR    CRR    RPR

F. RUSSO – DIRECT – MS. ZVEROVICH

1   retained a percentage, and the lottery winners from South

2   Carolina retained a percentage.

3          MS. ZVEROVICH:  Ms. Hochron, if we can put up

4   Government Exhibit 1126 for identification.

5   BY MS. ZVEROVICH:

6   Q    Do you recognize this, Mr. Russo?

7   A    Yes, I do.

8   Q    What is it?

9   A    This is the operating agreement that we filled out after

10  opening up the corporation.

11  Q    And is this a fair and accurate copy of the operating

12  agreement?

13  A    Yes, it is.

14         MS. ZVEROVICH:  The Government offers Government

15  Exhibit 1126.

16         MR. KASULIS:  No objection, Your Honor.

17         THE COURT:  All right.  Government Exhibit 1126 is

18  received in evidence.

19         (Government Exhibit 1126, was received in evidence.)

20         MS. ZVEROVICH:  And, Ms.  Hochron, if we can please

21  publish that to the jury.

22         (Exhibit published.)

23  BY MS. ZVEROVICH:

24  Q    What is the name of this agreement?

25  A    Operating Agreement of B and B, LLC.

                SAM     OCR     RMR     CRR     RPR

F. RUSSO – DIRECT – MS. ZVEROVICH

1    Q     And what's the date?

2    A     May 21st , 2019.

3    Q     And if we go to the last page, what is reflected here?

4    A     This reflects the capital contribution and the percentage

5    of ownership for each person.

6    Q     And so under "Members," the first thing that it says

7    there is a redaction, but it says:  HS, LLC.

8            And it says:  Initial capital contribution

9    $1 million, percentage interest 60 percent.

10           What does that reflect?

11   A     That reflects the ownership that the South Carolina

12   winners had in this entity.

13   Q     What is that ownership?

14   A     60 percent.

15   Q     Okay.  And let's go to the next one.

16   A     That is the ownership that Frank and myself and Luca

17   Williams retained for the B and B, LLC.

18   Q     And the last item?

19   A     That's the percentage of ownership that Jason Kurland

20   retained.

21   Q     So, to be clear, under this you and Frank Smookler had a

22   30 percent ownership interest in the horses, and Jason Kurland

23   had 10 percent, correct?

24   A     Yes.

25   Q     And as reflected in the middle column, none of you put up

SAM     OCR     RMR     CRR     RPR

F. RUSSO – DIRECT – MS. ZVEROVICH

1    any money whatsoever for these horses, correct?

2    A    Correct.

3    Q    How did it come about that you and Smookler came to have

4    a 30 percent ownership in these horses?

5    A    To my memory, Luca Williams retained 20 percent out of

6    that 30 percent.  Frank and myself split the 5 percent -- or

7    the 10 percent and we got 5 percent each.

8             And, basically, it was agreed upon, if I'm not

9    mistaken, between Frank Smookler, Luca Williams, and Jason

10   Kurland.

11   Q    And Jason Kurland agreed to give you a 30 percent

12   ownership interest?

13   A    Yes, Jason Kurland said his clients agreed to the

14   percentage.

15   Q    Now, did you spend any portion of the client's $1 million

16   on anything other than horse-related expenses?

17   A    Yes.

18   Q    What was that?

19   A    At some point, I remember moving money over from

20   B and B ▮▮▮▮▮▮ to JBMML to make interest payments and other

21   payments that were due.

22   Q    Did you tell the defendant that you were moving money

23   from B and B, LLC, to JBMML?

24   A    At the time, yes, we did explain to him that we moved

25   money from JBMML to  -- from B and  B to JBMML.

SAM      OCR      RMR      CRR      RPR

F. RUSSO – DIRECT – MS. ZVEROVICH

1   Q    Now, do you still have a 30 percent ownership interest in

2   these horses?

3   A    No.

4   Q    What happened?

5   A    When we were in the PPE space, when that started to go

6   south, Jay explained that this would just look bad, that we

7   had an ownership in this business.  And it would just look

8   good if we just gave them back the horses because we're,

9   basically, losing money everywhere else.

10          So, we agreed to sell the horses for a dollar each,

11  basically, back to the South Carolina winners.

12          MS. ZVEROVICH:  Ms. Hochron, if we can pull up

13  Government Exhibit 1010 in evidence, and go to page 78.

14          (Exhibit published.)

15          MS. ZVEROVICH:  And if we could please zoom in on

16  the bottom two messages.

17  BY MS. ZVEROVICH:

18  Q    Mr. Russo, what is this?

19  A    This is a text message between Jason Kurland and myself.

20  Q    And what's the date?

21  A    The date is 6/25/2020.

22  Q    Okay.  And the next message is 6/26/2020?

23  A    Yes.

24  Q    The defendant wrote:  Are you around tomorrow to sign

25  Bill of Sale for the horses?

SAM     OCR     RMR     CRR     RPR

F. RUSSO – DIRECT – MS. ZVEROVICH

1      Just sent you the bill of sale for horses.  Any way

2 you can get your signature notarized somewhere on Monday?

3      What did you understand the defendant to be saying?

4 A    That he was going to send me a bill of sale for the

5 horses the next day.  And the next day he had sent me this

6 bill of sale for the horses, and he had asked me to get the

7 bill of sale notarized with my signature.

8 Q    And did the defendant, in fact, send you bills of sale

9 for the horses?

10 A    Yes.

11 Q    And did you sign them?

12 A    Yes, and notarized them -- or had them notarized.

13      MS. ZVEROVICH:  Ms. Hochron, let's pull up

14 Government Exhibits 642, 643, and 644 for identification.

15 BY MS. ZVEROVICH:

16 Q    Beginning with 642, do you recognize this?

17 A    Yes, I do.

18 Q    What is it?

19 A    This is the bill of sale for horse -- the Horse 1.

20 Q    And did you sign it?

21 A    Yes, I did.

22      MS. ZVEROVICH:  Let's go to 643.

23 Q    What is this?

24 A    This is the bill of sale for Horse Number 2.

25 Q    Did you sign it?

SAM     OCR     RMR     CRR     RPR

F. RUSSO – DIRECT – MS. ZVEROVICH

1   A    Yes.

2          MS. ZVEROVICH:  And let's go to 644.

3   Q    What is this?

4   A    This is the bill of sale for Horse Number 3.

5   Q    Did you sign that one?

6   A    Yes.

7          MS. ZVEROVICH:  The Government offers Government

8   Exhibits 642, 643, and 644.

9          MR. KASULIS:  No objection, Your Honor.

10          THE COURT:  All right.  Government Exhibits 642,

11   643, and 644 are received in evidence.

12          (Government Exhibit 642, 643, 644, was received in

13   evidence.)

14          MS. ZVEROVICH:  Ms. Hochron, let's publish 642 to

15   the jury.

16          (Exhibit published.)

17   BY MS. ZVEROVICH:

18   Q    Mr. Russo, what are we looking at here?

19   A    We are, basically, looking at the three bills of sale for

20   the horses.

21   Q    So, 642 is one of those bills?

22   A    Yes.

23   Q    And what's the date?

24   A    6/26/2020.

25   Q    And after the name of Horse, and it says "redacted here,"

SAM    OCR    RMR    CRR    RPR

F. RUSSO – DIRECT – MS. ZVEROVICH

1   Horse 1, what does it say afterwards?

2   A    For the consideration of $1, including all applicable

3   taxes.

4   Q    Okay.  And who signed this bill of sale?

5   A    Myself.

6   Q    And who signed on behalf of the buyer?

7   A    Jason Kurland.

8   Q    And are 643 and 644 similar bills for $1 -- bills of sale

9   for $1 for the horses?

10  A    Yes, they are.

11  Q    Did Mr. Kurland pay you the $3?

12  A    I don't believe so.

13  Q    Now, Mr. Russo, in preparing for your testimony, were you

14  asked to listen to and review certain recorded calls in this

15  case?

16  A    Yes.

17  Q    And did you also review corresponding transcripts?

18  A    Yes.

19        MS. ZVEROVICH:  Ms. Hochron, if we can please

20  publish Government Exhibit 720T in evidence.

21        (Exhibit published.)

22  BY MS. ZVEROVICH:

23  Q    Mr. Russo, what is this?

24  A    This is a recorded conversation between Jason Kurland.

25  Q    And who else?

SAM     OCR     RMR     CRR     RPR

F. RUSSO – DIRECT – MS. ZVEROVICH

1    A    Myself and Frank Smookler.

2    Q    I'm sorry, so who are the participants on this call based

3    on this transcript?

4    A    Jason Kurland, Frank Smookler, and myself.

5         MS. ZVEROVICH:  Ms. Hochron, if we can highlight the

6    participants.

7    A    Oh, just myself and Frank Smookler.

8    Q    Okay.  And what is the date?

9    A    The date is June 30th, 2020.

10        MS. ZVEROVICH:  Ms. Hochron, if we can play

11   Government Exhibit 720, which is the call, alongside with the

12   transcript.

13        THE COURT:  All right.  Members of the jury, before

14   this call is played, the transcript is an aide to assist you

15   in listening to the recording.  Any distinction between what

16   you hear in the recording and what you see on the transcript,

17   it's the recording that is the evidence that you will follow

18   and not the transcript.

19        All right.  Go ahead.

20        MS. ZVEROVICH:  Thank you, Your Honor.

21        (Continued on the following page.)

22

23

24

25

SAM        OCR        RMR        CRR        RPR

F. RUSSO – DIRECT – MS. ZVEROVICH

1       MS. ZVEROVICH:  If we go to the actual transcript on

2  the next page, Ms. Hochron.

3       We're just having some telling technical issues.

4       (Audio played.)

5       MS. ZVEROVICH:  I believe, Ms. Hochron --

6       THE COURT:  What is the problem?

7       MS. ZVEROVICH:  Your Honor, this is the incorrect

8  exhibit.  720-T is what we should be publishing.

9       (Audio played.)

10       THE COURT:  Can we go to the top, okay 720T.  Go

11  ahead.

12       (Audio played.)

13  BY MS. ZVEROVICH:

14  Q    What were you discussing here with Mr. Smookler?

15  A    Frank was unaware that I had signed the bill of sale

16  giving away our percentage of the horses.

17  Q    For one dollar?

18  A    Yes.

19  Q    Switching gears.  Did there come a time when you became

20  involved in an investment opportunity involving PPE?

21  A    Yes.

22  Q    Can you remind the jury what is the PPE or personal

23  protective equipment?

24  A    The face masks, rubber gloves, surgical gowns associated

25  with the COVID pandemic, but really any kind of use that

Rivka Teich CSR RPR RMR FCRR
Official Court Reporter

F. RUSSO – DIRECT – MS. ZVEROVICH

1   requires it.

2   Q     Was this PPE investment opportunity part of your MCA

3   business or separate?

4   A     Completely separate.

5   Q     Were any of your MCA partners involved in the PPE

6   investment with you?

7   A     Yes.

8   Q     Who was that?

9   A     Myself, Frank Smookler and Jason Kurland.

10  Q     Why did the three of you decide to get involved in a PPE

11  investment?

12  A     After what happened with Greg Altieri and JBMML, this

13  opportunity came, we thought this was the best answer for us

14  to make money to pay back what we lost within JBMML.

15  Q     Were you hoping to make any money for yourself?

16  A     Oh, on top of paying everything back we were hoping to

17  make a ton of money.

18  Q     How did you find out about PPE investment?

19  A     Frank Smookler's friend basically approached Frank

20  Smookler's friend, who approached Frank, who approached Jason

21  and myself explaining he had this opportunity to secure a deal

22  with the state of California.

23  Q     Who was that Frank Smookler's friend?

24  A     Eric Fessler.

25  Q     What did Frank Smookler and Eric Fessler tell you and the

F. RUSSO – DIRECT – MS. ZVEROVICH

1  defendant about this investment?

2  A    Basically there was a signed deal with the state of

3  California in the amount of $799 million and that it simply

4  required funding in order to provide the product.  If that

5  would happen, we would basically be included in this scenario,

6  in the deal.

7  Q    The idea would be that the funding would get you to

8  purchase PPE, which would then get sold to California?

9  A    The funding would be used to purchase PPE from

10 manufacturers and shipped to California, and then we would

11 collect our revenue from there, from the state of California.

12 Q    Did Smookler and Fessler tell you how much funding they

13 needed initially?

14 A    Yes.  Initially they needed I believe $19.5 million in

15 order to secure enough product to get the California deal

16 secured.

17 Q    Did you discuss that with the defendant?

18 A    Yes.

19 Q    How much profit were the three of you, or the four of

20 you, if Fessler, expecting to make open of this PPE

21 investment?

22 A    Astronomical.  After paying everything else out we would

23 be left with roughly a little more than a hundred million

24 dollars.

25 Q    Did you discuss with the defendant how you would get

F. RUSSO – DIRECT – MS. ZVEROVICH

1    funding for this PPE investment?

2    A    Yes.  He was going approach his clients.

3    Q    Did the defendant agree do that?

4    A    Yes.

5    Q    Did any of his clients in fact make an investment in this

6    PPE deal?

7    A    Yes.

8    Q    Which client?

9    A    The South Carolina winners.

10   Q    How much did they investment?

11   A    Initially $19.5 million.

12   Q    Approximately when was that?

13   A    Around Easter.

14   Q    Of 2020?

15   A    Of 2020.

16   Q    Where was this 19 and a half million dollars from South

17   Carolina wired to?

18   A    It was wired to an escrow account of a lawyer that I

19   guess was in charge of making sure, handling the, where the

20   money went.

21   Q    It was supposed to be used for what?

22   A    Purchasing of equipment in order to supply California.

23   Q    After this 19 and a half million dollars was wired, did

24   there come a time when you were told that more money was

25   needed?

F. RUSSO - DIRECT - MS. ZVEROVICH

1    A    Yes.

2    Q    Who told you?

3    A    Eric Fessler and Frank Smookler basically explained that

4    there was a gentleman named Chris Chierchio, Chris Chierchio

5    explained it wasn't a $19.5 million raise, it was closer to

6    $40 million raise that was needed in order to secure the

7    California deal.  That he needed a second tranche of

8    $19.5 million in order to basically get this California deal

9    secured.

10   Q    Who's Chris Chierchio?

11   A    I never met Chris Chierchio, but Eric Fessler knew him.

12   Chris Chierchio was the middle man to the California deal.

13   Q    Did you discuss this request for a second 19 and a half

14   million dollars with the defendant?

15   A    Yes.

16   Q    And what, if anything, did the defendant say?

17   A    Initially I told the defendant to take it easy, you

18   already performed, you already raised $19.5 million when

19   anybody thought could you do it.  You did it around Easter,

20   let the California deal perform, let it start to work.

21        Shortly after that interaction with him I spoke with

22   Frank, Eric Fessler and Chris Chierchio.  They set the

23   urgency, that there is no waiting or holding, that if we don't

24   get this second tranche of 19.5 the California deal will blow

25   up.  I went back to Jay and said there is no negotiation, it's

F. RUSSO – DIRECT – MS. ZVEROVICH

1    either we do it or we're at a loss again.  We have no choice.

2    Q    What did the defendant tell you?

3    A    At first he was stressed out, pressured, you know.  This

4    was unexpected that a second tranche of 19.5 was required.

5         Then he told me that he had a very brief meeting

6    with the South Carolina winners, actually just the wife the

7    husband was away at the time.  He said he had a good meeting

8    with the wife.  And that he didn't get the yes, but he felt in

9    the next few meetings with her he could get a yes out of her.

10   She was a little bit reluctant because her husband wasn't

11   around, that's what I remember speaking to Jay about.

12   Q    After this call with the defendant, did you speak with

13   Chierchio?

14   A    Yes.

15   Q    What did Chierchio tell you?

16   A    Chierchio explained to me that basically he did not want

17   to deal with the lawyer with the escrow account.  It put too

18   much of a lag on to the time that it needed for him to make a

19   deal with these manufacturers and to get them the money, and

20   then get the product from manufacturers over to the state of

21   California.  He wanted the money sent to him directly.

22   Q    He wanted to get the second 19 and a half directly

23   Chierchio, right?

24   A    Yes.

25   Q    What happened next?

F. RUSSO – DIRECT – MS. ZVEROVICH

1   A     Jay sent the money to my account that Frank and I

2   basically had control of, which was called Azimut LLC.

3         He gave me two stipulations:  Make sure that Chris

4   Chierchio signs all the documents that I needed, and make sure

5   I was confident in the deal.  And once I was confident, either

6   collect invoices from Chris Chierchio and pay them

7   individually or just send the money to Chris Chierchio, but

8   once those two things were done, I could release the funds.

9   Q     So you received the transfer of 19 and a half million

10  dollars?

11  A     Yes.

12  Q     Who sent that money to you?

13  A     Jason Kurland through his clients.

14  Q     Through his client's account you mean?

15  A     His client's bank account.

16  Q     What account did that money go into?

17  A     An account called Azimut 43 LLC.

18  Q     What is Azimut?

19  A     It was an LLC that we used to manage a boat that Frank

20  Smookler and myself purchased.  When there was no boat for the

21  LLC to manage, it was an LLC with a bank account that was

22  basically shelfed.  It was the only one that we could use that

23  was ready to go.

24  Q     Who controlled the Azimut bank account?

25  A     Myself and Frank Smookler.

F. RUSSO – DIRECT – MS. ZVEROVICH

1  Q    Did the defendant have access to that bank account?

2  A    No, he did not.

3  Q    Ms. Hochron, if we can pull up 401B in evidence.  Go to

4  page 16, please.

5        Looking first on the top portion, what is this?

6  A    This is a bank statement from Signature Bank for Azimut

7  43LLC.

8  Q    What is the period?

9  A    The month of April 2020.

10 Q    Let's focus on the debits and other credits section of

11 this statement.  What is the first wire there listed?

12 A    Incoming wire on April 23 amount of 19 and a half million

13 dollars from the South Carolina winners.

14 Q    We can take this down.  Thank you.

15        After you received this 19 and a half million

16 dollars in your Azimut account, did you speak with the

17 defendant?

18 A    Yes.

19 Q    What, if anything, did the defendant tell you?

20 A    Just that he wanted me to basically follow two

21 stipulations:  Make sure that the documentation was signed,

22 that he wanted Chris Chierchio to sign.  And once I was

23 confident that the deal was good, to release the funds.

24 Q    What, if anything, did he tell you about when he needed

25 to get this money back?

F. RUSSO – DIRECT – MS. ZVEROVICH

1   A     He explained to me that he basically took the money from

2   his client's account without them knowing.  I believe the

3   account was either, had to do with taxes or had to do with a

4   property that they were looking to purchase.

5   Q     And what, if anything, did he tell you about when he

6   needed to get it back, if anything?

7   A     Yes.  The moneys that were in the account were going to

8   be used to purchase a property.  And he had basically a

9   deadline that he needed to put the money back into the account

10  before they were aware.

11  Q     Aware of what?

12  A     That the money even went missing.

13  Q     Ms. Hochron, if we can pull up Government Exhibit 1010 in

14  evidence.  Go to page 76, and zoom in on the last message

15  there.

16              What is this?

17  A     A text message from Jason Kurland to myself.

18  Q     What is the date?

19  A     4/23/2020.

20  Q     Around the same time you received the wire transfer,

21  correct?

22  A     Yes.

23  Q     What was the defendant providing to you here?

24  A     Jason Kurland was texting me Chris Chierchio' business

25  and account wiring information so I could release the

F. RUSSO – DIRECT – MS. ZVEROVICH

1   $19.5 million to him.

2   Q     What is Church Group LLC?

3   A     Chris Chierchio's company that he used for the PPE space.

4   Q     We can take that down.  Thank you, Ms. Hochron.

5         After you received 19 and a half million dollars

6   from the defendant into your Azimut account, what did do you

7   with it?

8   A     I had a conversation with Frank Smookler, Eric Fessler

9   and Chris Chierchio to discuss how it was going to be divided.

10  Q     What did you discuss?

11  A     Frank Smookler and Eric Fessler basically explained to me

12  where the money was going to be going.  That $4 million off

13  the top going to be divvied up between myself, Eric Fessler

14  and Frank Smookler.  And $15.5 million was going to be going

15  to Chris Chierchio.

16  Q     So the three of you, you, Smookler and Fessler decided to

17  take $4 million of this client's money for yourselves?

18  A     Yes.

19  Q     Ms. Hochron, if we can publish Government Exhibit 401B in

20  evidence, and go to page 16.

21        First, briefly, again what is this?

22  A     This is a bank statement from Signature Bank for Azimut

23  43 LLC.

24  Q     That's the same statement we looked at?

25  A     Yes.

F. RUSSO - DIRECT - MS. ZVEROVICH

1    Q    If we can go into the withdrawals and other debits

2    section.  Let's start with the first withdrawal.

3                It's an outgoing wire on April 23, 2020 in at amount

4    of $2 million going to Taryn Levi, who is that?

5    A    Eric Fessler's daughter.

6    Q    What was this $2 million for?

7    A    That was his -- he received 50 percent of the $4 million

8    that we took off the top of the 19.5.

9    Q    Let's look at the next wire transfer.  What is this?

10   A    $15.5 million going to the Church Group LLC on the same

11   day.

12   Q    So that's Chris Chierchio?

13   A    Yes.

14   Q    Let's look at the next one.

15   A    That's a 2 million transfer, same day, to a corporation

16   that Frank and myself controlled.

17   Q    So you personally received $1 million of this money,

18   correct?

19   A    Yes.

20   Q    Did you tell Mr. Kurland that you, Smookler and Fessler

21   were taking $4 million off the top from this 19 and a half

22   million?

23   A    No, we did not.

24   Q    Why not?

25   A    Again, it was absolutely wrong.  At the time we jutified

F. RUSSO - DIRECT - MS. ZVEROVICH

1    it that we were basically taking out money from the deal that

2    was going to be funded in a week right off the top.  The deal

3    was supposed to pay back a total of 27 million, instead Chris

4    Chierchio signed that the deal will pay back $23 million.  We

5    took the $4 million up front.

6    Q    You previously testified that Mr. Kurland told you not to

7    release this money, the 19 and a half million, to Chierchio

8    until you felt confident; is that right?

9    A    Yes.

10   Q    When you sent the 15 and a half million to Chierchio, did

11   you in fact feel confident in the transaction?

12   A    No.

13   Q    Why not?

14   A    Because there were too many variables within the

15   industry.  We didn't have a real business like an office or

16   anything showing like substance, it was just over-the-phone.

17   Even though the California deal was signed by the state of

18   California, it was a real purchase order, if we didn't provide

19   the product in a certain amount of time by a deadline, the

20   deal was could blow up seven ways from Tuesday.

21        It didn't sound as if Chris Chierchio was going to

22   be able to make the necessary purchases and make the

23   deliveries in time to make this deal real.

24   Q    Yet despite all of these concerns, you wired 15 and a

25   half million to Chierchio, right?

F. RUSSO - DIRECT - MS. ZVEROVICH

1    A    Yes.

2    Q    Did you tell the defendant you were not confident?

3    A    No.  I lied to him and told him I was confident.

4    Q    How do you feel about that now?

5    A    I feel horrible.  It was the wrong thing to do.

6    Q    Did Chierchio sign any agreement for the second 19 and a

7    half million dollars?

8    A    Yes.

9    Q    Ms. Hochron, if we can pull up Government Exhibit 202 for

10   identification.

11            Mr. Russo, do you recognize this?

12   A    Yes, I do.

13   Q    What is it?

14   A    This is a promissory note from Chris Chierchio' company

15   in the amount of 23 million -- I believe that's 800,000, I

16   can't see, it's very blurry -- $23,800,000 from the Chris

17   Chierchio Group to the South Carolina winners.

18   Q    This relates to the second tranche of the 19 and a half

19   million?

20   A    Yes.

21   Q    Is this a fair and accurate copy of the promissory note?

22   A    Yes, it is.

23            MS. ZVEROVICH:  The Government offers Government

24   Exhibit 202.

25            MR. KASULIS:  No objection.

                    Rivka Teich CSR RPR RMR FCRR
                        Official Court Reporter

F. RUSSO – DIRECT – MS. ZVEROVICH

1    THE COURT:  Government Exhibit 202 is received in

2    evidence.

3    (Government Exhibit 202, was received in evidence.)

4    BY MS. ZVEROVICH:

5    Q    If we can please publish that to the jury.

6    What is the date, Mr. Russo?

7    A    The date is April 23, 2020.

8    Q    How much is Chris Chierchio and his company, Church

9    Group, promising to pay here?

10   A    Promising to pay $23.8 million back.

11   Q    The redaction GP here, that's the South Carolina client?

12   A    Yes.

13   Q    Under the note, what was the due date for this

14   $23.8 million payment?

15   A    The due date was May 11, 2020.

16   Q    So that's about two and a half weeks after Chierchio got

17   the 15 and a half million?

18   A    Yes.

19   Q    Did Chierchio in fact repay this $23.8 million?

20   A    No.

21   Q    As far as you know, did Chierchio ever pay any money to

22   the client under this promissory note?

23   A    No.

24   Q    Did you, Fessler or Smookler pay back any of the

25   $4 million that you took back to the client?

Rivka Teich CSR RPR RMR FCRR
Official Court Reporter

F. RUSSO – DIRECT – MS. ZVEROVICH

1   A     No.

2   Q     We can take that down.  Thank you, Ms. Hochron.

3          Apart from the 19 and a half million dollars

4   transfer, were you involved in any other PPE deals?

5   A     Yes.

6   Q     Did there come a time that you received another deposit

7   into your Azimut account?

8   A     Yes.

9   Q     What was that?

10  A     In the amount of $2.5 million.

11  Q     Who was that from?

12  A     Healthy Rainbow.

13  Q     Remind the jury, what is Healthy Rainbow?

14  A     One of Jason Kurland's lottery winners.

15  Q     Was there any agreement with the defendant's clients

16  relating to this investment?

17  A     Yes.  This money was supposed to be paid back at a

18  certain time.  And there it agreed that there would be no

19  partner distributions of any kind until this money was paid

20  back in total.

21  Q     Ms. Hochron, if we can publish Government Exhibit 1009 in

22  evidence.  If we can go to page 59.

23          Looking on the top message, what is that?

24  A     That's a group text between myself, Jason Kurland, and

25  Frank Smookler.

F. RUSSO - DIRECT - MS. ZVEROVICH

1   Q    What is the date?

2   A    5/12/2020.

3   Q    What did you write in this message?

4   A    We agreed to no partner distributions until the 2.5 is

5   paid back.

6   Q    What did you mean by that?

7   A    Just outlining that this $2.5 million that we signed,

8   there would be no partner distributions of any type until the

9   total amount of $2.5 million was paid back.

10  Q    Were there various contracts for this two and a half

11  million dollars investment?

12  A    Yes.

13  Q    Can we please publish Government Exhibit 203 for

14  identification.

15       Do you recognize that, Mr. Russo?

16  A    Yes, I do.

17  Q    What is it generally?

18  A    This is the agreement that we signed for the

19  $2.5 million.

20  Q    Is it a fair and accurate copy of the agreement?

21  A    Yes, it is.

22       MS. ZVEROVICH:  The Government offers Government

23  Exhibit 203.

24       MR. KASULIS:  No objection.

25       THE COURT:  Government Exhibit 203 is received in

F. RUSSO – DIRECT – MS. ZVEROVICH

1    evidence.

2              (Government Exhibit 203, was received in evidence.)

3    BY MS. ZVEROVICH:

4    Q    Ms. Hochron, if we can publish to the jury, and go to

5    page five.

6              Looking at the top what is the date and amount --

7    first, what is the title of this document?

8    A    The title is:  Promissory note with personal guarantees.

9    Q    What is the date and the amount?

10   A    At date is April 29, 2020, and the amount is

11   $2.5 million.

12   Q    Looking at the first paragraph there, what is the date by

13   which this two and a half million dollars was supposed to be

14   repaid?

15   A    July 15, 2020.

16   Q    Let's go to page seven.  Let's go to the third paragraph

17   from the bottom, the one underneath.

18             Could you read the first paragraph on top there?

19   A    Yes:  Platinum hereby agrees not to make any

20   distributions to its members until such time as the Azimut

21   note is paid in full.

22   Q    Is this referring to the same agreement for no partner

23   distributions until the two and a half million is paid back?

24   A    Yes.

25   Q    Whose company was Platinum?

Rivka Teich CSR RPR RMR FCRR
Official Court Reporter

F. RUSSO – DIRECT – MS. ZVEROVICH

1    A    Mine, Frank Smookler's -- I'm not sure if Eric Fessler

2    was partners in it, I believe Eric Fessler and Jason

3    Kurland's.

4    Q    Did you honor this agreement with the client not to

5    distribute any money or take any profits until the principal

6    was paid back?

7    A    No, we didn't.

8    Q    After the two and a half million dollars was transferred

9    into Azimut, what did you do with?

10   A    First we funded Chris Chierchio roughly $1.4 million.

11   And then we sent $1 million to secure a New York leased

12   apartment PPE deal on the table even prior to this raise.

13   Q    Did you discuss with the defendant that you would be

14   sending $1.4 million of the client's money to Chierchio?

15   A    Yes.

16   Q    What was his response to that?  At the time when we first

17   originally raised the $2.5 million, it was to start a PPE

18   business that was going to have three warehouses, one in

19   California, one in Florida one in New York.  And we were going

20   to basically run these warehouses, fill it with product, and

21   basically make sales and cut out the leg work or the unknowns

22   or the variables associated with dealing with the

23   manufacturers.  When that fell through, or we realized it

24   would take a little bit more time, and we already funded the

25   $2.5 million and we wanted to put the money to work.

F. RUSSO – DIRECT – MS. ZVEROVICH

1        Chris Chierchio had a deal that he said that could

2   pay back very quickly.  We had a deal with the New York City

3   Police Department that would pay off quickly.  So that's what

4   we did we, gave Chris Chierchio a portion of the monies needed

5   to secure his deal; and we funded our $1 million New York City

6   Police Department deal.

7   Q    You discussed all of that with the defendant?

8   A    Yes, we did.

9   Q    In addition to doing that, did you also take any money

10  for yourself from the two and a half million dollars?

11  A    Yes, we did.

12  Q    Who took money?

13  A    Myself, Eric Fessler, and Frank Smookler.

14  Q    How much did you take?

15  A    I believe we took $10,000 each.  And we justified at the

16  time -- again, it was wrong -- that it was salary.

17  Q    Did you tell the defendant about the salary?

18  A    No, we did not.

19  Q    You said that you testified that you sent $1 million of

20  Healthy Rainbow, two and a half million for a PPE deal

21  involving the NYPD; is that right?

22  A    Yes.

23  Q    Just in basic terms, what was that NYPD deal?

24  A    It was a deal that required funding to purchase face

25  masks to be delivered to the New York City Police Department.

F. RUSSO – DIRECT – MS. ZVEROVICH

1  Q   So similar with the California deal but now with the New

2  York Police Department?

3  A   Yes.

4  Q   Were you expecting to make a profit off of that?

5  A   Yes.

6  Q   Did this deal, this 1 million deal, with the New York

7  Police Department in fact generate a profit?

8  A   Yes, it did.

9  Q   How much money did you get back from the NYPD?

10 A   In total the NYPD paid us $1.7 million.

11 Q   Did you tell the defendant once this $1.7 million from

12 the NYPD came in?

13 A   Yes.

14 Q   What did you all do with that $1.7 million?

15 A   We did what we originally discussed.  We basically paid

16 the brokerage and the middle man and Eric Fessler their share.

17 And Jason, myself, and Frank Smookler divvied up our equal

18 share what was left over.

19 Q   So Fessler, you, Smookler and Jason Kurland all took

20 money for yourselves from this $1.7 million, correct?

21 A   Yes, split basically the 700,000.

22 Q   How much did you get?

23 A   I don't remember the exact amount, but I think right

24 around 100,000.

25 Q   How about Smookler?

F. RUSSO – DIRECT – MS. ZVEROVICH

1    A     100,000.

2    Q     And how about the defendant?

3    A     100,000.

4    Q     What did you do with the rest of the money?

5    A     The remaining 400,000 we paid to Eric Fessler on his side

6    to secure the deal.  And the $1 million of the principle that

7    was left over, we put into another glove deal.

8              THE COURT:  Did you issue 1099s for these payments?

9              THE WITNESS:  We didn't get a chance to.  It was

10   right before we got arrested, so we didn't even get a chance

11   to do any type of taxes associated with the PPE business.

12   Everything prior, yes, we did.

13             THE COURT:  Go ahead.

14             MS. ZVEROVICH:  Thank you, your Honor.

15   BY MS. ZVEROVICH:

16   Q     So the 1.7 million came in, you said Eric Fessler takes

17   approximately 400,000, correct?  You, Smookler and the

18   defendant take approximately 300,000 together.  And 1 million

19   you said you sent to another deal?

20   A     Yes.  Frank Smookler had another glove deal on the table,

21   so we wanted to send it out to generate more income.

22   Q     After you got this 1.7 million, did any portion of it go

23   back to the defendant's client?

24   A     No.

25   Q     At the time that you, Smookler, and the defendant took

Rivka Teich CSR RPR RMR FCRR
Official Court Reporter

F. RUSSO – DIRECT – MS. ZVEROVICH

1  these $100,000 distributions from the 1.7 million, had you

2  made any payments to the client on the two and a half million

3  dollars investment?

4  A    No.

5  Q    Were you allowed to take these $100,000 distributions?

6  A    No.

7  Q    Why not?

8  A    Because the money that was used for the deal was out of

9  the 2.5 million, which we agreed no type of partner

10 distributions of any type until the 2.5 was paid back in full.

11 Q    Turning back to Chierchio for a second.  You testified

12 that Chierchio received 15 and a half million dollars of the

13 South Carolina client's money, correct?

14 A    Yes.

15 Q    And $1.4 million of the Healthy Rainbow client's money,

16 correct?

17 A    Yes.

18 Q    As far as you know, did Chierchio pay back any of that

19 money to the defendant's clients?

20 A    No.

21 Q    And after it became clear that Chierchio wasn't making

22 payments, how, if at all, did the defendant's demeanor change?

23 A    He started to become frantic.  We lost all this money in

24 the Merchant Cash Advance space and now we're starting to miss

25 dates and default on the PPE space.

F. RUSSO - DIRECT - MS. ZVEROVICH

1   Q    Did the defendant explain to you why he was frantic?

2   A    Yes.  Specifically with the second tranche of

3   19.5 million it was imperative he got it back on a certain

4   date.  He wanted it back in the account before his clients

5   were aware it was missing.  He was frantic about the

6   $2.5 million because we had voided that contract.

7          And at this point the FBI were knocking on doors of

8   his clients.  And his clients were telling him that they had a

9   visit from the FBI pertaining to the investments through Jason

10  Kurland.

11  Q    Ms. Hochron, if we can please publish Government Exhibit

12  731-T.  This is a transcript of a call.

13          Who are the participants on the call?

14  A    Jason Kurland and myself.

15  Q    What is the date?

16  A    May 21, 2020.

17  Q    Ms. Hochron, if we could please play 731 alongside the

18  transcript the next page at 731-T.

19          Here JK stands for Kurland, and FR stands for Russo?

20  A    Yes.

21          MS. ZVEROVICH:  Play the call.

22          (Audio played.)

23  BY MS. ZVEROVICH:

24  Q    What are you discussing here?

25  A    The fact that it's imperative that he gets the second

Rivka Teich CSR RPR RMR FCRR
Official Court Reporter

F. RUSSO – DIRECT – MS. ZVEROVICH

1    tranche of 19.5 paid back so that his clients can make that

2    real estate purchase in South Carolina.

3    Q    Did you have other calls with the defendant on this

4    subject?

5    A    Yes.

6    Q    Ms. Hochron, if we can please publish Government Exhibit

7    737-T in evidence.

8              And so this is a transcript of another call, what is

9    the date?

10   A    May 27, 2020.

11   Q    Who are the participants on this call?

12   A    Jason Kurland and myself.

13             MS. ZVEROVICH:  Let's play 737 alongside the

14   transcript.

15             (Audio played.)

16   BY MS. ZVEROVICH:

17   Q    Let's leave the transcript up, Ms. Hochron.

18             Mr. Russo, what were you discussing with the

19   defendant in this call?

20   A    Initially we were talking about Greg Altieri, how he

21   scammed us for the $40 million.  And I would pay a fine just

22   to make sure that he goes to jail, and that we lightly touch

23   on that.

24             Then Jay was going over the dates that he needed the

25   $2.5 million back and the dates that he needed the

F. RUSSO – DIRECT – MS. ZVEROVICH

1   $19.5 million back.  I was confirming that basically I told

2   Frank Smookler, Eric Fessler, and Chris Chierchio that Jason

3   Kurland's clients need this money back.  They are making a

4   real estate purchase and they are not even aware that the

5   money is out of the account at this point.

6          (Continued on next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1   DIRECT EXAMINATION (Continued)

2   BY MS. ZVEROVICH:

3   Q    Okay.  And looking at the bottom of the page.

4            What was the defendant's response to that?

5   A    All right.  Later.

6   Q    Okay.  And prior to that, he said, okay, thank you?

7   A    Okay, thank you.

8            MS. ZVEROVICH:  We can take that down.

9            Thank you.

10  Q    Mr. Russo, around this time, were you talking to

11  Mr. Smookler about the defendant?

12  A    Yes.

13  Q    And what were you telling Smookler?

14  A    There was a conversation where Frank was talking about a

15  glove or our face mask machine that he wanted to purchase, and

16  at the time, he wanted a larger percentage of the deal because

17  he's the one who carved it out, and I was aggravated, so I

18  explained to Frank that I never asked for a larger percentage

19  even when the $19.5 million came over and I lied to Jay and I

20  treated him like a duck or like prey.  I was referring to the

21  games at the carnival where you shoot the duck, and that

22  basically, I was -- did whatever it took to make sure that Jay

23  was okay with me sending the money out, and that I never asked

24  for a larger percentage than we got and that I didn't think

25  that it was fair that Frank was basically doing it.
```

```
1    Q    Now, did you have anything to do with taking the second

2    19 and a half million dollars out of the defendant's client's

3    account?

4    A    No.  And by the time I lied to Jay, it was already in my

5    account.

6    Q    And who sent it to you?

7    A    Jason Kurland.

8    Q    Now, you testified that you sent 15 and a half million

9    dollars of South Carolina's money to which question Chierchio?

10   A    Yes.

11   Q    And what is your understand of what Chierchio was

12   supposed to do with that money?

13   A    Secure PPE product so that we could secure this deal with

14   the State of California.

15   Q    Do you have any idea what he, in fact, used that money

16   on?

17   A    No.

18   Q    And what, if anything, did Chierchio tell you about

19   whether or not California made any payments on this deal?

20   A    There was a 7- or $7.5 million payment that California

21   made that was in that same escrow account that the original

22   19.5 was deposited and that he was waiting for it to be

23   released.

24   Q    And did you discuss with Chierchio when he planned for

25   this seven and a half million payment from California?
```

*Avery N. Armstrong, RPR*
*Official Court Reporter*

1    A     Yes.  Chris explained that he had other deals and he

2    wanted to really buy more equipment and that he wanted to use

3    that 7.5 in purchasing more equipment, so that he wanted to

4    get Jay to agree that if he made a payment, that Jay would

5    basically give it right back to him so that he could use it

6    right away.  And he was really concerned that he wanted to

7    make sure that he got that payment, that $7.5 million back

8    from Jay when he made the payment.

9    Q     And did you discuss that with the defendant?

10   A     Yes.

11   Q     As far as you know, did Chierchio, in fact, return or

12   send any portion of that seven and a half million dollars to

13   you or to the defendant?

14   A     No, I don't believe so.

15   Q     Did you personally get any payments from Chris Chierchio?

16   A     Yes, I did.

17   Q     What was that?

18   A     Around the same time, Chris Chierchio basically was

19   explaining that he had other deals within the PPE space that

20   had funded and that he wanted to basically use me in a

21   consulting-type of scenario to pitch Jay new deals and that he

22   was going to give me a million dollars in advance for

23   consulting so that I can raise money from Jay for Chris

24   Chierchio and future PPE dealings.

25   Q     So just to make sure I understand, so Chierchio told you

*Avery N. Armstrong, RPR*
*Official Court Reporter*

1  he would give you $1 millions so that you can get Jay to send

2  additional money to Chierchio?

3  A    Yes.  In the near future, he wanted to pitch Jay new

4  deals, and he basically would give me an advance on those

5  deals.

6  Q    All right.  And did he send you $1 million?

7  A    Yes, he did.

8  Q    Did you tell Frank Smookler about this transfer?

9  A    Yes.

10  Q    Did you tell Mr. Kurland about this transfer?

11  A    No, I didn't.

12  Q    Why not?

13  A    Because at the time, again, it was wrong, I justified it

14  that Jason -- that Chris Chierchio was -- and myself were

15  entering in a sort of, consulting-type of agreement, and that

16  this was separate from any of the current PPE dealings that we

17  had on the table.

18  Q    Now, did you have any understanding that this

19  $1 million -- about whether or not this $1 million was coming

20  from the seven and a half million dollars from California?

21  A    No.  Chris Chierchio was clear in stating that that

22  $1 million had nothing to do with those $7.5 million.

23  Q    And sitting here now, do you know whether, in fact, that

24  was true?

25  A    I do not.

```
1   Q    Apart from the $1 million, did you get any other money

2   from Chris Chierchio?

3   A    Yes, we did.

4   Q    What was that?

5   A    I don't remember the time, but Frank Smookler had talked

6   to Chris Chierchio about receiving even a small type of

7   payment.  Chris Chierchio explained that he could give a cash

8   payment.  We had sent somebody to the office to Staten Island

9   to pick up this cash payment and which was done.

10  Q    So you got a cash payment from Chris Chierchio?

11  A    Yes.

12  Q    Do you remember how much?

13  A    I don't remember the amount.  I remember it being small.

14  I believe it was around five or $10,000.  I just remember when

15  we received it, Frank was upset, I was upset, because we

16  thought it was going to be much larger being the numbers that

17  we were dealing with Chris.

18  Q    And what did you do with the cash that you got?

19  A    Frank and myself split that payment.

20  Q    And do you remember if you gave any of that cash to Jay?

21  A    No, we did not.

22  Q    Did you declare the cash that you got from Chris

23  Chierchio on your taxes?

24  A    No.  Never got a chance to do any type of taxes.

25  Q    And did you give any money that you got from Chierchio,
```

1    either the $1 million or the cash, any portion of that money,

2    did you give to the defendant's clients?

3    A    No, we did not.

4    Q    Did there come a time when you found out about contact by

5    the FBI?

6    A    Yes.

7    Q    Who did you find out from?

8    A    Even in the merchant cash advance space when we were

9    running JBMML, Jason explained to us that his clients were

10   approached by FBI agents pertaining to the investments that

11   they had made through Jason Kurland.

12   Q    And how many conversations did you have with the

13   defendant on this subject about the FBI?

14   A    Quite a lot.

15   Q    What was the defendant's general demeanor on those

16   conversations?

17   A    At first, it was a question, we didn't understand why

18   they were approaching his clients.  Then, it was fear, panic,

19   and towards the end, it was almost desperation.  You know, we

20   hired lawyers.  We didn't know what was going on.  It got

21   crazy.

22   Q    And what, if anything, did the defendant do after the FBI

23   began knocking on his client's doors?

24   A    Well, after they started knocking on the doors in the PPE

25   space and that pressure started to turn up, that's when he

```
 1    made us sell the horses back to the clients, and that's when

 2    he hired his lawyer.

 3    Q    Okay.  And did he return any money that he got from any

 4    of these investments?

 5              MR. KASULIS:  Objection, Your Honor.

 6              THE COURT:  Sustained.

 7              MS. ZVEROVICH:  Ms. Hochron, if we can please

 8    publish Government Exhibit 740-T in evidence.

 9              This is a transcript of a call.

10    Q    What is the date?

11    A    May 29, 2020.

12    Q    And who are the participants on this call?

13    A    Frank Russo, Frank Smookler, and Jason Kurland.

14    Q    Okay.

15              MS. ZVEROVICH:  Ms. Hochron, if we can please play

16    740, the call itself, alongside the transcript.

17              (Audio recording played.)

18    Q    What was the defendant telling you to do here?

19              MR. KASULIS:  Objection.

20              THE COURT:  You can answer that.

21    A    The defendant was telling me that he believed that we

22    should basically send back the moneys that we divvied up on

23    the New York City Police Department deal because of the -- of

24    what was happening currently.

25    Q    And what did you understand him to mean when he told you,
```

*Avery N. Armstrong, RPR*
*Official Court Reporter*

1    just say, like, it was inadvertently sent?

2    A    He wanted me to, basically, send an e-mail that stated

3    that it was inadvertently sent to him just in case, I guess,

4    the FBI came around so that -- because this was in a direct

5    violation of the $2.5 million promissory note.

6    Q    And was it, in fact, inadvertently sent?

7    A    It was originally discussed and we divided it exactly as

8    it was agreed upon.

9    Q    Okay.  And earlier in the call, there was a reference

10   to --

11          MS. ZVEROVICH:  If we can go up one page,

12   Ms. Hochron.

13   Q    -- there was a reference to, this guy Minsky.

14          Who's that?

15   A    Jason Kurland's client explained that this FBI agent with

16   the last name of Minsky was the one who approached them and

17   was asking all these questions, wanted all these documents

18   pertaining to the investments that they made in the PPE space

19   and to JBMML.

20   Q    Okay.

21          MS. ZVEROVICH:  Let's publish Government

22   Exhibit 741T in evidence.

23          (Exhibit published.)

24   Q    This is another call.

25          What is the date?

                                *Avery N. Armstrong, RPR*
                                 *Official Court Reporter*

1    A    May 29, 2020.

2    Q    And who are the participants?

3    A    Myself, Frank Smookler, and Jason Kurland.

4    Q    All right.

5         MS. ZVEROVICH:  Ms. Hochron, if we can please play

6    741, the call, along with the transcript.

7         (Audio recording played.)

8    Q    What were you discussing with the defendant here?

9    A    Again, he wanted the wire instructions so he could send

10   back his portion of the New York Police Department deal and

11   that he was asking if anybody else was contacted and what are

12   we, basically, doing.

13   Q    Now, before the FBI contacted the client, did the

14   defendant try to send back the hundred thousand dollars?

15   A    No.

16   Q    And after the FBI made contact with the client, did the

17   defendant, in fact, return the hundred thousand dollars?

18   A    Yes.

19   Q    And did you have any discussions with the defendant about

20   you or others returning any portions of those moneys?

21   A    Yes.  He wanted Frank, myself, and Eric Fessler to return

22   the moneys, as well.

23   Q    And did the defendant explain why?

24   A    Yeah.  That it directly violated the $2.5 million

25   agreement and that if the FBI looked at this scenario, they

                    *Avery N. Armstrong, RPR*
                    *Official Court Reporter*

1   can trace where all the moneys went and that it just was not

2   the right thing to do as far as to have violated the

3   $2.5 million agreement.

4   Q    And before you found out about the FBI contact, did the

5   defendant ever ask you to return money?

6   A    No.

7            MS. ZVEROVICH:  Ms. Hochron, if we can please

8   publish Government Exhibit 744T.

9            (Exhibit published.)

10  Q    This is another call.

11           What's the date?

12  A    July 16, 2020.

13  Q    And who are the participants?

14  A    Jason Kurland and myself.

15           MS. ZVEROVICH:  Ms. Hochron, let's play 744,

16  alongside the transcript.

17           (Audio recording played.)

18  Q    What were you discussing with the defendant on this call?

19  A    Discussing the New York City Police Department deal, how

20  we disbursed it, and regarding the $2.5 million promissory

21  note.

22  Q    And what did you understand the defendant to mean when he

23  told you, everyone has that and everyone can trace everything?

24  A    That his clients had the promissory note, the FBI had the

25  promissory note, and when push comes to shove, the FBI is

                        *Avery N. Armstrong, RPR*
                        *Official Court Reporter*

1    going to be able to trace everything, where the moneys went,

2    and everything of the short.

3            MS. ZVEROVICH:  Ms. Hochron, if we can please

4    publish Government Exhibit 746T.

5            (Exhibit published.)

6    Q    This is another call.

7            What's the date?

8    A    The date is July 20th, 2020.

9    Q    And who are the participants onto this call?

10   A    Frank Smookler and myself.

11           MS. ZVEROVICH:  Ms. Hochron, let's play 746, along

12   with the transcript.

13           (Audio recording played.)

14   Q    Mr. Russo, what were you and Smookler discussing?

15   A    That the FBI, once again, went to Jay's client and asked

16   about the $2.5 million and if, in fact, it was paid back at

17   this point, and Jay explained to Frank that his clients

18   acknowledged that they received a $250,000 payment and that

19   they expected the rest to come in and that Jay told Frank to

20   make sure that me, Frank, and Eric put back the money that we

21   took out for the New York City Police Department deal.

22   Q    Now, at this point, July 20th, as we looked at, the full

23   principal of two and a half million was already due, correct?

24   A    Yes.

25   Q    And had you paid back the two and a half million?

*Avery N. Armstrong, RPR*
*Official Court Reporter*

1    A    No.  We just made a few payments equaling $250,000.

2            MS. ZVEROVICH:  Ms. Hochron, if we can please

3    publish Government Exhibit 748T.

4            (Exhibit published.)

5    Q    This is another call.

6            What's the date?

7    A    July 21, 2020.

8    Q    And who are the participants on this call?

9    A    Jason Kurland and myself.

10           MS. ZVEROVICH:  Let's play the call, along side the

11   transcript, 748.

12           (Audio recording played.)

13   Q    Mr. Russo, what were you discussing with the defendant?

14   A    This is when Jay was just getting frantic about the

15   $2.5 million and that even if we paid back the money, at this

16   point, the FBI was going to be able to track how it was

17   disbursed and that we're crazy for going down for something

18   associated with this.

19           MS. ZVEROVICH:  Now, if we can go up to the prior

20   page for just a second.

21   Q    Now on the bottom of that page, defendant told you he

22   wasn't part of it.

23           What did you understand him to be saying?

24   A    I believe he was saying -- describing that he wasn't part

25   of the negotiations for the $2.5 million deal, or at least,

                        *Avery N. Armstrong, RPR*
                        *Official Court Reporter*

1    that's my understanding when I see this transcript.

2    Q    And was he, in fact, part of the negotiations for the

3    deal?

4    A    I believe so, because how could we -- I believe so.

5    Q    Now, before the FBI investigation, did the defendant ask

6    you to send any money back?

7    A    No.

8    Q    Now, did the defendant ever tell you that any of his

9    clients were anonymous?

10   A    Yes.

11   Q    How did this topic come up?

12   A    We spoke about it often.  So his lottery clients, the

13   first thing that he would do would be to set them up so that

14   they could accept the lottery winner's anonymously.  In New

15   York State, that is undoable, so that's why everybody knows

16   the Staten Island winners, even though they have a trust set

17   up.  But in South Carolina, he was effectively able to allow

18   them to collect their lottery winnings anonymously.

19              THE COURT:  Ms. Zverovich.

20              MS. ZVEROVICH:  Yes.

21              THE COURT:  How many more questions do you have for

22   this witness?  Because I don't want to keep the jury past

23   5:30.

24              MS. ZVEROVICH:  Yes, Your Honor.  I believe about

25   five to 10 more minutes, at most.

                         *Avery N. Armstrong, RPR*
                          *Official Court Reporter*

1          THE COURT:  Well, I'm going to call it quits for the

2     day, and for the week, because I think, you know, anything you

3     have to discuss with the witness, you can discuss on Monday

4     morning.

5          MS. ZVEROVICH:  Thank you, Your Honor.

6          THE COURT:  All right.  Thank you.

7          Members of the jury, I want to remind you again that

8     it's extremely important that you follow my instruction that

9     you not discuss this case with anyone, not your family,

10    friends, or business associates and not other jurors.  In

11    addition, you must not read, listen to, watch, or access any

12    accounts of this case on any form of media such as newspapers,

13    radio, T.V., or the internet, nor research or seek outside

14    information about any aspect of the case.  Please do not

15    communicate with anyone in the case on your phone, whether

16    through e-mail, text messaging, or through any blog or website

17    or by way of any social media or website or application.  If

18    you're in the courthouse, don't discuss the case with anyone.

19    Don't talk to yourself about the case because if you're on an

20    elevator, you don't know who's on there.  So really, don't say

21    anything to anybody about anything regarding this case.

22         I think that's just a general rule of thumb.  So I

23    really appreciate that.

24         You must not consider anything you may have heard or

25    read about the case outside of this courtroom, whether you

*Avery N. Armstrong, RPR*
*Official Court Reporter*

1    read it before or during voir dire or during the trial.  Do

2    not attempt any independent research or investigation about

3    the case, and do not visit any of the locations identified on

4    the questionnaire or discussed during the course of the voir

5    dire or this trial.

6              I want to thank you for your excellent attention

7    during the last two days.  It's been a challenging week for

8    you.  We all appreciate it.  The parties appreciate it.

9              Get some rest.  Next week, we're going to go from

10   Monday until Friday, and the following week, from Monday until

11   Friday, if necessary, and we'll see you on Monday morning at

12   9:30.  Have a good weekend.

13             All rise for the jury.

14             (Jury exits the courtroom.)

15             THE COURT:  Mr. Russo, you may stand down.  Please

16   do not discuss your testimony with anyone.

17             We'll see you Monday morning at 9:30.

18             THE WITNESS:  Okay.

19             (The witness steps down.)

20             THE COURT:  Please be seated.

21             Is there anything from the Government this evening?

22             MS. ZVEROVICH:  No, Your Honor.

23             THE COURT:  About how much more in terms of time do

24   you have for this witness?

25             MS. ZVEROVICH:  Your Honor, I do believe it would

*Avery N. Armstrong, RPR*
*Official Court Reporter*

1    be -- I don't want to overpromise, but under 15, I think.

2              THE COURT:  Under 15 minutes.

3              And you sir, you have now -- but for those 15

4    critical minutes of testimony, do you have a sense of about

5    how long your cross will be?

6              MR. KASULIS:  I would say about three hours, Your

7    Honor.

8              THE COURT:  Okay.  Which will take us into the

9    afternoon.

10             And then who are the other witnesses for Monday so

11   we all know?

12             MR. PELLEGRINO:  Your Honor, then the Government

13   will call Beth Smith and then following --

14             THE COURT:  Who?

15             MR. PELLEGRINO:  Beth Smith who is Victim Number 3

16   and then we will call Steve Smith after Beth Smith.

17             THE COURT:  Okay.  So before we call Victim

18   Number -- Victims Number 3, we're going to have to go over the

19   protocol.  You'll explain the protocol to me for the

20   identification of the real names of those victims to the jury,

21   and to me, because that information has never been given to

22   the Court, and I'm waiting with wild anticipation to get what

23   I think I'm entitled to here.

24             So there is going to be a procedure.

25             Have you discussed that with the defense?

                          *Avery N. Armstrong, RPR*
                          *Official Court Reporter*

1          MR. PELLEGRINO:  No.  Other than what we've said in

2   open court which was that we were going to provide envelopes

3   for the jury.  As for the Court, we can provide that

4   information via e-mail under seal and CC the defense.

5          THE COURT:  Why don't you just deliver a -- the old

6   fashion way, deliver a letter to the Court as to who these

7   people are, under seal.

8          MR. PELLEGRINO:  That sounds good, Your Honor.

9   We'll do that.

10         THE COURT:  I'll just hold onto it.

11         MR. PELLEGRINO:  Great.

12         THE COURT:  All right.  Anything else from you,

13  Mr. Kasulis, for tonight?

14         MR. KASULIS:  No, Your Honor.  Thank you.

15         THE COURT:  All right, everyone.  We'll see you on

16  Monday.  Have a good weekend.

17         (Whereupon, the matter was concluded until Monday,

18  July 18, 2022 at 9:30 a.m.)

19                      *    *    *    *    *

20

21

22

23

24

25

<pre>
 1                        I N D E X

 2   WITNESS                                    PAGE

 3   DAVID WILK

 4   DIRECT EXAMINATION    BY MR. PELLEGRINO   202
     CROSS-EXAMINATION     BY MR. KASULIS      208
 5

 6   VICTORIA HERNANDEZ

 7   DIRECT EXAMINATION    BY MS. ZVEROVICH    222
     CROSS-EXAMINATION     BY MR. KASULIS      236
 8   REDIRECT EXAMINATION  BY MS. ZVEROVICH    249
     RECROSS-EXAMINATION   BY MR. KASULIS      253
 9

10   FRANCESCO RUSSO

11   DIRECT EXAMINATION    BY MS. ZVEROVICH    257

12

13                        EXHIBITS

14   GOVERNMENT                PAGE
     2201 - 2206               227
15   720, 728, 731, 737, 740 - 748   236
     720-T, 728-T, 731-T, 737-T, 740-T - 748-T   259
16   802                           272
     1, 2, 3, 5, and 6             281
17   1146                      332
     7                         344
18   1202                      353
     104 and 105                   371
19   106                           382
     107                           383
20   108                       412
     1126                      429
21   642, 643, 644             434
     202                       450
22   203                       453

23   DEFENSE                   PAGE
     1701                      245
24

25
</pre>