**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA

     v.

JASON KURLAND,

      Defendant.

No. 1:20 Cr. 306 (NGG)

## SENTENCING SUBMISSION ON BEHALF OF JASON KURLAND

MORVILLO ABRAMOWITZ GRAND
IASON & ANELLO, P.C.

Telemachus P. Kasulis
A. Dennis Dillon

565 Fifth Avenue
New York, NY 10017
(212) 856-9600 (telephone)
(212) 856-9494 (facsimile)

*Attorneys for Defendant Jason Kurland*

## TABLE OF CONTENTS

JASON'S BACKGROUND AND CIRCUMSTANCES .................................................................. 1

I.      PERSONAL HISTORY ............................................................................................. 1

    A.    Jason's Youth And Education ..................................................................... 1

    B.    Jason's Focus On His Family ..................................................................... 2

    C.    Jason's Career ............................................................................................ 6

    D.    Jason's Engagement With His Friends and Community ............................. 9

II.     THE IMPACT OF THE PROSECUTION ON JASON AND OTHERS ..................... 12

    A.    Jason and His Family Already Have Suffered Significant Consequences
        From His Conviction .................................................................................. 12

    B.    Jason Has Been A Model Supervisee And Cooperated with the
        Government's Investigations. .................................................................... 14

DISCUSSION ...................................................................................................................... 15

I.      APPLICABLE LEGAL STANDARD ......................................................................... 15

II.     ADVISORY GUIDELINES CALCULATION ............................................................ 16

    A.    Any Intended Loss Was No More Than Jason's Personal Gain. ................ 18

    B.    Actual Loss Either Cannot Be Estimated With Reasonable Certainty Or
        Was Not Reasonably Foreseeable to Jason And Within The Scope Of
        The Conspiracy. ....................................................................................... 22

        1.    The PSR's calculation of actual loss is highly speculative. ......................... 22

2.  Any loss that reasonably can be determined was not reasonably foreseeable to Jason. ................................................. 25

C.  Jason's Personal Gain Is The Amount Of The Undisclosed Commissions.......................................................... 28

D.  A Sophisticated Means Enhancement Is Not Warranted. .......................................... 29

E.  The PSR Incorrectly Applies An Adjustment For Abuse of Trust to the Unlawful Monetary Transaction Counts.................................... 30

F.  The Court Should Apply the Guidelines Amendments Recently Adopted by the United States Sentencing Commission ............................. 31

G.  Jason's Advisory Guidelines Range Is 37 to 46 Months. ........................... 32

III.  THE SECTION 3553(A) FACTORS DEMONSTRATE THAT LENIENCY IS JUST AND APPROPRIATE ................................. 33

A.  Any Loss Amount Used to Calculate the Guidelines Range Overstates the Seriousness of the Offense.................................. 34

B.  The Nature and Circumstances of the Offense ........................... 36

C.  Jason's History and Characteristics ........................... 41

D.  The Devastating Impact of Jason's Arrest and Conviction Are Adequate Retribution. ........................................... 43

E.  A Lenient Sentence Will Be An Adequate Deterrent, Will Recognize Jason's Low Risk for Recidivism, And Will Safeguard Against Unwarranted Sentencing Disparity ........................... 455

IV.    A FINE IS NOT WARRANTED ....................................................................... 50

V.    ANY FORFEITURE ORDER SHOULD BE LIMITED TO JASON'S
PERSONAL GAIN AND SHOULD NOT INCLUDE THE
KURLANDS' FAMILY HOME. ................................................................... 51

VI.    RESTITUTION SHOULD BE IMPOSED BASED ON THE ACTUAL
LOSS TO THE VICTIMS THAT WAS REASONABLY
FORESEEABLE TO MR. KURLAND. ......................................................... 52

CONCLUSION ............................................................................................................ 53

# <u>TABLE OF AUTHORITIES</u>

Page(s)

Cases

*Gall v. United States*,
    552 U.S. 38 (2007).................................................................................. 16

*In re Troodler*,
    63 N.Y.S.3d 97 (2d Dep't 2017)...................................................... 12, 43

*Matter of Ofsink*,
    85 N.Y.S.3d 450 (1st Dep't 2018) .................................................. 12, 43

*Paroline v. United States*,
    572 U.S. 434 (2014).................................................................................. 52

*Thaler v. United States*,
    706 F. Supp. 2d 361 (S.D.N.Y. 2009)................................................... 23

*United States v. Adelson*,
    441 F. Supp. 2d 506 (S.D.N.Y. 2006)............................ 35, 41, 43, 46

*United States v. Algahaim*,
    842 F.3d 796 (2d Cir. 2016)................................................................... 34

*United States v. Banks*,
    55 F.4th 246 (3d Cir. 2022) ................................................................... 19

*United States v. Bland*,
    17 Cr. 684 (ER)........................................................................................ 45

*United States v. Booker*,
    543 U.S. 220 (2005).................................................................................. 15

*United States v. Brennan*,
    395 F.3d 59 (2d Cir. 2005)...................................................................... 17

*United States v. Bryant*,
    128 F.3d 74 (2d Cir. 1997)...................................................................... 17

*United States v. Bryson*,
    101 F. Supp. 3d 147 (D. Conn. 2015).......................................... 27, 28

*United States v. Burns*,
    843 F.3d 679 (7th Cir. 2016) ................................................................. 22

*United States v. Butler*,
    264 F.R.D. 37 (E.D.N.Y. 2010) ................................................................. 45

*United States v. Canova*,
    412 F.3d 331 (2d Cir. 2005)..................................................................... 42

*United States v. Capanelli*,
    270 F. Supp. 2d 467 (S.D.N.Y. 2003)....................................................... 17

*United States v. Carmona-Rodriguez*,
    2005 WL 840464 (S.D.N.Y. Apr. 11, 2005)............................................. 42

*United States v. Caspersen*,
    16 Cr. 414 (JSR) ..................................................................................... 46

*United States v. Confredo*,
    528 F.3d 143 (2d Cir. 2008).............................................................. 18, 19

*United States v. Coppola*,
    671 F.3d 220 (2d Cir. 2012)..................................................................... 17

*United States v. Corsey*,
    723 F.3d 366 (2d Cir. 2013)..................................................................... 34

*United States v. Cuti*,
    08 CR. 972 2011 WL 3585988 (S.D.N.Y. July 29, 2011)............................ 17

*United States v. Daugerdas*,
    892 F.3d 545 (2d Cir. 2018)..................................................................... 51

*United States v. Deutsch*,
    987 F.2d 878 (2d Cir. 1993) (vacating ..................................................... 18

*United States v. Dorvee*,
    616 F.3d 174 (2d Cir. 2010)..................................................................... 16

*United States v. Faibish*,
    12 Cr. 265 2015 WL 4637013 (E.D.N.Y. Aug. 3, 2015)............................. 34

*United States v. Gaind*,
    829 F. Supp. 669 (S.D.N.Y. 1993)........................................................... 45

*United States v. Gamez*,
    1 F. Supp. 2d 176 (E.D.N.Y. 1998) .......................................................... 44

*United States v. Geringer*,
    672 F. App'x 651 (9th Cir. 2016) ................................................... 23

*United States v. Getto*,
    729 F.3d 221 (2d Cir. 2013)........................................................... 26

*United States v. Gupta*,
    904 F. Supp. 2d 349 (S.D.N.Y. 2012)............................... 35, 41, 42 46

*United States v. Gushlak*,
    728 F.3d 184 (2d Cir. 2013)........................................................... 52

*United States v. Harding*,
    05 Cr. 1285 2006 WL 2850261 (S.D.N.Y. Sept. 28, 2006).............. 45

*United States v. Hild*,
    No., 19 Cr. 602 (RA) .................................................................... 47

*United States v. Ho*,
    17 Cr. 779 (Preska, J.) (S.D.N.Y.) ................................................ 35

*United States v. Howe*,
    543 F.3d 128 (3d Cir. 2008)........................................................... 42

*United States v. Johnson*,
    16-CR-457-1 (NGG), 2018 WL 1997975 (E.D.N.Y.)..............Passim

*United States v. Kent*,
    16 Cr. 385 (Cote, J.) (S.D.N.Y.) .................................................. 35

*United States v. Komar*,
    529 F. App'x 28 (2d Cir. 2013) ..................................................... 27

*United States v. Levenson*,
    314 F. App'x 347 (2d Cir. 2008) ................................................... 28

*United States v. Li*,
    15 Cr. 870 (Sweet, J.) .................................................................. 35

*United States v. Litvak*,
    13 Cr. 19 (JCH)............................................................................ 35

*United States v. McKinney*,
    2022 WL 17547467 (E.D. Mich. Dec. 9, 2022) .............................. 19

*United States v. Mullings*,
 131 F. Supp. 3d 1 (E.D.N.Y. 2015) ................................................................ 44

*United States* v. *Nesbeth*,
 188 F. Supp. 3d 179 (E.D.N.Y. 2016) ............................................................ 49

*United States v. Newton*,
 766 F. App'x 742 (11th Cir. 2019) ................................................................ 29

*United States v. Ofsink*,
 14 Cr. 399 (ENV) ........................................................................................... 48

*United States v. Pina*,
 2019 WL 1904920 (S.D.N.Y. Apr. 11, 2019) ............................................... 17

*United States v. Ruiz*,
 2006 WL 1311982 (S.D.N.Y. May 10, 2006) ............................................... 42

*United States v. Stanley*,
 12 F.3d 17 (2d Cir. 1993) (vacating .............................................................. 19

*United States v. Schulman*,
 No.,  16 Cr. 442 (JMA) ................................................................................. 48

*United States v. Stern*,
 2021 WL 3474040 (S.D.N.Y. Aug. 5, 2021) ................................................. 52

*United States v. Stewart*,
 590 F.3d 93 (2d Cir. 2009) ..................................................................... 45, 48

*United States v. Studley*,
 47 F.3d 569 (2d Cir. 1995) ..................................................................... 26, 27

*United States v. Thurston*,
 544 F.3d 22 (1st Cir. 2008) ........................................................................... 42

*United States v. Turk*,
 626 F.3d 743 (2d Cir. 2010) ............................................................. 18, 21, 27

*United States v. Tzolov*,
 435 F. App'x 15 (2d Cir. 2011) .................................................................... 28

*United States v. Yeaman*,
 248 F.3d 223 (3d Cir. 2001) ......................................................................... 46

*United States v. Younger*,
 16 Cr. 348 (Rakoff, J.) ................................................................. 35

*United States v. Zangari*,
 677 F.3d 86 (2d Cir. 2012)........................................................... 28

*V.R.W., Inc. v. Klein*,
 68 N.Y.2d 560 ............................................................................. 52

Statutes

18 U.S.C. § 1957 .................................................................................. 33

18 U.S.C. § 3553(a) ....................................................................... Passim

18 U.S.C. § 3572(a) ............................................................................ 50

18 U.S.C. § 3664(h) ............................................................................ 52

18 U.S.C. § 371 ............................................................................. 16, 49

18 U.S.C. § 1341 ................................................................................ 16

18 U.S.C. § 1346 ................................................................................ 16

18 U.S.C. § 1956(h) ........................................................................... 16

18 U.S.C. § 1957 ................................................................................ 16

21 U.S.C. § 848.............................................................................. 31, 32

28 U.S.C. § 994(j) .............................................................................. 32

Rules

U.S.S.G. § 2B1.1............................................................................ Passim

U.S.S.G. § 2S1.1 ..................................................................... 16, 17, 33

U.S.S.G. § 5E1.2(d) ........................................................................... 50

Other Authorities

1 N.Y. Law & Practice of Real Property § 14:28 (2d ed.)............................ 52

21 Cr. 154 (NGG) .............................................................................. 47

David Weisburd *et al.*, *Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes*, 33 Criminology 587 (1995)......................................................... 46

Francis T. Cullen et al., *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011)....................................................... 46

Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice 1 (2006) ........................................................................ 46

We respectfully submit this memorandum on behalf of defendant Jason Kurland, who is scheduled to be sentenced by the Court on June 15, 2023. For the reasons set forth herein, we respectfully request that the Court sentence Jason to probation with a term of home confinement. This approach is consistent with the law and the unusual facts in this case, the forthcoming amendments to the United States Sentencing Guidelines, and the requirement that a sentence be no greater than necessary to achieve the ends of justice.

## JASON'S BACKGROUND AND CIRCUMSTANCES

### I.   PERSONAL HISTORY

#### A.  Jason's Youth And Education

Jason was born to Alan and Marlene Kurland on March 7, 1974, in Brooklyn, New York. PSR ¶ 104. Both were public-school educators. Alan was a high-school principal, and Marlene an elementary school teacher. *Id.* They married in 1969. Six years after they had Jason, they had his sister Dayle. *Id.*

Jason grew up in New Jersey, where his parents moved after his birth. It was a happy, although sheltered, childhood. PSR ¶ 106. Jason was a good student and a superlative athlete. Phyllis at 1.[1] He won scholarships to high school and eventually Skidmore College, even though he also held jobs throughout his education. Marlene at 1. Jason's main sport was hockey; he played goalkeeper. In Jason's athletic career, he distinguished himself not only by his skills, but also by his sense of sportsmanship and his desire to "help the underdog." Alan at 1. Into his time at college, Jason acted as a leader on his teams, making sure that tough games never got ugly, teaching others how to play, and advising his teammates about issues on and off the field. Alan at 1.

---

[1] Citations to letters submitted in support of Jason are referenced by the last name of the author, save for members of the Kurland family where the first name of the author is used for clarity.

After college, Jason decided to go to law school,[2] drawing in part on the advice of his family friend Howard Butensky and his uncle, Paul Kurland.  Butensky at 1; Paul at 1.  His uncle notes how even as a law student, when Jason was interning at his firm, he "proved himself to be a diligent, hard-working law student who was honest and trustworthy."  Paul at 1.

### B.  Jason's Focus On His Family

As the many letters submitted of support attest, Jason has tried put his family first throughout his life.  His mother, father, and sister—not to mention his extended family and friends—all speak to the warmth and care that characterize Jason's familial relationships.  Alan at 1 ("He is kind, loyal, compassionate, caring and thoughtful."): Gross at 1 ("We have a particularly close family and Jason is an integral part of that."); Mizrachi at 1 ("From the time of his childhood, Jason has always deeply cared about others."); Paul at 1 ("I have always known Jason to be a good person as well as an exemplary father, husband and son"); Phyllis at 1 ("I see Jason as a caring son and a loving father who is devoted to his children and wife."); Schiebelhuth at 2 ("[T]he first word that comes to mind when we think of the Kurlands is Family.").  That closeness has persisted after Jason's arrest: he speaks with his mother and sister frequently, and with his father "constantly."  Alan at 1; PSR ¶ 104.  That support network has been critical for Jason over the past few years.

Jason himself has been a necessary support for his parents and extended family at difficult moments in their lives – helping his grandmother find elder care or assisting with the aftermath of his father's stroke.  But he also has played a role in keeping that family together.

---

[2] After college, Jason worked briefly as a bartender in Saratoga Springs, NY.  In that period, he recalls drinking very heavily—in fact, he recalls that he was rarely sober for weeks.  *See* PSR ¶ 118.  But Jason realized he had a problem and dealt with it, cutting back substantially on his drinking.  *Id.*  Jason has managed his problematic relationship with alcohol effectively as an adult, however, and avoided backsliding even after the traumatic events of his arrest and conviction.

2

As Jason's mother relates, after her mother passed away, she and her siblings disagreed about the disposition of the family home. This kind of dispute is not uncommon, and not uncommonly causes years-long rifts. But as his mother explains, with Jason's patience, time, and mediation skills, through "countless meetings" he was able to guide the family to "a compromise we could all accept." Marlene at 2.

Jason meant still more to his sister. As Dayle describes in her ███████████████ ████████████████████████████████████████████████████ ███. Dayle at 1. As her condition worsened, Jason acted decisively. He helped her find options for treatment and spent hours upon hours going to meetings and talking through the problem with her. *Id.*; *see* Marlene at 1. Just as importantly, he helped his parents understand what their daughter was going through, repairing their relationship and ensuring that Dayle had the support structure she needed to overcome her illness. Dayle at 1; *see also* PSR ¶ 107. For Dayle, this "experience proved to me that I could always depend on my brother." Dayle at 1.

This compassion found its greatest expression in his greatest joy: his role as a husband and a father. In law school, Jason met another student, Lauren Blyer. The early years of their relationship were not easy for Jason and Lauren. When they first met, Lauren's mother was terribly sick with cancer. Rather than shy away from commitment in these difficult circumstances, Jason threw himself into the relationship. Lauren at 3. As Lauren has written, Jason quickly "became part of our tight group," forming "his own connection" with her mother. She fondly recalls how he would take her mother to manicures, and "sit[] up with her to watch the Home Shopping Network when I fell asleep." Jason and Lauren rushed to marry so that her mother could be present, "holding our hands through the ceremony," and then moved in together in Lauren's family home. Lauren at 4. When her mother passed away, they still didn't move

out—instead, as Lauren puts it, they "stayed with my father, sleeping in my childhood twin bed, for years, just to be there for him." Lauren at 4-5.

Lauren and Jason's relationship has consistently been characterized by this intense affection and mutual respect. Alan at 1. The family's rabbi, Dr. Beuchler, confirms that Jason is truly a "loving and devoted husband." Buechler at 1. While Lauren is conscious of Jason's "foolishness and mistakes," she continues to see Jason as a man with a "good soul"; a true "mensch" who lives for the relationships that make life meaningful to him. Lauren at 1-3. She loves Jason for that, noting how he is the kind of person "who would always remember to ask a friend about an ailing parent[,] . . . always listening to what you have to say before sharing a story of his own and always willing to see the best in people."

Only on the day that their first children—their twins ███ and ███—were released from the hospital did Jason and Lauren move out of her parents' home. They moved into a townhouse they had bought years earlier, where they began their lives together in earnest. Lauren at 4. Just a few years later, their younger daughter ███ was born, and the children have been the focus of Jason's life ever since. Jason at 3-4.

Jason's embrace of fatherhood, his total commitment to spending every available minute with his children, and his pride in their accomplishments have become his defining traits. *See, e.g.*, Bunone at 1 ("I still remember how happy Jason was when he told me he was going to be a father. He couldn't wait to show me pictures of his children and was so happy when his wife Lauren would bring them to the office for a visit."); Dayle at 1 ("Watching how he behaves as a father has made the biggest impact on me. . . . He tries to capture it all on video and then calls us with the play-by-plays!"). Jason's childhood friend Andrew Gerstenfeld relates how Jason told him "there's no better feeling than watching a ballgame on tv with his young children on his

lap," and how Jason wished that Dr. Gerstenfeld would feel the same joy with his own children. Gerstenfeld at 1.  As Lauren puts it, "[f]rom day one he has prioritized their happiness and has always put their needs and wants before his own."  She reports how Jason dotes upon his children, cheering them on at games, shepherding them to and from social events, going to their school plays, and dressing up with them for Halloween.  Lauren at 4.

One of the most tangible aspects of Jason's engagement with his children is his dedication to their athletic pursuits.  In Jason's view—shared by many parents—sports teach children lifelong lessons about the importance of grit and practice.  They give children an opportunity to excel and build confidence in themselves.  And they help children learn firsthand the virtues of sportsmanship and fairness in competition.  Abby Kurland, Jason's cousin, attests to this impact.  Abby at 2 ("Through his coaching, he has instilled in his children, and in the other members of their teams, the values of discipline, dedication, teamwork, as well as how rewarding practice and hard work can be; he has also ensured that these kids have fun while learning.")  In this case, their shared love of sports binds Jason and his children even closer together.

The result is an extraordinary connection between Jason and his children.  Lauren at 4. Jason's friends and family attest to how personally meaningful this connection is to Jason.  Rob Bender, in a touching anecdote, remembers the "look of pride in Jason's eyes" at ███ athletic accomplishments—as a toddler.  Bender at 1.  His children and their endeavors filled his life.  *See* Diaz at 1 ("Jason was always coming from work. . . .  He would always make it to the games even if he had to be a little late.").  As his aunt Phyllis puts it, "he has organized his life around their sporting and academic events.  Every time I have seen Jason the last several years, it seems like he has been on his way from or to one of his children's games."  Phyllis at 1.  Even

since his arrest, he has remained "immersed" in their lives, "offer[ing] stability" at a time of deep

instability in his own life.  Lauren 4.  This dedication inspires others, particularly his sister, who

"tr[ies] to show the same pride and care with [her] own family."  Dayle at 1; *see* Sperr at 2 ("His

calming presence and sense of family is something I admire and strive to exemplify in my own

life.").

Jason's care for his family has extended to the older generation.  His sister notes how

attentive Jason has been to their parents, whether by helping them transition from their home to a

senior community or managing the aftermath of his father's stroke.  His father himself describes

how Jason was "our pillar at that time . . . helping us with both financial and psychological

concerns."  Alan at 1.  During his father's recovery, "Jason would visit me often and speak to me

several times a day."  *Id.*  His mother highlights the same experiences, noting how Jason was

with them "every step of the way" in their transition into retirement, and how when her husband

had his stroke, Jason "took charge . . . ensuring his father would get the best care."  Marlene at 1.

Jason's care extends to Lauren's father Steven as well.  Steven lives with the Kurland

family.  His health is poor, as it has been for years, and last year—the year of Jason's trial—he

fell and broke a hip and several bones in his leg.  Lauren at 5.  Since then, Steven has not

recovered his mobility, and Jason has become essential to his care.  *Id*.  As Lauren explains,

Jason is the only person who can move her father around.  Jason is the only person who can carry

her father's motorized scooter.  And when her father falls, Jason is the only one who can pick

him up.  As she says, without Jason, "I don't know what my father would do."  *Id*.

### C.  Jason's Career

Shortly after law school, Jason started work at Certilman Bailin, where he distinguished

himself through hard work and his care for others.  As his former administrative assistant at

Certilman notes, Jason stood out among the associates for his generosity and humility, staying

6

late on weekends and holidays in case his help was needed.  Bunone at 1.  Jason's early practice focused on commercial real estate: a bread-and-butter business of managing relationships and making deals.  Eventually, Certilman made him a partner.

Jason never set out to represent lottery winners.  It happened by chance, beginning with the representation of a friend of a friend who needed help after he won.  As Jason developed a reputation for quality representation in this niche area, more clients sought his assistance.  But Jason never stopped practicing commercial real estate, and that practice grew in parallel with his lottery work.  Eventually Jason's success drew the attention of a larger firm, Rivkin Radler LLP, which brought him aboard more for his traditional practice than his lottery business.  Tr. 1250:23-1251:1.

There is no doubt, however, that Jason loved being the Lottery Lawyer and caring for his clients, whom he often thought of as friends.  Jason at 1.  Lauren echoes that sentiment, telling the Court that "[a]s the lottery lawyer he was able to develop friendships with his clients[,] and he truly loved that aspect of his work."  Lauren at 2.  The destruction of those relationships has been for Jason not only the inevitable consequence of his arrest, but also "a great personal loss." Lauren at 3.[3]

One of Jason's clients, Elizabeth Chen, felt strongly enough to write the Court directly, despite Jason's conviction.  Ms. Chen's letter speaks to the qualities that Jason brought to his representations.  She originally retained Jason after watching him represent the other side in a

---

[3] Even as they testified against Jason, his clients confirmed the good work he had done for them in matters not connected to his offense.  Mr. Mangal, for example, noted that he still works with the financial advisors to whom Jason introduced him.  Tr. 117:17-21.  And Mr. Kurland's partners testified that Mr. Kurland helped them transition his representation of these clients even after his arrest.  Tr. 219:13-18.

real estate deal.[4]  Chen at 1.  Impressed by the way he handled himself, she hired him for later deals, and has grown to trust him "both as an employee and as a friend."  *Id*.  Despite being aware of this case, she hired Jason to work for her own company after his arrest, and he has become "the gatekeeper and the shield for my business."  *Id*.  Ms. Chen has told the court that she understands the damage that untrustworthy partners can do.  *Id*.  ("Because I didn't know or understand the US legal systems and rules too well, I was taken advantage of many times by those dishonest people.")  But she has faith in Jason and considers that faith rewarded.  *Id*.  ("The Jason I know would never intentionally hurt any of his clients.").  Jason has become essential to her company's work and a well-loved colleague.

Even "[a]s Jason's career progressed and his success grew, he remained the same person he had always been.  Modest, humble and a true family man."  Kuritzky at 1.  Despite the way it was sometimes portrayed in the media, Jason's lifestyle before his arrest was not extravagant for a successful lawyer.  Jason drove a Porsche but he leased it.  He received watches as gifts from Smookler and Russo.  Jason's friends and family attest that Jason never boasted of his success and had simple tastes.  His neighbors the Shiebelhuths observed that the Kurlands' home was sparingly decorated, and that his children never showed signs of being spoiled or snobbish.  To the contrary, they are "smart, hardworking, friendly, and respectful."  Shiebelhuth at 2.  Indeed, much of the home has been turned over to impromptu hockey and soccer practices; the children's beds lack mattresses because they have piled them up in their parents' room so everybody can sleep in the same place.  Lauren at 1.  While Jason was obviously interested in and hopeful that the MCA businesses would be profitable, Lauren attests to Jason's personal simplicity: "Jason is

---

[4] Ms. Chen, who immigrated to the United States from China, does not write English fluently. We understand that one of Ms. Chen's Chinese-speaking employees helped her draft and translate her letter for the Court.

interested in business and was fascinated by the lottery but is not and never has been concerned with having a lot of money himself." What truly made Jason happy was working with clients, which he will never be able to do again. Lauren at 2.

### D. Jason's Engagement With His Friends and Community

Despite his busy legal practice and dedication to his family, Jason also has made time to contribute to his broader community. One important aspect of that contribution before his arrest was Jason's dedication to the Interfaith Nutrition Network, a Long Island charity that focuses on feeding hungry families. Jason at 5. Jean Kelly, who works for the INN, states that when she met Jason ten years ago, she was immediately struck by his identification with and compassion for the visitors to the INN's soup kitchen. Jean Kelly at 1. Jason rapidly became heavily involved with the organization, helping it raise funds, volunteering in one of its facilities, and serving on its board. Jean notes that Jason's largest contribution was bringing others to understand the power of the INN's work, expanding the organization's base of support in his own community. *Id.* Rob Kammerer, who also has been involved with the INN, notes the same multiplier effect Jason—as a "thoughtful, helpful, and kind gentleman"— had on the organization's efforts. Rob Kammerer at 1.

That kindness has also found expression in Jason's work and his friends. As Jason's former administrative assistant describes, when her husband died suddenly, Jason "helped me through some of the darkest times in my life with compassion and kindness for which I will be forever grateful." Bunone at 1. She notes how that compassion was not an isolated event: "In my experience I found that after the initial loss most people stop asking how you are or say nothing at all, but that wasn't Jason, he would always ask me how I was doing and how he could help." Bunone at 1. Tom Bair, Jason's friend, describes how when his wife became very sick, even though he and Jason had not yet become close, "Jason was the first to reach out, asking if

there was anything he could do for me and my family, and speaking with my son about staying

positive and having confidence that things would be ok." Bair at 1.

Youth sports have been another aspect of Jason's engagement with his community. Even

as Jason has supported his children, he has found time to bring together their teammates and

support them as well. Rob Diaz, a coach for some of Jason's children's teams, explains how

Jason would always pitch in whatever way he could. Diaz at 1. In cheering on his children and

their friends, Jason has modeled good sportsmanship from the sidelines. And even though "Long

Island youth sports can be intense," Jason has "treated all the kids and fellow parents with the

utmost respect and dignity even during some difficult moments." Bair at 1. Ken Sperr, another

parent and friend, likewise notes Jason's "calming presence not only for the young girls, but also

for the parents." Jason asked for nothing in return. Sperr at 1 (Jason is "best describe[d] . . . as

selfless. No recognition was ever asked or expected.").

Sometimes more was needed. Lauren relates a story of how 

. Jason did all of this without any expectation of

recognition: the family still does not know his role. Lauren at 5.

Even since the arrest that devastated his life and his finances, Jason has continued to help

others. Ms. Chen has described for the Court Jason's "strong empathy" and successful effort to

assist her brother-in-law's family escape the war in Ukraine. Chen at 1. And Jason helps Ms.

Chen administer her own charity, which helps underprivileged students attend college, even

though this is not part of his work for her company. *Id*.; *see* PSR ¶ 124.

This care for others has inspired remarkable loyalty to a person who has been convicted of federal offenses.  Echoing Roseann Bunone's description of Jason's care for his colleagues at Certilman long ago, Ms. Chen has told the Court that everyone else in her office "love[s] Jason" as much as they need him.  Chen at 2.  Ken Sperr reports that he trusts Jason "completely" with the safety of his daughters, adding "I would give him a key to my house if he needed a place to stay [and] the shirt of my back."  Sperr at 2.   Jean Kelly, who worked with Jason at the INN, has told the Court that she sees Jason as "truly a lovely, kind and very thoughtful gentle man."  Kelly at 2.

In the same vein, many of those closest to Jason have noted how atypical the conduct of his conviction is.  His friend Steven Kurizky explains how he has "spent the better part of the last two years trying to reconcile the crimes that Jason had been charged with, and now convicted of, with the person I have known, trusted and admired for nearly three decades," concluding "I simply cannot."  Kuritzky at 2.  Howard Butensky, who has known Jason since he was a child and helped guide him to becoming a lawyer, explains that "[w]hen I learned of Jason's troubles . . . I was shocked, as the allegations were so contrary to the person I have known for about 40 years."  Butensky at 1.  Jean Kelly says she "feel[s] very strongly that whatever has happened, was an aberrant error in judgement, and completely out of character for the man I know and admire."  Jean Kelly at 1.  Roseann Bunone likewise notes how she "can only tell you that what I read in the newspaper is not the Jason I have known all these years."  Bunone at 1.  Rob Diaz, Jason's friend, is similarly blunt: "Doesn't sound like the Jason I have known for over 10 years."  Diaz at 1.

## II.   THE IMPACT OF THE PROSECUTION ON JASON AND OTHERS

### A.   Jason and His Family Already Have Suffered Significant Consequences From His Conviction.

Jason's indictment and conviction already have had crushing direct and collateral consequences.  Rivkin Radler fired Jason the day of his arrest.  Simultaneously, the government seized Jason's principal bank accounts and the balance of his Rivkin Radler capital account, leaving him only a 401(k) and secondary bank accounts with negligible balances to his name. Although Ms. Chen, Jason's former client, was willing to hire him despite the charges against him, she could do so only at a salary that is considerably less than half of his compensation at Rivkin Radler.  *See* PSR ¶¶ 124; 126.  This combination of blows immediately put Jason's family in dire financial straits, where they have remained for the last three years.  They have cut spending where they could, but to fill the gap and attempt to minimize the effect of the charges on his children's day-to-day lives, Jason has spent almost all his retirement savings, and he and Lauren have given up their own health insurance.  PSR ¶¶ 114; 135; 136.[5]  His principal remaining asset is the family home, PSR ¶ 135, which the government seeks to forfeit.

Now that Jason has been convicted, New York law likely requires he be automatically disbarred after the Court issues its judgment.  *See* Judiciary Law § 90(4) (requiring automatic disbarment on New York felony conviction or equivalent); *see, e.g., Matter of Ofsink*, 85 N.Y.S.3d 450, 452 (1st Dep't 2018) (finding federal wire fraud conviction required disbarment); *In re Troodler*, 63 N.Y.S.3d 97, 98 (2d Dep't 2017) (same).  Jason has been a lawyer his entire adult life; building a new career after the age of 50 would be a daunting prospect even without the impediment of a federal criminal conviction.  Lauren, meanwhile, has not worked regularly

---

[5] Because of his lack of health insurance, Jason recently went to a doctor for the first time in three years.  He was diagnosed with significant heart palpitations and the doctor insisted that he undergo additional testing in the coming weeks.

since their children were born, and only recently has found part-time employment at a pay scale that does not come close to matching Jason's.  *See* PSR ¶ 110 (stating that Ms. Kurland earned $1,500 in March 2023).  In short, Jason's arrest and conviction have financially devastated his family, without prospect for meaningful recovery.

That financial impact has only compounded the social consequences.  After his arrest Jason quickly was ostracized—asked to step down from his charitable role at INN and shunned by former colleagues and friends.  Jason at 5.  While he desperately sought and ultimately found work, his deep and cherished connection to professional communities in real estate, finance, and the law was irrevocably severed.

 It is no wonder that the few who have remained by his side observe a marked change in him—none more than his wife, who has written to the Court to describe the "new Jason."  For the last three years, Jason has been "waking up shaking."  Lauren at 3; *see also* Jason at 4.  His remaining friends likewise see the difference: Ken Sperr notes how the "gravity of this situation . . . is weighing heavy on [Jason's] mind and heart [] not only [for] what the future may bring for himself personally, but more so what the toll ultimately may be on his family."  Sperr at 1.  Ms. Chen also observes this wound, though she notes Jason's resilience as well.  Chen at 2 ("The past 2 years have been very sad for Jason, but he never brings his negative energy into work.")

The toll of Jason's conviction on others is also "tangible."  Abby at 2.  Jason's parents have suffered from their son's conviction, even beyond their understandable "anguish."  Gross at 1.  Jason's father is 76 years old.  His health has worsened sharply in the last few years, starting with the stroke he suffered in 2020, increasing his reliance on Jason and others.  *See* Alan at 1; PSR ¶ 104.  Jason's mother's mental health has deteriorated substantially, requiring her to see a psychotherapist and start medication.  Marlene at 1.  Her physical health, too, has worsened, as

13

her heart and nerves fray under the stress.  Marlene at 1; Butensky at 2.  They are unsure how they will manage if Jason is imprisoned.  Abby at 2.

Lauren and the children have also been affected.  Lauren suffers deeply from the "concern, sadness and uncertainty of what [Jason's] absence would bring."  Ken at 1; *see* PSR ¶ 111 ("The wife feels as though she is living in a 'nightmare' from which she has not yet awoken.").  The children, present during their father's sudden arrest, "still freeze where there is a knock on the door," showing "panic and fear when the doorbell rings."  Lauren 3.  They have suffered in school as their peers taunted them, humiliated them, and then shunned them.  Lauren 3.  The financial fallout of Jason's arrest and conviction forced the family to cancel religious celebrations and made them quit many of the sports and activities that formed such a central part of their lives.  In Lauren's words, they have "lost so much of what brought them happiness;" she is "petrified of what else they could lose should their father be put in jail."  Lauren 4.

### B.  Jason Has Been A Model Supervisee And Cooperated with the Government's Investigations.

Jason was arrested in August 2020.  By the time he is sentenced by this Court, he will have been under supervision for almost three years.  In that time, despite intense disruption to his life and deterioration of his own physical and mental health, he found a job and remained employed, and continued to be present and engaged with his children.  Throughout this period, he has scrupulously complied with his conditions of release, reporting regularly and forbearing from contact with alleged victims or witnesses except as authorized.  He has been a model supervisee.

Jason's respect for this Court's directives has been expressed in other ways as well. Jason has dutifully avoided doing anything that would compromise this Court's decision to allow his clients to testify pseudonymously.  He consented to the vast majority of the government's

proposed protective measures, and helped his attorneys identify potential risks to the clients'

anonymity in the trial presentation by both parties.  As Jason's letter notes, he did not oppose

these protections, despite their prejudice to his defense.  Jason at 1.

Jason's conscientiousness since his unexpected arrest mirrors his responsible approach to

the government's investigation.  Even though Jason was shaken by the FBI's contact with his

clients, he never discouraged them from speaking with the government.  *See, e.g.,* Tr. 928:2-7

(Ms. Smith: "Oh, he never said don't talk to the FBI.  He never indicated that I shouldn't.").

Indeed, Jason arranged for a new lawyer for Mr. Mangal after the SEC contacted him, and then

gave that new lawyer documents—including many pertaining to the investments that have led to

Jason's conviction—to provide to the SEC.  He produced documents of his own to the SEC

shortly before his arrest.  And at the time of that arrest, Jason was also corresponding with

Rivkin Radler about the investigation and to secure approval to produce additional documents to

the SEC.  Tr. 160:9-28.

## DISCUSSION

We respectfully submit that the Section 3553(a) factors require leniency in this matter,

especially given the unusual facts of this case and the forthcoming changes to the United States

Sentencing Guidelines.  While we do not request a sentence of probation with home confinement

lightly, we believe that it would be a reasonable sentence under the circumstances and consistent

with the law's admonishment that sentence must not be greater than necessary to reach the ends

of justice.

### I.    APPLICABLE LEGAL STANDARD

Following the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220, 245

(2005), the Sentencing Guidelines are advisory.  Although "a district court should begin all

sentencing proceedings by correctly calculating the applicable Guidelines range," the Guidelines

are merely the "starting point and the initial benchmark . . . ." *Gall v. United States*, 552 U.S. 38, 49 (2007) (internal citations and quotations omitted).  The Court must "consider all of the § 3553(a) factors" and "make an individualized assessment based on the facts presented." *Id.* at 49–50; *see also United States v. Dorvee*, 616 F.3d 174, 184 (2d Cir. 2010) (reasonableness of a sentence is driven by "the district court's individualized application of the statutory sentencing factors," not "the amount by which a sentence deviates from the applicable Guidelines range"). These delineated purposes include: the nature and circumstances of the offense and the history and characteristics of the defendant; the seriousness of the offense; the need to promote respect for the law and provide just punishment; considerations of general deterrence; protection of the public from further crimes of the defendant; the provision of educational or vocational training, medical care, or other correctional treatment; the types of sentences available; and the avoidance of unwarranted disparities.  18 U.S.C. § 3553(a).  The Court must "impose a sentence sufficient, *but not greater than necessary*" to comply with the purposes of sentencing.  *Id*. (emphasis added).

## II.   ADVISORY GUIDELINES CALCULATION

Jason was convicted at trial of conspiracy to commit wire fraud and wire fraud, in violation of 18 U.S.C. §§ 371 and 1341, honest services wire fraud, in violation of 18 U.S.C. §§ 1341 and 1346, and conspiracy to make unlawful monetary transactions and making unlawful monetary transactions, in violation of 18 U.S.C. §§ 1956(h) and 1957.  The applicable Guideline for the wire fraud counts is Section 2B1.1.  The applicable Guideline for the honest services wire fraud counts is Section 2B4.1, the commercial bribery guideline, which also uses the loss table in Section 2B1.1.  The applicable Guideline for the money laundering counts is Section 2S1.1, which as relevant here operates by adding one offense level to the offense level of the underlying conduct.  U.S.S.G. § 2S1.1(b)(2)(A).  All counts are grouped as closely related under Section

3D1.2 pursuant to Section 2S1.1 n. 6, which requires grouping where the offenses of conviction

are "a count of laundering funds and a count for the underlying offense from which the laundered

funds were derived."  For purposes of Jason's Guidelines calculation, then, the determination of

"loss" under Section 2B1.1 is central.

The commentary to Section 2B1.1 states that the Court should use the greater of "actual

loss" or "intended loss" to determine the applicable loss amount.  U.S.S.G. § 2B1.1 comment.,

n.3.  "In determining a loss amount for purposes of Guidelines calculation, a district court's

findings must be grounded in the evidence and not derive from mere speculation," *United States*

*v. Coppola*, 671 F.3d 220, 249 (2d Cir. 2012), and must be found by a preponderance of the

evidence, *United States v. Brennan*, 395 F.3d 59, 74 (2d Cir. 2005).  In other words, while the

Guidelines do not require "certainty," they do require that the loss be "a reasonable estimate

based on the available facts."  *United States v. Bryant*, 128 F.3d 74, 75-76 (2d Cir. 1997).   "For

Guidelines calculation purposes conspirators' 'specific intent' to steal a specific amount of

money is not a free-flying and rudderless balloon.  The amount must be grounded in the realities

to be deduced from the trial record, and it is the government's burden to prove those realities."

*United States v. Capanelli*, 270 F. Supp. 2d 467, 474 (S.D.N.Y. 2003).

Where a loss amount suggested by the government is speculative, a court must disregard

it for sentencing purposes.  *See, e.g.*, *United States v. Pina*, No. 18 CR. 179 (JSR), 2019 WL

1904920, at *3 (S.D.N.Y. Apr. 11, 2019) (not crediting portion of loss asserted by government

that was unsupported by evidence and speculative); *United States v. Cuti*, No. 08 CR. 972

(DAB), 2011 WL 3585988, at *4 (S.D.N.Y. July 29, 2011) (finding no loss shown for sentencing

purposes despite government's and probation office's claimed loss amount of $20 million to $50

million because evidence did not show that victims relied exclusively on fraudulent information

in overpaying); *see also United States v. Deutsch*, 987 F.2d 878, 886 (2d Cir. 1993) (vacating sentence where trial court's approximation of loss amounted to "pure speculation").

Jason does not dispute that the three lottery winners at issue in his trial lost significant sums as a result of their investments in opportunities he brought to them. He deeply regrets that loss. Jason at 1-2. We respectfully submit, however, that for Guidelines purposes the intended loss attributable to Jason was no more than his personal gain, and that the actual loss associated with his offense cannot reasonably be determined and was not reasonably foreseeable. Jason's personal gain should be measured by the amount of the payments he received in connection with his clients' investments in the MCA companies he owned: $626,000.[6]

## A. Any Intended Loss Was No More Than Jason's Personal Gain.

Intended loss "means the pecuniary harm that the defendant *purposely sought* to inflict." U.S.S.G. § 2B1.1 n.3 (emphasis added). Where loss is based on allegedly fraudulently obtained loans, the Second Circuit has stated that the defendant's subjective beliefs determine intended loss, rather than the face value of the principal. *See United States v. Confredo*, 528 F.3d 143, 152 (2d Cir. 2008) ("[A] defendant who applied for, or caused someone else to apply for, a $1 million loan, fully expecting at least $250,000 to be repaid, intended a loss of no more than $750,000."); *see also United States v. Turk*, 626 F.3d 743, 748 n.3 (2d Cir. 2010) (noting that defendant who induced real estate loans from victims on the false promise that loans were secured by collateral did not intend any loss at all, making actual loss the appropriate Guidelines

---

[6] Given the jury's verdict, for purposes of this submission we have assumed that these payments did in fact represent undisclosed commissions paid to Mr. Kurland in exchange for his clients' investments.

metric).[7]  In other words, indented loss should not include investments made by Jason's clients

that he intended to be repaid.  *See Confredo*, 528 F.3d at 152; *see also United States v. Stanley*,

12 F.3d 17, 21 (2d Cir. 1993) (vacating sentence in part because district court did not indicate

whether it found that defendant intended to defraud each of his clients).

Indeed, whether "intended loss" is a valid theory of loss at all is at present an unsettled

question.  As the Third Circuit recently recognized, "the ordinary meaning of 'loss' in the

context of § 2B1.1 is 'actual loss,'" meaning the application notes' reference to intended loss

does not bind the court in calculating loss at all.  *United States v. Banks*, 55 F.4th 246, 257 (3d

Cir. 2022); *see also United States v. McKinney*, No. 22 Cr. 20249, 2022 WL 17547467, at *7–9

(E.D. Mich. Dec. 9, 2022) (finding *Banks* "persuasive" and granting defendant's objection to

PSR).  As the *Banks* court found, sentencing judges need not defer to the Guidelines commentary

on the definition of loss the Guidelines combine legislative rules—the Guidelines themselves—

with interpretive rules, *i.e.*, the Sentencing Commission's application notes and commentary.

*Banks*, 55 F.4th at 255.  Interpretive rules are entitled to deference only where the text of the rule

they interpret is ambiguous, and the Third Circuit has determined that "loss," as used in Section

2B1.1, is not ambiguous, but rather must take its ordinary meaning of "actual loss."  *Id*. at 255-

57.

Regardless, if the Court does determine to calculate intended loss the appropriate metric

here is the commissions on investments that Jason received and that the jury necessarily found

(by its verdict on the honest services charge) that Jason did not disclose to his clients.  Whatever

the objective merits of the MCA ventures at issue, there was no evidence at trial that Jason did

___
[7] *Confredo* was a case interpreting Section 2F1.1, which since has been removed.  In that case, however, the application note at issue directed the Court to apply the greater of intended and actual loss, as in the current Section 2B1.1.

19

not firmly believe the related investments would be profitable for his clients, or intend that they would earn back both their principal and the substantial interest—nine percent or greater per year, over multi-year terms—that he had secured for them.  While evidence of other clients' investments was not introduced at trial, many others also invested in Jason's MCA entities and achieved the intended returns.  Indeed, Jason invested his *own* money in JBMML, the entity that suffered the greatest losses, *well after* two of his clients did.  *See* Tr. 1499:17-19; GX-415-B at 225 (Jason's investment of $450,000 in JBMML in July 2019).  This unequivocally demonstrates Jason's belief in the MCA entities and that he believed investments would be repaid.

Likewise, the record at trial established that Jason was deceived by the other defendants with respect to the approximately $41.5 million that his clients invested in PPE-related transactions.  As this Court heard, the other defendants and their unindicted coconspirators told Jason over and over again, including on calls intercepted by the government, that the deal was solid and that his clients would be repaid in full.  *See, e.g.,* DX-30-T (Russo to Jason: "I assure you everything will be whole . . . . I promise you.").  They showed him photographs of the PPE being manufactured before his clients invested, showed him photographs of the PPE arriving in a warehouse in California, and showed him the executed purchase order (which Jason independently verified with a person in the California state government).  DX-199; DX-1556. Smookler and Russo frankly admitted at trial, meanwhile, that Jason had no idea that they and Eric Fessler had stolen *$4 million dollars* off the top of one of the investments.  Tr. 641:3-11 (Russo); Tr. 1184:2-13 (Smookler).  And Chierchio has pleaded guilty to stealing the rest without Jason's knowledge.  The wiretap evidence showed him lying to Jason repeatedly about the progress of the investment. DX-17-A-T (Chierchio tells Jason it is "very possible" clients'

initial investment will be returned in two weeks, and that he has "closings coming up . . . that are staggering").

Jason himself received *absolutely none* of the money his clients invested in PPE at the time of their investment.  Tr. 641:12-14 ("Q. To be absolutely clear, of that $4 million we're talking about, not a dime of that went to Mr. Kurland, correct?  A. Correct.").  Nor did he accept any of the limited returns on the one aspect of the PPE transactions that was successful, because he was not a partner in the entities involved.  As the Court heard at trial, when the other defendants sent Jason $100,000 in profit from the sale of masks to the NYPD, he told them that he did not want the money and sent it back.[8]  Indeed, the wiretap evidence in this case showed that Jason was hard at work trying to recover his clients' investments in the PPE deals before his arrest, even as the other defendants tried to frustrate those efforts.  *See, e.g.*, DX-16-T (Chierchio asks Russo to get Jason to stop pursuing $7 million remitted by California for PPE).

In light of Jason's subjective belief these investments would be repaid to his clients, only the commissions that the jury found that Jason did not disclose may be considered "intended loss."  *Turk*, 626 F.3d at 748 n.3.  The amount of these commissions was $626,000, corresponding to one percent of the $42.6 million invested by the Smiths, $5 million invested by the Wilsons, and $15 million invested by the Mangals in MCA companies Jason introduced to them.  As the government's witnesses repeatedly conceded, the rest was stolen by others without Jason's knowledge, let alone intent.

---

[8] The government argued at trial this return was due to the FBI's contact with the Wilsons, but Smookler told Fessler *days before* that contact with the government that Jason did not want the money.  *See* DX-44-T.

**B.  Actual Loss Either Cannot Be Estimated With Reasonable Certainty Or Was Not Reasonably Foreseeable to Jason And Within The Scope Of The Conspiracy.**

The Guidelines define actual loss as "reasonably foreseeable pecuniary harm."  U.S.S.G. § 2B1.1 n.3.  "Reasonably foreseeable pecuniary harm means pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." U.S.S.G. § 2B1.1 n.3.  To put it another way, proof of actual loss requires proof that the defendant was both the but-for and proximate cause of loss.  *United States v. Burns*, 843 F.3d 679, 688–89 (7th Cir. 2016).

The government estimated at trial an actual loss of approximately $102 million to Jason's clients, and the Probation Office has adopted that estimate.  *See* GX-1822; PSR ¶¶ 65, 70. Respectfully, these figures are highly speculative and inaccurate.  But more importantly, even if the Court were to find actual loss could reasonably be determined that loss is not attributable to Jason because it was not reasonably foreseeable to him and within the scope of the charged conspiracy.

*1.  The PSR's calculation of actual loss is highly speculative.*

a.  Cheddar Capital

First, the attribution of any loss at all to clients' investment in Cheddar Capital requires speculation.  The Mangals and the Smiths invested a total of $20 million with Cheddar Capital. See GX-1819 (showing $10 million investment by the Smiths); GX-1818 (showing $10 million investment by the Mangals).  That principal had not come due at the time of Jason's arrest, because the investments were made on 5-year promissory notes.

The evidence at trial showed that the victims received substantial interest payments on their investment in Cheddar Capital.  The government calculated that Mr. Mangal had received $1,648,333 from Cheddar by the time of Jason's arrest, representing a very favorable investment

22

return.  GX-1818.  The Smiths had received $900,000, again counting only the period before Jason's arrest.  GX-1819.  The government properly deducted these pre-arrest payments from the loss calculation presented at trial, but that calculation does not reflect that both alleged victims testified that they *were still receiving these payments from Cheddar Capital when they testified almost two years later*.  Tr. 144 (Mr. Mangal receives $100,000 per month in payments from Cheddar); Tr. 930:21-931:9 (Ms. Smith still receives payments from Cheddar but does not know the amount).   Based on that testimony, payments may well be continuing to this day.

These ongoing payments demonstrate that the overall status of the Cheddar investments remains unclear.  The payment of interest suggests that Cheddar Capital may be able to return the principal, but there is simply insufficient evidence to establish by a preponderance one way or another whether this money will be repaid.  Even if Cheddar Capital does *not* return the principal on time, the Lottery Victims may sue that entity for recovery, and in doing so may be able to recover some or all of their investment from the company (or its wealthy backer Brian Mastroberti).[9]  In other words, the only certainty as to these investments is that to date they have produced a gain—albeit in uncertain amount—and while Jason does not argue that they could never be considered a loss at all, attributing any particular loss to them at this stage requires a high degree of speculation.[10]

_____

[9] Mr. Kurland has had no involvement with Cheddar Capital—which has owners that were not indicted in this case, Anthony Lodati and Mr. Mastroberti—since his arrest.

[10] The government also includes in its calculation of Mr. Mangal's loss his $2 million purchase of Francis Bay Holding Company's assets, but there was no showing at trial that these assets were worthless or that Mr. Mangal did not take valid ownership of them.  It is inappropriate to include them in the measure of loss in this case.  *See Thaler v. United States*, 706 F. Supp. 2d 361, 370 (S.D.N.Y. 2009) ("A fraudulently induced purchase of certain assets does not cause loss equaling the entire purchase price if the assets actually have some value greater than zero."); *see also United States v. Geringer*, 672 F. App'x 651, 652–53 (9th Cir. 2016) ("A victim's loss should be offset by the victim's benefit for the purpose of calculating loss under the Sentencing

23

b.  PPE

Relatedly, the loss calculation presented in the PSR as to Jason's clients' investment in PPE is speculative.  The evidence at trial proved that the first investment of $19.5 million by the Smiths was undertaken in support of a valid purchase order from the state of California and was indisputably used in substantial portion to acquire PPE.  *See* Tr. 832-834; DX-14 (purchase order for $799 million in PPE); GX-632.  The only available information indicates that whatever PPE Chierchio did purchase with part of that initial $19.5 million investment remained in a warehouse in California at the time of Jason's arrest.  Tr. 649:4-10; DX-1556 (Jason receives photographs of PPE in California warehouse).  To be sure, some significant proportion of these goods must be considered lost—if for no other reason than PPE has lost value as the pandemic has abated—but again, even an estimate of the amount to be deducted requires undue speculation.

c.  Altieri

Finally, the loss caused by Jason's offense cannot be reasonably determined because there is insufficient evidence to determine the extent to which his clients' loss was caused by the unrelated criminal acts of Gregory Altieri.  Altieri represents a very large proportion of the overall loss: the evidence at trial suggested that the gross amount invested with Altieri by JBMML alone—leaving aside any investments by any other entities involved—was over $39 million; the net loss appears to have been at least $25 million.  Tr. 1498:19-22.[11]  Not all this

---

Guidelines."); U.S.S.G § 2B1.1, comment. n. 3(E)(i) (stating loss should be reduced or offset by the "money returned, and the fair market value of the property returned and the services rendered, by the defendant ... to the victim before the offense was detected[ ]").

[11] The PSR states that the loss to all victims of Mr. Altieri's scheme was $69.5 million.  PSR ¶ 14 n.1.

investment was drawn from the victims' investments in JBMML, however.  And some portion of this money may be recovered through Mr. Altieri's restitution payments and the government's efforts to locate and return the funds he stole.

> 2.  *Any loss that reasonably can be determined was not reasonably foreseeable to Jason.*

Even leaving aside the question of whether a sufficient factual predicate exists to properly determine the quantifiable loss to the victims without significant speculation, nearly all of those losses were unforeseeable to Jason.  The government's witnesses bizarrely suggested at trial that Altieri's scheme should have been apparent to Jason from its early days, but all the evidence points in the other direction: Altieri came recommended by another lawyer, began as an "exemplary client," and continued to repay large sums long after Jason's clients invested.  *See* Tr. 344:4-9; Tr. 579:6-582:23; Tr. 1155:10-23.  Moreover, Russo and Smookler—the day-to-day managers of the MCA entities—continued to reassure Jason that Altieri would not default and lied to Jason to keep him in the dark.  *See, e.g.*, DX-1270 (Russo jokes with Smookler about lies to Jason about size of Altieri repayment shortly before Jason invests his own money in JBMML). As the dozens of claims in bankruptcy proceedings against Altieri and his company prove, Altieri readily deceived many others over the course of his scheme, including relatively sophisticated investors and lawyers.  To hold Jason responsible for Altieri's independent crime would be to embrace an unduly expansive vision of causation and loss.

In *United States v. Johnson*, the Court properly focused on the role that causality must play, refusing to consider amounts as loss where "the causal connection between the criminal conduct . . . [and the loss was] too attenuated."  No. 16 Cr. 457-1 (NGG), 2018 WL 1997975, at *2 (E.D.N.Y. Apr. 27, 2018).  As in *Johnson*, the connection to the loss caused by Altieri is far too attenuated to be attributable to Jason.  It makes no sense to hold Jason criminally responsible

25

for the savvy Ponzi scheme of another, especially as he himself was also victimized in that scheme.

The loss caused by the other defendants' thefts also was not reasonably foreseeable to Jason or within the scope of their agreement.[12]  Both Smookler and Russo admitted on the stand that Jason had no idea they had stolen money from JBMML to buy houses and boats for themselves, or that they had taken extraordinary upfront fees from JBMML's loans to Altieri. Tr. 383:24-384:14 (Russo admits he and Smookler took $1,325,000 in upfront fees without Jason's knowledge); Tr. 415:20-25 (Russo admits to purchasing a $1.5 million dollar home with Jason's clients' money); Tr. 1201:6-12 (Smookler admits he bought a boat with Jason's clients' money and lied to Jason about it).   Indeed, the evidence showed that they continued to pilfer the company well into the spring of 2020, taking money that could have been used to pay interest owed to Jason's clients.  Tr. 676:2-15 (Russo takes $400,000 from JBMML account in April 2020).  And the testimony at trial was equally clear that Jason had no idea that the other

---

[12] While the Guidelines permit the Court to find that loss caused by co-conspirators is relevant conduct, in such circumstances, "a district court must make a particularized finding as to whether the activity was foreseeable to the defendant" and a separate particularized finding on the "scope of the criminal activity agreed upon by the defendant."  *United States v. Studley*, 47 F.3d 569, 574–75 (2d Cir. 1995).  Only losses that are both reasonably foreseeable and within the scope of the criminal activity the defendant agreed upon are relevant conduct.  *Id*.  And the Second Circuit has been clear that "the scope of conduct for which a defendant can be held accountable under the sentencing guidelines is significantly narrower than the conduct embraced by the law of conspiracy," in that a defendant may be liable for joining a conspiracy without all of the aims or results being reasonably foreseeable to him.  *United States v. Getto*, 729 F.3d 221, 234 n.11 (2d Cir. 2013).

While as a technical matter this aspect of the Guidelines is distinct from the calculation of "actual loss," because it is addressed in Chapter 3, both the Guidelines' definition of "actual loss" in Section 2B1.1 and the provisions determining when a defendant may be held liable for conduct by co-conspirators incorporate this concept of reasonable foreseeability.  As such, we respectfully submit the Court may consider both aspects of the Guidelines calculation simultaneously.

defendants stole money destined for PPE; to the contrary, Smookler, for example, admitted that they actively concealed this theft from him.  Tr. 1183:22-1184:13 (Smookler admits that he, Fessler, and Russo stole $4,000,000 from clients' investment without Jason's knowledge); Tr. 1188:14-21 (Smookler admits that he and Fessler coordinated lies to Jason).  Those thefts were in no way foreseeable to Jason, even assuming (as we must) that the jury concluded that Jason received undisclosed kickbacks for suggesting the MCA investments to his clients.  Thefts by Russo, Smookler, and Chierchio that were *actively hidden* from Jason should not be included in his Guidelines calculation.  *Studley*, 47 F.3d at 575.

　　We anticipate the government may argue that the entire amount of the victims' losses is attributable to Jason on the theory that these investments were fraudulently induced.  While courts have stated in certain circumstances the entire amount of a fraudulently induced investment should be considered loss, these cases address situations in which the misrepresentation pertained to a fundamental characteristic of the investment—typically whether it was secured by collateral or the relative seniority of the position.  *See United States v. Turk*, 626 F.3d 743, 748–51 (2d Cir. 2010) (defendant misrepresented that investment would be secured by collateral); *United States v. Komar*, 529 F. App'x 28, 29 (2d Cir. 2013) (defendant did not inform victims of existing mortgage on property); *United States v. Bryson*, 101 F. Supp. 3d 147, 155–56 (D. Conn. 2015) (defendant misrepresented that creditors would have senior position).  That is not the case here, where the fraudulent omission embraced by the government was as to Jason's ownership interest.  Each of those decisions also considered the inducement theory in the context of *actual loss* rather than *intended loss*, meaning the touchstone of the analysis was whether the loss of the entire investment was reasonably foreseeable to the

27

defendant. *Id.* For the reasons described above, it was not reasonably foreseeable to Jason that the other defendants and Gregory Altieri would steal most or all of his clients' investments.[13]

In short, we respectfully submit that the Court cannot determine with sufficient certainty whether the actual loss in this case is the government's figure of approximately $102 million, or some far smaller amount that accounts for (a) the millions of dollars that remain invested in Cheddar and the associated income, (b) the uncertain amount in the tens of millions stolen by Altieri, or (c) the value of the PPE purchased pursuant to Jason's clients' express authorization. To the extent that the Court believes it reasonably can determine some amount of loss beyond Jason's commissions, moreover, that amount is not reasonably foreseeable to him and was not within the scope of the conspiracy.

### C.  Jason's Personal Gain Is The Amount Of The Undisclosed Commissions.

Where, as here, the loss "reasonably cannot be determined," the Guidelines recommend a court calculate the loss amount as "the gain that resulted from the offense." U.S.S.G. § 2B1.1, Application Note 3(B). The appropriate metric of Jason's gain is the commissions he received in association with the fraudulent transactions. *See United States v. Tzolov*, 435 F. App'x 15, 17 (2d Cir. 2011) (finding district court did not err in using "commissions earned on the fraudulent sales" to measure loss where actual loss could not reasonably be determined); *see also United States v. Zangari*, 677 F.3d 86, 92 (2d Cir. 2012) (noting Probation Office permissibly calculated

---

[13] While in *United States v. Levenson*, 314 F. App'x 347, 350 (2d Cir. 2008), the Second Circuit upheld the district court's decision to hold the defendant responsible for money stolen by a related party overseas, on the grounds that the inexperienced staff and unprofitable history of his operation meant the defendant should have known a "total loss" was foreseeable, there is insufficient evidence that Mr. Kurland was at all aware of comparable lack of experience in Smookler and Russo, who presented themselves as successful businessmen. (Brian Mastroberti, their partner in Cheddar, in fact *is* a successful businessman.) In any event, the trial court in *Levenson* found that the Guidelines range overstated the seriousness of the defendant's role in the offense, because the defendant did not personally receive the proceeds, and gave the defendant a below-Guidelines sentence. *Id.* at 349.

loss based on gain from undisclosed kickbacks where overall loss reasonably could not be determined).  As shown at trial, Jason received payments in the amount of one percent of his clients' investments in the MCA entities at issue.  His clients invested a total of $62.6 million in these entities, and the associated payments to Jason were $626,000.

The gross amount paid to Jason by the MCA entities during the conspiracy period is not an appropriate metric of gain because it includes payments without any connection to his clients' investments, including returns on Jason's own investments and ordinary ownership distributions owed to Jason because he was partner in these companies, not because of any criminal acts.  Not all of the funds invested by the MCA companies in question derived from these three clients, and the MCA companies generated profits from their investments during these periods, making any direct connection between the clients' investments and these ordinary distributions excessively attenuated.  The gross amount that Jason received also does not account for Jason and his wife's investment in JBMML that was lost, which totaled over $750,000.  Tr. 1499:6-22.  For the same reason, consistent with the PSR, the Court should not include in any calculation of Jason's gain his compensation by Rivkin Radler, which had no direct connection to his clients' payments to the firm and was based on his work across a wide variety of matters, including in real estate and banking representations.

**D. A Sophisticated Means Enhancement Is Not Warranted.**

The enhancement for use of sophisticated means set forth in § 2B1.1 is specific to each defendant, rather than the broader scheme.  It requires that "*the defendant intentionally engaged in or caused the conduct* constituting sophisticated means."  U.S.S.G. § 2B1.1(b)(10)(C) (emphasis added); *see also United States v. Newton*, 766 F. App'x 742, 760 (11th Cir. 2019) (noting this was a "new requirement" added as part of the 2015 amendments).  The PSR recommends an enhancement for use of sophisticated means, pursuant to Section

29

2B1.1(b)(10)(C), on the grounds that "the defendant directed his clients (the victims) to invest in MCA companies, which he owned, but the defendant never informed them of his ownership in those companies. . . ."  PSR ¶ 79.

This enhancement is unwarranted: the PSR's recommendation rests on nothing more than the jury's presumed finding that Mr. Kurland omitted material information about the investment when discussing it with his clients.  If that is a scheme involving sophisticated means, nearly everything would be.  To the extent the government argues an alternative basis for a sophisticated means enhancement might be the use of Mr. Kurland's entity GK3, LLC, that would also be insufficient.  Mr. Kurland registered GK3, LLC himself and named it after his children, all of whom share the initials G.K.  The entity is not a "shell company" akin to the confusing and ever-shifting array of companies owned and operated by Russo and Smookler, but rather a personal LLC of the kind used by millions of Americans to limit liability associated with their business interests.  Whatever one thinks of this conduct, it is hardly "sophisticated."

### E.  The PSR Incorrectly Applies An Adjustment For Abuse of Trust to the Unlawful Monetary Transaction Counts.

Mr. Kurland does not contest the applicability of Section 3B1.1's adjustment for an abuse of trust to his fraud convictions; he recognizes that given the jury's verdict and his status as a member of the bar, it is appropriate.  But the PSR also recommends this adjustment apply to the money laundering counts.  PSR ¶ 87.  This adjustment is unwarranted.  The Guidelines direct that application of an adjustment under Chapter 3 (such as for abuse of trust) must be based on the "laundering of the criminally derived funds[,] and not on the underlying offense from which the laundered funds were derived."  U.S.S.G. comment. n. 2(C).  The conduct involved in these counts is nothing more than the transfer of the proceeds of the offense to bank accounts

30

controlled by Mr. Kurland.  That conduct is not sufficient for an adjustment under Section 3B1.1 to the offense level associated with unlawful monetary transaction counts.

### F.  The Court Should Apply the Guidelines Amendments Recently Adopted by the United States Sentencing Commission

On April 5, 2023, the Sentencing Commission adopted three new Guidelines provisions that impact Jason's sentencing.  Although they will not formally go into effect until November 2023, we respectfully submit that the Court should apply them now – either as part of its Guidelines calculation or pursuant to its variance authority under 18 U.S.C. § 3553(a).

*First*, the Sentencing Commission adopted a new Guideline – Section 4C1.1.  Section 4C1.1 provides for a two-level offense reduction of an offense under Chapter Two or Three of the Guidelines where:

(1) the defendant did not receive any criminal history points from Chapter Four, Part A;

(2) the defendant did not receive an adjustment under §3A1.4 (Terrorism);

(3) the defendant did not use violence or credible threats of violence in connection with the offense;

(4) the offense did not result in death or serious bodily injury;

(5) the instant offense of conviction is not a sex offense;

(6) the defendant did not personally cause substantial financial hardship;

(7) the defendant did not possess, receive, purchase, transport, transfer, sell, or otherwise dispose of a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;

(8) the instant offense of conviction is not covered by §2H1.1 (Offenses Involving Individual Rights);

(9) the defendant did not receive an adjustment under §3A1.1 (Hate Crime Motivation or Vulnerable Victim) or §3A1.5 (Serious Human Rights Offense); and

(10) the defendant did not receive an adjustment under §3B1.1 (Aggravating Role) and was not engaged in a continuing criminal enterprise, as defined in 21 U.S.C. § 848.

Amendments to the Sentencing Guidelines (Preliminary), dated April 5, 2023, at 11-12.  As

Jason satisfies these criteria, a two-level offense level reduction is appropriate.

      *Second*, the Sentencing Commission amended the commentary to Section 5C1.1. Section

5C1.1's new commentary recommends that judges impose non-custodial sentences for

individuals who (1) receive the new 4C1.1 adjustment set forth above, and when (2) the

applicable sentencing range is in Zone A or B of the sentencing table.  *Id.* at 14-15.

      *Third*, the Sentencing Commission also included commentary stating that a non-

incarceratory sentence may be appropriate for first-time offenders with no criminal history points

who qualify for an adjustment under § 4C1.1 even where their applicable Guidelines range is in

Zone C or Zone D, if "the applicable guideline range overstates the gravity of the offense

because the offense of conviction is not a crime of violence or an otherwise serious offense."  *Id.*

*See also* 28 U.S.C. § 994(j) ("The Commission shall insure that the guidelines reflect the general

appropriateness of imposing a sentence other than imprisonment in cases in which the defendant

is a first offender who has not been convicted of a crime of violence or an otherwise serious

offense . . . .").

      We will address the applicability of this commentary in explaining why a term of

probation with home confinement would be appropriate for Jason under the Court's variance

authority in Section III, *infra*.

### G.  Jason's Advisory Guidelines Range Is 37 to 46 Months.

      In sum, the appropriate measure of loss for Guidelines purposes in this case is Jason's

personal gain.  That personal gain is at most $626,000, which corresponds to a 14-point

enhancement under Section 2B1.1's loss table.  Using that amount, and excising the mistaken

enhancements applied in the PSR, Jason's Guidelines calculation is as follows:

32

- A base offense level of 7, for the underlying wire fraud, conspiracy, and honest services wire fraud (§ 2B1.1(a)(1));

- A 14-level enhancement for a loss amount greater than $550,000 (§ 2B1.1(b)(1));

- A 2-level enhancement for abuse of trust or use of a specialized skill (§ 3B1.3);

- An adjusted offense level of 23 for the fraud counts;

- The combined offense level (including the money transaction counts) is also 23;[14]

- A 2-level reduction is appropriate under the new Section 4C1.1; and

- The Guidelines total offense level is 21.

Because Jason is a first-time offender, his Guidelines range is 37 to 46 months. Pursuant to the new commentary to Section 5C1.1, the Guidelines recommend that a non-incarceratory sentence may be appropriate even though the calculation places Jason in Zone D because Jason has no prior criminal history and the offense is "not a crime of violence or otherwise serious offense."

## III. THE SECTION 3553(A) FACTORS DEMONSTRATE THAT LENIENCY IS JUST AND APPROPRIATE

Despite the importance of the crimes of conviction, a sentence far below the Guidelines range is sufficient to serve the purposes set forth in 18 U.S.C. § 3553(a). No matter what calculation the Court uses to determine loss—even the proper approach based on Jason's gain outlined above—that calculation will result in a sentencing range that overstates his culpability. We respectfully urge the Court to vary from the Guidelines and instead carefully weigh the

---

[14] The total offense level for the unlawful monetary transaction counts is 22, being the offense level of the underlying offense before application of the enhancement for abuse of trust (21) plus a one-point enhancement for conviction under 18 U.S.C. § 1957. *See* U.S.S.G. §§ 2S1.1(a)(1); -(b)(2)(A). Because all counts are grouped, PSR ¶ 90, and the highest offense level is the offense level pertaining to the fraud counts, that offense level dictates Mr. Kurland's Guidelines range.

33

Section 3553(a) factors to determine a reasonable sentence.  *See Johnson*, 2018 WL 1997975, at

*4. While we understand it would represent a meaningful departure from the advisory Guidelines

range, we believe that a sentence of probation with a term of home confinement would be

sufficient but not greater than necessary to meet the needs of sentencing.

### A. Any Loss Amount Used to Calculate the Guidelines Range Overstates the Seriousness of the Offense

The Probation Office (and, presumably, the government) would have this Court enhance

Jason's Guidelines calculation by 24 offense levels based on "loss," meaning that two thirds of

Jason's total offense level would be driven by this calculation alone.   Regardless of whether the

Court elects to use Jason's gain to measure the loss caused by his conduct or takes a different

approach, the Guidelines' focus on loss distorts the Guidelines beyond utility in this case.[15]

The Second Circuit has recognized the disproportionate effect a high loss amount can

have on a sentence and has invited district courts "to consider whether the significant effect of

the loss enhancement, in relation to the low base offense level, should result in a non-Guidelines

sentence." *United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016) (remanding where trial

court applied 10-level enhancement); *see also* U.S.S.G. § 2B1.1 comment, n. 21(C) (noting that

the basis for a "downward departure may be warranted" where the offense level "substantially

overstates the seriousness of the offense").

Indeed, as this Court has powerfully stated in the past, "the Sentencing Commission's

loss-enhancement numbers do not result from any reasoned determination of how the

punishment can best fit the crime, nor any approximation of the moral seriousness of the crime."

---

[15] The Court need not hold a hearing to resolve factual disputes over the amount of loss if it decides to impose a below-Guidelines sentence that does not depend on the disputed loss amount.  *See, e.g.*, *United States v. Faibish*, No. 12 Cr. 265 (ENV), 2015 WL 4637013, at *3 (E.D.N.Y. Aug. 3, 2015).

*Johnson*, 2018 WL 1997975, at *3; *see United States v. Corsey*, 723 F.3d 366, 380 (2d Cir. 2013) (Underhill, J., concurring) ("[T]he higher the loss amount, the more distorted is the guideline's advice to sentencing judges.").[16]

As described above, the proper application of the Guidelines requires this Court to find a loss amount of $626,000.  Regardless of the Court's conclusion as to the Guidelines measure of loss, however, we urge the Court to follow its past practice of discarding the misleading advice of the Guidelines, and instead carefully weigh the Section 3553(a) factors to "independently" determine a reasonable sentence.  *Johnson*, 2018 WL 1997975, at *4; *see United States v. Adelson*, 441 F. Supp. 2d 506, 515 (S.D.N.Y. 2006) ("Where, as here, the calculations under the guidelines have so run amok that they are patently absurd on their face, a Court is forced to place greater reliance on the more general considerations set forth in section 3553(a), as carefully applied to the particular circumstances of the case and of the human being who will bear the consequences.").[17]  Careful consideration of these factors, we submit, counsels leniency here.

---

[16] This Court's conclusion is consistent with others in the Eastern District.  Sentencing Commission statistics show that in 2021, 74 percent of fraud defendants in this District received below-Guidelines sentences.  *See* United States Sentencing Commission, Interactive Data Analyzer (available at https://ida.ussc.gov/).

[17] Myriad courts in this Circuit have agreed with this Court's decision to discount the Guidelines' broken mechanics when dealing with these kinds of offenses.  *See, e.g.*, *United States v. Ho*, No. 17 Cr. 779 (Preska, J.), Dkt. 230 at 21:23–22:8, 24:11–31 (S.D.N.Y. March 25, 2019) (36 month bribery sentence in spite of 262 to 327 month Guideline range, because fraud provisions "dramatically overstate the seriousness of the offense and the appropriate guideline range"); *United States v. Kent*, 16 Cr. 385 (Cote, J.), Dkt. 58 at 11:1–4, 34:10–35:7 (S.D.N.Y. Oct. 6, 2017) (imposing year-and-a-day sentence despite 46 to 57 month Guidelines range because range is "not representative of what would be a reasonable sentence"); *United States v. Younger*, 16 Cr. 348 (Rakoff, J.), Dkt. 13 at 2:13–18, 24:5–16 (S.D.N.Y. Sept. 19, 2016) (four month sentence even with 18 to 24 month Guidelines range based, in part, on the "artificiality of the guidelines"); *United States v. Li*, 15 Cr. 870 (Sweet, J.), Dkt. 18 at 16:10–13, 20:25–21:1 (S.D.N.Y. June 13, 2016) (sentence of probation despite Government's request for 60 month sentence); *United States v. Gupta*, 904 F. Supp. 2d 349, 341, 355 (S.D.N.Y. 2012) (Rakoff, J.) (24 month sentence notwithstanding 78 to 97 month Guidelines range) ("By making a Guidelines sentence turn, for

## B. The Nature and Circumstances of the Offense

The evidence at trial showed that Jason's receipts from the events at issue were orders of magnitude less than Chierchio, Smookler, and Russo, and that more importantly Jason *had no idea that the other defendants were pilfering his and his clients' investments wholesale*. The gravamen of Jason's offense, accepting the jury's verdict, was his receipt of undisclosed commissions in exchange for steering his clients to particular investments – investments in which he wholly believed, as can be amply seen by his own invested (and lost) money. These facts set Jason apart from the other defendants and warrant a substantial downward variance.

As this Court will recall, the wiretap exhibits in this case—even though they capture only a slice of the charged conduct, at its very end—are replete with examples of the other defendants' contempt for and exploitation of Jason. Russo summed it up in calling Jason "a duck . . . a chicken"; in other words, his "prey." Tr. 686:24-687:3. In recorded calls, Russo explained to Chierchio how it was his "whole plan . . . not to give [Jason] back a dollar." DX-19-T. Consistent with their predation, Russo and Smookler hid from Jason anything that might reveal he and Smookler were not "real gentlemen." DX-29-T at 2. Over and over, Russo, Smookler, and Chierchio told each other and their confederates not to give Jason "details" he could use to figure out what had happened to his clients' money, instead preferring to "keep him in the dark". DX-27-T at 2; Tr. 651:23-652:4. Russo reassured Smookler that he would "handle" Jason once Jason started pressing for details. DX-31-T at 2. And that's exactly what the other defendants did: tell Jason "everything will be whole…I promise you," without any

---

all practical purposes, on [loss enhancement], the Sentencing Commission . . . effectively guaranteed that many such sentences would be irrational on their face."); *Adelson*, 441 F. Supp. 2d at 507 (42-month sentence versus 85 year Guidelines range); *United States v. Litvak*, 13 Cr. 19, Dkt. 611 at 75:14–16, 170:7–12 (D. Conn. April 26, 2017) (24 month sentence despite 108 to 135-month Guidelines range).

basis in fact, even as Jason started asking tougher questions.  DX-30-T; *see also* DX-141 (Chierchio tells Jason there is "zero problem" with the California PPE deal.).  That candid-camera view offered by the government's wiretap was confirmed by the testimony at trial.  Russo frankly admitted to the jury that he had both lied to Jason throughout their relationship and that he instructed others to lie to Jason as well.  Tr. 517:8-518:2.

Consistent with this deception by the other defendants, Jason's gain from the conduct was far less than any other defendant.  The fees Jason received in connection with his clients' investments in the MCA entities amounted to $626,000.  He did not buy a house or a boat.  He did not take a private jet or decamp for deep sea fishing in the Virgin Islands.  Even the car payments that JBMML covered for Jason began before any of his clients invested and were approved by JBMML's lawyer.  Tr. 599:15-600:5 (JBMML's outside counsel advised that JBMML could pay its partners' expenses "within reason," and that "a certain amount of a car payment could be justified."; Tr. 601:16-21 (lease occurred before investment by victim); Tr. 1151:8-17 (JBMML's outside counsel advised that expenses for car payments, entertainment, and travel were no problem).  And, as discussed previously, Jason invested a lot of money back in the JBMML business because he believed in its mission.

The evidence conclusively showed that Jason believed that each of his clients' investments were placed in legitimate investment opportunities.  Smookler testified that Cheddar was a "well-oiled machine" at the time of the clients' investments.  As discussed above, he does not appear to have been wrong: Cheddar continued to make payments even after Jason's arrest. Tr. 1164:3-6.  Mr. Kurland invested hundreds of thousands of dollars of his own money into JBMML, including after his clients invested.  The California PPE transactions (to which the Smiths' money went) stemmed from a bona fide purchase order for $799 million from the State

of California, and involved several others not accused of wrongdoing, including the former

Attorney General of Alabama.   1097:19-23; *see* DX-14 (Purchase Order).[18]   The State of

California in fact remitted $7 million in exchange for certain deliveries of that PPE.  Tr. 1189:2-

9.  And the New York PPE transaction (to which the Wilson's money went) was tied to a deal—

which in the end was completed—to sell masks to the NYPD at a substantial profit.  Tr. 1193:7-

12.  None of these investments, as far as Jason knew, were inherently fraudulent.

Nor, at the risk of stating the obvious, was there any evidence that Jason was aware of

Altieri's criminal plan.  Russo and Smookler testified that they now believe they should have

known better than to trust Altieri, but the fact remains that they did.  *See, e.g.*, Tr. 1155:8-23

(Smookler describes initial faith in Altieri).  To the extent they did become aware of issues with

Altieri, they concealed from Jason—who remained a step removed from Altieri and spoke with

him only infrequently—the true extent of the financial damage caused by Altieri's crime.  *See,

e.g.*, DX-1270.  And text messages show months of evasion and outright lies by Altieri, which

continued well into the pandemic period of March 2020.  See DX-187 (Altieri invents illness to

avoid explaining failure to meet with fictious creditor in December 2019); DX-189 (Altieri tells

Jason he believes payment will come on January 7, 2020); DX-195 (Altieri promises fictious

creditor will pay "tomorrow or Friday," on March 11, 2020); DX-196 (Altieri tells Jason he is

still confident in payment despite COVID disruption, on March 23, 2020).  Altieri's scheme sunk

JBMML and damaged many others.  A large proportion of the victims' losses are directly

attributable to his unconnected crime.

---

[18] Indeed, once the deal fell through, that group retained Quinn Emanuel to seek reinstatement of
the cancelled California purchase order.  Tr. 1185:17-22.

We recognize that the jury found that Jason concealed material facts from three of his clients regarding these investments.  But whatever the truth as to Jason's communication of those facts, Jason did not obscure the fundamental nature of those investments from his clients.  Mr. Mangal, for example, testified that he met with Jason and Brian Mastroberti, who accurately described Cheddar's business model: "they lend money out to small businesses that can't [get] loans from banks fast enough and they get a higher interest rate back from that."  Tr. 75:16-18; *see also* Tr. 880:10-19 (Ms. Smith demonstrates understanding that Cheddar made loans to small businesses).  Each of the three victims also received copies of the underlying MCA investment documents, and either retained direct access to their financial accounts or received regular reports from Jason and their advisors on their financial affairs.[19]   *See, e.g.*, Tr. 877:12-18 (Ms. Smith receives a binder full of financial documents, including documentation of loans to JBMML); Tr. 1411:1-1412:17 (Mr. Wilson describes his contact with financial advisors introduced by Mr. Kurland); DX-1307 (Mr. Wilson receives online access to his bank accounts).  And in their statements to the government, Ms. Smith and Mr. Mangal both conveyed an understanding that Mr. Kurland himself had invested in some of the MCA entities at issue.  *See* DX-235 (stating notes taken by the FBI reflect that Mr. Kurland "mentioned he had invested his own money in Francis Bay Holding Company, but was not an owner," and that "Mr. Kurland told the Smiths that he has his own personal money invested with the diamond deal.").

---

[19] Moreover, all of Jason's communications related to this conduct also took place in the digital open: using a single cell phone on which he conducted both personal and law firm business, and relying primarily upon his Rivkin Radler corporate email account.  In this respect his conduct starkly differs from Russo and Smookler, who owned multiple telephones and even used their wives' phones to speak when they feared they were being recorded.  Tr. 1168:16-22.  Nor (again unlike Smookler and Russo) did Mr. Kurland discuss the possibility of obstructing justice by destroying computers and hard drives.  Tr. 1166:12-14.

Jason also did not hide his affiliation with the MCA entities in question from the world. He told his law firm about them, Tr. 1234:2-13, and introduced his clients to his partners at that law firm, Tr. 112:13-18; Tr. 1404:5-14.  He appeared on the corporate documentation for these entities, including some documents that were publicly available.  Tr. 522:19-524:12 (Russo testifies that Jason was on corporate paperwork for Cheddar Capital and related entities); Tr. 530:21-23 (Russo testifies that Mr. Kurland was on paperwork for JBMML, after initial denial).[20]  The money he received from these entities all went to GK3, LLC, an entity named after his children that he had incorporated himself.  He invited Elizabeth Chen—a client who placed comparable trust in Jason to his lottery clients—to invest in JBMML with full disclosure of his interest, and she did.  Chen at 2.  ("I knew all about his businesses, and was an investor myself.").  And as the letters submitted to the court indicate, Jason approached other friends and clients, lottery winners or no, to see if they would be interested in investing in these companies. *See* Kuritzky at 2 (describing how Jason approached him to invest in "a cash advance business that he was a partner in and which he felt would offer me a solid return.").

Nor was Jason involved in Smookler and Russo's other crimes, or aware of Chierchio's affiliations.  Jason had no idea of Smookler and Russo's "street loan" to Altieri until well after the fact, let alone the horrifying threats they used to try to collect on it.  To the contrary, he cautioned Smookler and Russo against aggressive tactics.  Tr. 566:4-18 (Russo testifies that Mr. Kurland warned him and Smookler not to harass Altieri or send threatening text messages).  And

---

[20] While Smookler and Russo claimed at trial that Mr. Kurland was also a member of the entities involved in the PPE transactions and concealed that fact, we respectfully submit that this testimony was false or mistaken.  As explored in detail during the trial, Mr. Kurland did not appear on the paperwork for these entities, unlike the MCA entities at issue, precisely because he was not a member.  See also DX-40-A-T (Russo tells administrative assistant not to give information to Jason about entity associated with PPE deals because "he's not an owner" of that entity)

the government did not allege at trial that Jason was at all aware of Chierchio's alleged Mafia connection—indeed, in its superseding indictment the government did not charge Jason with conspiring with Chierchio at all.

These facts support leniency.  Jason has been convicted of five offenses.  He feels the weight of this verdict, and the pain that he has caused to his family and his clients.  But his conduct took place in an atmosphere of striking manipulation and deception by his co-defendants, and much of his clients' loss is attributable to either theft that other defendants hid from Jason or the actions of an entirely unconnected Ponzi schemer.  Simply put, Mr. Kurland is the least culpable defendant in this matter by any stretch of the imagination.

### C.  Jason's History and Characteristics

Justice also requires this Court note Jason's personal qualities, including his record of deep engagement with and care for his family and community.  As Judge Rakoff has noted, "surely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance." *Adelson*, 441 F. Supp. 2d at 513–14, *aff'd*, 301 F. App'x 93 (2d Cir. 2008) (holding that sentence was not unreasonably lenient); *see also United States v. Gupta*, 904 F. Supp. 2d 349, 353 (S.D.N.Y. 2012).

Jason can well point to the good he has done, whether for his family and friends.  As set forth in Section I of this submission and in the letters submitted to the Court, Jason stands out for his whole-hearted dedication to his family.  His devotion to parenting is so distinctive that his sister and his friends continue to cite him as a model, despite his felony convictions.  Jason's community contribution also goes beyond friends and family.  Throughout his adult life he has found ways to give back, whether through his service to the INN, his financial support of a struggling family in his community, or his more recent work on behalf of Ms. Chen's Ukrainian

in-laws.  These are not the actions of a fundamentally greedy, self-absorbed con man: they are the deeds of a man who, whatever his offense, has more often in life been distinguished by his care for those around him.

This history of community involvement and good works weighs in favor of a downward variance.  *See, e.g.*, *United States v. Canova*, 412 F.3d 331, 358–59 (2d Cir. 2005) (affirming downward departure based on defendant's history of public service and good works); *Gupta*, 904 F. Supp. at 353 (noting fraud defendant's charitable work in sentencing defendant to 24 months of imprisonment despite Guidelines range of 78 to 97 months); *see also, e.g.*, *United States v. Howe*, 543 F.3d 128, 137–38 (3d Cir. 2008) (affirming a sentence of probation with three months of home confinement for wire fraud, despite Guidelines range of 18 to 24 months, and noting defendant's devotion to family, community, and church); *United States v. Thurston*, 544 F.3d 22, 26 (1st Cir. 2008) (affirming a three-month sentence for Medicare fraud conspiracy with associated loss of more than $5 million based on, among other things, the defendant's charitable work, community service, generosity with his time, and support and assistance of others).

Another relevant characteristic is Jason's age: next March, he will turn 50 years old.  This Court should join others in recognizing that the defendant's age, and the inverse correlation between age and recidivism, is a relevant factor to consider when imposing a sentence.  *See, e.g.*, *United States v. Ruiz*, No. 04 Cr. 1146-03 (RWS), 2006 WL 1311982, at *4 (S.D.N.Y. May 10, 2006) ("This Court and others have previously declined to impose Guidelines sentences on defendants who, like Ruiz, were over the age of forty at the time of sentencing on the grounds that such defendants exhibit markedly lower rates of recidivism in comparison to younger defendants."); *United States v. Carmona-Rodriguez*, No. 04 CR 667RWS, 2005 WL 840464, at *4 (S.D.N.Y. Apr. 11, 2005) (noting lower risk of recidivism for defendants over the age of 40

and imposing a below-Guidelines sentence).  All of these factors militate in favor of substantial leniency.

### D.  The Devastating Impact of Jason's Arrest and Conviction Are Adequate Retribution.

With respect to "just punishment" or retribution, Jason has already suffered the destruction of his reputation, his finances, and his health.  Rivkin Radler fired Jason the day of his arrest, and the government seized substantially all his financial assets.  Institutions closed his accounts and canceled his credit cards.  Although a former client, Elizabeth Chen, was willing to hire Jason despite the charges against him, she could do so only at a much lower salary.  This combination immediately put Jason's family in dire financial straits, where they have remained for the last two years.  They have cut spending where they could, but to fill the gap and attempt to minimize the effect of the charges on his children's day-to-day lives, Jason has spent almost all his retirement savings.  His principal remaining asset is the family home, which the government seeks to forfeit.

Now that Jason has been convicted, New York law likely requires he be automatically disbarred.  *See* Judiciary Law § 90(4) (requiring automatic disbarment on New York felony conviction or equivalent); *see, e.g., Matter of Ofsink*, 85 N.Y.S.3d 450, 452 (1st Dep't 2018) (finding federal wire fraud conviction required disbarment); *In re Troodler*, 63 N.Y.S.3d 97, 98 (2d Dep't 2017) (same).  Jason has been a lawyer his entire adult life and cannot imagine at this point how he will provide for his family going forward.  Lauren, meanwhile, has not worked regularly since their children were born, and in over two years has been unable to find full-time employment.  In short, Jason's arrest and conviction have financially devastated his family, without prospect for recovery.  *See Adelson*, 441 F. Supp. 2d at 514 (recognizing that "an important kind of retribution may be achieved through the imposition of financial burdens"

where they "virtually guarantee[] that [the defendant] will be making substantial restitution payments for the rest of his life.").

Jason's family likewise have suffered substantially and will continue to suffer without him. As Lauren's letter to the Court describes, their children have been mocked and humiliated for their father's crime and have been forever altered by the experience. They are entering their teenage years, in which the presence of strong parental figures is so important for development. *See* ▮▮▮ at 1. And Lauren's ailing father, who lives with the family, depends on Jason for even basic tasks. We respectfully submit that the Court should account for these concerns in fashioning its sentence. *See United States v. Mullings*, 131 F. Supp. 3d 1, 4–5 (E.D.N.Y. 2015) (non-custodial sentence for defendant who defrauded bank of $525,000, where fraudulent conduct was aberrational and incarceration would harm defendant's wife and children); *United States v. Gamez*, 1 F. Supp. 2d 176, 185 (E.D.N.Y. 1998) (non-custodial sentence due to the "detriment that would be felt by [defendant's family] if lengthy periods of incarceration were imposed").

Finally, a full picture of Jason's physical condition is difficult to portray given that he has been unable to visit a doctor for three years because he could not afford health insurance. Jason at 4. When he recently went to a check-up because he was dealing with heart palpitations, the doctor insisted additional tests would have to be performed after preliminary screenings showed very high cholesterol and triglyceride numbers. *Id.* It is not difficult to connect these symptoms and results to the overwhelming stress and anxiety that Jason has been enduring for the past three years.

### E.   A Lenient Sentence Will Be An Adequate Deterrent, Will Recognize Jason's Low Risk for Recidivism, And Will Safeguard Against Unwarranted Sentencing Disparity

A sentence of probation with a term of home confinement will also serve both the specific and general deterrent aims set forth in Section 3553(a)(2).  The Second Circuit has observed that "the need for further deterrence and protection of the public is lessened" when a conviction impacts a defendant's employment prospects, because "the conviction itself already visits substantial punishment on the defendant."  *United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) (quotation omitted) (approvingly quoting trial court and affirming sentence of 20 months' imprisonment despite Guidelines range of 78 to 97 months).  Jason will be disbarred and has suffered national public humiliation far beyond the average criminal defendant.  Given his former prominence, his arrest and trial have been covered by the New York Times, New York Post, Daily News, Newsday, NBC, Reuters, Bloomberg, and many other outlets, which have pursued his family and friends in search of details of his supposedly "mobbed up" life and scheme.  Millions of Americans know not only his name but now also his disgrace.

As Jason's own letter describes, he has felt this mark keenly.  Jason at 1-2.  And as his cousin—a former federal prosecutor—notes, he already represents a cautionary tale to lawyers and other fiduciaries.  Abby at 1; *see United States v. Gaind*, 829 F. Supp. 669, 671 (S.D.N.Y. 1993), *aff'd*, 31 F.3d 73 (2d Cir. 1994) (loss of defendant's business, assets, and income "constitutes a source of both individual and general deterrence").  Concerning the need to "protect the public," 18 U.S.C. § 3553(a)(2)(C), we respectfully submit that if this Court imposes a term of probation – indeed, even if it somehow imposed no sentence at all – no stranger will ever place the same trust in Jason again.  Given that his legal career is over, no one will even have the chance to.  *See United States v. Bland*, 17 Cr. 684 (S.D.N.Y. June 5, 2019) (Ramos, J.), ECF 286 at 29:20–24, 32:15–24 (non-custodial sentence for bribery defendant where no need for

45

general deterrence given case publicity and the defendant's inability to work in his field going

forward).[21]

A longer sentence would not increase this deterrent effect.  "It is widely recognized that

the duration of incarceration provides little or no general deterrence for white collar crimes."

*United States v. Yeaman*, 248 F.3d 223, 238 (3d Cir. 2001) (Nygaard, J., dissenting).  In fact,

research shows that "increases in severity of punishments do not yield significant (if any)

marginal deterrent effects."  Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime

and Justice 1, 28–29 (2006); *see also* Francis T. Cullen et al., *Prisons Do Not Reduce*

*Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011) (According to

the "best available evidence, . . . prisons do not reduce recidivism more than noncustodial

sanctions."); Amy Baron-Evans, Sentencing by the Statute, at 7 (Apr. 27, 2009)[22] ("[E]mpirical

research shows no relationship between sentence length and deterrence.");  David Weisburd *et*

*al.*, *Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes*, 33

Criminology 587 (1995) (recognizing that no difference in deterrence is found even between

probation and custodial sentences).  Courts in this Circuit repeatedly have recognized that "even

relatively short sentences can have a strong deterrent effect on prospective 'white collar'

---

[21] Despite the public humiliation and collateral consequences that have accompanied Jason's
arrest, Jason's strong support network has not wavered.  Courts often grant sentences below the
applicable Guidelines range based on similar ties, knowing that such support can mean all the
difference to a person enduring the worst moments of his or her life.  *See, e.g., United States v.*
*Harding*, 05 Cr. 1285-02, 2006 WL 2850261, at *5 (S.D.N.Y. Sept. 28, 2006) (Sweet, J.)
(below-Guidelines sentence based on defendant's "significant network [of family and
community members] that is ready to support [the defendant] upon his release from prison");
*United States v. Butler*, 264 F.R.D. 37, 38–40 (E.D.N.Y. 2010) (below-Guidelines sentence
despite "staggering" loss amount, where defendant's community of friends and family suggested
high likelihood of rehabilitation).

[22] http://www.fd.org/docs/select-topics---sentencing/Sentencing_by_the_Statute.pdf

offenders." *Adelson*, 441 F. Supp. 2d at 514; *United States v. Caspersen*, No. 16 Cr. 414 (JSR) (S.D.N.Y. Dec. 7, 2016), Dkt. 37 at 59; *Gupta*, 904 F. Supp. 2d at 355 ("[C]ommon sense suggests that most business executives fear even a modest prison term to a degree that more hardened types might not" such that "a relatively modest prison term should be sufficient, but not more than necessary for this purpose."). That general deterrent is all the greater given the unusually severe collateral consequences of Jason's conviction. Mr. Kurland has hit rock bottom and the world knows it.

A sentence of probation with a term of home confinement will "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), because a lenient sentence would be in keeping with the approach taken by this Court in comparable cases. In *Johnson*, as the Court will recall, the defendant's Guidelines range—keyed to a loss amount of $3.1 million corresponding to the gain from the offense—was 87 to 108 months. The Court, after criticizing the loss table for the reasons set forth above, found that an appropriate sentence was 24 months of incarceration, in light of the defendant's professional ruin, status as a first-time offender, and community involvement. 2018 WL 1997975, at *6. And in *United States v. Peltz*, despite a Guidelines range of 37 to 46 months, the Court determined that no sentence of incarceration was necessary, and sentenced the defendant to five years of probation. 21 Cr. 154 (NGG), Dkt. 70 (E.D.N.Y. Feb. 15, 2022). And there are factors that distinguish Jason's case more favorably from these examples. Among other things, this Court found that Johnson had perjured himself at trial to evade conviction, while Jason chose not to exercise his right to testify.

A lenient sentence also would be consistent with comparable decisions from other courts in this Circuit. In *United States v. Hild*, for example, the defendant—a lawyer—faced a

Guidelines range after his trial of 324 to 405 months of imprisonment.  No. 19 Cr. 602 (RA), Dkt. 144 (S.D.N.Y. Jan. 20, 2023).  Judge Abrams declined to impose the outrageous term of imprisonment counseled by the Guidelines, determining instead that a sentence of 44 months (a little over 10% of the Guidelines range) was adequate, *even though she found that the defendant had perjured himself at trial*.  *Id.*  Similarly, in *United States v. Greebel*, the defendant—also a lawyer who was convicted after trial—faced a Guidelines range of 108 to 135 months, but Judge Matsumoto of this District sentenced him to 18 months of incarceration despite finding he "engaged in a sophisticated pattern and practice of deceit."[23]  The conduct of conviction here, while serious, is less egregious than that of the defendants in those cases.

We recognize that Jason was a lawyer and lawyers are held to high standards by the courts and the justice system.  But a sentence of probation with a term of home confinement would also be consistent with sentences given to other lawyers that recognize the collateral consequences of their conviction, which in some ways are uniquely severe.  In *United States v. Schulman*, for example, Judge Azrack of this District found that a lawyer she concluded had "betrayed" his clients' trust by using their confidential information to insider trade nevertheless had "already been subjected to substantial and meaningful punishment," – in particular due to "the likely loss of his law license and his ability to work in a profession that he clearly loves," as well as the ensuing "devastating" effects on the defendant and his "emotional well-being."  No. 16 Cr. 442 (JMA), Dkt. 155 at 39 (E.D.N.Y. Oct. 6, 2017).  Finding these "significant collateral

---

[23] Likewise, in *United States v. Ofsink*, No. 14 Cr. 399 (ENV) (E.D.N.Y.), the court sentenced a defendant lawyer in a case in which the intended loss was approximately $13,000,000 and the Guidelines range (setting aside a statutory cap) was 108 to 135 months.  Despite noting the defendant had been a "guardian angel" to his clients and the "predatory conduct" involved in his offense, Judge Vitaliano criticized the Guidelines' "mindless acceleration of numbers" and imposed a 21-month sentence of incarceration.

effects of the defendant's conviction, including his likely disbarment, have already achieved the goal of deterrence," and noting his "near zero risk of recidivism," the court imposed a non-custodial sentence despite a Guidelines range of 41 to 51 months. *Id*. at 40; *see United States* v. *Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) ("It is difficult to see how a court can properly calibrate a 'just punishment' if it does not consider the collateral effects of a particular sentence."); *see also United States* v. *Nesbeth*, 188 F. Supp. 3d 179, 180 (E.D.N.Y. 2016) (imposing non-custodial sentence "in part because of a number of statutory and regulatory collateral consequences [defendant] will face as a convicted felon"). As with the defendant in *Schulman*, Jason faces the disgrace of disbarment and the end of a beloved career. There is no coming back from that.

Finally, a sentence of probation with a term of home confinement will avoid disparity between Jason and the other defendants in this case. Christopher Chierchio has pleaded guilty to one violation of 18 U.S.C. § 371, meaning that despite his extensive criminal history and confession of a $41.5 million loss, he will receive at most a 5-year sentence. If the Court is inclined to determine that Chierchio deserves the statutory maximum term of imprisonment, we respectfully suggest that his sentence should set an *outer* limit on the Court's consideration of Jason's own culpability. As the evidence at trial showed and his guilty plea confirms, Chierchio stole tens of millions of dollars of Jason's clients' money that Chierchio promised would be used to import and distribute scarce PPE at the height of the worst pandemic in a century. To give Jason anything approaching the same sentence, given Chierchio's much more severe conduct and status as a repeat offender, would be manifestly unjust.

As to Russo and Smookler, we cannot speculate as to what sentences the Court will impose. As the Court no doubt will recall, Russo threatened to tear out Altieri's son's teeth. He

threatened to shoot Altieri with his combat shotgun.  Both men confessed to stealing from Jason

and his clients in amounts that dwarf Jason's own gain from the offense.[24]  And the

inconsistencies between their prior statements and trial testimony, explored during cross-

examination, revealed that both men lied either to the government or this Court and the jury

repeatedly.  The enormity of their conduct vastly exceeds whatever Jason said to induce his

clients to invest in companies that he himself firmly believed in.

    The Court was ultimately correct when it remarked during a break at trial that – if it came

to pass – Jason would not be the first defendant convicted by a jury where others lied and stole

from him.  We understand the jury's verdict.  But those lies and thefts should matter at

sentencing.  The Court should impose a sentence that recognizes that whatever Jason did, he has

lost more than he would have thought possible already.  A lenient sentence would be justice here.

## IV.    A FINE IS NOT WARRANTED

    We respectfully submit, consistent with Probation's assessment that Jason is unable to

pay, that Jason's sentence should not include a fine.  Pursuant to 18 U.S.C. § 3572(a), the Court

must consider, *inter alia*, the following factors in determining whether to impose a fine, and the

amount and timing of any payment:

(1) the defendant's income, earning capacity, and financial resources, 18 U.S.C. §
    3572(a)(1);

(2) the burden that the fine will impose upon the defendant, any person who is financially
    dependent on the defendant, or any other person that would be responsible for the
    welfare of any person financially dependent on the defendant, relative to the burden

---

[24] Both men have benefited in other ways from their cooperation.  At the time of trial—two years
after his arrest—Russo, for example, resided in a house purchased (unbeknownst to Mr. Kurland)
with stolen funds.  Tr. 496:12-18.  He was released on bail after 21 months in custody with the
consent of the government, despite the government's prior vociferous contention that public
safety required his remand.  Tr. 509:15-510:16.

that alternative punishments would impose, 18 U.S.C. § 3572(a)(2), U.S.S.G. § 5E1.2(d)(3);

(3) the need to deprive the defendant of illegally obtained gains from the offense, 18 U.S.C. § 3572(a)(5), U.S.S.G. § 5E1.2(d)(1).

These factors strongly militate against a fine in this case.   With respect to the first and second factors listed above, Jason's arrest has led to financial catastrophe.  The government already has seized substantially all of his financial assets.  His only remaining asset of any material value is the family home—which the government also seeks to forfeit.  Jason's wife has not worked outside the home for many years and has had difficulty securing steady employment since his arrest, meaning Jason has continued as the family's breadwinner.  Adding the burden of a fine will have a severe impact on his wife and the children.  Jason faces disbarment and—as a convicted felon—will have greatly reduced prospects for earning and employment.  Finally, with respect to the third factor, the Court's forfeiture and restitution orders in this case will ensure that any proceeds of the crimes of conviction will not remain in Jason's hands.

## V.   ANY FORFEITURE ORDER SHOULD BE LIMITED TO JASON'S PERSONAL GAIN AND SHOULD NOT INCLUDE THE KURLANDS' FAMILY HOME.

The government already has seized $447,690 from Jason, in the form of the funds held in Chase Bank accounts under his control and the value of his Rivkin Radler partnership capital account.  The total proceeds of his offense, as described above in detail, are $626,000.   The appropriate forfeiture order, then, would comprise forfeiture of the funds seized, with an additional money judgment against Mr. Kurland of $178,310.

While we concede that this additional money judgment is appropriate based on the jury's verdict, we respectfully request that the Court not include the Kurlands' family home in its order of forfeiture, whether as a traceable or substitute asset.  A person may only forfeit their own interest in an asset, not someone else's.  *See United States v. Daugerdas*, 892 F.3d 545, 548 (2d

Cir. 2018).  This home is the family's only meaningful property.  Jason's interest in the home is

coextensive with his wife's interest.  Under New York law they are tenants by the entirety, which

means each shares an undivided interest in the whole property with a right of survivorship, and

cannot sell or convey the entire property without the consent of the other.  1 N.Y. Law &

Practice of Real Property § 14:28 (2d ed.).

Even if Jason's personal interest in the family home (not his wife's) were forfeit, under

New York property law principles there is an "absolute bar" to involuntary partition of a

property by a third-party creditor to whom one spouse has conveyed their interest.  *V.R.W., Inc.

v. Klein*, 68 N.Y.2d 560, 566 n. 1 (N.Y. 1986).  Accordingly, if the Court does determine that

Jason's interest in the home is subject to forfeiture, the home should not be sold by the

government during the pendency of Mrs. Kurland's lifetime as she would own the house in

common with the government with a right of survivorship.  *See United States v. Stern*, 2021 WL

3474040, at *5 (S.D.N.Y. Aug. 5, 2021).  Turning a blameless spouse and her children on the

street is not necessary in this case.

## VI.     RESTITUTION SHOULD BE IMPOSED BASED ON THE ACTUAL LOSS TO THE VICTIMS THAT WAS REASONABLY FORESEEABLE TO MR. KURLAND.

When determining the amount to order in restitution by the defendant, "a court must

assess as best it can from available evidence the significance of the individual defendant's

conduct in light of the broader causal process that produced the victim's losses. This cannot be a

precise mathematical inquiry and involves the use of discretion and sound judgment."  *Paroline*

*v. United States*, 572 U.S. 434, 459 (2014).   Even though restitution is mandatory in this case,

the Court should exercise its discretion to ensure the amount ordered in restitution be "only . . .

the amount of losses directly and proximately caused by the defendant's conduct."  *United States*

*v. Gushlak*, 728 F.3d 184, 194–95 (2d Cir. 2013).  In other words, restitution need not be fully

joint and several, or the full amount of the victims' alleged loss.  *See* 18 U.S.C. § 3664(h) (stating where "the court finds that more than 1 defendant has contributed to the loss of a victim, the court may make each defendant liable for payment of the full amount of restitution or may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.").  For the reasons set forth above, we respectfully submit that the proper amount to be ordered in restitution against Jason is again the amount of his personal gain.

<u>**CONCLUSION**</u>

For the reasons set forth herein, we respectfully ask the Court to sentence Jason to a term of probation with a condition of home confinement.  Such a sentence would be consistent with the facts, the law, the recent Guidelines amendments, and the mandate that a sentence should not be greater than necessary to achieve the ends of justice.

Respectfully submitted,

*/s/ Telemachus P. Kasulis*
Telemachus P. Kasulis
A. Dennis Dillon
Morvillo Abramowitz Grand Iason & Anello PC
565 Fifth Avenue
New York, NY 10017
(212) 856-9600

*Attorneys for Defendant Jason Kurland*