UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

                                   :

UNITED STATES OF AMERICA

                                   :

        - v. -

                                   :    S1 20 Cr. 306 (NGG)

JASON KURLAND, a/k/a "Jay,"

                                   :

               Defendant.

                                   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x


## GOVERNMENT'S SENTENCING MEMORANDUM
## REGARDING DEFENDANT JASON KURLAND


                                 DAMIAN WILLIAMS
                                 United States Attorney
                                 Southern District of New York
                                 Attorney for the United States of America


DANIELLE KUDLA
LOUIS PELLEGRINO
OLGA I. ZVEROVICH
Assistant U.S. Attorneys
Southern District of New York
Special Attorneys Acting Under Authority
Conferred by 28 U.S.C. § 515

BRIAN MORRIS
Assistant United States Attorney
Eastern District of New York

(Of Counsel)

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................... 1

OFFENSE CONDUCT ............................................................................................... 3

SENTENCING GUIDELINES CALCULATION ..................................................... 20

I.   The Guidelines Range .................................................................................... 21

II.  Discussion ..................................................................................................... 22

    A.   Loss Calculation ...................................................................................... 22

       1.   Applicable Law ................................................................................ 22

       2.   Discussion ...................................................................................... 23

    B.   Sophisticated Means ................................................................................ 34

       1.   Applicable Law ................................................................................ 34

       2.   Discussion ...................................................................................... 34

    C.   Kurland's Invitation to Use a Guidelines Manual Not Yet in Effect Should Be Rejected ................................................................................................. 36

  ARGUMENT ........................................................................................................ 36

I.   The Court Should Sentence Kurland at the Lower End of the Guidelines Range of 135 to 168 Months' Imprisonment ...................................................................... 36

    A.   Applicable Law ....................................................................................... 36

    B.   Discussion ............................................................................................. 37

       1.   Nature and Circumstances of the Offense ...................................... 37

       2.   History and Characteristics of the Defendant ................................ 41

       3.   The Need to Afford Adequate Deterrence ...................................... 44

II.  The Court Should Impose a Forfeiture Money Judgment Against Kurland in the Amount of $64,600,000 ......................................................................................... 46

    A.   Applicable Law ....................................................................................... 46

    B.   Discussion ............................................................................................. 47

    C.   The Forfeitability of Kurland's Residence is Not at Issue .......................... 48

III. The Court Should Award Restitution in Favor of the Lottery Victims in the Amount of $62,006,109 ........................................................................................... 50

    A.   Applicable Law ....................................................................................... 50

    B.   Discussion ............................................................................................. 51

  CONCLUSION ..................................................................................................... 52

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA              :

  - v. -                              :

                                           S1 20 Cr. 306 (NGG)

JASON KURLAND, a/k/a "Jay,"            :

            Defendant.                :

- - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## GOVERNMENT'S SENTENCING MEMORANDUM
## REGARDING DEFENDANT JASON KURLAND

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum in advance of the sentencing of defendant Jason Kurland and in response to the arguments raised by the defendant in his sentencing memorandum dated April 24, 2023 ("Kurland Br.").

Jason Kurland—an officer of the court—knowingly participated in an egregious fraud scheme, in which he abused his position of trust to defraud three of his largest clients (the "Lottery Victims") of tens of millions of dollars. In public, Kurland marked himself as the leading lottery lawyer in the country. He touted his ability to navigate the challenges faced by the sudden influx of vast wealth, including communicating with lottery commissions, retaining anonymity, establishing trusts, and investing in various financial investments. But behind these public reassurances, Kurland secretly abused his position of trust as the Lottery Victims' attorney—a profession founded on duties of honesty and undivided loyalty—to steer his clients to investments in, among other things, merchant cash advance ("MCA") companies that, unbeknownst to the Lottery Victims, were owned by Kurland and his co-conspirators, including Francesco Russo and Francis Smookler. Russo and Smookler, in turn, siphoned money from the Lottery Victims'

investments for themselves, and paid Kurland secret kickbacks and ownership distributions from the MCA companies. Kurland never disclosed to the Lottery Victims his kickbacks or his ownership interests in the MCA companies, because he knew that if he told the truth, the Lottery Victims would have never agreed to the investments. As further described below, Kurland also made various other misrepresentations to his clients in connection with the investments.

After fraudulently inducing the Lottery Victims to agree to the MCA investments, and in order to further enrich himself using the Lottery Victims' money, Kurland, along with Russo and Smookler, chose to invest most of the Lottery Victims' money, tens of millions of dollars, with one individual, Gregory Altieri, for purported jewelry deals, despite the significant risks inherent with such a reckless investment strategy.[1] In doing so, Kurland once again placed personal greed over his legal and professional duties to the Lottery Victims.

When this speculative get-rich-quick investment strategy unsurprisingly failed, Kurland did not come clean to the Lottery Victims. Instead, he doubled down. Kurland defrauded the Lottery Victims yet again to obtain even more money in hopes that he could recoup his losses without having to tell his clients the truth about his fraud. As part of this second get-rich-quick plan, Kurland steered two of the three Lottery Victims to invest in COVID-19 personal protective equipment ("PPE") deals, at least two of which were brokered by co-defendant Christopher Chierchio. In one instance, Kurland outright stole $19.5 million from one of the Lottery Victims' bank accounts and transferred it—without his clients' knowledge or consent—to his co-conspirators for purported PPE investment. Kurland stole this money because he knew that the

---

[1] On December 30, 2020, Altieri pleaded guilty in this District to wire fraud for perpetrating a *Ponzi* scheme (20 Cr. 249 (BMC)). Altieri has not been sentenced yet.

alternative was to disclose his repeated lies and deceit to the Lottery Victims. Rather than protecting his clients, Kurland once again tried to protect himself through yet more fraud.

When an attorney engages in an extensive fraud and repeatedly abuses the trust of his clients for his own benefit, the Section 3553(a) factors demand a significant prison sentence. For nearly two years, Kurland lied to, manipulated, and stole from the Lottery Victims to enrich himself and his co-conspirators. Even now, as he stands to be sentenced, Kurland attempts to minimize and downplay his egregious crimes. As he did at trial, he continues to argue that Russo, Smookler, Chierchio, and Altieri lied to him, as if that somehow makes his conduct any less criminal. It does not. Put simply, the massive fraud in this case could not have occurred but for Kurland's decision to lie to and steal from his own clients. But for Kurland's criminal actions, Russo, Smookler, Chierchio, and Altieri—none of whom had any direct access to Kurland's clients—could have never gotten or stolen a penny of Kurland's clients' money.

For the reasons set forth below, the Government respectfully submits that a sentence at the lower end of the Guidelines range of 135 to 168 months' imprisonment would be sufficient, but not greater than necessary, to achieve the purposes of sentencing.

## OFFENSE CONDUCT

Between mid-2018 and mid-2020, Kurland was a successful partner at a Long Island law firm, earning approximately $500,000 in annual compensation. Over time, through public advertisement and self-endorsement, Kurland built a niche practice representing lottery jackpot winners across the country. Kurland marketed himself widely in the national media as the "Lottery Lawyer," touting expertise in counseling individuals and families who had won lotteries and consequently achieved sudden wealth. (PSR ¶¶ 16-17).

3

In 2018 and 2019, Kurland was retained by the three Lottery Victims to provide legal services in connection with their lottery winnings, including basic estate planning and introductions to financial planners and managers. The Lottery Victims relied on Kurland to safeguard their winnings and provide sound advice. In exchange for these services, each of the Lottery Victims signed an initial retainer agreement with a flat fee of between $75,000 and $200,000, typically to cover legal services for claiming the lottery jackpots, followed by a second retainer agreement with a monthly retainer fee of between $15,000 and $50,000 for providing legal and consulting services thereafter. Kurland led the Lottery Victims to believe that these retainer fees were the only compensation for his services. As described below, Kurland lied to his clients. In reality, Kurland was receiving undisclosed kickbacks from his co-conspirators in exchange for steering the Lottery Victims to invest in their MCA companies. (PSR ¶ 18).

## The MCA Companies

Between 2015 and 2018, Kurland and his business partners created and operated various MCA companies.[2] First, in 2015, Kurland and his partners created Cheddar Express, an MCA broker, and Cheddar Capital, an MCA funder. The Cheddar entities had five partners: Kurland, Russo, Smookler, Anthony Lodati, and Brian Mastroberti. Then, in 2017, Kurland, Russo, and Smookler formed another MCA funder company called Francis Bay Holding Company, Inc. ("Francis Bay Holding"). Kurland, Russo, and Smookler were equal owners of Francis Bay Holding. (PSR ¶¶ 19, 21).

---

[2] Merchant cash advances, or MCAs, refer to short-term, high-interest financing to small businesses that generally need capital quickly or are unable to qualify for a traditional bank loan. There are typically three key parties to an MCA transaction: the funder (*i.e.*, the company providing the financing), the small business (*i.e.*, the company receiving the funding), and the broker (*i.e.*, the company that connects the funder and the small business). Because of the high rates of return charged, known as a "factor," the MCA industry has the potential to be lucrative, particularly for funders. (PSR ¶ 20).

4

The key priority for the MCA companies was raising capital: without capital, the companies could not provide any cash advances or make any profits.  The five partners therefore looked to bring in investors to the companies.  Initially, Kurland was struggling to raise capital.  On June 12, 2018, Kurland texted Russo, "We're still killing it, right? I'm trying to keep raising but I squeezed everyone I know."  (PSR ¶ 22).

Kurland's solution was to resort to fraud in order to use his lottery clients as sources of capital for his side businesses.

<u>Ricky Mangal</u>

In early September 2018, Kurland received a call from Nandlall ("Ricky") Mangal, a mechanical worker who had recently won a $245 million jackpot.  Mangal was looking for an attorney to assist him with claiming the prize and managing his newfound wealth.  Mangal and his wife, neither of whom had any background with financial investments or estate planning, selected Kurland after their first in-person meeting because Kurland presented as knowledgeable and experienced when it came to representing lottery winners.  Mangal trusted Kurland and believed that Kurland, as his attorney, was there to represent his best interests.  Mangal signed two retainer agreements with Kurland's firm, agreeing to pay a $100,000 upfront fee and, later, a $15,000 monthly fee for Kurland's services.  (PSR ¶ 24).

Behind the scenes, Kurland and his MCA business partners were strategizing about how to steer Mangal to invest in Cheddar Capital.  On September 6, 2018, the same day that Kurland signed the first retainer agreement with Mangal, Kurland texted Russo, "Have to figure out how

to have this get to us," referring to how Kurland would seek to direct Mangal's money to their MCA business.  (PSR ¶ 25).

Leveraging his unique access to big lottery winners and their capital, Kurland demanded that his business partners give him a "finder's fee," or kickback, based on a set percentage of his clients' investments.  Although Kurland initially asked for a higher percentage, the partners ultimately agreed to give Kurland a kickback of 1% of each lottery client's investment in the MCA companies.  Apart from Kurland, no other partner received any finder's fees or kickbacks for bringing in investors.  (PSR ¶ 26).

To convince Mangal to invest in Cheddar Capital, Kurland set up a meeting between Mangal and Brian Mastroberti, Kurland's partner.  Kurland arranged for this meeting to be the last in a series of four meetings, the first three of which were with representatives from well-respected financial institutions.  In the days leading up to the meeting, which took place on September 20, 2018, Kurland and Mastroberti discussed their strategy to get Mangal's money over to their MCA business.  On September 17, 2018, Kurland texted to Mastroberti, "I will move the other guy in front of you. Back to batting cleanup?"  Mastroberti responded, "Perfect. Thanks buddy.  Load the bases so we can hit a grand slam!"  The next day, following a meeting with Mangal, Kurland texted Smookler and Russo, "haven't talked about the investment yet, but I could not have teed it up better for Brian."  As Smookler explained at trial, Kurland's text indicated that he had "prepped his client and, essentially, put in a good word for Brian, so that when they had this meeting [Mangal] would be tenderized."  (Tr. 1018).[3]  Kurland, who attended the September 20 meeting with Mastroberti and Mangal, never disclosed to his client that Mastroberti was his own business

---

[3] "Tr." refers to the trial transcript in this case.  "GX" refers to a government exhibit at trial.

6

partner, that Kurland was an owner in Cheddar Capital, or that Kurland would receive a 1% kickback if Mangal agreed to invest to Cheddar Capital.  (PSR ¶ 27).

Kurland's strategy worked.  On October 1, 2018, only a few days after claiming his lottery prize, Mangal invested $5 million with Cheddar Capital based on Kurland's recommendation and advice.  Kurland texted his co-conspirators, "Hey guys. I'm thrilled to report the 5 mill hit our account this afternoon. Go deploy!!!!!"  (GX 1027).  The next day, on October 2, 2018, Kurland received his undisclosed 1% kickback, totaling $50,000, transferred to an account in the name of GK3, LLC ("GK3"), an entity controlled by Kurland.  (PSR ¶ 28).

Within about two weeks of fraudulently inducing Mangal to invest $5 million in Cheddar Capital, Kurland fraudulently sold Francis Bay Holding—the company that he co-owned with Russo and Smookler—to Mangal for $2 million.  Kurland invited Mangal to an impromptu lunch and, during the lunch, pitched Mangal on a purported new investment.  Kurland falsely presented the investment to Mangal as an opportunity to purchase shares held by one of many investors in the company.  Kurland fraudulently concealed that Mangal in fact would be purchasing the entire company, that Kurland was one of the owners of the company, and that, should Mangal agree to invest, Kurland and his business partners would personally receive most of Mangal's investment funds.  (PSR ¶ 29).

Trusting Kurland, Mangal agreed to invest $2 million, which was transferred to Francis Bay Holding's account on October 17, 2018.  That same day, Kurland, Russo, and Smookler each took $359,191.66 from the sale.  These payments were transferred from the Francis Bay Holding account to bank accounts for the conspirators' respective entities: GK3 (Kurland), Meeker World Management, LLC (Russo), and Gold Standard Depository Co, LLC (Smookler).  The day after

receiving this large payout from the Francis Bay transaction, Kurland texted Smookler, "Like looking at my bank statement today. Not gonna lie."  (PSR ¶ 30).

Mangal testified that had he known he would be the sole new owner of the company, he would not have agreed to the investment.  Mangal further testified that it would have been material to him to know that Kurland was one of the investors that Mangal was buying out in the Francis Bay transaction, because "if [Kurland] was selling his share, [Mangal] would want to know why he was selling his share."  (PSR ¶ 31).

Kurland created a new legal entity, Francis Bay LLC, to hold interests in the company that his client now owned.  After the sale, Kurland, Russo, and Smookler, as well as one of their employees, started collecting a monthly 7% "management fee," purportedly for managing the new company for Mangal.  Kurland never disclosed this management fee to Mangal.  (PSR ¶ 32).

Kurland, Russo, and Smookler used their profits from the Francis Bay sale to start a new MCA funder company, JBMML.  The three conspirators were equal owners of JBMML.  However, unlike with Cheddar Capital, Kurland specifically asked not to be listed on JBMML's bank accounts or articles of organization.  Russo testified at trial that Kurland explained that "it didn't look good to his clients him showing ownership on all these different businesses that he was getting them to invest in." (Tr. 337).  Smookler similarly testified that Kurland "didn't want to be on the paperwork as it was a conflict between him bringing the money through his clients to us, and having an ownership and distributions, et cetera, from our entities."  (Tr. 1043).  Russo and Smookler agreed not to list Kurland on JBBML's accounts.  Instead, Kurland accessed the JBMML accounts using Russo's login credentials.  (PSR ¶ 33).

In 2019, Kurland convinced Mangal to make two more investments: an additional $5 million in Cheddar Capital on January 2, 2019, and $5 million in JBMML on April 12, 2019.

8

Kurland collected undisclosed 1% kickbacks from each of these investments.  At no point did Kurland disclose his ownership interests in these companies or his kickbacks to Mangal.  Mangal testified that it would have been important for him to know that his lawyer was receiving outside fees, "[b]ecause then he wouldn't put our best interests first; he would put his own."  (Tr. 105). When pressed by the defense to explain why these facts mattered to him, Mangal testified, "[b]ecause if [Kurland]'s getting paid, there's a reason why he's getting paid and it's not because of my best interest. . . . I was paying [Kurland] to put my best interest first.  If I was paying you the same money, I would want you to put my best interest first." (Tr. 149-50).  (PSR ¶ 34).

<u>Beth and Steve Smith[4]</u>

In December 2018, Kurland signed a retainer agreement with the then-largest individual lottery winner in U.S. history, Beth Smith, who won approximately $1.5 billion in South Carolina. Smith and her husband, Steve Smith, signed two retainer agreements with Kurland's firm, agreeing to pay a $200,000 upfront fee and, later, a $50,000 monthly fee for Kurland's services.  Kurland led the Smiths to believe that these fees, totaling more than half a million dollars per year, represented the entirety of the fees associated with Kurland's legal representation.  (PSR ¶ 35).

Beth Smith claimed the lottery prize on March 4, 2019.  Unlike Mangal, who publicly claimed his winning ticket, Smith opted to remain anonymous, which was permitted under South Carolina law.  In order to protect their family's anonymity, the Smiths permitted their bank accounts and trusts, which Kurland established to manage the lottery winnings, to be solely

---

[4] The Court permitted two of the Lottery Victims to testify at trial using pseudonyms to protect their anonymity and privacy: the couple from South Carolina, who used the pseudonyms Beth and Steve Smith, and the winner from Long Island, who used the pseudonym Alex Wilson.

controlled by Kurland, at his recommendation.  Kurland was the only person who had access to the bank accounts in which the Smiths' lottery prize money was deposited.  (PSR ¶ 36).

To place a limitation on Kurland's authority, the Smiths required Kurland to execute an agreement expressly stating that he could "not take any action that involves more than five thousand ($5,000) dollars" on their behalf without their written consent.  At the Smiths' request, Kurland drafted this agreement and signed it on March 5, 2019.  Kurland abided by this agreement for all transactions with the exception of Kurland's theft of $19.5 million, which Kurland transferred from the Smiths' account without their knowledge or authorization in April 2020.  (PSR ¶ 37).

Almost immediately after the Smiths claimed the lottery prize, Kurland fraudulently steered them to invest with Cheddar Capital and JBMML.  The Smiths wanted to set up a stable income stream for their family members.  Rather than recommending a trust or other standardized arrangement that would generate an income stream, Kurland told his clients that the Cheddar and JBMML investments would generate sufficient monthly interest to pay a set amount of money to the Smiths' relatives each month.  In pitching these investments to the Smiths, Kurland fraudulently concealed both his own ownership interests in Cheddar Capital and JBMML and the 1% kickbacks that he stood to receive from the Smiths' investments.  (PSR ¶ 38).

Based on Kurland's fraudulent representations, the Smiths agreed to invest $20 million in JBMML and $10 million in Cheddar Capital on March 6, 2019, just two days after claiming the lottery prize.  On the day that the Smiths agreed to the investments, immediately after the wire transfers, Kurland texted Russo and Lodati asking to have the office secretary send Kurland "the

1%." Kurland received kickbacks on these two investments, totaling $300,000, in his GK3 account within about one day of the Smiths' investments.  (PSR ¶ 39).

Beth Smith testified that, had she known about Kurland's ownership interests and kickbacks, she would not have agreed to invest, explaining that "we were pretty adamant about the fact that we didn't want any conflicts and we would see that as a huge conflict.  We wanted our representative to look out for our best interests and not his own, and that would have been a huge red flag."  (Tr. 775; PSR ¶ 40).

Approximately one month later, Kurland contacted Beth Smith about a "diamond" investment.  Kurland told Smith that his other clients had successfully invested with an individual in the wholesale diamond industry.  Kurland failed to disclose to Smith that JBMML—the same entity that was involved in the Smiths' March 2019 family investment—was also involved in the diamond investment, and that Kurland was a partner in JBMML.  Kurland also, once again, failed to disclose that he would receive another 1% kickback based on the diamond investment.  Based on Kurland's fraudulent representations, the Smiths invested $12.6 million in JBMML on April 12, 2019, the same day that Ricky Mangal invested $5 million in JBMML.  On April 15, 2019, based on these two investments (totaling $17.6 million), Kurland received a $176,000 kickback in his GK3 account.  (PSR ¶ 41).

In May 2019, Kurland reached out to Beth Smith again to inquire whether she was interested in purchasing thoroughbred horses.  Kurland told the Smiths that horses were one of the "last [remaining] tax advantage[s] for individuals that have wealth."  (Tr. 805).  Smith agreed to invest $1 million, which was to be used solely for the purchase and care of thoroughbred horses.  Smith also agreed to give Kurland a 10% non-financial interest in the horses solely to allow Kurland to have access to the horses.  Unbeknownst to Smith, Kurland allowed Russo, Smookler,

11

and a third individual, through a new entity, to have a 30% financial ownership interest in the horses, even though only the Smiths had contributed any money toward the purchase of the horses and their care.[5]  Russo and Smookler, with Kurland's knowledge, also fraudulently transferred a portion of the Smiths' $1 million to JBMML, where it was used for expenses unrelated to the horses, including interest payments to Beth Smith's own relatives that were supposed to have been funded by the original $30 million investments in JBMML and Cheddar.  (PSR ¶ 42).

Unbeknownst to Mangal and the Smiths, between March 2019 and April 2019, Kurland, Russo, and Smookler used Mangal's and the Smiths' investment funds to advance Gregory Altieri approximately $32 million dollars for purported jewelry deals.  The evidence at trial showed that these cash advances exceeded all standards in the already risky MCA industry.  Russo testified that these advances were "papered up" using standardized MCA contracts even though they were not in fact MCA deals because normal due diligence was not done.  Instead, Kurland, Russo, and Smookler used the Lottery Victims' investment funds to advance whatever amounts Altieri had requested in the hopes of making millions of dollars in profits for themselves.  (PSR ¶ 43).

During this time period, Russo and Smookler were taking so-called "upfront fees," of approximately 10% of each MCA transaction, including the large advances to Altieri.  As a result, Russo and Smookler personally pocketed millions of dollars of the Lottery Victims' funds.  In March 2019, for example, Russo and Smookler each received approximately $1 million in purported upfront fees.  Although Russo and Smookler did not disclose these fees to Kurland, Kurland had access to the JBMML bank accounts and accounts receivable data through Russo's

---

[5] In June 2020, at Kurland's direction, Russo signed bills of sale for the "consideration" of $1 to "sell" the horses to an entity controlled by Beth Smith.  (PSR ¶ 42).

TD Bank login and a JBMML accounting spreadsheet that was circulated to all owners, including Kurland.  (PSR ¶ 44).

Over the months that ensued, Altieri missed multiple scheduled payments and defaulted on his repayment obligations.  Kurland, Russo, and Smookler began to panic and were in frequent communication regarding the situation, including about Altieri's continued excuses for his default.  On October 19, 2019, Kurland texted Russo that "there isn't even proof that this guy exists," referring to the debtor from whom Altieri claimed he was supposed to receive payments in connection with the jewelry deals.  Despite the growing red flags, however, Kurland concealed Altieri's increasing default from both Mangal and the Smiths.  Instead, in an effort to conceal the fraud, Kurland, Russo, and Smookler started "borrowing from Peter to pay Paul"—using money from other sources to make interest payments to Kurland's clients.  (PSR ¶ 45).

<u>Alex Wilson</u>

In August 2019, Kurland was retained by a third major lottery winner, Alex Wilson, who had won a Powerball jackpot of approximately $148 million.  After Wilson found out that his wife bought the winning ticket, he was worried about protecting his family and ensuring that nothing negative happened because of the win.  Wilson immediately looked for an attorney and met with Kurland at his Long Island law firm that same day.  Kurland made Wilson feel comfortable during the meeting.  (PSR ¶ 46).

Consistent with Kurland's practices, Wilson signed two retainer agreements with Kurland's firm, agreeing to pay a $75,000 upfront fee and, later, a $15,000 monthly fee for ongoing services.  As he did with the other Lottery Victims, Kurland led Wilson to believe that these fees represented the entirety of the fees associated with Kurland's legal representation.  Notably, Wilson's retainer agreements with Kurland's law firm specifically stated that "this Firm will not

request or receive any commissions or other payment as a result of any introduction, which the Firm may provide." (Tr. 1315). Wilson trusted Kurland because he believed that lawyers are required to practice law based on a particular code of ethics. Wilson testified that it was important to him that his attorney not have any conflicts of interest. (PSR ¶ 47).

In October 2019—at the same time that Kurland, Russo, and Smookler were having serious issues with Altieri's growing default—Kurland recommended an investment to Wilson with a "Diamond District" group, presumably a reference to Altieri. Wilson told Kurland that he was not interested in "fast money" and was concerned about a *Ponzi* scheme like "Madoff." (Tr. 1320, 1332). In response, Kurland assured Wilson that the investment was "very safe" because Kurland's other clients had also invested, and Kurland had been monitoring the investment and "it looks pretty good." (Tr. 1332). In reality, at the time of Wilson's investment, Altieri owed tens of millions of dollars to JBMML, and Kurland therefore knew it was anything but a "very safe" investment. Wilson testified that Kurland's assurances made him feel confident because he believed that Kurland, as his attorney, would protect his interests and tell him the truth. (PSR ¶ 48).

On October 31, 2019, Wilson invested $5 million with JBMML. Kurland concealed from Wilson that Kurland was a partner in JBMML and that he received a 1% kickback based on this investment. Wilson testified that he "would not even imagine that would happen" because it would have been a conflict of interest for his attorney to be on both sides of a transaction and make an introduction that would serve his self-benefit. (Tr. 1340). After Wilson's $5 million was deposited in JBMML's bank account, it was used, among other things, to make payments for Kurland's Porsche and to make *Ponzi*-like interest payments to the other victims. In addition, Wilson's funds

14

were used to make over $260,000 in American Express payments, including approximately $134,000 for a boat for Smookler, and to purchase a $1.5 million home for Russo.  (PSR ¶ 49).

On December 27, 2019, Altieri notarized a confession of judgment ("COJ") in favor of JBMML in the amount of $69,886,040.21.  In January 2020, less than three months after Wilson's investment, the COJ was publicly filed in court, but Kurland did not inform Wilson or any of the other Lottery Victims of these events.  By April 2020, JBMML was unable to pay its monthly interest payments.  When Mangal and Wilson inquired separately about the missing payments, Kurland lied and told them it was due to the COVID-19 pandemic.  (PSR ¶ 50).

### The PPE Investments

In the spring of 2020, in an effort to recoup their losses and conceal their fraud from the Lottery Victims, Kurland, Russo, and Smookler resorted to PPE deals, causing tens of millions of dollars in additional losses to the Lottery Victims.  (PSR ¶ 52).

### The California PPE Deal

In April 2020, Eric Fessler, a friend of Smookler, contacted Smookler about a PPE deal with the State of California.  According to Fessler, California was looking to purchase a large quantity of PPE as a result of the COVID-19 pandemic.  As a result, Fessler's contacts were looking for a source of capital to purchase the PPE.  According to the purchase order, California was willing to pay approximately $799 million for the PPE.  Fessler put Smookler in touch with Christopher Chierchio, who would be supplying the PPE through Chinese sources.  Smookler and Russo turned to Kurland for funds for the deal.  (PSR ¶ 53).

In early April 2020, Kurland pitched the PPE deal to Beth Smith, who agreed to invest $19.5 million.  On April 16, 2020, a promissory note was issued by Chierchio through his company, Chrch Group, LLC ("Chrch Group"), in the amount of $19.5 million.   The note

guaranteed $300,000 in interest per month and was to be paid back within six months.  The Smiths requested that any profits generated from the sale of the PPE be donated to charity, because they did not want to profit from others' misfortune during the pandemic.  In mid-April 2020, the Smiths' $19.5 million was deposited in an attorney escrow account for the purchase of PPE.  Although $2.4 million of these funds were refunded, this same amount was transferred from one of the Smiths' accounts, through a series of transactions, to an account held by Chrch Group, which was controlled by Chierchio.  (PSR ¶ 54).

Within days of the first $19.5 million investment, Chierchio told Kurland that more money was needed to keep the investment on track.  In a series of text messages, Chierchio requested from Kurland "20 mil more," or another $20 million dollars.  Chierchio told Kurland—"we will make 1 billion dollars.  This year bro."  "Once in a life time."  "Do this for our kids."  "[G]o deep with me here."  Capitalizing on his knowledge that Kurland was already deeply in debt with his clients' money, Chierchio said, "Make all ur losses back  I will make u another 5-10 mil if u do this.  In this deal I promise."  (PSR ¶ 55).

On April 23, 2020, without Beth or Steve Smith's authorization or knowledge, Kurland secretly transferred $19.5 million from the Smiths' bank account, over which Kurland had sole control.  After stealing these funds, Kurland told Russo that he needed to put the money back into the account before his clients found out that the money was missing.  Kurland transferred the $19.5 million to an account in the name of Azimut 43 LLC ("Azimut"), controlled by Russo and Smookler.  On the same day, without Kurland's knowledge, Russo, Smookler, and Fessler took a total of $4 million of this money for themselves—$1 million for Russo, $1 million for Smookler, and $2 million for Fessler.  The remaining funds, $15.5 million, were transferred from Azimut to Chierchio's Chrch Group account to fund the purchase of PPE.  Russo testified that Kurland asked

him not to release the funds unless Russo felt "confident" in the transaction; Russo did not feel

confident, but released the funds to Chierchio anyway.  (PSR ¶ 56).

Chierchio fraudulently misappropriated a substantial portion of the Smiths' funds for his

own use.  Aside from the $2.4 million and $15.5 million received by Chierchio discussed above,

Chierchio received an additional $7.25 million in his Chrch Group account, representing payments

from the State of California for the purchase of PPE.  Chierchio did not return any of this money

to the Lottery Victims.   Of the approximately $25.15 million received by Chierchio, only

approximately $10.15 million was directed to entities believed to be involved in PPE.  Between

May 2020 and July 2020, Chierchio used the remaining funds in his Chrch Group account,

intended for the purchase of PPE, in the following ways, among others:

- $1 million was transferred to Sirenusa G LLC, an entity controlled by Russo and Smookler;

- $699,757.71 was transferred to a brokerage account controlled by Chierchio, which was used for day trading;

- Chierchio engaged the services of a "runner" to present $1,050,000 in checks made payable to Chierchio's construction business, Chase Mechanical LLC, at Bay Street Check Cashing Corporation, which the runner cashed and then returned to Chierchio in cash;

- $62,000 was used to purchase flights on private jets; and

- $18,492 was used to purchase women's jewelry as a birthday gift.

(PSR ¶ 57).

## The NYPD PPE Deal

In April 2020, Kurland recommended to Alex Wilson an investment relating to a PPE deal

with a police department.  Kurland told Wilson that the same Diamond District group that had

been involved in Wilson's previous investment had secured a contract to provide PPE to a police

department and needed funding.  Wilson agreed to invest $2.5 million based on Kurland's representation that all the money would go to the PPE deal with the police department, and that no profits would be distributed until Wilson's principal was paid back in July 2020.  Wilson signed contracts to this effect.  (PSR ¶ 58).

Kurland transferred Wilson's $2.5 million to Azimut on April 29, 2020.  The next day, in contravention of the agreement with Wilson, Russo, Smookler, and Fessler (through Fessler's daughter's account) each received $10,000 from Azimut.  Subsequently, on May 1, 2020, Chrch Group, Chierchio's company, received $1.4 million from Azimut.  The balance of Wilson's investment, approximately $1 million, was used in a PPE deal with the New York City Police Department ("NYPD").  Kurland never disclosed to Wilson that only $1 million of his $2.5 million investment was used for the purpose for which it was designated—a PPE deal with the police.  In particular, Kurland never told Wilson that any of Wilson's $2.5 million would be used for any other deal besides the deal with the police department.  (PSR ¶ 59).

On May 20, 2020, the NYPD paid a return in the amount of $1.715 million in connection the PPE deal.  None of this money was ever remitted to Wilson as required under the promissory note.  Instead, in clear violation of the agreement with Wilson, Kurland took $100,000 through his entity, GK3, Smookler and Russo each took $110,000, and Fessler, again through his daughter's account, took $307,500.  Unbeknownst to Wilson, Kurland, Russo, and Smookler then transferred the remaining approximately $1 million for another PPE deal involving gloves.  Wilson testified that Kurland never told him that the NYPD had made a payment or that Kurland had personally received any distribution relating to this deal.  (PSR ¶ 60).

On the morning of May 29, 2020, the FBI interviewed Wilson.  After the interview, Wilson told Kurland about the interview and texted the FBI agents' business cards to Kurland.  Within

18

hours, Kurland, Russo, and Smookler convened a conference call.  During the call, Kurland told Russo and Smookler to return his $100,000 cut of the NYPD profits.  As Kurland put it, "just send me the 100 – the wire instructions back, . . . just say, here are the wire instructions, you were—it was inadvertently sent to you through—I dunno."  Two days later, on June 1 and 2, 2020, Kurland sent back to Azimut his $100,000 cut in two separate transactions of $50,000 each.  On August 14, 2020, days before the arrests in this case, Azimut had an account balance of approximately $33,823.  (PSR ¶ 61).

<u>Financial Summary</u>

The Lottery Victims' investments, all induced by Kurland, are summarized below:

| Victim Name | Investment Date | Investment Type/Entity | Amount of Investment |
|---|---|---|---|
| Mangal | 10/01/18 | Cheddar Capital | $5,000,000 |
| | 10/17/18 | Francis Bay Holding | $2,000,000 |
| | 01/02/19 | Cheddar Capital | $5,000,000 |
| | 04/12/19 | JBMML | $5,000,000 |
| | | | Total (Mangal): $17,000,000 |
| Smiths | 03/06/19 | JBMML | $20,000,000 |
| | 03/06/19 | Cheddar Capital | $10,000,000 |
| | 04/12/19 | JBMML | $12,600,000 |
| | 05/29/19 | Horse Investment | $1,000,0000 |
| | 04/13/20 | PPE | $19,500,000 |
| | 04/23/20 | PPE | $19,500,000 |
| | | | Total (Smiths): $82,600,000 |

| Wilson | 10/31/19 | JBMML | $5,000,000 |
|--------|----------|-------|-----------|
|        | 04/29/20 | PPE   | $2,500,000 |
|        |          |       | Total (Wilson): $7,500,000 |
|        |          |       | **Total: $107,100,000** |

(GX 1818, 1819, 1821).

As of the time of trial, the Lottery Victims received payments totaling $5,335,994 on these investments, resulting in a net loss to the Lottery Victims of $101,764,006.  (GX 1818, 1820-22).

Between September 2018 through August 2020, Kurland received in his GK3 bank account a total of approximately $2,577,836 from Cheddar Capital, JBMML, Francis Bay Holding, and SMARK Associates (another MCA entity associated with the defendants), which included ownership distributions and 1% kickbacks.  (*See* GX 1912).   Kurland's kickbacks totaled $626,000.

Between November 2018 and December 2019, Kurland, Russo, and Smookler transferred approximately $39 million of JBMML investment funds to Altieri.  (GX 1825).

## SENTENCING GUIDELINES CALCULATION

Kurland was convicted after trial of all five counts in Superseding Indictment S1 20 Cr. 306 (NGG): conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349 (Count One); wire fraud, in violation of 18 U.S.C. §§ 1343 and 2 (Count Two); honest services wire fraud, in violation of 18 U.S.C. §§ 1343 and 1346 (Count Three); conspiracy to engage in unlawful monetary transactions, in violation of 18 U.S.C. § 1956(h) (Count Four); and unlawful monetary transactions, in violation of 18 U.S.C. §§ 1957 and 2 (Count Five).

## I.  The Guidelines Range

The Government respectfully submits that the Guidelines range for Kurland's crimes is calculated as follows:

Offense Level

1. The November 1, 2021, Guidelines Manual applies to this case.

Counts One, Two, and Three (the "Wire Fraud Counts")

2. The Guidelines applicable to the Wire Fraud Counts are U.S.S.G. §§ 2B1.1, 2X1.1.

3. Pursuant to U.S.S.G. § 2B1.1(a)(1), the base offense level is 7.

4. Pursuant to U.S.S.G. § 2B1.1(b)(1)(L), because the loss amount was more than $25,000,000 but not more than $65,000,000, the offense level is increased by 22 levels.

5. Pursuant to U.S.S.G. § 2B1.1(b)(10)(C), because the offense involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means, the offense level is increased by 2 levels.

6. Pursuant to U.S.S.G. § 3B1.3, because the defendant abused a position of private trust, and used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, the offense level is increased by 2 levels.

7. The total offense level applicable to the Wire Fraud Counts is 33.

Counts Four and Five (the "Money Laundering Counts")

8. The Guideline applicable to the Money Laundering Counts is U.S.S.G. § 2S1.1.

9. Pursuant to U.S.S.G. § 2S1.1(a)(1) & comment. (n.2(C)), the base offense level is the offense level for the underlying offense (here, the Wire Fraud Counts) from which the laundered funds were derived, not including any Chapter Three adjustments.  Accordingly, the base offense level is 31.

10. Pursuant to U.S.S.G. § 2S1.1(b)(2)(A), because the defendant is convicted under 18 U.S.C. § 1957, the offense level is increased by 1 level.

11. The total offense level applicable to the Money Laundering Counts is 32.[6]

---

[6] Kurland submits that the Probation Office miscalculated the offense level for the Money Laundering Counts by incorrectly including the abuse-of-trust enhancement under U.S.S.G. § 3B1.3 with respect to the Money Laundering Counts.  (Kurland Br. 30-31).  The Government

Grouping

12. Pursuant to U.S.S.G. §§ 2S1.1 comment. (n.6) and 3D1.2(c), Counts One through Five are grouped together (the "Group"). Pursuant to U.S.S.G. § 3D1.3(a), the offense level applicable to the Group is the offense level for the most serious of the counts comprising the Group. Here, as set forth above, the Wire Fraud Counts are the most serious counts.

13. Accordingly, the total offense level is 33.

Criminal History Category

14. The defendant is in Criminal History Category I.

Guidelines Range

15. Based on an offense level of 33 and a Criminal History Category of I, the applicable Guidelines range is 135 to 168 months' imprisonment.

Kurland objects to the loss amount and the application of the sophisticated means enhancement. Those aspects of the Guidelines calculation are addressed below.

## II.   Discussion

### A.  Loss Calculation

#### 1.  Applicable Law

Under Section 2B1.1 of the Guidelines, a defendant's offense level is based in part on the amount of "loss" involved in the offense. *See* U.S.S.G. § 2B1.1(b)(1) & comment. (n.3(A)). "Loss" is defined as "the greater of actual loss or intended loss." U.S.S.G. § 2B1.1, comment. (n.3(A)). "Actual loss" means the reasonably foreseeable "pecuniary harm" that resulted from the offense. U.S.S.G. § 2B1.1, comment. (n.3(A)(i)). "Pecuniary harm" means harm that is monetary

---

agrees. Because Kurland did not abuse a position of trust or use a special skill with respect to his convictions for the money laundering offenses, this enhancement should not be included in the determination of the offense level for these offenses. *See* U.S.S.G. § 2S1.1(a)(1), comment. (n.2(C)). Kurland does not dispute that the abuse-of-trust enhancement is properly included for the Wire Fraud Counts. (Kurland Br. 30).

or that otherwise is readily measurable in money.   U.S.S.G. § 2B1.1, comment. (n.3(A)(iii)).

"'[R]easonably foreseeable pecuniary harm' means pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." U.S.S.G. § 2B1.1, comment. (n.3(A)(iv)).

"The sentencing court is only required to make a reasonable estimate of the loss." *United States v. Lacey*, 699 F.3d 710, 719 (2d Cir. 2012).[7]   The evidence "need not . . . establish loss with absolute precision; it need only permit the district court to make a reasonable estimate of the loss given the available information." *United States v. Coppola*, 671 F.3d 220, 250 (2d Cir. 2012); *see also United States v. Bryant*, 128 F.3d 74, 75 (2d Cir. 1997).   Moreover, the calculation of loss need only be determined by a preponderance of the evidence.  *See United States v. Gonzalez*, 407 F.3d 118, 125 (2d Cir. 2005).

"[B]ecause the sentencing court is in a unique position to assess the evidence and estimate the loss based upon that evidence, the sentencing court's loss determination is entitled to appropriate deference." *Lacey*, 699 F.3d at 720.  The district court has "broad discretion" to consider "all relevant information" when making factual findings related to sentencing.  *United States v. Pico*, 2 F.3d 472, 475 (2d Cir. 1993); *see also United States v. Prince*, 110 F.3d 921, 924 (2d Cir. 1997).

## 2.  Discussion

The Government respectfully submits that the loss amount in this case should be determined based on the Lottery Victims' actual losses, not the losses intended by Kurland.[8]

---

[7] Unless otherwise noted, case text quotations omit internal quotation marks, citations, and previous alterations.

[8] The Guidelines define loss as "the greater of actual loss or intended loss."  U.S.S.G. § 2B1.1, comment. (n.3(A)).  "Intended loss" means the pecuniary harm that the defendant purposely sought

Contrary to Kurland's arguments (Kurland Br. 22-25), the actual losses suffered by the Lottery Victims are readily ascertainable and supported by overwhelming evidence presented at trial, including the testimony of the Lottery Victims, the promissory notes underlying the investments, and bank records, all of which established the actual losses suffered by the Lottery Victims as a result of the investments that Kurland fraudulently induced them to make.

The Government respectfully submits that, conservatively, the actual losses to the Lottery Victims total $62,006,109, comprising the following four categories: (1) the Lottery Victims' net losses from the JBMML investments,[9] (2) the Smiths' second $19.5 million, which Kurland stole from their account for a purported PPE investment, (3) Wilson's net loss from his $2.5 million PPE investment, which Kurland fraudulently induced and which he and his co-conspirators misused and misappropriated,[10] and (4) Kurland's 1% kickbacks stemming from the Cheddar Capital investments.[11]   The Lottery Victims' actual losses are summarized in the following table:

---

to inflict; and includes "intended pecuniary harm that would have been impossible or unlikely to occur." U.S.S.G. § 2B1.1, comment. (n.3(A)(ii)).  Here, the Lottery Victims' actual losses exceeded the losses intended by Kurland.  Although the evidence is clear that Kurland's criminal actions caused the Victims' actual losses, and those actual losses were reasonably foreseeable to Kurland (as discussed below), there is no dispute that Kurland did not intend for all of that money to be lost and stolen.

[9] The net losses from the JBMML investments are calculated by taking the total of each Lottery Victims' JBMML investments and subtracting any interest payments from JBMML accounts that had been received by the Lottery Victims.  These figures are summarized in GX 1818 (Mangal), GX 1819 and 1820 (Smith), and GX 1821 (Wilson).

[10] Wilson's net loss from his PPE investment is calculated by taking the total amount of the investment ($2.5 million) and subtracting the payments that Wilson received in connection with that investment ($475,000).  These figures are reflected in GX 1821.

[11] To avoid double counting, the Government did not include in the loss calculation the kickbacks that Kurland collected from the JBMML investments, since the JBMML investments are already part of the loss calculation.

| Victim Name | Type of Actual Loss | Amount of Actual Loss |
|---|---|---|
| Mangal | JBMML Loss | $4,470,000 |
| | Cheddar Kickbacks to Kurland | $100,000 |
| Smiths | JBMML Loss | $30,994,443 |
| | Cheddar Kickbacks to Kurland | $100,000 |
| | PPE Loss | $19,500,000 |
| Wilson | JBMML Loss | $4,816,666 |
| | PPE Loss | $2,025,000 |
| | | **Total: $62,006,109** |

Each of these categories of actual losses is properly attributable to Kurland because he fraudulently induced the Lottery Victims to agree to the investments that resulted in the losses— or, in the case of the Smiths' second $19.5 million, stole and transferred the funds that were ultimately lost.  As the Second Circuit has explained, "[t]he guidelines provide that when an investor puts money into a fraudster's hands, and ultimately receives nothing of value in return, his loss is measured by the amount of principal invested. . . . "  *United States v. Hsu*, 669 F.3d 112, 121 (2d Cir. 2012).  Here, Kurland was the only one of the criminal actors with access to the Lottery Victims and their funds: but for his fraud against his own clients, none of the Lottery Victims' actual losses would have been incurred.  As such, it is proper to hold Kurland responsible for the entirety of the Lottery Victims' lost investments. *See United States v. Stitsky*, 536 F. App'x 98, 112 (2d Cir. 2013) ("[B]ecause investors received nothing of value at the time the fraud was uncovered, the district court reasonably estimated the loss to be the principal amount invested by the victims of defendants' fraud.").

25

Moreover, as discussed below, there is ample evidence in the trial record that each of the above four categories of actual losses was reasonably foreseeable to Kurland. Kurland acknowledges that the last category, his kickbacks, are properly included as part of the loss amount. (Kurland Br. 28-29). The remaining categories of actual losses are discussed below in turn.[12]

<u>JBMML Investments</u>

The evidence at trial showed that, after fraudulently inducing his clients to agree to the JBMML investments, Kurland, working with his co-conspirators Russo and Smookler, knowingly placed the vast majority of them in off-the-charts risky investments, by agreeing to turn over tens of millions of dollars of his clients' money to Altieri for purported jewelry deals based on nothing but Altieri's word.[13]

---

[12] The Government notes at the outset that its actual loss calculation is conservative because it does not include Mangal's and the Smiths' Cheddar investments (which total $20 million), Mangal's $2 million Francis Bay Holding investment, the Smiths' $1 million horse-related investment, or the Smiths' first $19.5 million PPE investment. With respect to the Cheddar investments, the Government was recently informed by counsel for Mangal and the Smiths that Cheddar Capital has not made the required interest payments due under the promissory notes in April and May 2023 and that, as a result, counsel has served default notices on Cheddar Capital. The Government expects that, pursuant to the terms of the Cheddar Capital promissory notes, the principal amounts will become due within 30 days of the service of the default notices—*i.e.*, before the defendant's sentencing date. (*See, e.g.*, GX 101 ("In the event of a default under the terms of this Note by Maker, which default is not cured within thirty (30) days written notice from Payee, the balance of the Principal Amount shall become due at the option of Payee.")). Although it appears nearly certain that the Cheddar investments will result in actual losses to the Lottery Victims, the Government, in an effort to take a conservative approach, agrees to the exclusion of the Cheddar Capital investments, as well as the other investments listed above, from the Guidelines loss calculation.

[13] The evidence at trial established that Kurland, Russo, and Smookler made joint decisions about, among other things, transferring the Lottery Victims' funds to Altieri (and later to Chierchio). To the extent that Russo and Smookler physically executed those transfers, their actions are attributable to Kurland under the Guidelines. *See* U.S.S.G. § 1B1.3(a)(1)(B) ("[I]n the case of a jointly undertaken criminal activity," the "offense" includes "all acts and omissions of others that were—(i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity.").

As Russo and Smookler explained at trial, traditional MCAs were very risky, because they provided unsecured funding to merchants that typically could not qualify for a bank loan or other conventional financing.  (Tr. 275-76, 1058).  To offset these inherent risks, an MCA lender needed to diversify its cash advances across several merchants, capping each advance amount to a reasonable limit.  (Tr. 1058-59).  But the Altieri jewelry deals—to which Kurland, Russo, and Smookler diverted the vast majority of the Lottery Victims' JBMML investments—were not traditional MCA advances.  Kurland and his co-conspirators threw all risk mitigation strategies out the window when they advanced Altieri tens of millions of dollars of Kurland's clients' money with no due diligence or security—on nothing but Altieri's word.  Kurland, Russo, and Smookler "papered up" the Altieri advances as traditional MCAs, even though their exorbitant amounts disqualified them under MCA practices, which required the amount of funding to be limited based on "what is flowing through the bank statements of that business."  (Tr. 349; *see also* Tr. 350, 701; GX 718, 718-T (Russo to Kurland: "Yes, but we still MCAed it up.  So even though it went into a jewelry deal, we still MCAed it up.")).  Rather than advance Altieri smaller amounts that were supported by Altieri's business bank statements, Kurland, Russo, and Smookler advanced him whatever millions of dollars he asked for, using the Lottery Victims' money.  (Tr. 349).

In just over a month, Kurland and his co-conspirators advanced Altieri $32 million of the Lottery Victims' money.  On March 7, 2019, a day after Kurland fraudulently induced the Smiths to invest $20 million in JBMML, Kurland, Russo, and Smookler advanced Altieri $15 million of the Smiths' money.  Two weeks later, on March 21, 2019, Kurland, Russo, and Smookler advanced Altieri an additional $3.5 million.  And on April 12, 2019, the day that Kurland fraudulently induced Mangal and the Smiths to collectively invest $17.6 million in JBMML, Kurland, Russo, and Smookler advanced Altieri $13.5 million of Kurland's clients' money.  (Tr. 356-58; GX 1202).

It was the joint decision of Kurland, Russo, and Smookler to fund Altieri through JBMML in such a gravely reckless manner—and it was certainly reasonably foreseeable to all three that transferring tens of millions of dollars of Kurland's clients' money to one person, with no security or due diligence, and using fake MCA contracts, was exceedingly risky and could generate large losses. *See* U.S.S.G. § 2B1.1, comment. (n.3(A)(iv)) ("'[R]easonably foreseeable pecuniary harm' means pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense.").

Indeed, the evidence at trial showed that all three were so eager to personally make millions from Altieri (Tr. 700-01) that they ignored the increasing red flags that Altieri was running a scam. Russo testified that, after he, Kurland, and Smookler funded the very first jewelry deal with Altieri in October 2018 (before the Lottery Victims' JBMML investments), there was a "big red flag": despite their requests, Altieri refused to provide any agreements or show any payments going to his purported jewelry fulfillment center, and refused to allow them to see the center in person. (Tr. 353-56). The red flags mounted after that. Altieri's payment track record "progressively got worse and worse and worse, and then it came to a point where [the] payments completely stopped and there was an excuse for everything." (Tr. 387). Altieri's purported debtor—who was supposed to pay him on the jewelry deals—was a phantom nowhere to be found. (Tr. 387-90).

Kurland was monitoring the Altieri relationship and was well aware of these growing red flags. (Tr. 355, 390-93). As early as January 2019 (again, before the Lottery Victims' JBMML investments), Kurland expressed to Russo his concern that Altieri may be "playing" the group and could default. (Tr. 394 (Kurland: "If he was going to default, this is exactly how it would play out.")). The concerns, red flags, and missed payments mounted after that. (Tr. 395-400). And yet, Kurland continued to hide Altieri's growing default from his clients and to solicit yet more

28

client investments through lies.  To conceal the fraud from the Lottery Victims, Kurland, Russo, and Smookler started "borrowing from Peter to pay Paul"—using money from other sources to make interest payments to Kurland's clients.  (Tr. 401).

By October 2019, Altieri had long been in complete default.  (Tr. 396 (Russo: by about July 2019, Altieri's payments had "ceased"; "[h]e stopped making payments and his excuses were numerous to the reasons); Tr. 407 (Altieri was in "major default")).  On October 19, 2019, Kurland texted Russo that "there isn't even proof that this guy exists," referring to Altieri's purported debtor.  (Tr. 400).  On October 31, 2019, Kurland texted Smookler, "Greg is the real problem" (Tr. 1090), referring to the millions of dollars in unpaid cash advances to Altieri that were plaguing JBMML.  And yet, even as Kurland and his co-conspirators were panicking over Altieri's growing default, Kurland did not hesitate to defraud Wilson by inducing him to make a $5 million investment in JBMML in October 2019.  Even after Wilson expressly told Kurland that he was not interested in fast money and was concerned about a *Ponzi* scheme, Kurland falsely assured Wilson that the "Diamond District" group investment was "very safe" because Kurland's other clients had also invested, and Kurland had been monitoring the investment and "it looks pretty good."  (Tr. 1332).  On October 31, 2019, the same day that Kurland told Smookler that "Greg is the real problem," Kurland successfully induced Wilson to invest $5 million in JBMML based on false assurances and advice.

In sum, the trial evidence showed that Kurland fraudulently induced the Lottery Victims to agree to invest in JBMML, and then—with no due diligence, security, or other safeguards— turned over tens of millions of dollars of his clients' money to Altieri, papering up the transactions using false contracts and ignoring mounting red flags along the way.  On this record, the Lottery

Victims' JBMML losses represent reasonably foreseeable pecuniary harm that resulted from Kurland's offenses.

<u>The Smiths' Stolen $19.5 Million</u>

After JBMML failed, Kurland turned to even more speculative investments in PPE in a last-ditch effort to cover up his fraud and recoup his losses. In a string of text messages in April 2020, days after Kurland persuaded the Smiths to agree to invest the initial $19.5 million in PPE, Chierchio baited Kurland, knowing that he wanted to keep the Lottery Victims from discovering the MCA losses. Chierchio asked Kurland for "20 mil more," telling Kurland that they would "make 1 billion dollars." Based on these text messages, with no due diligence or security, Kurland stole $19.5 million from the Smiths' bank account and transferred it to an account controlled by Russo and Smookler—the same co-conspirators with whom he previously lost tens of millions of dollars of the Lottery Victims' money through the Altieri jewelry deals—to be transferred to Chierchio. As with the losses of the JBMML investments, the loss of the $19.5 million certainly was a reasonably foreseeable consequence of Kurland's decision to steal the money from his clients' bank account and transfer it to his co-conspirators for Chierchio's use in a speculative PPE deal, with no due diligence, security, or other assurances.

<u>Wilson's $2.5 Million PPE Investment</u>

Finally, the loss of Wilson's $2.5 million PPE investment was also a reasonably foreseeable consequence of Kurland's fraud. To start, as with the JBMML investments, Kurland lied to Wilson to induce him to agree to the $2.5 million investment. Among other things, Kurland told Wilson that the same Diamond District group that had been involved in Wilson's previous investment had secured a contract to provide PPE to a police department, that the entire $2.5 million would go toward the PPE deal with the police department, and that no profits would be distributed until

Wilson's principal was paid back in July 2020. (PSR ¶¶ 58, 59). This was false. In reality, only $1 million of Wilson's $2.5 million investment was used toward a PPE deal with the NYPD. As Kurland knew, most of the rest, unbeknownst to Wilson, went to Chierchio, who received $1.4 million of Wilson's money. (*See, e.g.*, Tr. 706-07). Moreover, when the NYPD paid the conspirators a return of $1.715 million on the PPE deal, Kurland and his co-conspirators, in direct contravention of the agreement with Wilson, did not return a penny of that money to Wilson. Instead, without Wilson's knowledge or consent, Kurland and his co-conspirators took illegal distributions for themselves and transferred the remaining approximately $1 million of the NYPD return for an unrelated speculative PPE deal involving gloves—again, with no due diligence, security, or other reasonable assurances. On this record, the loss of Wilson's $2.5 million was reasonably foreseeable to Kurland.

<u>Kurland's Arguments</u>

Notwithstanding that his clients lost tens of millions of dollars as a result of his criminal actions, Kurland argues that the Guidelines loss calculation should be limited to the amount of money he received from kickbacks ($626,000). (Kurland Br. 28-29). Kurland's argument should be rejected. Under the Guidelines, "the gain that resulted from the offense" should be used "as an alternative measure of loss only if there is a loss but it reasonably cannot be determined." U.S.S.G. § 2B1.1, comment. (n.3(B)). As described in detail above, here, the actual losses that the Lottery Victims can be reasonably determined.[14]

---

[14] Even if "gain" were an appropriate consideration here (it is not), limiting the gain to Kurland's kickbacks would still be inappropriate where, as here, the record demonstrates that Kurland lied about his ownership interests to obtain the Lottery Victims' money and then collected ownership distributions derived in part from the victims' investments.

Kurland argues that the Lottery Victims' losses are not properly attributable to him because they were caused, at least in part, by the criminal actions by others, namely Russo, Smookler, Altieri, and Chierchio. (Kurland Br. 25-28). This argument should also be rejected. Kurland fraudulently induced all of the investments that resulted in the Lottery Victims' losses; but for his criminal actions, the Lottery Victims would not have been exposed to any risk that their funds would be lost and stolen by anyone. As such, Kurland is responsible for the entirety of the Lottery Victims' actual losses. *See United States v. Balboa*, 622 F. App'x 31, 32 (2d Cir. 2015) ("Balboa argues that the global economic downturn, rather than his fraudulent scheme, was the ultimate cause of the victims' loss and therefore, the actual loss attributable to the fraud was $0. Balboa's argument is foreclosed [by Second Circuit precedent]."); *Stitsky*, 536 F. App'x at 112 ("[T]he district court reasonably determined that no offset was warranted for losses resulting from changed economic circumstances because . . . investors would not have been exposed to such risks had defendants not fraudulently induced them to invest in the first instance.").

Moreover, as discussed above, given the highly speculative and extremely risky investments into which Kurland placed his clients' money, it was reasonably foreseeable to Kurland that his co-conspirators and business associates, including Altieri and Chierchio, might lie and cheat and that the investments may be lost. *Cf. United States v. Gohari*, 227 F. Supp. 3d 313, 316 (S.D.N.Y. 2017) ("As suggested by the age-old maxim 'no honor among thieves,' coconspirators may reach some basic agreements among themselves but also engage in self-interested lying to each other on other points"). Even if Kurland did not *know to a certainty* that others were also cheating and stealing his clients' money, Kurland "reasonably should have known" that the losses of his clients' investments—which he fraudulently induced them to make and which (unbeknownst to his clients) he placed in extremely risky, unsecured purported deals

32

with Altieri, Chiercio, and others based on nothing but those individuals' word—were "a potential result of the offense." U.S.S.G. § 2B1.1, comment. (n.3(A)(iv)); *see also United States v. Turk*, 626 F.3d 743, 750 (2d Cir. 2010) ("[T]he Guideline does not hold defendants accountable only for certain or near-certain losses, but for losses that were 'reasonably foreseeable pecuniary harm'"; when a defendant "could not have obtained [his] victims' money" absent the deceit, "[i]t follows that a potential direct result" of that fraud "was the total loss of the moneys" obtained.).

Kurland's reliance on *United States v. Studley*, 47 F.3d 569 (2d Cir. 1995), is misplaced. (Kurland Br. 26-27). In *Studley*, the Second Circuit held that a salesperson working in a telemarketing center engaged in fraudulent activity should not have been held responsible for the entire loss caused by the telemarketing operation during the course of his employment. *Id.* at 570, 572-73, 576. The Court explained that Studley "had no interest in the success of the operation as a whole, and took no steps to further the operation beyond executing his sales"; to the contrary, the evidence showed "that he was competing *against* the other sales representatives for commissions." *Id.* at 576 (emphasis in original). Unlike Studley, Kurland personally caused *all* of the Lottery Victims' losses in this case. Kurland was the only one of the conspirators who had access to the Lottery Victims and their money. Kurland fraudulently induced (or, in the case of the Smiths' second $19.5 million, stole) all of the investments that resulted in the actual losses to the Lottery Victims. Moreover, Kurland fraudulently steered the Lottery Victims to invest in businesses in which he held ownership interests (that he failed to disclose to the Lottery Victims); from which he received monthly distributions of funds (that he also failed to disclose to the Lottery Victims); and as part of which he made decisions about what to do with the Lottery Victims' funds, including the reckless decisions to give tens of millions of dollars of the Lottery Victims' funds to Altieri and Chiercio (which again was not disclosed to the Lottery Victims). On this record, the

33

actual losses suffered by the Lottery Victims plainly resulted from Kurland's offenses and were reasonably foreseeable to him.

Based on the foregoing, the appropriate loss calculation for purposes of U.S.G.G. § 2B1.1 is $62,006,109, which results in a 22-level increase pursuant to Section 2B1.1(b)(1)(L).

### B. Sophisticated Means

#### 1. Applicable Law

Under the Guidelines, a two-level offense level enhancement is warranted if the offense "involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means." U.S.S.G. § 2B1.1(b)(10)(C). The Guidelines define "sophisticated means" as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." U.S.S.G. § 2B1.1, comment. (n.9(B)). For example, "[c]onduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts . . . ordinarily indicates sophisticated means." *Id.* It is clear, however, that the enhancement is not limited to a particular type of fraud or techniques to mask the offense. Moreover, each step in a scheme need not be elaborate if "the total scheme was sophisticated in the way all the steps were linked together." *United States v. Jackson*, 346 F.3d 22, 25 (2d Cir. 2003); *see also United States v. Fofanah*, 765 F.3d 141, 146 (2d Cir. 2014) (noting that "tactics to conceal offense conduct" and "repetitive and coordinated conduct" indicate sophistication).

#### 2. Discussion

The sophisticated means enhancement is warranted here. There can be no real dispute that Kurland's criminal conduct was sophisticated and complex, carefully designed and executed to conceal the scheme from the Lottery Victims as Kurland and his co-conspirators continued to

defraud them for nearly two years. As Russo and Smookler testified, Kurland deliberately requested that his name not be included on certain corporate documents and bank accounts associated with the MCA companies to minimize the risk that the scheme would be discovered by the Lottery Victims. (Tr. 337, 1043). In particular, despite being one of three owners of JBMML, Kurland intentionally caused his name to not be listed on the JBMML bank accounts. Kurland received his kickbacks and ownership distributions into GK3, a shell entity that, to an outside observer, had no obvious or identifiable links to Kurland. Kurland presented the Lottery Victims with promissory notes for the MCA companies, which nowhere referenced him as one of the owners. For example, Mangal was presented with a 27-page limited liability company operating agreement for Francis Bay, LLC, which only noted that prior owner was Francis Bay Holding. Kurland's name as an owner of Francis Bay Holding was nowhere to be found. With Kurland's knowledge and authorization, Russo and Smookler created yet another legal entity to hold ownership of the Smiths' racehorses, which was concealed from the Smiths. All of these companies had multiple bank accounts, which were used at various points during the fraud scheme. Kurland even relied on the anonymity protections that he instituted for the Smiths, which allowed him to have exclusive access their bank account containing lottery proceeds, to steal $19.5 million.

Even if each of these actions, taken in isolation, may not have been particularly elaborate or sophisticated, the combination of these actions gave rise to a complex scheme that was designed to conceal the fraud, and successfully did so for nearly two years. This concealment enabled Kurland and his co-conspirators to continue to fraudulently obtain money from the Lottery Victims. The sophisticated means enhancement is warranted.

### C.  Kurland's Invitation to Use a Guidelines Manual Not Yet in Effect Should Be Rejected

Kurland invites this Court to use a Guidelines Manual not yet in effect, arguing that a proposed amendment to the Guidelines would result in a lower offense level.  (Kurland Br. 31-32).  This argument should be squarely rejected.  Absent *ex post facto* concerns (which are not present here), "sentencing courts are required to apply the Guidelines Manual in effect on the date that the defendant is sentenced." *United States v. Brooks*, 732 F.3d 148, 149 (2d Cir. 2013).  It is undisputed that the proposed amendment is not in effect; therefore, this Court should not alter its calculation of the Guidelines range based on the proposed amendment.  However, the Court may take into account the proposed amendment as one fact among many to consider as part of its analysis of the sentencing factors under Section 3553(a).

In accordance with the foregoing, the applicable Guidelines range is 135 to 168 months' imprisonment.

## ARGUMENT

### I.  The Court Should Sentence Kurland at the Lower End of the Guidelines Range of 135 to 168 Months' Imprisonment

#### A.  Applicable Law

The Guidelines are no longer mandatory, but they continue to play a critical role in trying to achieve the "basic aim" that Congress tried to meet in enacting the Sentencing Reform Act, namely, "ensuring similar sentences for those who have committed similar crimes in similar ways." *United States v. Booker*, 543 U.S. 220, 252 (2005); *see also United States v. Crosby*, 397 F.3d 103, 113 (2d Cir. 2005) ("[I]t is important to bear in mind that *Booker*/*Fanfan* and section 3553(a) do more than render the Guidelines a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge.").  As the Supreme Court stated, "a district court should begin

all sentencing proceedings by correctly calculating the applicable Guidelines range"—that "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).

After calculating the Guidelines range, a sentencing judge must consider the factors set forth in Section 3553(a) and "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing: "a) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for that offense; b) the need to afford adequate deterrence to criminal conduct; c) the need to protect the public from further crimes by the defendant; and d) the need for rehabilitation." *United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008) (citing 18 U.S.C. § 3553(a)(2)).   Section 3553(a) further directs the Court "in determining the particular sentence to impose" to consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the statutory purposes noted above; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range as set forth in the Sentencing Guidelines; (5) the Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense. *See* 18 U.S.C. § 3553(a).

### B. Discussion

The Government respectfully submits that a sentence at the lower end of the Guidelines range of 135 to 168 months' imprisonment is necessary to reflect the seriousness and gravity of Kurland's offense conduct, provide just punishment, afford general deterrence, and promote respect for the law.

### 1. Nature and Circumstances of the Offense

Kurland's crimes were extraordinarily serious.   For over a year, Kurland fraudulently induced the Lottery Victims to relinquish more than $60 million of their funds for purported investments in Kurland's own MCA companies.   To get them to agree to these investments,

Kurland lied to the Lottery Victims time and time again.  Taking advantage of his clients' vulnerabilities as newly minted lottery winners and exploiting their trust in him, Kurland presented these investments as arms-length transactions with third-party companies and purported to recommend them to the Lottery Victims as their neutral trusted advisor—their attorney, who was there to look out for their best interests.  Behind the scenes, unbeknownst to the Lottery Victims, Kurland was directing their money, tens of millions of dollars, straight to entities controlled by him and his co-conspirators.  Behind the Lottery Victims' backs, Kurland and his co-conspirators schemed about how to induce the investments and celebrated when the investments hit their bank accounts.  From each investment, Kurland immediately demanded and collected his 1% kickback, which the Lottery Victims knew nothing about.

By mid-to-late 2019, Kurland knew that his fraud had cost his clients tens of millions of dollars, which was lost and stolen in large part through the jewelry deals with Altieri.  But instead of coming clean to his clients, Kurland chose to continue to lie and defraud them.  To cover up his fraud and attempt to recoup his losses, Kurland outright stole $19.5 million from the Smiths' bank account and transferred it to his co-conspirators for purported PPE investment.  He also defrauded Wilson by fraudulently inducing him to agree to a $2.5 million PPE investment, which was also lost and stolen.

Kurland's status as an attorney makes these egregious crimes all the more serious—and worthy of a Guidelines sentence.  Kurland committed the massive fraud against the Lottery Victims knowing full well that he was violating not only the law, but also his professional duties to his clients.  (*See* GX 703-T, at 4 ll. 8-16: "I looked it up . . . when I was first doing this . . . and I'm not even allowed to get a commission.  [I]t's a conflict of interest and it's an ethical offense,

for sure.  Disbarable [sic] offense.").[15]  A lawyer is an "officer of the legal system with special responsibilities for the quality of justice."  N.Y. Rules of Prof'l Conduct, *Preamble: A Lawyer's Responsibilities*.[16]  "[E]ach lawyer has a duty to uphold the legal process; to demonstrate respect for the legal system; to seek improvement of the law; and to promote access to the legal system and the administration of justice."  *Id.*  Kurland abandoned these basic tenets when he became involved in this scheme.  Rather than uphold legal process, he abused it.  Rather than respect the legal system, he tossed it aside.  Rather than improve the law, he used it for his own pecuniary gain.  Rather than protect his clients, he took advantage of his clients' trust to line his own pockets and those of his co-conspirators.

Kurland's actions toward Mangal—his first major lottery client—illustrate Kurland's criminal, greed-driven conduct.  After more than twenty years of hard work, Mangal was shocked to learn that he had won a $245 million jackpot after a trip to the grocery store, with no idea what to do with this sudden wealth.  He did what he thought was smart—he turned to an attorney who he thought would look out for his best interests.  Kurland reassured Mangal with his knowledge and confidence.

When it came time for him to invest his winnings just a few weeks later, Mangal did not hesitate to follow Kurland's advice because he trusted him.  But, unbeknownst to Mangal, Kurland

---

[15] Kurland was right:  The New York Rules of Professional Conduct, which govern the conduct of all New York attorneys who practice law within the state, prohibit a lawyer's receipt of compensation from investments recommended to a client, in recognition of the grave risk that the lawyer's professional judgment would be adversely affected by the lawyer's own financial interests.  *See* New York State Bar Association Committee on Professional Ethics, Opinion 1155 (08/27/18), at ¶¶ 8-25 (concluding that attorney's receipt of compensation from investments recommended to client would give rise to conflict of interest under Rule 1.7 that is not waivable, even by obtaining client's written consent).

[16]     *See*     https://www.nycourts.gov/ad3/AGC/Forms/Rules/Rules%20of%20Professional%20Conduct%2022NYCRR%20Part%201200.pdf  (last visited Apr. 6, 2023).

just saw him as a way to get rich.  Before the ink had even dried on the retainer agreement, Kurland was already scheming with Russo and Smookler on how to steer Mangal to Kurland's MCA companies.  (GX 1010 at 4 (Kurland to Russo: "Have to figure out how to have this get to us.")).  For once, Kurland found himself with the upper hand in negotiations with his MCA partners, and he used it shamelessly.  He dangled access to Mangal and future lottery clients in exchange for kickbacks.  Thereafter, Kurland sat quietly in the room while Mastroberti pitched Mangal on an investment in Cheddar Capital.  Kurland, who was paid by Mangal to represent his best interests, never once mentioned that Mastoberti was in fact his business partner; that he was an owner in Cheddar Capital; that his ownership distributions would be enhanced by Mangal's investment; and that he would receive a kickback for setting up the deal.  When the strategy worked, and Mangal agreed to invest $5 million, Kurland promptly collected his secret 1% kickback.

After Mangal's first investment, Kurland showed no remorse for his deceitful actions and no signs of turning back.  To the contrary, he was emboldened by the ease of his fraud.  Within less than a month, Kurland exploited Mangal again.  He convinced Mangal to buy Francis Bay Holding, which gave Kurland, Russo, and Smookler much-needed liquidity to create and operate JBMML.  By deceiving his client, Kurland took home more than $350,000 in a single payday.  There was no remorse.  No second thoughts.  No concern for his client.  When the money was deposited into his account, Kurland texted Smookler, "Like looking at my bank statement today.  Not gonna lie."  (GX 1011 at 6).  From there, Kurland's crimes continued, to the tune of tens of millions of dollars in losses to his clients.

The Government strongly disagrees with the defense's assertion that "Mr. Kurland is the least culpable defendant in this matter by any stretch of the imagination."  (Br. 41).  Kurland is the most culpable defendant charged in this case.  He was the gatekeeper who set the scheme in motion

by exploiting his clients and their trust in him.  Without Kurland's repeated criminal decisions to lie, cheat, and steal from his clients—to whom only he had access as their attorney—the fraud scheme would not have been possible.

Kurland's prolonged, brazen criminal conduct, which involved a grave abuse of his clients' trust, warrants a Guidelines sentence.

## 2.  History and Characteristics of the Defendant

Unlike many of the defendants who appear before this Court, Kurland has enjoyed great advantages in his life, which most people can only dream about.  He is a highly educated professional.  He finished college and law school and, as reflected in his letters of support, is surrounded by a community of family and friends.  At the time that he committed the crimes in this case, he was making more than $500,000 per year as an attorney.  He was recognized as one of the leading lawyers in the United States who specialized in helping lottery winners claim their prizes.

But none of this was enough for Kurland.  Instead of using his education, talent, support, and money to benefit society, Kurland chose to commit a massive fraud against his own clients. This was plainly a crime of opportunity driven by greed, not necessity.  But even now, as he stands to be sentenced, Kurland cannot truthfully acknowledge his motivation to the Court and attempts to deflect responsibility for his serious crimes by placing the blame on others, much like he tried to do at trial.

Kurland has submitted numerous letters attesting to his positive qualities and expressing support.  It is, of course, appropriate for the Court to take these letters into account in connection with sentencing.  However, these attestations to Kurland's positive qualities do not distinguish him from the typical defendant in a white-collar case and do not warrant a departure or variance from

the Guidelines range.  This collection of letters, as Judge Victor Marrero observed with respect to
a defendant in another case:

> falls into a pattern advanced by a subset of the white collar criminal.  This category
> encompasses a select class: distinguished, reputable, highly esteemed model citizens such
> as this defendant.  The list of their achievements and virtues is long and impressive.  Let
> us count the ways.  At home, they are good family men and women, caring spouses,
> loving parents, loyal and reliable to friends.  At work, they are looked up to as outstanding
> professionals and business partners.  To their community's charities and public causes
> they are generous patrons and sponsors.

*United States v. Regensberg*, 635 F. Supp. 2d 306 (S.D.N.Y. 2009), *aff'd*, 381 F. App'x 60 (2d
Cir. 2010); *see also United States v. Vrdolyak*, 593 F.3d 676, 682 (7th Cir. 2010) ("[I]t is usual
and ordinary, in the prosecution of similar white-collar crimes . . . to find that a defendant was
involved as a leader in community charities, civic organizations, and church efforts," and the
defendant "should not be allowed to treat charity as a get-out-of-jail card").

The Government does not question that Kurland is a good family man and has helped and
supported many others.  But these positive qualities, while admirable, do not set Kurland apart
from other similarly situated white-collar defendants—individuals who, although high-achieving
and successful in their fields, and have the love and support of their family and others in the
community, nonetheless choose to steal and defraud, and to hide that side of themselves, as
Kurland did, from their family, friends, and colleagues.

Kurland also suggests that his humiliation and loss of social and professional standing as a
result of his conviction warrant a lighter sentence.  (*See, e.g.*, Kurland Br. 43-44).  This claim
should be rejected.  Any notion that highly successful white-collar criminals should be sentenced
more lightly than defendants of a lower socioeconomic status cannot not be countenanced.  "It is
impermissible for a court to impose a lighter sentence on white-collar defendants than on blue-
collar defendants because it reasons that white-collar offenders suffer greater reputational harm or

have more to lose by conviction."  *United States v. Prosperi*, 686 F.3d 32, 47 (1st Cir. 2012); *see also United States v. Musgrave*, 761 F.3d 602, 608 (6th Cir. 2014) ("In imposing a sentence of one day with credit for the day of processing, the district court relied heavily on the fact that Musgrave had already 'been punished extraordinarily' by four years of legal proceedings, legal fees, the likely loss of his CPA license, and felony convictions that would follow him for the rest of his life. '[N]one of these things are [his] sentence.  Nor are they consequences of his sentence'; a diminished sentence based on these considerations does not reflect the seriousness of his offense or effect just punishment."); *United States v. Kuhlman*, 711 F.3d 1321, 1329 (11th Cir. 2013) ("The Sentencing Guidelines authorize no special sentencing discounts on account of economic or social status.").  And, as the Seventh Circuit has observed:

> [N]o "middle class" sentencing discounts are authorized.  Business criminals are not to be treated more leniently than members of the "criminal class" just by virtue of being regularly employed or otherwise productively engaged in lawful economic activity.  It is natural for judges, drawn as they (as we) are from the middle or upper-middle class, to sympathize with criminals drawn from the same class.  But in this instance we must fight our nature.  Criminals who have the education and training that enables people to make a decent living without resorting to crime are more rather than less culpable than their desperately poor and deprived brethren in crime.

*United States v. Stefonek*, 179 F.3d 1030, 1038 (7th Cir. 1999).

As Judge Colleen McMahon explained in *United States v. Binday*, a case that involved an insurance fraud scheme where the defendant was sentenced to 144 months' imprisonment, "[o]nly if white collar crime is punished commensurate with the damage it inflicts on society will citizens actually believe that the law metes out equal right to the poor and to the rich, which words are the cornerstone of the judicial oath."  (12 Cr. 152 (CM), Dkt. No. 349, Sent. Tr.  46; *see also id.* at 45 ("There are crimes for which a critically important component of sentencing should be to send a message to the community, for the industry that this kind of behavior is intolerable, and to send a message to the community and to the industry that this sort of behavior is every bit as reprehensible

as the types of crimes for which I and others like me routinely send poor, disadvantaged persons to prison for dozens of years.")); *see also United States v. Gupta*, 904 F. Supp. 2d 349, 355 (S.D.N.Y. 2012) ("While no defendant should be made a martyr to public passion, meaningful punishment is still necessary to reaffirm society's deep-seated need to see justice triumphant.  No sentence of probation, or anything close to it, could serve this purpose.").

Finally, this Court should put little weight on the fact that Kurland is a first-time offender. Lawyers, financial advisors, and other professionals who are convicted and sentenced for white-collar crimes are almost always first-time offenders.  Indeed, if he had a criminal record, Kurland would not have been a member of the Bar and in a position to commit these crimes in the first place.  Moreover, this is not a case where the offense conduct was wildly aberrant or prompted by a brief lapse in judgment and where, as a result, it might be appropriate to give more weight to the defendant's otherwise law-abiding life.  For nearly two years, Kurland methodically perpetrated a fraud scheme against him clients, causing them to lose tens of millions of dollars.  This prolonged, greed-driven criminal conduct warrants serious punishment.

### 3.  The Need to Afford Adequate Deterrence

One of the factors that the Court must consider in imposing sentence under Section 3553(a) is the need for the sentence to "afford adequate deterrence to criminal conduct."  18 U.S.C. § 3553(a)(2)(B).  The Government acknowledges that specific deterrence, while a factor, is not a substantial concern in this case: considering Kurland's likely loss of his law license as a result of this case, he is unlikely to engage in a fraud scheme like this again.  But general deterrence remains a paramount consideration for this Court.  As the Second Circuit recently explained, "consideration of general deterrence is especially important" in white-collar cases.  *Watts v. United States*, No. 21-2925, 2023 WL 2910634, at *4 (2d Cir. Apr. 12, 2023); *see also United States v. Zukerman*,

897 F.3d 423, 429 (2d Cir. 2018) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it.").  The sentence imposed upon Kurland must send a strong message to the public that perpetrating a massive fraud scheme will result in serious punishment.

Achieving general deterrence is particularly important in a case like this one, involving a professional who committed crimes in grave abuse of his clients' trust.  Our society and the rule of law depend on attorneys to enforce the law and look out for their clients' best interests.  When attorneys break that basic tenet, abuse their clients' trust, and commit crimes, it is incumbent upon courts to hold them accountable—both to deter similar misconduct in the future and promote respect for the law in our society.

It is clear from Kurland's letter and sentencing submission that he does not want to go to prison.  But the dread of prison is by no means unique to Kurland and is precisely the reason why this Court should impose a Guidelines sentence in this case.  Such a sentence will send the message to other would-be fraudsters that, when you get caught, the consequences will be steep, which will serve to deter future crimes.

Kurland's requested sentence of probation with home confinement would fail *entirely* to serve the goal of general deterrence.  The message that would be sent to the community by such a lenient sentence is that a massive fraud by an attorney against his own clients, resulting in tens of millions of dollars in losses, is not a big deal and not worthy of serious punishment at all.  Such a sentence would provide a would-be fraudster every incentive to perpetrate a fraud scheme—the reward is high, the chance of being caught and successfully prosecuted is low, and the punishment

in the unlikely event of a successful prosecution is minimal.  Respectfully, that is *not* the message

that this Court should send to the public through its sentencing of Kurland.

## II.     The Court Should Impose a Forfeiture Money Judgment Against Kurland in the Amount of $64,600,000

### A.  Applicable Law

It is well settled that forfeiture is a mandatory part of sentence where the defendant is

convicted of a statute that carries a corresponding forfeiture provision.  Pursuant to Title 28, United

States Code, Section 2461(c), if a defendant is convicted of an offense giving rise to forfeiture, the

court *shall* order the forfeiture of the property as part of the sentence in the criminal case.  *See*

*United States v. Monsanto*, 491 U.S. 600, 607 (1989) ("Congress could not have chosen stronger

words to express its intent that forfeiture be mandatory in cases where the statute applied. . . .");

*United States v. Bonventre*, 2011 WL 1197853, at *4 (S.D.N.Y. Mar. 30, 2011) (Section 2461(c)

makes forfeiture mandatory in criminal cases).

Title 18, United States Code, Section 981 provides, in pertinent part, for the forfeiture of

any property, real or personal, which constitutes or is derived from proceeds traceable to a violation

of any offense, or a conspiracy to commit such an offense, which constitutes "specified unlawful

activity," as defined in Title 18, United States Code, Section 1956(c)(7).  18 U.S.C. § 981(a)(1)(C).

In turn, Section 1956(c)(7)(A), by incorporation of Section 1961(1), defines the term "specified

unlawful activity" to include wire fraud in violation of Section 1343.  18 U.S.C. §§ 1956(c)(7)(A)

and 1961(1)(B).

Rule 32.2(b) of the Federal Rules of Criminal Procedure provides that if the Government

seeks a personal money judgment, the court must determine the amount of money that the

defendant will be ordered to pay.  *See* Fed. R. Crim. P. 32.2(b)(1)(A).  Courts in the Second Circuit

have routinely imposed forfeiture money judgments pursuant to 18 U.S.C. § 981(a)(1)(C) and 28

46

U.S.C. § 2461(c).  *See, e.g., United States v. Marsh*, Nos. 10–CR–0480, 10–CR–0697, 10–CR–0700, 10–CR–0800, 10–CR–0801, 2011 WL 5325410 (E.D.N.Y. Oct. 26, 2011) (Weinstein, J.); *United States v. Dipascali*, No. 09 Cr. 764, 2010 WL 9002774 (S.D.N.Y. June 18, 2010); *United States v. Capoccia*, No. 1:03-CR-35-01, 2009 WL 2601426 (D. Vt. Aug. 19, 2009), *aff'd*, 402 F. App'x 639 (2d Cir. 2010).

In contrast to the guilt phase of the criminal trial, the Government bears the burden of establishing the amount of money subject to forfeiture only by a preponderance of the evidence. *See United States v. Capoccia*, 503 F.3d 103, 116 (2d Cir. 2007) (sentencing courts determine forfeiture amounts by a preponderance of the evidence); *United States v. Bellomo*, 176 F.3d 580, 595 (2d Cir. 1999) (upholding trial court's application of preponderance standard on grounds that criminal forfeiture is part of sentencing).  The Government is not required to provide a precise calculation of the amount of money a defendant must forfeit.  *United States v. Treacy*, 639 F.3d 32, 48 (2d Cir. 2011).  Instead, the money judgment amount can be reasonably estimated based upon evidence already in the record.  *See Capoccia*, 503 F.3d at 109; *United States v. Roberts*, 660 F.3d 149, 166 (2d Cir. 2011) ("district courts may use general points of reference as a starting point for a forfeiture calculation and 'make reasonable extrapolations' supported by a preponderance of the evidence").

## B.  Discussion

The fraud scheme of which Kurland stands convicted involved various investments by the Lottery Victims.  These investments, specifically in JBMML, together with the $2.5 million that Kurland raised from Wilson and the $19.5 million that he stole from the Smiths for the purchase of PPE, are tabulated below and represent the amount of criminal proceeds that are subject to forfeiture. *See* GX 1818, 1819 and 1821.

| Name of Lottery Victim | Amount of Investment |
|---|---|
| Mangal | $5,000,000 |
| Smiths | $52,100,000 |
| Wilson | $7,500,000 |
| **Total** | **$64,600,000** |

In his sentencing submission, Kurland argues that he should only be held responsible for forfeiting the commissions that he received from the Lottery Victims' investments, totaling $626,000.  (Kurland Br. 51).  Kurland's argument reflects an overly narrow view of the scope of criminal forfeiture, which is not limited to those funds in his possession but extends to all property under his control.  *See United States v. Bergstein*, 788 F. App'x 742, 748 (2d Cir. 2019) (upholding forfeiture of property outside of defendant's possession where defendant participated in fraudulent scheme to transfer funds between pools of investors without disclosing conflicts of interest) (distinguishing *Honeycutt v. United States*, 581 U.S. 443 (2017)).

Accordingly, the Court should impose a forfeiture money judgment against Kurland in the amount of $64,600,000.  A proposed Order of Forfeiture is enclosed herewith.[17]

### C.  The Forfeitability of Kurland's Residence is Not at Issue

In his sentencing submission, Kurland requests that the Court exclude Kurland's residence located in Dix Hills from any order of forfeiture entered against him, suggesting that his wife's interest in the property falls beyond the reach of criminal forfeiture.  (Kurland Br. 51-52).  While Kurland is wrong about the scope of criminal forfeiture, the Government does not presently seek

---

[17] It should be noted that, to avoid double counting, the proposed Order of Forfeiture provides that the value of any property finally forfeited to the Government in this case, including any specific assets identified in Preliminary Orders of Forfeiture previously entered by the Court, shall be credited toward payment of the forfeiture money judgment.  *See* Proposed Order of Forfeiture, at ¶ [3]; Preliminary Orders of Forfeiture, Dkt. No. 81, at 2-4; Dkt. No. 186, at 2-4; Dkt. No. 216, at 1-3.

to include in its proposed Order of Forfeiture Kurland's residence, which has already been identified in Preliminary Orders of Forfeiture entered against Kurland's co-conspirators.[18]  *See* Preliminary Orders of Forfeiture, Dkt. No. 81 at 4; Dkt. No. 186 at 3.  As a result, the exclusive mechanism for Kurland or his wife to contest the forfeiture of such property is through the filing of a third-party petition in a criminal forfeiture ancillary proceeding conducted in accordance with the procedures codified in 21 U.S.C. § 853(n).  *See United States v. Watts*, 477 F. App'x 816, 817-818 (2d Cir. 2012) ("[C]riminal forfeiture is not a measure restricted to property owned by the criminal defendant . . . .  The likelihood that some property involved in an offense will be owned by persons other than the criminal defendant is reflected in the provision for an ancillary proceeding[.]"); *United States v. Davenport*, 668 F.3d 1316, 1321 (11th Cir. 2012) ("A codefendant in a criminal case is properly viewed as a third-party with regard to another defendant's forfeiture of property."); *United States v. Porchay*, 533 F.3d 704, 709 (8th Cir. 2008) (affirming district court's decision to treat acquitted defendant as third-party petitioner under Section 853(n)); *United States v. Becker*, No. 10-40077-02-JAR, 2011 WL 93762, at *1 (D. Kan. Jan. 11, 2011) (declining defendant's request to conduct hearing on release of funds for payment attorney's fees in circumvention of ancillary proceeding where funds were identified in order of forfeiture entered against co-defendant).  Accordingly, the forfeitability of Kurland's residence is not at issue at this stage of the proceedings.

---

[18] Nor is Kurland's argument one that is appropriate for him to advance.  *See United States v. Brown*, No. 04 CR 159 NGG, 2006 WL 898043, *5 (E.D.N.Y. Apr. 4, 2006) (Garaufis, J.) (defendant cannot object to forfeiture of real property on grounds that property belongs to his wife); *United States v. Schlesinger*, 396 F. Supp. 2d 267, 273 (E.D.N.Y. 2005) (Spatt, J.) (defendants cannot object to forfeiture on grounds that property did not belong to them); *United States v. Rivers*, 60 F. Supp. 3d 1262 (M.D. Fla. 2014) ("any objection [defendant] may have on the basis that a third party holds an interest in forfeitable property is not his objection to make").

### III.   The Court Should Award Restitution in Favor of the Lottery Victims in the Amount of $62,006,109

#### A.   Applicable Law

The Mandatory Victims Restitution Act ("MVRA") requires that a defendant convicted of specific offenses "in which an identifiable victim or victims has suffered a . . . pecuniary loss" be ordered to make restitution to the victim.  18 U.S.C. § 3663A(a)(1), (c)(1).  A "victim" is any "person directly and proximately harmed as a result of the commission of an offense," and, "in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern."  18 U.S.C. § 3663A(a)(2).  Restitution extends to all losses caused "by the specific conduct that is the basis of the offense of conviction."  *Hughey v. United States*, 495 U.S. 411, 413 (1990); *see also id.* at 420 ("the loss caused by the conduct underlying the offense of conviction establishes the outer limits of a restitution order").

"[T]he purpose of restitution is essentially compensatory: to restore a victim, to the extent money can do so, to the position he occupied before sustaining injury."  *United States v. Boccagna*, 450 F.3d 107, 115 (2d Cir. 2006).  The "primary and overarching" goal of the MVRA is "to make victims of crime whole, to fully compensate these victims for their losses and to restore these victims to their original state of well-being."  *Id.*  It is "significant that the statute mandates that courts 'order restitution to each victim in the full amount of each victim's losses as determined by the court[.]'"  *United States v. Quarashi*, 634 F.3d 699, 703 (2d Cir. 2011) (quoting 18 U.S.C. § 3664(f)(1)(A)).

In the context of crimes resulting in damage or loss or destruction of property, compensable losses are measured by "the value of the property on the date of the damage, loss, or destruction . . . less . . . the value (as of the date the property is returned) of any part of the property that is

50

returned." 18 U.S.C. § 3663A(b)(1)(B); *see also United States v. Bengis*, 631 F.3d 33, 40 (2d Cir. 2011) ("A victim's pecuniary losses may be considered lost 'property' where the victim has been deprived of 'money to which it is entitled by law.'"); *Boccagna*, 450 F.3d at 112 (victim's out-of-pocket loss offset by the value of recouped collateral). The "law recognizes a number of reasonable measures of property value." *Boccagna*, 450 F.3d at 115. The measure need not be complicated, however; "complexity does not inhere in value determinations where the property lost is cash . . . ." *Qurashi*, 634 F.3d at 699. In addition to the value of lost money, victims are also entitled to recoup the time value of money, or prejudgment interest. *Id.* at 704.

Restitution may be offset only by funds that are actually received by a victim. *United States v. McGinn*, 787 F.3d 116, 131 (2d Cir. 2015); *see also United States v. Cadet*, 664 F.3d 27, 34 (2d Cir. 2011) (requiring offset for funds actually received). "The case law can be restated in a simple principle: restitution may not result in double recovery." *United States v. Dharia*, 284 F. Supp.3d 262, 270 (E.D.N.Y. 2018) (Weinstein, J.).

### B.  Discussion

In accordance with the foregoing principles, the Government respectfully requests that the Court award restitution to the Lottery Victims in the amount of the actual losses discussed above (in connection with the Guidelines loss analysis) and tabulated below.

| Name of Victim | Amount of Loss |
| --- | --- |
| Nandlall Mangal | $4,570,000 |
| Beth & Steve Smith | $50,594,443 |
| Alex & Kate Wilson | $6,841,666 |
| **Total** | **$62,006,109** |

In connection with the defendant's sentencing, which is scheduled for June 15, 2023, the Government intends to submit a proposed restitution order in favor of the victims.

## **CONCLUSION**

On the facts of this case, a sentence at the lower end of the Guidelines range of 135 to 168 months' imprisonment is appropriate and just. Such a sentence is necessary to reflect the seriousness of Kurland's crimes, provide just punishment, afford general deterrence, and promote respect for the law.

Dated: New York, New York
       May 15, 2023

                                        Respectfully Submitted,

                                        DAMIAN WILLIAMS
                                        United States Attorney for the
                                        Southern District of New York


                              By:      _____/s/_____
                                        Danielle Kudla
                                        Louis Pellegrino
                                        Olga I. Zverovich
                                        Assistant United States Attorneys
                                        Southern District of New York
                                        Special Attorneys Acting Under Authority
                                        Conferred by 28 U.S.C. § 515

                                        Brian Morris
                                        Assistant United States Attorney
                                        Eastern District of New York



Cc:    Defense Counsel
       (Via ECF)